UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO. _____
SECTION _____
**03-21642**
MAGISTRATE _____
**CIV-SEITZ**

MAGISTRATE JUDGE
BANDSTRA



RIZALYN BAUTISTA, Individually and
as Personal Representative of the Estate
of MARI-JOHN BAUTISTA, and all
those claiming by and through her,

      Plaintiff,

vs.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

      Defendants.

_____/

## NOTICE OF REMOVAL

    Defendants Star Cruises[1] and Norwegian Cruise Line, Ltd., ("NCL"), by and through its undersigned counsel, hereby files this, its Notice of Removal, pursuant to 28 U.S.C. § 1441, et seq., and 9 U.S.C. §205, and respectfully states as follows:

    1.      In or about May, 2003, Mari-John Bautista ("Bautista"), a Philippine citizen and resident, died while working as a seaman on board a vessel owned by NCL.

    2.      Bautista's employment with NCL was governed by the terms of a standard Philippine Overseas Employment Administration (POEA) Contract of Employment (the "Contract"), attached as Exhibit "A".

---

[1]    In the State Court action from which this Notice of Removal originates, Plaintiff names "Star Cruises" as a Defendant. Star Cruises has moved to dismiss on the basis that it has not been properly served; it is not a proper party to the action in that it owns no vessels and employs no crewmembers; and that the court lacks jurisdiction. Notwithstanding and without waiving any of its rights, Star Cruises joins in and consents to the removal of this action for purposes of this removal to Federal Court.

**MASE & GASSENHEIMER, P.A.**
**80 SW Eighth Street, Suite 2700, Miami, Florida 33130 (305) 377-3770**

3.     The Contract, in Paragraph 2, states that its terms and conditions are to be observed in accordance with Department Order No. 4 and Memorandum Circular No. 9, series 2000. Department Order No. 4, in turn, incorporates the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going vessels.  (The "Standard Terms").  Copies of Department Order No. 4, the Standard Terms, and Memorandum Circular No. 9, are attached hereto as Composite Exhibit "B."

4.     Section 29 of the Standard Terms governs Dispute Settlement Procedures and provides that where the parties are covered by a collective bargaining agreement, all claims or disputes arising from the seaman's employment must be submitted to the original and exclusive jurisdiction of a voluntary arbitrator or panel of arbitrators appointed by the Philippine Department of Labor and Employment.

5.     In the instant case, the parties were covered by a collective bargaining agreement, the Agreement Between Norwegian Cruise Line Limited and Norwegian Seamen's Union for Deck and Engine Room Personnel, which provided that NCL would provide those benefits, including unearned wages, maintenance, cure, benefits, and compensation, (The "CBA"), which had been collectively bargained for by the Norwegian Seaman's Union.

6.     Accordingly, the Contract constitutes an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").

7.     On or about June 4, 2003, NCL was served with a Complaint in state court in the Eleventh Circuit of Miami-Dade County, Florida, Case No. 03-12884 CA 25, asserting claims for Jones Act negligence and unseaworthiness on behalf of Bautista's

2

estate.  A copy of the Complaint and all other pleadings, process, and orders in this case is attached hereto as Exhibit "C," pursuant to 28 U.S.C. §1446(a).

8.       This suit is an action of which this court has original jurisdiction under the provision of 9 U.S.C. § 202  et. seq., and one that may be removed to this court under the provisions of 9 U.S.C. § 205, in that it is an action arising under the laws of the United States and relating to an arbitration  agreement falling under the Convention.  The grounds for removal are as follows:

a.       There has been no trial of the state court action.

b.       Mari-John Bautista was a Filipino seaman.  Defendant Norwegian Cruise Line is a Bermudian Corporation, and the S/S Norway is a Bahamian flagged vessel.

c.       The underlying employment contract, a Contract of Employment prescribed by the Philippine Overseas Employment Administration (the "POEA"), regulates the employment of Philippine citizens abroad.

d.       The Contract incorporates by reference the Standard Terms, which requires arbitration of all claims where, as here, the parties are governed by a collective bargaining agreement.

e.       Because the Contract is between a foreign corporation and a foreign seaman and because the agreement provides for arbitration, this dispute falls under the provisions of the Convention. See 9 U.S.C.  §202 et. seq.

9.       Accordingly, this court has jurisdiction over this action, and this case is removed to the Southern District of Florida, pursuant to U.S.C. § 205.

MASE & GASSENHEIMER, P.A.
80 SW Eighth Street, Suite 2700, Miami, Florida  33130 (305) 377-3770

10.     NCL files and presents herewith the sum of $150.00 as required by 28 U.S.C. § 1446.

WHEREFORE, Defendants, Star Cruises and Norwegian Cruise Line, Ltd., move this court for an order that the action now pending against it in the Eleventh Judicial Circuit, in and for Miami-Dade County, described above, be removed to this Court and proceed therein.

Respectfully submitted,

MASE & GASSENHEIMER, P.A.
Attorneys for Defendant
80 S.W. Eighth Street, Suite 2700
Miami, Florida 33131
Telephone No.:  (305) 377-3770
Telefax No.:  (305) 377-0080

By

CURTIS J. MASE
Florida Bar No. 478083
RACHEL S. COHEN
Florida Bar No. 0036810

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S. mail on this 17 day of June, 2003, to **William Huggett, Esq.,** Attorney for Plaintiff, The Huggett Lawfirm, 66 West Flagler Street, Suite 400, Miami, Florida 33130.

RACHEL S. COHEN

RSC/ps/16438/#144181

## VERIFICATION

STATE OF FLORIDA    )
                            ) SS.

COUNTY OF DADE    )

        RACHEL S. COHEN, being first duly sworn, states that she is counsel for

Norwegian Cruise Lines, Ltd., and that all the allegations in the Notice of Removal are

true and correct to the best of her knowledge and belief.

                                                        RACHEL S. COHEN

STATE OF _Florida_   )

                              ) SS:

COUNTY OF _Miami-Dade_ )

        The foregoing was acknowledged before me on this _17_ day of June, 2003, by

Curtis J. Mase, who is personally known to me and did not take an oath.

                                            NOTARY PUBLIC

                                            (print name)

RSC/ps/16438/#144181

                                      Joyce A. Ferguson
                                      Commission #DD162994
                                      Expires: Nov 04, 2006
                                        Bonded Thru
                                      Atlantic Bonding Co., Inc.

**MASE & GASSENHEIMER, P.A.**
**80 SW Eighth Street, Suite 2700, Miami, Florida  33130 (305) 377-3770**

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION
CONTRACT OF EMPLOYMENT

KNOWN ALL MEN BY THESE PRESENTS:

This Contract, entered into voluntarily by and between:

Name of Seafarer :   **BAUTISTA, MARI JOHN Y UMATAN**

Address :   **96-C MARYLAND ST CUBAO QUEZON CITY**

SIRB No :   **A606811**       SRC No. :   **0057723-93**

License No. :

hereinafter referred to as the Employee, and

Name of Agent :   **C.F. SHARP CREW MANAGEMENT, INC.**
Name of Agent :   **CASA ROCHA 290-292 GENERAL LUNA ST. INTRAMUROS, MANILA**
For and in behalf of   **NORWEGIAN CRUISE LINE**
                                   (Principal/Country)

for the following vessel.

Name of Vessel :   **S/S NORWAY**

Official No. :       Gross Registered Tonnage (GRT) :   **76049**

Flag :       Year Built :   **1962**   Classification Society :   **218762 BV**

hereinafter referred to as the Employer

## WITNESSETH

1   That the employee shall be employed onboard under the following terms and conditions:

| | |
|---|---|
| 1.1 Duration of Contract | **10.00** months |
| 1.2 Position | **1ST ASST REF ENGINEER** |
| 1.3 Basic Monthly Salary | **$   558.00** per month |
| 1.4 Hours of Work | **8 hours/day MONDAYS TO FRIDAYS INCLUSIVE** |
| 1.5 Overtime Rate | **$   4.03** per hour Weekdays + |
| | **4.84** per hour Saturdays, Sundays and Public Holidays |
| 1.6 Guaranteed OT | **$   470.00** per month after 103 hours |
| 1.7 Leave Subsistence | **$   156.00** per month |
| 1.8 POINT OF HIRE | **MANILA** |
| 1.9 Other Agreement | **Subject to Random Alcohol or Drug Test** |

2.   The herein terms and conditions in accordance with Department Order No. 4 and Memorandum Circular No. 09, both Series of 2000, shall be strictly and faithfully observed.

3   Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed, and approved by the Philippine Overseas Employment Administration (POEA). Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going

4   Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this **28 of August 2002** at Manila, Philippines.

BAUTISTA, MARI JOHN Y UMAT
Seafarer

26 AUG 02

**EXHIBIT**

" A "

Department of Labor and Employment
Philippine Overseas Employment Administration
(POEA) Contract Processing
Certified POEA Approved Employment Contract
MR. LAWRENCE L. FRANCIA

**Republic of the Philippines**
**DEPARTMENT OF LABOR AND EMPLOYMENT**
**Intramuros, Manila**

## DEPARTMENT ORDER NO. __4__
*Series of 2000*

In view of recent developments in the international maritime industry affecting the recruitment and employment of Filipino seafarers on ocean-going vessels and cognizant of the Department's objective of ensuring the continued employment of our seafarers and maintaining the Philippine global comparative advantage in shipmanning, the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels is hereby amended reflecting the consensus of all the stakeholders as determined through the several tripartite consultations conducted by the Philippine Overseas Employment Administration.

The Philippine Overseas Employment Administration (POEA) shall formulate the guidelines for the implementation of the amended contract, a copy of which is hereto attached.

The amended rules shall take effect fifteen (15) days from date of publication in a newspaper of general circulation.

All Orders and issuances inconsistent herewith are hereby repealed and superseded accordingly.

For strict compliance.

**BIENVENIDO E. LAGUESMA**
Secretary

Manila, 31 May 2000

DISSEMINATED BY AS-RECORDS SECTION ON____611____2000



EXHIBIT
B



**ANNEX A**

### STANDARD TERMS AND CONDITIONS
### GOVERNING THE EMPLOYMENT OF FILIPINO SEAFARERS
### ON-BOARD OCEAN-GOING VESSELS*

**Definition of Terms:**

For purposes of this contract, the following terms are defined as follows:

1. Point of Hire - refers to the place indicated in the contract of employment which shall be the basis for determining commencement and termination of contract.
2. Convenient Port - any port where it is practicable, economical, safe and convenient to repatriate the seafarer.
3. Philippine Port - refers to any Philippine airport or seaport.
4. Basic Wage - refers to the salary of the seafarer exclusive of overtime, leave pay and other bonuses.
5. Departure - refers to the actual departure from the point of hire of the seafarer through air, sea or land travel transport to join his vessel to a Philippine or foreign port.
6. Regular Working Hours - refers to the seafarer's eight (8) hour working hours within the period of 24 hours.
7. Dental Treatment - covers tooth extraction or dental surgery, if necessary, due to accident.
8. Shipwreck - refers to the damage or destruction of a vessel at sea caused by collision, storm, grounding or any other marine peril at sea or in port rendering the vessel absolutely unnavigable or unable to pursue her voyage.
9. Compassionate Ground - refers to incidence of death of an immediate member of the seafarer's family which includes his parents, spouse and children if the seafarer is married or his parents if the seafarer is single.
10. Principal - any person, partnership or corporation hiring Filipino seafarers to work on board ocean-going vessels.
11. Work-Related Injury - injury(ies) resulting in disability or death arising out of and in the course of employment.
12. Work-Related Illness - any sickness resulting to disability or death as a result of an occupational disease listed under Section 32-A of this Contract with the conditions set therein satisfied.

### SECTION 1.    DUTIES

A. Duties of the Employer/Agency/Master:
   1. To faithfully comply with the stipulated terms and conditions of this contract, particularly the prompt payment of wages, remittance of allotment and the expeditious settlement of valid claims of the seafarer.
   2. To make operational on board the vessel the grievance machinery provided in this contract and ensure its free access at all times by the seafarer.
   3. To provide a seaworthy vessel for the seafarer and take all reasonable precautions to prevent accident and injury to the crew including provision of safety equipment, fire prevention, safe and proper navigation of the vessel and such other precautions necessary to avoid accident, injury or sickness to the seafarer.
   4. To observe the Code of Ethics for Seafarers and conduct himself in the traditional decorum of a master.
B. Duties of the Seafarer:
   1. to faithfully comply with and observe the terms and conditions of this contract, violation of which shall be subject to disciplinary action pursuant to Section 33 of this contract;
   2. to abide by the Code of Discipline as provided in the POEA rules and regulations governing overseas contract workers and the Code of Ethics for Seafarers;
   3. to be obedient to the lawful commands of the Master or any person who shall lawfully succeed him and to comply with company policy including safety policy and procedures and any instructions given in connection therewith;
   4. to be diligent in his duties relating to the vessel, its stores and cargo, whether on board, in boats or ashore; and
   5. to conduct himself in an orderly and respectful manner towards passengers and shippers stevedores, port authorities and other persons on official business with the ship.

### SECTION 2.    COMMENCEMENT /DURATION
###                       OF CONTRACT

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.
B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to the mutual consent of both parties.

### SECTION 3.    FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT
###                       OF EMBARKATION

The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed at the expense of the employer.

### SECTION 4.    BAGGAGE ALLOWANCE

The seafarer travelling to or join a vessel or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines. The cost of the excess baggage shall be for the account of the seafarer.

### SECTION 5.    HYGIENE AND VACCINATION

A. The seafarer shall keep his quarters and other living spaces - such as messrooms, toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master. The work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.
B. The seafarer shall submit to the order of the master or to the laws of any country within the territorial jurisdiction of which the vessel may enter to have such vaccination or inoculation or to undertake measures safeguarding his health and of the whole crew.

### SECTION 6.    WAGES

The seafarer shall be paid his monthly wages not later than 15 days of the succeeding month from the date of commencement of the contract until the date of arrival at point of hire upon termination of his employment pursuant to Section 18 of this Contract.

### SECTION 7.    PAYMENT ON BOARD

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment. Advances shall be at the master's/employer's discretion and in accordance with the foregoing conditions.

### SECTION 8.    ALLOTMENTS AND REMITTANCES

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank. The master/employer/agency shall provide the seafarer with facilities to do so at no expense to the seafarer. The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary including backwages, if any.
B. The master/employer/agency may also provide facilities for the seafarer to remit any amount earned in excess of his allotment to his designated allottee in the Philippines through any authorized Philippine bank without any charge to him.
C. The allotments shall be paid to the designated allottee in Philippine currency at the rate of exchange indicated in the credit advice of the local authorized Philippine bank.

### SECTION 9.    ACCOUNT OF WAGES & CERTIFICATE
###                       OF EMPLOYMENT

The seafarer, upon his discharge, shall be given a written account of his wages reflecting all deductions therefrom. Where a seafarer is landed in an emergency, the written account of his wages shall be given to him as soon as practicable thereafter. Upon the seafarer's request, he shall also be provided by his employer/agency his certificate of employment or service record without any charge.

### SECTION 10.    HOURS OF WORK

A. The seafarer shall perform not more than forty-eight(48) hours of regular work a week. The hours of work shall be determined and prescribed by the master, provided that it conforms with customary international practices and standards and as prescribed in paragraph B below.
B. Regular working hours for the seafarer shall be eight (8) hours in every 24 hours, midnight to midnight, Monday to Sunday. The normal practice is as follows:
   1. the day worker shall observe the eight (8) regular working hours during the period from 0600 hours to 1800 hours.
   2. the steward personnel shall observe the eight (8) regular working hours during the period from 0500 hours to 2000 hours.
   3. the Radio Operator shall observe the eight (8) regular working hours in every twenty-four (24) hours, midnight to midnight, from Monday to Sunday as established by International Telecommunication Conventions and as prescribed by the master.
   4. for those who are on sea watch, their working hours shall be eight (8) hours per day. Staggering of working hours will be at the master's discretion.
C. The seafarer shall be allowed reasonable rest period in accordance with international standards.

### SECTION 11.    OVERTIME & HOLIDAYS

A. The seafarer shall be compensated for all work performed in excess of the regular eight (8) hours as prescribed above. Overtime pay may be classified as open, fixed or guaranteed.
   In computing overtime, a fraction of the first hour worked shall be considered as one full hour. After the first hour overtime, any work performed which is less than thirty (30) minutes shall be considered as half an hour and more than thirty (30) minutes shall be considered one full hour.
B. Overtime work may be compensated at the following rates:
   1. Open overtime - not less than 125 percent (125%) of the basic hourly rate computed based on two hundred eight (208) regular working hours per month.
   2. Guaranteed or fixed overtime - not less than thirty percent (30%) of the basic monthly salary of the seafarer. This fixed rate overtime shall include overtime work performed on Sundays and holidays but shall not exceed one hundred five (105) hours a month.
   3. Overtime work for officers shall be computed based on the fixed overtime rate.
   4. For ratings, overtime work shall be based on guaranteed or open overtime rate, as mutually agreed upon by the contracting parties. Overtime work in excess of 105 hours a month for ratings shall be further compensated on the open overtime rate.
C. Any hours of work or duty including hours of watchkeeping performed by the seafarer on designated rest days and holidays shall be paid rest day or holiday pay. The following shall be considered as holidays at sea and in port.

| | |
|---|---|
| New Year's Day | January 1 |
| Maundy Thursday | movable date |
| Good Friday | movable date |
| Araw ng Kagitingan (Bataan & Corregidor Day) | April 9 |
| Labor Day | May 1 |
| Independence Day | June 12 |
| National Heroes Day | Last Sunday of August |
| All Saints Day | November 1 |
| Bonifacio Day | November 30 |
| Christmas Day | December 25 |
| Rizal Day | December 30 |

D. Emergency Duty - No overtime work shall be considered for any work performed in case of emergency affecting the safety of the vessel, passenger, crew or cargo, of which the master shall be the sole judge, or for fire, boat, or emergency drill or work required to give assistance to other vessels or persons in immediate peril.

### SECTION 12.    LEAVE PAY

The seafarer's leave pay shall be in accordance with the number of days leave per month as agreed upon. Days leave shall not be less than two and a half (2-1/2) days for each month of service and pro-rated. Leave pay shall be settled onboard or settled within two weeks after arrival of the seafarer at the point of hire.

### SECTION 13.    SHORE LEAVE

The seafarer shall be allowed shore leave when practicable, upon the consent of the master or his deputy, taking into consideration the operations and safety of the vessel.

### SECTION 14.    VICTUALLING, VESSEL STORES
###                         AND PROVISIONS

A. The seafarer shall be provided by the master/employer with subsistence consistent with good maritime standards and practices while on board the vessel

B.   "/3 stores and provisions issued to the seafarer are only for use and consumption on board the vessel and any unused or unconsumed stores or provisions shall remain the property of the employer. The seafarer shall not take ashore, sell, destroy or give away such stores and provisions.

**SECTION 15.   TRANSFER CLAUSE**

The seafarer agrees to be transferred at any port to any vessel owned or operated, manned or managed by the same employer, provided it is accredited to the same manning agent and provided further that the position of the seafarer and the rate of his wages and terms of service are in no way inferior and the total period of employment shall not exceed that originally agreed upon.
Any form of transfer shall be documented and made available when necessary.

**SECTION 16.   GRIEVANCE MACHINERY**

A.   If the seafarer considers himself aggrieved, he shall make his complaint in accordance with the following procedures:
   1.   The seafarer shall first approach the head of the Department in which he is assigned to explain his grievance.
      a.   In the Deck, Radio and Catering Department, the head is the Chiefmate.
      b.   In the Engine Department, the head is the Chief Engineer.
      c.   In the Catering and/or Hotel Department in a passenger ship, the head is the Chief Steward and/or Purser.
   2.   The seafarer shall make his grievance in writing and in an orderly manner and shall choose a time when his complaint or grievance can be properly heard.
   3.   The Department head shall deal with the complaint or grievance and where solution is not possible at his level, refer the complaint or grievance to the Master who shall handle the case personally.
   4.   If no satisfactory result is achieved, the seafarer concerned may appeal to the management of the company or with the Philippine Overseas Labor Officer or consular officer overseas. The master shall afford such facilities necessary to enable the seafarer to transmit his appeal.
   5.   If after observing the grievance procedure the master finds that the seafarer violated the terms of his Contract or has committed breach of discipline, the master shall discipline the seafarer or, if warranted, terminate his employment.
   6.   The seafarer may also seek the assistance of the highest ranking Filipino seafarer on board.
B.   When availed of by the seafarer, the grievance procedure and all actions or decisions agreed upon shall be properly documented for the protection and interest of both parties.
C.   The foregoing procedure shall be without prejudice to other modes of voluntary settlement of disputes and to the jurisdiction of the Philippine Overseas Employment Administration (POEA) or the National Labor Relations Commission (NLRC) over any unresolved complaints arising out of shipboard employment that shall be brought before it by the seafarer.

**SECTION 17.   DISCIPLINARY PROCEDURES**

The Master shall comply with the following disciplinary procedures against an erring seafarer:
A.   The Master shall furnish the seafarer with a written notice containing the following:
   1.   Grounds for the charges as listed in Section 33 of this Contract or analogous act constituting the same.
   2.   Date, time and place for a formal investigation of the charges against the seafarer concerned.
B.   The Master or his authorized representative shall conduct the investigation or hearing, giving the seafarer the opportunity to explain or defend himself against the charges. These procedures must be duly documented and entered into the ship's logbook.
C.   If after the investigation or hearing, the Master is convinced that imposition of a penalty is justified, the Master shall issue a written notice of penalty and the reasons for it to the seafarer, with copies furnished to the Philippine agent.
D.   Dismissal for just cause may be effected by the Master without furnishing the seafarer with a notice of dismissal if there is a clear and existing danger to the safety of the crew or the vessel. The Master shall send a complete report to the manning agency substantiated by witnesses, testimonies and any other documents in support thereof.

**SECTION 18.   TERMINATION OF EMPLOYMENT**

A.   The employment of the seafarer shall cease when the seafarer completes his period of contractual service aboard the vessel, signs-off from the vessel and arrives at the point of hire.
B.   The employment of the seafarer is also terminated when the seafarer arrives at the point of hire for any of the following reasons:
   1.   when the seafarer signs-off and is disembarked for medical reasons pursuant to Section 20 (B)(5) of this Contract.
   2.   when the seafarer signs-off due to shipwreck, ship's sale, lay-up of vessel, discontinuance of voyage or change of vessel principal in accordance with Sections 22, 23 and 26 of this Contract.
   3.   when the seafarer, in writing, voluntarily resigns and signs off prior to expiration of contract pursuant to Section 19 (G) of this Contract.
   4.   when the seafarer is discharged for just cause as provided for in Section 33 of this Contract.

**SECTION 19.   REPATRIATION**

A.   If the vessel is outside the Philippines upon the expiration of the contract, the seafarer shall continue his service on board until the vessel's arrival at a convenient port and/or after arrival of the replacement crew provided that, in any case, the continuance of such service shall not exceed three months. The seafarer shall be entitled to earned wages and benefits as provided in his contract.
B.   It the vessel arrives at a convenient port before the expiration of the contract, the master/employer may repatriate the seafarer from such port, provided the unserved portion of his contract is not more than one (1) month. The seafarer shall be entitled only to his earned wages and earned leave pay and by his basic wages corresponding to the unserved portion of the contract, unless within 60 days from disembarkation, the seafarer is rehired at the same rate and position, in which case the seafarer shall be entitled only to his earned wages and earned leave pay.
C.   If the vessel arrives at a convenient port within a period of three (3) months before the expiration of his contract, the master/employer may repatriate the seafarer from such port provided that the seafarer shall be paid all his earned wages. In addition, the seafarer shall also be paid his leave pay for the entire contract period plus a termination pay equivalent to one (1) month of his basic pay, provided, however, that this mode of termination may only be exercised by the master/employer it the original contract period of the seafarer is at least ten (10) months; provided, further, that the conditions for this mode of termination shall not apply to dismissal for cause.

D.   The seafarer shall, if discharged at a port abroad for any reason other than for discipline, be accommodated ashore and in cases where it is not intended that he rejoin the vessel, shall be repatriated to the Phillippines via sea or air or as may otherwise be directed by the employer/master/agency.
E.   When the seafarer is discharged for any just cause, the employer shall have the right to recover the costs of his replacement and repatriation from the seafarer's wages and other earned benefits.
F.   The seafarer, when discharged and repatriated as directed by the employer/master/agency shall be entitled to basic wages from date of signing off until arrival at the point of hire except when the discharge is in accordance with the above or for disciplinary reasons.
   If the seafarer delays or desires a detour and/or another destination other than the most direct to the point of hire, all additional expenses shall be to the seafarer's account. The seafarer's basic wage shall be calculated based on the date of arrival by the most direct route.
G.   A seafarer with requests for early termination of his contract shall be liable for his repatriation cost as well as the transportation cost of his replacement. The employer may, in case of compassionate grounds, assume the transportation cost of the seafarer's replacement.

**SECTION 20.   COMPENSATION AND BENEFITS**

A.   COMPENSATION AND BENEFITS FOR DEATH
   1.   In case of work-related death of the seafarer, during the term of his contract the employer shall pay his beneficiaries the Philippine Currency equivalent to the amount of Fifty thousand US dollars (US$50,000) and an additional amount of Seven Thousand US dollar (US$7,000) to each child under the age of twenty-one (21) but not exceeding four (4) children at the exchange rate prevailing during the time of payment.
   2.   Where death is caused by warlike activity while sailing within a declared war zone or war risk area, the compensation payable shall be doubled. The employer shall undertake appropriate war zone insurance coverage for this purpose.
   3.   It is understood and agreed that the benefits mentioned above shall be separate and distinct from, and will be in addition to whatever benefits which seafarer is entitled to under Philippine laws from Social Security System, Overseas Workers Welfare Administration, Employees' Compensation Commission, Philippine Health Insurance Corporation and Pag-ibig, if applicable.
   4.   The other liabilities of the employer when the seafarer dies as a results of work-related injury or illness during the term of employment are as follows:
      a.   The employer shall pay the deceased's beneficiary all outstanding obligations due the seafarer under this Contract.
      b.   The employer shall transport the remains and personal effects of the seafarer to the Philippines at employer's expense except if the death occurred in a port where local government laws or regulations do not permit the transport of such remains. In case death occurs at sea, the disposition of the remains shall be handled or dealt with in accordance with the master's best judgment. In all cases, the employer/master shall communicate with the manning agency to advise for disposition of seafarer's remains.
      c.   The employer shall pay the beneficiaries of the seafarer the Philippine currency equivalent to the amount of One Thousand US dollars (US$1,000) for burial expenses at the exchange rate prevailing during the time of payment.
B.   COMPENSATION AND BENEFITS FOR INJURY OR ILLNESS
   The liabilities of the employer when the seafarer suffers work-related injury or illness during the term of his contract are as follows:
   1.   The employer shall continue to pay the seafarer his wages during the time he is on board the vessel;
   2.   If the injury or illness requires medical and/or dental treatment in a foreign port ,the employer shall be liable for the full cost of such medical, serious dental, surgical and hospital treatment as well as board and lodging until the seafarer is declared fit to work or to be repatriated.
      However, if after repatriation, the seafarer still requires medical attention arising from said injury or illness, he shall be so provided at cost to the employer until such time he is declared fit or the degree of his disability has been established by the company-designated physician.
   3.   Upon sign-off from the vessel for medical treatment, the seafarer is entitled to sickness allowance equivalent to his basic wage until he is declared fit to work or the degree of permanent disability has been assessed by the company-designated physician but in no case shall this period exceed one hundred twenty (120) days.
      For this purpose, the seafarer shall submit himself to a post-employment medical examination by a company-designated physician within three working days upon his return except when he is physically incapacitated to do so, in which case, a written notice to the agency within the same period is deemed as compliance. Failure of the seafarer to comply with the mandatory reporting requirement shall result in his forfeiture of the right to claim the above benefits
      If a doctor appointed by the seafarer disagrees with the assessment, a third doctor may be agreed jointly between the Employer and the seafarer The third doctor's decision shall be final and binding on both parties.
   4.   Those illnesses not listed in Section 32 of this Contract are disputably presumed as work related.
   5.   Upon sign-off of the seafarer from the vessel for medical treatment, the employer shall bear the full cost of repatriation in the event the seafarer is declared (1) fit for repatriation; or (2) fit to work but the employer is unable to find employment for the seafarer on board his former vessel or another vessel of the employer despite earnest efforts.
   6.   In case of permanent total or partial disability of the seafarer caused by either injury or illness the seafarer shall be compensated in accordance with the schedule of benefits enumerated in Section 32 of this Contract. Computation of his benefits arising from an illness or disease shall be governed by the rates and the rules of compensation applicable at the time the illness or disease was contracted.
C.   It is understood that computation of the total permanent or partial disability of the seafarer caused by the injury sustained resulting from warlike activities within the warzone area shall be based on the compensation rates payable within the warzone area as prescribed in this Contract.
D.   No compensation and benefits shall be payable in respect of any injury, incapacity, disability or death of the seafarer resulting from his wilful or criminal act or intentional breach of his duties, provided however, that the employer can prove that such injury, incapacity, disability or death is directly attributable to the seafarer.
E.   A seafarer who knowingly conceals and does not disclose past medical condition, disability and history in the pre-employment medical examination constitutes fraudulent misrepresentation and shall disqualify him from any compensation and benefits. This may also be a valid ground for termination of employment and imposition of the appropriate administrative and legal sanctions.
F.   When requested, the principal shall furnish the seafarer a copy of all pertinent medical reports or any records at no cost to the seafarer.
G.   The seafarer or his successor in interest acknowledges that payment for injury, illness, incapacity, disability or death of the seafarer under this contract shall cover all claims arising from or in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country

2

**SECTION 21.   WAR AND WARLIKE OPERATIONS ALLOWANCE**

A.   If a war or warlike operations should arise during the term of this Contract in any country within the vessel's trading area, the seafarer may sail the vessel within and out of the trading area if required by the Master.

B.   If at the time of the signing of the contract, an area is declared a war or war-risk trading area and the seafarer binds himself in writing to sail into that area, the agreement shall be properly appended to the Contract for verification and approval by the Philippine Overseas Employment Administration (POEA). The seafarer shall comply with the agreement, or shall bear his cost of repatriation when he opts not to sail into a war or war-risk trading area.

C.   The seafarer when sailing within a war-risk trading area shall be entitled to such premium pay as the POEA may determine through appropriate periodic issuances.

D.   The POEA shall be the sole authority to determine whether the vessel is within a war risk trading area. It shall also determine the amount of premium pay to which the seafarer shall be entitled to when sailing in that war-risk trading area.

**SECTION 22.   TERMINATION DUE TO SHIPWRECK**

Where the vessel is wrecked necessitating the termination of employment before the date indicated in the contract, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at employer's cost and one month basic wage as termination pay.

**SECTION 23.   TERMINATION DUE TO VESSEL SALE, LAY-UP OR DISCONTINUANCE OF VOYAGE**

Where the vessel is sold, laid up, or the voyage is discontinued necessitating the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's cost and one (1) month basic wage as termination pay, unless arrangements have been made for the seafarer to join another vessel belonging to the same principal to complete his contract in which case the seafarer shall be entitled to basic wages until the date of joining the other vessel.

**SECTION 24.   TERMINATION DUE TO UNSEAWORTHINESS**

A.   If the vessel is declared unseaworthy by a classification society, port state or flag state, the seafarer shall not be forced to sail with the vessel.

B.   If the vessel's unseaworthiness necessitates the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at cost to the employer and termination pay equivalent to one (1) month basic wage.

**SECTION 25   TERMINATION DUE TO REGULATION 1/4, CONTROL PROCEDURES OF THE 1978 STCW CONVENTION, AS AMENDED**

If the seafarer is terminated and repatriated as a result of port state control procedures/actions in compliance with Regulation 1/4 of the 1978 STCW Convention, as amended, his termination shall be considered valid. However, he shall be entitled to repatriation, earned wages and other benefits.

**SECTION 26.   CHANGE OF PRINCIPAL**

A.   Where there is a change of principal of the vessel necessitating the termination of employment of the seafarer before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's expense and one month basic pay as termination pay.

B.   If by mutual agreement, the seafarer continues his service on board the same vessel, such service shall be treated as a new contract. The seafarer shall be entitled to earned wages only.

C.   In case arrangements has been made for the seafarer to join another vessel to complete his contract, the seafarer shall be entitled to basic wage until the date of joining the other vessel.

**SECTION 27.   LOSS OF OR DAMAGE TO CREW'S EFFECTS BY MARINE PERIL**

A.   The seafarer shall be reimbursed by the employer the full amount of loss or damage to his personal effects but in no case shall the amount exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000) if his personal effects are lost or damaged as a result of the wreck or loss or stranding or abandonment of the vessel or as a result of fire, flooding, collision or piracy.

B.   In case of partial loss, the amount shall be determined by mutual agreement of both parties but in no case to exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000).

C.   Reimbursement for loss or damage to the seafarer's personal effects shall not apply if such loss or damage is due to (a) the seafarer's own fault; (b) larceny or theft or (c) robbery.

D.   Payment of any reimbursement shall be computed at the rate of exchange prevailing at the time of payment.

**SECTION 28.   GENERAL SAFETY**

A.   The seafarer shall observe and follow any regulation or restriction that the master may impose concerning safety, drug and alcohol and environmental protection.

B.   The seafarer shall make use of all appropriate safety equipment provided him and must ensure that he is suitably dressed from the safety point of view for the job at hand.

**SECTION 29.   DISPUTE SETTLEMENT PROCEDURES**

In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If the parties are not covered by a collective bargaining agreement, the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 8042 otherwise known as the Migrant Workers and Overseas Filipinos Act of 1995 or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If there is no provision as to the voluntary arbitrators to be appointed by the parties, the same shall be appointed from the accredited voluntary arbitrators of the National Conciliation and Mediation Board of the Department of Labor and Employment.

The Philippine Overseas Employment Administration (POEA) shall exercise original and exclusive jurisdiction to hear and decide disciplinary action on cases, which are administrative in character, involving or arising out of violations of recruitment laws, rules and regulations involving employers, principals, contracting partners and Filipino seafarers.

**SECTION 30.   PRESCRIPTION OF ACTION**

All claims arising from this Contract shall be made within three (3) years from the date the cause of action arises, otherwise the same shall be barred.

**SECTION 31.   APPLICABLE LAW**

Any unresolved dispute, claim or grievance arising out of or in connection with this Contract, including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants where the Philippines is a signatory.

---

**SECTION 32.   SCHEDULE OF DISABILITY OR IMPEDIMENT FOR INJURIES SUFFERED AND DISEASES INCLUDING OCCUPATIONAL DISEASES OR ILLNESS CONTRACTED.**

**HEAD**

Traumatic head injuries that result to:

1.   Apperture unfilled with bone not over three (3) inches without brain injury...... Gr. 9
2.   Apperture unfilled with bone over three (3) inches without brain injury........... Gr. 3
3.   Severe paralysis of both upper or lower extremities or one upper and one lower extremity................................................................................ Gr. 1
4.   Moderate paralysis of two (2) extremities producing moderate difficulty in movements with self-care activities............................................. Gr. 6
5.   Slight paralysis affecting one extremity producing slight difficulty with self-care activities............................................................................... Gr. 10
6.   Severe mental disorder or Severe Complex Cerebral function disturbance or post-traumatic psychoneurosis which require regular aid and attendance as to render worker permanently unable to perform any work.......................... Gr. 1
7.   Moderate mental disorder or moderate brain functional disturbance which limits worker to the activities of daily living with some directed care or attendance........ Gr. 6
8.   Slight mental disorder or disturbance that requires little attendance or aid and which interferes to a slight degree with the working capacity of the claimant....... Gr. 10
9   Incurable imbecility.................................................................... Gr. 1

**FACE**

1.   Severe disfigurement of the face or head as to make the worker so repulsive as to greatly handicap him in securing or retaining employment, thereby being no permanent functional disorder.................. Gr. 2
2.   Moderate facial disfigurement involving partial ablation of the nose with big scars on face or head.............................................................. Gr. 5
3.   Partial ablation of the nose or partial avulsion of the scalp............................ Gr. 9
4.   Complete loss of the power of mastication and speech function............... Gr. 1
5.   Moderate constriction of the jaw resulting in moderate degree of difficulty in chewing and moderate loss of the power of the expression of speech............. Gr. 6
6.   Slight disorder of mastication and speech function due to traumatic injuries to jaw or cheek bone ......................................................... Gr. 12

**EYES**

1.   Blindness or total and permanent loss of vision of both eyes...................... Gr. 1
2.   Total blindness of one (1) eye and fifty percent (50%) loss of vision of the other eye..................................................................... Gr. 5
3.   Loss of one eye or total blindness of one eye........................................ Gr. 7
4.   Fifty percent (50%) loss of vision of one eye........................................ Gr. 10
5.   Lagophalmos, one eye................................................................ Gr. 12
6.   Ectropion, one eye.................................................................... Gr. 12
7.   Ephiphora,one eye.................................................................... Gr. 12
8.   Ptosis, one eye........................................................................ Gr. 12
NOTE: (Smeller's Chart - used to grade for near and distant vision).

**NOSE AND MOUTH**

1.   Considerable stricture of the nose (both sides) hindering breathing................................................................................ Gr. 11
2.   Loss of the sense of hearing in one ear.............................................. Gr. 11
3.   Injuries to the tongue (partial amputation or adhesion) or palata causing defective speech................................................................ Gr. 10
4.   Loss of three (3) teeth restored by prosthesis........................................ Gr. 14

**EARS**

1.   For the complete loss of the sense of hearing on both ears........................ Gr. 3
2.   Loss of two (2) external ears......................................................... Gr. 8
3.   Complete loss of the sense of hearing in one ear................................... Gr. 11
4.   Loss of one external ear.............................................................. Gr. 12
5.   Loss of one half (1/2) of an external ear............................................. Gr. 14

**NECK**

1.   Such injury to the throat as necessitates the wearing of a tracheal tube.................................................................................... Gr. 4
2.   Loss of speech due to injury to the vocal cord....................................... Gr. 9
3.   Total stiffness of neck due to fracture or dislocation of the cervical spines......................................................................... Gr. 8
4.   Moderate stiffness or two thirds (2/3) loss of motion of the neck.................................................................................. Gr. 10
5.   Slight stiffness of neck or one third (1/3) loss of motion............................. Gr. 12

**CHEST-TRUNK-SPINE**

1.   Fracture of four (4) or more ribs resulting to severe limitation of chest expansion............................................................................... Gr. 6
2.   Fracture of four (4) or more ribs with intercostal neuralgia resulting in moderate limitation of chest expansion.............................................. Gr. 9
3.   Slight limitation of chest expansion due to simple rib functional without myositis or intercostal neuralgia................................................................ Gr. 12
4.   Fracture of the dorsal or lumbar spines resulting to severe or total rigidity of the trunk or total loss of lifting power of heavy objects................................ Gr. 6
5.   Moderate rigidity or two-thirds (2/3) loss of motion or lifting power of the trunk... Gr. 8
6.   Slight rigidity or one third (1/3) loss of motion or lifting power of the trunk......... Gr. 11
7.   Injury to the spinal cord as to make walking impossible without the aid of a pair of crutches........................................................................ Gr. 4
8.   Injury to the spinal cord as to make walking impossible even with the aid of a pair of crutches........................................................................ Gr. 1
9.   Injury to the spinal cord resulting to incontinence of urine and feces............. Gr. 1

**ABDOMEN**

1.   Loss of the spleen..................................................................... Gr. 8
2.   Loss of one kidney..................................................................... Gr. 7
3.   Severe residuals of impairment of intra-abdominal organs which requires regular aid and attendance that will unable worker to seek any gainful employment......... Gr. 1
4.   Moderate residuals of disorder of the intra-abdominal organs secondary to trauma resulting to impairment of nutrition, moderate tenderness, nausea, vomiting, constipation or diarrhea.............................................................. Gr. 7
5.   Slight residuals or disorder of the intra-abdominal organs resulting in impairment of nutrition, slight tenderness and/or constipation or diarrhea....................... Gr. 12
6.   Inguinal hernia secondary to trauma or strain........................................ Gr. 12

## PELVIS

1. Fracture of the pelvic rings as to totally incapacitate worker to work ................................................................................. Gr. 1
2. Fracture of the pelvic ring resulting to deformity and lameness ......................................................................... Gr. 6

## URINARY AND GENERATIVE ORGANS

1. Total loss of penis ................................................................ Gr. 7
2. Total loss of both testicles .................................................... Gr. 7
3. Total loss of one testicle ...................................................... Gr. 11
4. Scars on the penis or destruction of the parts of the cavernous body or urethra interfering with erection or markedly affecting coitus ......... Gr. 9
5. Loss of one breast ................................................................ Gr. 11
6. Prolapse of the uterus .......................................................... Gr. 13
7. Great difficulty in urinating .................................................. Gr. 13
8. Incontinence of urine ............................................................ Gr. 10

## THUMBS AND FINGERS

1. Total loss of one thumb including metacarpal bone ................... Gr. 9
2. Total loss of one thumb ........................................................ Gr. 10
3. Total loss on one index finger including metacarpal bone ......... Gr. 10
4. Total loss of one index finger ............................................... Gr. 11
5. Total loss of one middle finger including metacarpal bone ........ Gr. 11
6. Total loss of one middle finger ............................................. Gr. 12
7. Total loss of one ring finger including metacarpal bone ............ Gr. 12
8. Total loss of one ring finger .................................................. Gr. 13
9. Total loss of one small finger including metacarpal bone ......... Gr. 13
10. Total loss of one small finger ............................................... Gr. 14
11. Loss of two (2) or more fingers. Compensation for the loss or loss of use of two (2) or more fingers or one (1) or more phalanges of two or more digits of a hand must be proportioned to the loss of the hand occasioned thereby but shall not exceed the compensation for the loss of a hand:

   a. Loss of five (5) fingers of one hand ................................. Gr. 6
   b. Loss of thumb, index fingers and any of 2 or more fingers of the same hand ........................................................... Gr. 6
   c. Loss of the thumb, index finger and any one of the remaining fingers of the same hand .............................................. Gr. 7
   d. Loss of thumb and index finger ..................................... Gr. 8
   e. Loss of three (3) fingers of one hand not including thumb and index finger .......................................................... Gr. 9
   f. Loss of the index finger and any one of the other fingers of the same hand excluding thumb ................................. Gr. 9
   g. Loss of two (2) digits of one hand not including thumb and index finger .......................................................... Gr. 10
12. Loss of ten (10) fingers of both hands .................................... Gr. 3

## HANDS

1. Total loss of use of both hands or amputation of both hands at wrist joints or above ....................................................... Gr. 1
2. Amputation of a hand at carpo-metacarpal joints. ................... Gr. 5
3. Amputation between wrist and elbow joint. ............................ Gr. 5
4. Loss of grasping power for small objects between the fold of the finger of one hand. ..................................................... Gr. 10
5. Loss of grasping power for large objects between fingers and palm of one hand. ......................................................... Gr. 10
6. Loss of opposition between the thumb and tips of the fingers of one hand. ....................................................................... Gr. 9
7. Ankylosed wrist in normal position. ...................................... Gr. 10
8. Ankylosed wrist in position one third (1/3) flexed or half extended and/or severe limited action of a wrist ................. Gr. 11

## SHOULDER AND ARM

1. Inability to turn forearm (forearm in normal position-supination) ....... Gr. 11
2. Inability to turn forearm (forearm in abnormal position-pronation) ..... Gr. 10
3. Disturbance of the normal carrying angle or weakness of an arm or a forearm due to deformity of moderate atrophy of muscles. ......... Gr. 11
4. Stiff elbow at full flexion or extension (one side). ................... Gr. 7
5. Stiff elbow at right angle flexion. ......................................... Gr. 8
6. Flail elbow joint. ................................................................. Gr. 6
7. Pseudoarthrosis of the humerus with musculospiral or radial paralysis. ... Gr. 6
8. Ankylosis of one (1) shoulder, the shoulder blade remaining mobile. ..... Gr. 9
9. Ankylosis of one shoulder, the shoulder blade remaining immobile. ...... Gr. 8
10. Unreduced dislocation of one (1) shoulder. ............................ Gr. 8
11. Ruptured biceps or pseudoarthrosis of the humerus, close (one side). ................................................................... Gr. 11
12. Inability to raise arm more than halfway from horizontal to perpendicular. ................................................................. Gr. 11
13. Ankylosis of the shoulder joint not permitting arm to be raised above a level with a shoulder and/or irreducible fracture of faulty union collar bone. ...................................................... Gr. 10
14. Total paralysis of both upper extremities. .............................. Gr. 1
15. Total paralysis of one upper extremity. .................................. Gr. 3
16. Amputation of one (1) upper extremity at or above the elbow. ......... Gr. 4
17. Scar the size of the palm in one extremity. ............................. Gr. 14

## LOWER EXTREMITIES

1. Loss of a big toe. ................................................................. Gr. 12
2. Loss of a toe other than the big one. ..................................... Gr. 14
3. Loss of ten (10) digits of both feet. ....................................... Gr. 5
4. Loss of a great toe of one foot + one toe. ............................... Gr. 10
5. Loss of two toes not including great toe or toe next to it. ......... Gr. 12
6. Loss of three (3) toes excluding great toe of a foot. ................. Gr. 10
7. Loss of four (4) excluding great toe of a foot. ......................... Gr. 9
8. Loss of great toe and two (2) other toes of the same foot. ........ Gr. 9
9. Loss of five digits of a foot. ................................................ Gr. 8
10. Loss of both feet at ankle joint or above. ............................... Gr. 1
11. Loss of one foot at ankle joint or above. ................................ Gr. 6
12. Depression of the arch of a foot resulting in weak foot ............. Gr. 12
13. Loss of one half (1/2) metatarsus of one (1) foot ..................... Gr. 8
14. Loss of whole metatarsus or forepart of foot. .......................... Gr. 7
15. Tearing of achilles tendon resulting in the impairment of active flexion and extension of a foot. ................................. Gr. 12
16. Malleolar fracture with displacement of the foot inward or outward ....... Gr. 10
17. Complete immobility of an ankle joint in abnormal position. ......... Gr. 10
18. Complete immobility of an ankle joint in normal position. ......... Gr. 11
19. Total loss of a leg or amputation at or above the knee. ............ Gr. 3
20. Stretching leg of the ligaments of a knee resulting in instability of the joint. ........................................................ Gr. 10
21. Ankylosis of a knee joint in genuvalgum of varum. .................. Gr. 10
22. Pseudoarthrosis of a knee cap. ............................................. Gr. 10
23. Complete immobility of a knee joint in full extension. .............. Gr. 9
24. Complete immobility of a knee joint in strong flexion. .............. Gr. 7
25. Complete immobility of a hip joint in flexion of the thigh. ......... Gr. 5
26. Complete immobility of a hip joint in full extension of the thigh. ......... Gr. 9
27. Slight atrophy of calf of leg muscles without apparent shortening or joint lesion or disturbance of weight-bearing line. ............... Gr. 13
28. Shortening of a lower extremity from one to three centimeters with either joint lesion or disturbance of weight-bearing joint. ... Gr. 13
29. Shortening of 3 to 6 cm. with slight atrophy of calf or thigh muscles. ..................................................... Gr. 12
30. Shortening of 3 to 6 cm. with either joint lesion or disturbance of weight-bearing joint. ...................................... Gr. 11
31. Irregular union of fracture with joint stiffness and with shortening of 6 to 9 cm. producing permanent lameness. ......... Gr. 9
32. Irregular union of fracture in a thigh or leg with shortening of 6 to 9 cms. ......... Gr. 10
33. Failure of fracture of both hips to unite. ................................. Gr. 1
34. Failure of fracture of a hip to unite. ...................................... Gr. 3
35. Paralysis of both lower extremities. ....................................... Gr. 1
36. Paralysis of one lower extremity. ........................................... Gr. 3
37. Scar the size of a palm or larger left on an extremity. .............. Gr. 14

NOTE: Any item in the schedule classified under Grade 1 shall be considered or shall constitute total and permanent disability.

## SCHEDULE OF DISABILITY ALLOWANCES

| Impediment Grade | | Impediment | |
|---|---|---|---|
| 1 | US$50,000 | x | 120.00% |
| 2 | * | x | 88.81% |
| 3 | * | x | 78.36% |
| 4 | * | x | 68.66% |
| 5 | * | x | 58.96% |
| 6 | * | x | 50.00% |
| 7 | * | x | 41.80% |
| 8 | * | x | 33.59% |
| 9 | * | x | 26.12% |
| 10 | * | x | 20.15% |
| 11 | * | x | 14.93% |
| 12 | * | x | 10.45% |
| 13 | * | x | 6.72% |
| 14 | * | x | 3.72% |

To be paid in Philippine Currency equivalent at the exchange rate prevailing during the time of payment.

### SECTION 32-A.        OCCUPATIONAL DISEASES

For an occupational disease and the resulting disability or death to be compensable, all of the following conditions must be satisfied:

(1)  The seafarer's work must involve the risks described herein;
(2)  The disease was contracted as a result of the seafarer's exposure to the described risks;
(3)  The disease was contracted within a period of exposure and under such other factors necessary to contract it;
(4)  There was no notorious negligence on the part of the seafarer.

The following diseases are considered as occupational when contracted under working conditions involving the risks described herein:

| OCCUPATIONAL DISEASES | NATURE OF EMPLOYMENT |
|---|---|
| 1. Cancer of the epithelial lining of the bladder. (Papilloma of the bladder) | Work involving exposure to alpha-naphthylamine, beta-naphthylamine or benzidine or any part of the salts; and auramine or magenta |
| 2. Cancer, epithelomatous or ulceration of the skin or of the corneal surface of the eye due to tar, pitch, bitumen, mineral oil or paraffin, or compound product or residue of these substances. | The use or handling of, exposure to tar, pitch, bitumen, mineral oil (including paraffin) soot or any compound product or residue of any of these substances. |
| 3. Deafness | Any industrial operation having excessive noise particularly in the higher frequencies. |
| 4. Decompression sickness (a) Caissons disease (b) Aeroembolism | Any process carried on in compressed or rarefied air. Any process carried on in rarefied air. |
| 5. Dermatitis due to irritants and sensitizers. | The use or handling of chemical agents which are skin irritants and sensitizers. |
| 6. Infection (Brucellosis) | Any occupation involving the handling of contaminated food and drink particularly milk, butter and cheese of infected goats and cows. |
| 7. Ionizing radiation disease, inflammation, ulceration or malignant disease of skin or subcutaneous tissues of the bones or leukemia, or anemia of the aplastic type due to X-rays, ionizing particle radium or radioactive substances. | Exposure to X-rays, ionizing particles of radium or other radioactive substances or other forms of radiant energy. |
| 8. Poisoning and its sequelae caused by: | |
| (a) Ammonia | All work involving exposure to the risk concerned. |
| (b) Arsenic or its toxic compound. | All work involving exposure to the risk concerned. |
| (c) Benzene or its toxic homologues, nitro and aminotoxic derivatives of benzene or its homologue. | All work involving exposure to the risk concerned. |
| (d) Beryllium or its toxic compounds | All work involving exposure to the risk concerned. |
| (e) Brass, zinc or nickel | All work involving exposure to the risk concerned. |
| (f) Carbon dioxide | All work involving exposure to the risk concerned. |
| (g) Carbon bisulfide | All work involving exposure to the risk concerned. |
| (h) Carbon monoxide | All work involving exposure to the risk concerned. |
| (i) Chlorine | All work involving exposure to the risk concerned. |

4

(j)   Chrome or its toxic compounds — All work involving exposure to the risk concerned.
(k)   Dinitrophenol or its homologue — All work involving exposure to the risk concerned.
(l)   Halogen derivatives of hydrocarbon of the aliphatic series — All work involving exposure to the risk concerned.
(m)  Lead or its toxic compounds — All work involving exposure to the risk concerned.
(n)   Manganese or its toxic compounds — All work involving exposure to the risk concerned.
(o)   Mercury or its toxic compounds — All work involving exposure to the risk concerned.
(p)   Nitrous fumes — All work involving exposure to the risk concerned.
(q)   Phosgene — All work involving exposure to the risk concerned.
(r)   Phosphorous or its toxic compounds — All work involving exposure to the risk concerned.
(s)   Sulfur dioxide — All work involving exposure to the risk concerned.

9.  Diseases caused by abnormalities in temperature and humidity.
    (a)  Heat stroke/cramps/exhaustion — to excessive heat or cold.
    (b)  Chilblain/frostbite/freezing — All work involving exposure to the risk concerned.
    (c)  Immersion foot/general hypothermia — All work involving exposure to the risk concerned.

10.  Vascular disturbance in the upper extremities due to continuous vibration from pneumatic tools of power drills, riveting machines or hammers. — Any occupation causing repeated motions, vibrations and pressure of upper extremities.

11.  Cardio-Vascular Diseases. Any of the following conditions must be met:
    a.  If the heart disease was known to have been present during employment, there must be proof that an acute exacerbation was clearly precipitated by the unusual strain by reasons of the nature of his work.
    b.  The strain of work that brings about an acute attack must be sufficient severity and must be followed within 24 hours by the clinical signs of a cardiac insult to constitute causal relationship.
    c.  If a person who was apparently asymptomatic before being subjected to strain at work showed signs and symptoms of cardiac injury during the performance of his work and such symptoms and signs persisted, it is reasonable to claim a causal relationship.

12.  Cerebro-Vascular Accidents.    All of the following conditions must be met:
    a.  There must be a history, which should be proved, or trauma at work (to the head specially) due to unusual and extraordinary physical or mental strain or event, or undue exposure to noxious gases in industry.
    b.  There must be a direct connection between the trauma or exertion in the course of employment and the worker's collapse.
    c.  If the trauma or exertion then and there caused a brain hemorrhage, the injury may be considered as arising from work.

13.  Pneumonia.    All of the following conditions must be met:
    a.  There must be an honest and definite history of wetting and chilling during the course of employment and also, of injury to the crest wall with or without rib fracture, or inhalation of noxious gases, fumes and other deleterious substances in the place of work.
    b.  There must be direct connection between the offending agent or event and the seafarer's illness.
    c.  The signs of consolidation should appear soon (within a few hours) and the symptoms of initial chilling and fever should at least be 24 hours after the injury or exposure.
    d.  The patient must manifest any of the following symptoms within a few days of the accident: (1) severe chill and fever (2) headache and pain, agonizing in character, in the side of the body; (3) short, dry, painful cough with blood-tinged expectoration; and (4) physical signs or consolidation, with fine rales.

14.  Hernia.    All of the following conditions must be met:
    a.  The hernia should be of recent origin.
    b.  Its appearance was accompanied by pain discoloration and evidence of a tearing of the tissues.
    c.  The disease was immediately preceded by undue or severe strain arising out of and in the course of employment.
    d.  A protrusion of mass should appear in the area immediately following the alleged strain.

15.  Bronchial Asthma.    All of the following conditions must be met:
    a.  There is no evidence of history of asthma before employment.
    b.  The allergen is present in the working conditions.
    c.  Sensitivity test to allergens in the working environment should yield positive results.
    d.  A provocative test should show positive results.

16.  Osteoarthritis.
    Any occupation involving: a) joint strain from carrying heavy loads, or unduly heavy physical labor, as among laborers and mechanics; b) minor or major injuries to the joint; c) excessive use or constant strenuous usage of a particular joint, as among sportsmen, particularly those who have engaged in the more active sports activities; d) extreme temperature changes (humidity, heat and cold exposures); and a) faulty work posture or use of vibratory tools.

17.  Peptic Ulcer.
    Any occupation involving prolonged emotional or physical stress, as among professional people, transport workers and the like.

18.  Pulmonary Tuberculosis.
    In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving constant exposure to harmful substances in the working environment, in the form of gases, fumes, vapors and dust, as in chemical and textile factories; overwork or fatigue; and exposure to rapid variations in temperature, high degree of humidity, and bad weather conditions.

19.  Viral Hepatitis.
    In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving exposure to a source of infection through ingestion of water, milk, or other foods contaminated with hepatitis virus; Provided that the physician determining the causal relationship between the employment and the illness should be able to indicate whether the disease of the afflicted worker manifested itself while he was so employed, knowing the incubation period thereof.

20.  Essential Hypertension.
    Hypertension classified as primary or essential is considered compensable if it causes impairment of function of body organs like kidneys, heart, eyes and brain, resulting in permanent disability; Provided, that, the following documents substantiate it: (a) chest x-ray report, (b) ECG report (c) blood chemistry report, (d) funduscopy report, and (f) C-T scan.

21.  Asbestosis.    All of the following conditions must be met:
    a.  The seafarer must have been exposed to Asbestos dust in the work place, as duly certified to by the employer, or by a medical institution, or competent medical practitioner acceptable to or accredited by the System;
    b.  The chest X-ray report of the employee must show findings of asbestos or asbestos-related disease, e.g. pleural plaques, pleural thickening, effusion, neoplasm and interstitial fibrosis; and
    c.  In case of ailment is discovered after the seafarer's retirement/separation from the company, the claim must be filed with the System within three (3) years from discovery.

SECTION 33.    TABLE OF OFFENSES AND CORRESPONDING ADMINISTRATIVE PENALTIES

| OFFENSES | ADMINISTRATIVE PENALTIES | |
|---|---|---|
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| 1. Smuggling or violation of any custom rules and regulations of the Philippines and of foreign ports | | |
| a. smuggling any taxable item. | Dismissal to pay cost | 1st Offense:<br>Minimum - one (1) year suspension from POEA Registry<br>Maximum - two (2) years suspension<br>2nd Offense:<br>Minimum two (2) years and one (1) day suspension<br>Maximum - delisting from POEA Registry |
| b. possession or use of prohibited drugs, narcotics and other contraband | Dismissal | Delisting from POEA registry |
| c. gun-running or possession of explosives and the like | Dismissal | Delisting from POEA registry |
| d. abetting or conniving with others to commit smuggling | Dismissal | Minimum - 2 years suspension<br>Maximum - 3 years suspension |
| e. misdeclaration of or failing to declare articles leading to their seizure and fine to vessel | Dismissal | Minimum - 1 year suspension<br>Maximum - 2 years suspension<br>2nd Offense:<br>Minimum - 2 years and 1 day suspension<br>Maximum - delisting from POEA registry |
| f. misdeclaration of or failing to declare articles leading to their seizure but vessel not implicated | 1st Offense:<br>Reprimand and warning<br>2nd Offense:<br>Dismissal | 1st Offense:<br>Minimum - 2 years and 1 day suspension<br>Maximum - 2 years suspension<br>2nd Offense:<br>Minimum - 2 years and 1 day suspension<br>Maximum - delisting from POEA registry |
| g. possession of pornographic materials leading to its seizure and fine to vessel | Dismissal | Same as 1(e) |
| h. any other violation which will not implicate vessel | 1st Offense:<br>Reprimand and warning<br>2nd Offense:<br>Dismissal | Same as 1(f) |
| i. any other violation which will implicate the vessel | Dismissal | Minimum - 3 years suspension<br>Maximum - delisting from POEA registry |
| 2. Desertion | | |
| a. deserting or attempting to desert | Dismissal and to pay cost | Permanent Delisting from POEA registry |
| b. advising, assisting or persuading another to desert | Dismissal and to pay cost | Minimum - 3 yrs suspension<br>Maximum - Delisting from POEA registry |
| 3. Absence without leave | | |
| a. abandoning post or duty without being properly relieved | Dismissal and to pay cost | 1st Offense:<br>Minimum - 1 year suspension<br>Maximum - 2 years suspension<br>2nd Offense:<br>Minimum - 2 years and 1 day suspension<br>Maximum - delisting from POEA registry<br>Same as 3(a) |
| b. leaving the vessel without permission from responsible officers during working hours | Dismissal and to pay cost | 1st Offense:<br>Minimum - 6 months suspension<br>Maximum - 1 year suspension<br>2nd Offense:<br>Minimum - 1 year and 1 day suspension<br>Maximum - 2 years suspension<br>3rd Offense:<br>Minimum - 2 years and 1 day suspension<br>Maximum - delisting from POEA registry |
| c. entrusting to others assigned duties without authority of department head | At the discretion of Master | |
| d. leaving the vessel without permission | At the discretion of Master | Same as 3(c) |
| 4. Sleeping on post while on duty | Dismissal and to pay cost | Same as 3(a) |
| 5. Insubordination | | |
| a. any act of disobedience to lawful orders of a superior officer | Dismissal and to pay cost | Same as 3(a) |
| b. attempting to assault a superior officer | Dismissal and to pay cost | Same as 3(a) |
| c. assaulting a superior officer/ other persons on business with the ship without the use of deadly weapon | Dismissal and to pay cost | Same as 3(a) |
| d. assaulting a superior officer/ other persons on business with the ship with the use of deadly weapon | Dismissal and to pay cost | Delisting from POEA registry |
| e. behaving with disrespect | Dismissal and to pay cost | 1st Offense: |

5

| OFFENSES | ADMINISTRATIVE PENALTIES | |
| --- | --- | --- |
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| ...towards a superior officer | | Minimum - 6 months suspension / Maximum - 1 year suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - 3 years suspension / 3rd Offense: / Minimum - 3 years and 1 day sus pension / Maximum - delisting from POEA registry |
| f.Insulting a superior officer by words or deed | Dismissal and to pay cost | Same as 5(e) |
| g.Inciting another to commit insubordination | Dismissal and to pay cost | Same as 5(e) |
| 6.Drunkenness a.drunk while on duty | Dismissal and to pay cost | 1st Offense: / Minimum - 2 years suspension / Maximum - 3 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| b.creating trouble on board due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(e) |
| c.failure to perform assigned jobs due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(e) |
| 7.Creating trouble outside the vessel's premises | Same as 6(c) | Same as 6(c) |
| 8.Gambling a.which results in fighting or any incident as to upset the harmonious relationship on board the vessel | Dismissal and to pay cost | 1st Offense: / Minimum - 1 year suspension / Maximum - 2 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| b.any other form of gambling which is not purely recreational | At Master's discretion | Same as 5(e) |
| 9.Violation of company policies and regulations a.pilferage or theft of ship's store or cargo | Dismissal and to pay cost | 1st Offense: / Minimum - 1 year suspension / Maximum - 2 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| b.embezzlement of company funds | Dismissal and to pay cost | Same as 9(a) |
| c.unauthorized disposal of company vessel's properties for personal gain | Dismissal and to pay cost | Same as 9(a) |
| d.any act of dishonesty with intention to defraud the company | Dismissal and to pay cost | Same as 9(a) |
| e.for gross negligence and failure to observe proper storage and cargo handling procedures resulting in delay of vessels and/or damage to cargoes | Dismissal and to pay cost | Same as 9(a) |
| f.failure to observe and comply with regulation and non-baggage shipment and acceptance of parcels on board | At Master's discretion | 1st Offense: / Minimum - 6 months suspension / Maximum - 1 year suspension / 2nd Offense: / Minimum - 1 year and 1 day sus pension / Maximum - 2 years suspension / 3rd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| g.for failure to observe regulations on expiration of shore liberty | 1st Offense: Reprimand and warning Dismissal | Same as 9(f) |
| h.for being left behind by vessel in foreign port without justifiable reason | Dismissal and to pay cost | Same as 9(f) |
| i.for disorderly conduct and/or disrespect towards passengers | Dismissal and to pay cost | 1st Offense: / Minimum - 1 year suspension / Maximum - 2 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| j.for immorality so as to cast aspersion on the good name of the vessel and company | Dismissal and to pay cost | Same as 9(i) |

| OFFENSES | ADMINISTRATIVE PENALTIES | |
| --- | --- | --- |
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| k.for inflicting harm or injury to others | Dismissal and to pay cost | Same as 9(i) |
| 10.Incompetence and inefficiency | Dismissal and to pay cost | 1st Offense: / Minimum - 2 years suspension / Maximum - 3 years suspension / 2nd Offense: / Minimum - 3 years and 1 day sus pension / Maximum - delisting from POEA registry |
| 11.For inciting mutiny, malicious destruction of ship's property at any activity which will hamper the efficient operation of the vessel | Dismissal and to pay cost | 1st Offense: / Minimum - 2 years suspension / Maximum - 3 years suspension / 2nd Offense: / Minimum - 3 years and 1 day sus pension / Maximum - delisting from POEA registry |
| 12.Concerted action to breach approved contracts | Dismissal | 1st Offense: / Minimum - 2 years suspension / Maximum - 3 years suspension / 2nd Offense: / Disqualification from overseas employment |
| 13.Any activity which tends to destroy harmonious relationship of the company | Dismissal and to pay cost | same as 9(i) |
| 14.Grave abuse of authority a.grave abuse of authority (with the use of deadly weapon) resulting in harm or injury to subordinate | Dismissal and to pay cost | Delisting from POEA registry |
| b.grave abuse of authority (without the use of deadly weapon) resulting in harm or injury to subordinate | Dismissal and to pay cost | 1st Offense: / Minimum - 2 years suspension / Maximum - 3 years suspension / 2nd Offense: / Minimum - 3 years and 1 day sus pension / Maximum - delisting from POEA registry |
| c.any other case of abuse authority | At Master's discretion | 1st Offense: / Minimum - 1 year suspension / Maximum - 2 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - 3 years suspension |
| 15.For gross misbehaviour prejudicial to good order and discipline | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | 1st Offense: / Minimum - 1 year suspension / Maximum - 2 years suspension / 2nd Offense: / Minimum - 2 years and 1 day sus pension / Maximum - delisting from POEA registry |
| 16.Causing through neglect, damage loss, spoilage or deterioration of vessel's stocks and property | At Master's discretion | Same as 15(c) |
| 17.Connivance with or coddling of stowaway | Dismissal and to pay cost | Same as 16 |
| 18.For wilfully making false statement, reports, certification or spurious seafarer's documents for personal gain or with intent to mislead or defraud the company | Dismissal and to pay cost | Same as 16 |
| 19.Any other case as to cast aspersion on the good name of the company and vessel | At Master's discretion | Same as 15(c) |
| 20.Violation of safety and environmental rules/regulations | At Master's discretion | Maximum - 1 year suspension / Maximum - 2 years suspension |
| 21.Failure to observe the drug and alcohol policy of the company | Dismissal | Maximum - 1 year suspension / Maximum - 2 years suspension |

*This contract is pursuant to DOLE Department Order No. 4, and POEA Memorandum Circular No. 9, both Series of 2000.

SEAFARER

COPE C. PARAGATOS
EMPLOYER

DATE:

POEA APPROVAL
Department of Labor and Employment
Philippine Overseas Employment Administration
(In-House Contract Processing)
Certified POEA approved Employment Contract
By: DANILO M. BIMBINTAN
...

6

MAR 2 5 2003



**Philippine
Overseas
Employment
Administration**

Republic of the Philippines
Department of Labor & Employment

POEA Bldg. Ortigas Avenue Cor. EDSA, Mandaluyong City
P.O. Box 4061, Manila · Fax # 722-11 to 7221151
Website address: http://www.dgt.com~poea
E-mail address: poea_adm@mozart.com.ph
           poea_vdp@comp.ise.com.ph
Tel. 722-1142 to 99



MEMORANDUM CIRCULAR NO __9__
Series of 2000

TO                    ALL PRINCIPALS/EMPLOYERS, LICENSED MANNING
                      AGENCIES AND FILIPINO SEAFARERS

SUBJECT               AMENDED STANDARD TERMS AND CONDITIONS
                      GOVERNING THE EMPLOYMENT OF FILIPINO
                      SEAFARERS ON BOARD OCEAN-GOING VESSELS

        Pursuant to Department Order No. 4, Series of 2000 the following guidelines on the implementation of the Amended Standard Terms and Conditions Governing the Employment of Filipino Seafarers on Board Ocean-Going Vessels are hereby issued:

1.      The terms and conditions provided therein are the minimum requirements acceptable to the POEA for the employment of Filipino seafarers on board ocean-going vessels. The parties to the contract may therefore improve on the minimum terms and conditions provided such improvements shall be made in writing and appended to the contract of employment. Such improvements in the contract shall have prospective application

2.      Effective 25 June 2000, manning agencies shall use and submit to the POEA the full text of the seafarer's employment contract herein attached including improvements, if any, for approval and processing

3.      Manning agencies are directed to inform and provide copies of the amended standard terms and conditions to all its accredited principals

4.      Every departing seafarer is required to show a copy of the processed and approved employment contract, including its improvements, if any at the POEA's Labor Assistance Center (LAC) at the international airports

5.      Manning agencies are directed to include the discussion of the amended standard terms and conditions governing the employment of Filipino seafarers on board ocean-going vessels in the Pre-Departure Orientation Seminar/Briefing of all its hired seafarers





27/06/00  10:24  FAX 727 7780          POEA-ROCO                              ☑03

All Circulars and issuances inconsistent herewith are hereby repealed and
superseded accordingly.

For strict compliance.

REYNALDO A. REGALADO
Administrator

14 June 2000

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION

### CONTRACT OF EMPLOYMENT

**KNOW ALL MEN BY THESE PRESENTS:**

This Contract, entered into voluntarily by and between:

Name of Seafarer: _____
Address: _____
SIRB No.: _____ SRC No : _____
License No. _____
hereinafter referred to as the Employee

and

Name of Agent: _____
For and behalf of _____
(Principal/Country)

for the following vessel:
Name of Vessel: _____
Official Number: _____ Gross Registered Tonnage (GRT) _____
Flag: _____ Year Built: _____ Classification Society _____
hereinafter referred to as the Employer.

### WITNESSETH

1. That the employee shall be employed on board under the following terms and conditions

    1.1 Duration of Contract: _____
    1.2 Position: _____
    1.3 Basic Monthly Salary: _____
    1.4 Hours of Work: _____
    1.5 Overtime: _____
    1.6 Vacation Leave with Pay: _____
    1.7 Point of Hire: _____

2. The herein terms and conditions in accordance with Department Order No 4 and Memorandum Circular No 9 , both Series of 2000, shall be strictly and faithfully observed

3. Any alterations or changes, in any part of this Contract shall be evaluated verified, processed and approved by the Philippine Overseas Employment Administration (POEA) Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels

4. Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

    IN WITNESS WHEREOF the parties have hereto set their hands this _____ day of _____ 20_____ at _____. Philippines.


_____                    _____
Seafarer                                              For the Employer

Verified and approved by the POEA


_____                    _____
Date                                              Signature of POEA Official

SECTION A

Maura Standard

 

Republic of the Philippines

# DEPARTMENT OF LABOR AND EMPLOYMENT

Intramuros, Manila



## Department Order No. 05
### Series of 2000

In compliance with the upgraded rate arrived at during the 28th Session of the Joint Maritime Commission of the International Labour Organization and after due consultations with industry associations and seafarer unions, the basic salary for Filipino Able Seaman is hereby upgraded under the following guidelines:

1. All shipowners and principals shall pay the Filipino Able Seaman on board ocean-going vessels a minimum basic wage of US$385 per month;

2. The upgraded minimum wage shall apply only to contracts executed by Able Seamen upon the date of effectivity of this Order; and

3. Shipboard employment contracts executed prior to the effectivity of the wage increase shall remain valid and unaffected by this Order until their expiration or termination.

This Order shall take effect on 01 July 2000.

For compliance.

BIENVENIDO E. LAGUESMA
Secretary

31 May 2000

## Department Order No. 04
### Series of 2000

In view of recent developments in the international maritime industry affecting the recruitment and employment of Filipino seafarers on ocean-going vessels and cognizant of the Department's objective of ensuring the continued employment of our seafarers and maintaining the Philippine global comparative advantage in shipmanning, the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels is hereby amended reflecting the consensus of all stakeholders as determined through the several tripartite consultations conducted by the Philippine Overseas Employment Administration.

The Philippine Overseas Employment Administration (POEA) shall formulate the guidelines for the implementation of the amended contract, a copy of which is hereto attached.

The amended rules shall take effect fifteen (15) days from date of publication in a newspaper of general circulation.

All Orders and issuances inconsistent herewith are hereby repealed and superseded accordingly.

For strict compliance.

BIENVENIDO E. LAGUESMA
Secretary

31 May 2000

ANNEX A

5. To conduct himself in an orderly and respectful manner towards passengers and shippers stevedores, port authorities and other persons on official business with the ship.

## SECTION 2. COMMENCEMENT/DURATION OF CONTRACT

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.

B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to the mutual consent of both parties.

## SECTION 3. FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION

The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed at the expense of the employer.

## SECTION 4. BAGGAGE ALLOWANCE

The seafarer traveling by air to join a vessel or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines. The cost of the excess baggage shall be for the account of the seafarer.

## SECTION 5. HYGIENE AND VACCINATION

A. The seafarer shall keep his quarters and other living spaces such as messrooms, toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master. The work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.

B. The seafarer shall submit to the order of the master at to the laws of any country within the territorial jurisdiction of which the vessel may enter to have such vaccination or inoculation or to undertake measures safeguarding his health and of the whole crew.

## SECTION 6. WAGES

The seafarer shall be paid his monthly wages not later than 15 days of the succeeding month from the date of commencement of the contract until the date of arrival at point of hire upon termination of his employment pursuant to Section 18 of this Contract.

## SECTION 7. PAYMENT ON BOARD

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment. Advances shall be at the master's/employer's discretion and in accordance with this foregoing conditions.

## SECTION 8. ALLOTMENTS AND REMITTANCES

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank. The master/employer/agency shall provide the seafarer with facilities to do so at no expense to the seafarer. The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary including backwages, if any.

B. The master/employer/agency may also provide facilities for the seafarer

D. Emergency Duty - No overtime work shall be performed in case of emergency affecting the passenger, crew or cargo, of which the master or for fire, boat, or emergency drill or work related to other vessels or persons in immediate pe

## SECTION 12. LEAVE PAY

The seafarer's leave pay shall be in accordance leave per month as agreed upon. Days leave a and a half (2-1/2) days for each month of servic pay shall be settled onboard or settled within two seafarer at the point of hire.

## SECTION 13. SHORE LEAVE

The seafarer shall be allowed shore leave whe consent of the master or his deputy, taking into tions and safety of the vessel.

## SECTION 14. VICTUALLING, VESSEL STORE

A. The seafarer shall be provided by the mast tence consistent with good maritime standa on board the vessel.

B. All stores and provisions issued to the seafa consumption on board the vessel and any stores or provisions shall remain the prope seafarer shall not take ashore, sell, destroy and provisions.

## SECTION 15. TRANSFER CLAUSE

The seafarer agrees to be transferred at any po operated, manned or managed by the same accredited to the same manning agent and prov tion of the seafarer and the rate of his wages a no way inferior and the total period of employm originally agreed upon.

Any form of transfer shall be documented an necessary.

## SECTION 16. GRIEVANCE MACHINERY

A. If the seafarer considers himself aggrieved plaint in accordance with the following proc

1. The seafarer shall first approach the ho which he is assigned to explain his gri

   a. In the Deck, Radio and Catering De Chiefmate.

   b. In the Engine Department, the head

   c. In the Catering and/or Hotel Depart the head is the Chief Steward and/c

2. The seafarer shall make his grievanc derly manner and shall choose a tim grievance can be properly heard.

3. The Department head shall deal with and where solution is not possible at his

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI- DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:   0 3 - 1 2 8 8 4   CA 2 5

RIZALYN BAUTISTA, Individually and as
Personal Representative of the Estate of
MARI-JOHN BAUTISTA, and all those
claiming by and through her,

       Plaintiff,

v.

STAR CRUISES and NORWEGIAN CRUISE
LINES, LTD.

       Defendants.

_____/



ORIGINAL
FILED
JUN 0 2 2003
HARVEY RUVIN
CLERK

## SEAMAN'S COMPLAINT AND PROFFER OF EVIDENCE
## FOR PUNITIVE DAMAGES

The Plaintiff sues the Defendants and alleges:

1.      This is a seaman's action seeking compensatory damages Five Million Dollars and punitive damages in excess of One Billion Dollars.

2.      The Plaintiff is the Personal Representative and widow of MARI-JOHN BAUTISTA, deceased. She files this claim for herself, the Estate of MARI-JOHN BAUTISTA, and their minor child.

3.      The Defendant, Star Cruises, is a Malaysian company, which is the owner in fact of the vessel and the owner, parent and controlling entity of the subsidiary company, Norwegian Cruise Lines, Ltd.

EXHIBIT

4.    Norwegian Cruise Lines, Ltd. has its base of operations in Miami, Florida. Most passengers are Americans. The embarkation and debarkation port is Miami, Florida.

5.    The vessel SS Norway has a phony flag-of-convenience registration in Bermuda; the purpose of which is to avoid U.S. income taxes, and to avoid more strict safety regulations, which would be imposed if the vessel flew a U.S. flag.

6.    DATE OF ACCIDENT:    May 25, 2003.

7.    PLACE OF ACCIDENT:    Port of Miami

8.    VESSEL:    SS Norway

9.    FACTS OF ACCIDENT:    a)    MARI-JOHN BAUTISTA was working on the scope and course of his duties as a seaman on board the vessel Norway when a gigantic explosion from the ship's boiler tore apart the boiler room and all of the structures nearby, spewing superheated steam everywhere, knocking down walls and doors of the ship and killing MARI-JOHN BAUTISTA. The blast was so great that a hole was knocked in the side of the ship and some crew were blown out into the water.

b)    The SS Norway is an ancient dangerous vessel with a long history of safety problems, which should have been sent to the scrap yard years ago.

c)    The SS Norway and its equipment is over 41 years old. It is one of the only cruise ships, if not the only one, entering United States Ports and carrying United States passengers, which uses superheated steam for propulsion. Most cruise ships today, and indeed most naval vessels and cargo ships, long ago stopped using superheated steam, and instead use safer, more reliable diesel propulsion. Superheated steam under pressure can reach temperatures of 800-900° Fahrenheit.

d)     The Norway, which was formally the SS France, has a history of dangerous engine room failures, mechanical failures, and fires, dating back to 1981 and 1982.  In 2001 a broken sprinkler system was so severe that Norwegian Cruise lines was denied permission to carry passengers in and out of U.S. ports.  The United States Coastguard barred the Norway from leaving Miami because of improper repairs.  These improper repairs were welds which were made with sodering material, which would melt under the heat of a fire (the Norway had several previous fires) and then cause the sprinkler system to lose pressure endangering all aboard.  In approximately 1979, there was an electrical failure in which the Norway sat dead in the water for over a day.

e)     In September 2001, the Norway left Miami to sail from other parts of the world, in part because of the abominable safety records and the difficulty in passing safety standards.  The Defendants, however, disregarding the history of safety problems, brought it back to sail out of Miami purely for economic reasons, in order to make more money, despite the fact that they knew, or should have known if its propensity for disasters because of the unsafe superheated steam system.

f)     On or about February 14, 1997, the SS Norway's superheated steam scalded engine worker Marek Czerniak, due to totally inadequate maintenance of the system by an inadequate crew, a poorly supervised crew and ill trained polyglot crew of various nationalities who failed to understand the Norwegian engine room bosses.

g)     This ship has had repeated break downs, failures and safety violations, not only because the superheated steam is dangerous and the system is old, but it is improperly maintained and supervised.  As a result of many accidents, injuries, and breakdowns, the Defendants knew that their ancient vessel was dangerous because they used superheated steam not only to propel the vessel, but all of its various equipments.  The Defendants knew or should have known that an

accident was likely to happen because of the superheated steam, which under pressure is so hot and so dangerous that continuing to use this type of vessel for the express purpose of making more money, constitutes a reckless abandon for not only the life, but the welfare and health of U.S. passengers as well as the crew.

h)     As a result of Defendants' negligence, MARI-JOHN BAUTISTA suffered catastrophic injuries and burns throughout his body that resulted in his demise. He also suffered pre-death pain and suffering.

i)     As a result of Defendant's negligence, MARI-JOHN BAUTISTA, has left a wife and their minor child without means of support, his services, or companionship and guidance.

10.    Defendants, at all times material hereto, personally or through an agent:

    a.   Operated, conducted, engaged in, or carried on a business venture in this state and/or county or had an office or agency in this state and/or county.

    b.   Were engaged in substantial activity within this state.

    c.   Operated vessels in the waters of this state.

    d.   Committed one or more of the acts stated in Florida Statutes, Section 48.081, 48.181 or 48.193.

    e.   The acts of Defendants set out in this Complaint occurred in whole or in part in this county and/or state.

11.    Defendants are subject to the jurisdiction of the Courts of this state.

12.    The causes of action asserted in this Complaint arise under the Jones Act, 46 U.S.C., Section 688, and the General Maritime Law of the United States.

13.    The vessel was in navigable waters at all times material hereto.

14.    At all times material hereto, the vessel was owned, operated, managed, maintained and/or controlled by Defendants.

15.    On or about the above date, Plaintiff was employed as a seaman and a member of the vessel's crew by Defendants.

## COUNT I
## JONES ACT NEGLIGENCE

Plaintiff readopts and realleges paragraphs 1 through 15 as if stated herein verbatim and further alleges:

16.    It was the duty of Defendant to provide the Plaintiff with a safe place to work.

17.    On or about the above date, Plaintiff was injured due to the fault and negligence of Defendant and/or its agents, servants and/or employees as follows:

a.    Failure to use reasonable care to provide and maintain a safe place to work for Plaintiff, fit with proper and adequate machinery, crew and equipment;

b.    Failure to use reasonable care to provide Plaintiff a safe place to work;

c.    Failure to promulgate and enforce reasonable rules and regulations to insure the safety and health of the employees and more particularly the Plaintiff, while engaged in the course of his employment on said vessel;

d.    Failure to use reasonable care to provide Plaintiff with a safe place to work, having inadequate and inexperienced crew performing the task that was being performed at the time of the accident, and otherwise failing to use reasonable care to maintain the work place in a safe condition.

e.    Failure to use reasonable care to make reasonable and periodic inspections of said vessel and its equipment.

f.    Failure to provide adequate training, instruction and supervision to crew members and Plaintiff.

g.    Failure to provide prompt, proper and adequate medical care which aggravated Plaintiff's injuries and caused him additional pain and disability;

h.    Failure to provide Plaintiff and other crewmembers reasonable hours of employment so as to not overwork them to the point of not being physically fit to carry out their duties;

i.   Failure to ascertain the cause of prior similar accidents so as to take measures to prevent their reoccurrence and more particularly Plaintiff's accident.

j.   Failure to follow sound management practices with the goal of providing Plaintiff a safe place to work. Prior to Plaintiff's accident, Defendant failed to investigate the hazards to Plaintiff and then take the necessary steps to eliminate the hazards, minimize the hazard or warn the Plaintiff of the danger from the hazard.

19.   Defendant knew of the foregoing conditions causing Plaintiff's accident and did not correct them, or the conditions existed for a sufficient length of time so that Defendant in the exercise of reasonable care should have learned of them and corrected them.

20.   As a result of the negligence of Defendant, the Plaintiff was catastrophically injured about his body and extremities and died.

WHEREFORE, Plaintiff sues Defendant, for compensatory damages in the amount of $5,000,000 and punitive damages in the amount of 1,000,000,000, pre-judgment interest, and demands a trial by jury of all issues so triable.

## COUNT II
## UNSEAWORTHINESS

Plaintiff readopts and realleges paragraphs 1 through 15 as if stated herein verbatim and further alleges:

21.   On or about the previously stated date, Plaintiff was a seaman and a member of the crew of Defendant's vessel which was in navigable waters.

22.   At all times material hereto, the vessel was owned, managed, operated and/or controlled by Defendant.

23.   Defendant had the absolute nondelegable duty to provide Plaintiff with a seaworthy vessel.

24.   On or about the previously stated date, the unseaworthiness of Defendant's vessel was a legal cause of death to MARI-JOHN BAUTISTA, by reason of the following:

a.   The vessel was unsafe and unfit due to the conditions created by Defendant's conduct stated in paragraph 13;

b.   The vessel was not reasonably fit for its intended purpose;

c.   The vessel's crew was not properly trained, instructed or supervised;

d.   The vessel did not have a fit crew;

e.   The vessel did not have adequate manpower for the tasks being performed;

f.   The crew and Plaintiff were overworked to the point of being exhausted and not physically fit to carry out their duties.

25.   As a result of the unseaworthiness of the vessel, MARI-JOHN BAUTISTA was killed and his wife and minor child have been left without any means of support, the loss of his guidance, advice and companionship.

WHEREFORE, Plaintiff sues Defendant for compensatory damages in the amount of $5,000,000 and punitive damages in the amount of 1,000,000,000 and demands a trial by jury of all issues so triable.

THE HUGGETT LAWFIRM
Attorneys for Plaintiff
66 West Flagler Street
Suite 400, Concord Building
Miami, Florida 33130
(305) 371-1821

By: _____
William Huggett (FBN 094604)
Jerrold K. Wingate (FBN 928800)

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. No. 03-12884 CA 25

RIZALYN BAUTISTA, Individually and
as Personal Representative of the Estate
of MARI-JOHN BAUTISTA, and all
those claiming by and through her,

     Plaintiff,

vs.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

     Defendants.

_____/

## MOTION TO DISMISS DEFENDANT NORWEGIAN CRUISE LINES, LTD.

Defendant Norwegian Cruise Lines, Ltd., ("NCL"), by and through its undersigned counsel and pursuant to Florida Rule of Civil Procedure 1.140(b), responds to Plaintiff's Complaint, stating as follows:

1. In or about May, 2003, Mari-John Bautista ("Bautista"), a Philippine citizen and resident, died while working as a seaman on board a vessel owned by NCL.

2. Bautista's employment with NCL was governed by the terms of a standard Philippine Overseas Employment Administration (POEA) Contract of Employment (the "Contract"), attached as Exhibit "A," which provides for compulsory arbitration of any dispute arising thereunder in the Philippines.

3. The Contract constitutes an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), and

accordingly this suit is an action over which the United States District Court has original jurisdiction under the provision of 9 U.S.C. § 202 et. seq., and one that may be removed to federal court under the provisions of 9 U.S.C. § 205, in that it is an action arising under the laws of the United States and relating to an arbitration agreement falling under the Convention.[1]

4.  This Court lacks subject matter jurisdiction over this action by virtue of a valid forum selection clause in the Contract which has been given the effect of law by the government of the Philippines.  In accordance with the act of state doctrine and principles of international comity, Plaintiff's exclusive forum is in the Philippine Islands.

5.  This Court lacks personal jurisdiction over NCL by virtue of a valid forum selection clause in the Contract.

6.  This action has been filed in an improper venue by virtue of a valid forum selection clause in the Contract.

7.  This action should be dismissed under the doctrine of *forum non conveniens* in that it has been filed in an inconvenient venue.

8.  Plaintiff's claim as "personal representative" must be dismissed as Plaintiff fails to allege that she is the court-approved executor or administrator of the decedent's estate.  See, Briggs v. Walker, 171 U.S. 466, 472-73 (defining "personal representative" as the court-approved executor or administrator of decedent's estate").

---

[1]  Concurrent with the filing of this Motion, NCL has filed a Notice of Removal of this matter in the U.S. District Court for the Southern District of Florida.

2

**Mase & Gassenheimer, P.A.**
**80 Southwest Eighth Street, Suite 2700, Miami, Florida 33130 - (305) 377-3770**

CASE NO. No. 03-12884 CA 25

9.  Plaintiff's claims on behalf of the decedent's estate under the Jones Act must be dismissed because the Jones Act does not permit the personal representative to sue for the benefit of the estate of the deceased nor does any amount recovered or received become an asset of the deceased's estate, but instead the representative holds the amount of recovery in the nature of a trustee for the benefit of those persons upon whose behalf the statute authorizes recovery.  Chicago, Burlington & Quincy R.R. Co. v. Wells-Dickey Trust Co., 275 U.S. 161 (1927).

10. To the extent that it seeks punitive damages and/or other non-pecuniary damages, Plaintiff's claim must be dismissed as non-pecuniary damages are not permitted under the General Maritime Law.  Miles v. Apex Marine Corp., 498 U.S. 19 (1990).

11. In addition, Plaintiff's claim for punitive damages must be dismissed as Plaintiff has failed to make the required evidentiary showing to permit such a claim.   See, Norwegian Cruise Lines, Ltd., v. Zareno, 712 So.2d 791 (Fla. 3d DA 1998); Fla. Stat. §768.72 (requiring a proffer at the complaint stage to demonstrate a reasonable basis for punitive damages).

CASE NO. No. 03-12884 CA 25

WHEREFORE, Defendant Norwegian Cruise Line, Ltd. respectfully requests this Court to dismiss Plaintiff's Complaint.

Respectfully submitted,

MASE & GASSENHEIMER, P.A.
Attorneys for Defendant
80 Southwest Eighth Street, Suite 2700
Miami, Florida 33130
Telephone No.: (305) 377-3770
Telefax No.: (305) 377-0080

By _____
CURTIS J. MASE
Florida Bar No. 478083
RACHEL S. COHEN
Florida Bar No. 0036810

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by U.S. mail on this 17 day of June, 2003, to **William Huggett, Esq.,** Attorney for Plaintiff, The Huggett Lawfirm, 66 West Flagler Street, Suite 400, Miami, Florida 33130.

_____
RACHEL S. COHEN

RSC/16438/144423

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION
CONTRACT OF EMPLOYMENT

KNOWN ALL MEN BY THESE PRESENTS:

This Contract, entered into voluntarily by and between:

Name of Seafarer :   BAUTISTA, MARI JOHN Y UMATAN

Address :   96-C MARYLAND ST CUBAO QUEZON CITY

SIRB No. :   A606811                    SRC No. :   0057773-93

License No. :

hereinafter referred to as the Employee, and

Name of Agent :   C.F. SHARP CREW MANAGEMENT, INC.
Name of Agent :   CASA ROCHA 290-292 GENERAL LUNA ST. INTRAMUROS, MANILA
For and in behalf of                    NORWEGIAN CRUISE LINE
                                        (Principal/Country)

for the following vessel.

Name of Vessel :   S/S NORWAY

Official No. :                    Gross Registered Tonnage (GRT) :   76049

Flag :                    Year Built :   1962        Classification Society :   218762 BV

hereinafter referred to as the Employer

WITNESSETH

1   That the employee shall be employed onboard under the following terms and conditions
      1.1 Duration of Contract                    10.00  months
      1.2 Position                    1ST ASST REF ENGINEER
      1.3 Basic Monthly Salary          $        558.00  per month
      1.4 Hours of Work                    8 hours/day MONDAYS TO FRIDAYS INCLUSIVE
      1.5 Overtime Rate                 $          4.03  per hour Weekdays +
                                                   4.84  per hour Saturdays, Sundays and Public Holidays
      1.6 Guaranteed OT                 $        470.00  per month after 103 hours
      1.7 Leave Subsistence             $        156.00  per month
      1.8 POINT OF HIRE                    MANILA
      1.9 Other Agreement                  Subject to Random Alcohol or Drug Test

2.   The herein terms and conditions in accordance with Department Order No. 4 and Memorandum Circular No. 09, both Series of 2000, shall be strictly and faithfully observed

3   Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed, and approved by the Philippine Overseas Employment Administration (POEA).  Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going

4   Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this  28 of August 2002  at Manila, Philippines.

BAUTISTA, MARI JOHN Y UMAT...                EXHIBIT                Dept. of Labor and Employment
Seafarer                                        A 4             Philippine Overseas Employment Administration
                                                                (POEA Contract Processing)

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. No. 03-12884 CA 25

RIZALYN BAUTISTA, Individually and
as Personal Representative of the Estate
of MARI-JOHN BAUTISTA, and all
those claiming by and through her,

       Plaintiff,

vs.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

       Defendants.

_____/

## DEFENDANT STAR CRUISES LIMITED'S MOTION TO DISMISS

Star Cruises Limited,[1] by and through the undersigned counsel, hereby moves this court for an order dismissing it as a party defendant, and in support states as follows.

## UNDISPUTED FACTS

1.   The Plaintiff in this action is a Philippine citizen and an employee of Defendant, Norwegian Cruise Line, Limited ("NCL"), a co-defendant in this action. This lawsuit arises from an explosion aboard the S/S *Norway*, a ship owned by NCL.

---

[1]  Star Cruises Limited serves this motion in response to plaintiff's complaint. By serving this motion, Star Cruises Limited does not waive but instead expressly preserves any defenses inuring to its benefit on the basis that the named defendant does not exist, and likewise did not exist on the date alleged by the plaintiff to be the date of his alleged accident. In addition, Defendant Star Cruises Limited does not waive its right to right to contest jurisdiction by the filing of this motion.

MASE & GASSENHEIMER, P.A.
80 SW Eighth Street, Suite 2700, Miami, Florida 33130 (305) 377-3770

2.  NCL is a wholly-owned Bermuda-based subsidiary of Arrasas Limited, whose country of incorporation is the Isle of Man.

3.  Arrasas Limited is a wholly-owned subsidiary of Star Cruises Limited.

4.  Plaintiff has named "Star Cruises" and NCL as Defendants in the Complaint.

5.  There is no known entity which is known as "Star Cruises." "Star Cruises" is not a legal entity.  It is only a trade name.

6.  While Star Cruises Limited exists, it is a Bermudan company whose sole activity is investment holding.

7.  Star Cruises Limited does not own or operate cruise ships.

8.  Star Cruises Limited does not employ crewmembers.

9.  Star Cruises Limited does not conduct business in the State of Florida.

10. Star Cruises Limited does not have a registered agent in the State of Florida.

11. The complaint was served on Curtis J. Mase, Esq. He is not the registered agent for Star Cruises Limited.

12. Thus Star Cruises Limited moves to dismiss the complaint on the following grounds 1) improper service; 2) it is an improper party 3) lack of personal jursidction.

2

## MEMORANDUM OF LAW

### A. The Complaint be Dismissed because Defendant Star Cruises Limited was improperly served

This court must dismiss the complaint on account of improper service.  As a foreign

corporation Star Cruises Limited must be served pursuant to Fla. Stat. 48. 081:  It provides:

> (1)    Process against any private corporation, domestic or foreign, may be served:
>
> (a) On the president or vice president, or other head of the corporation;
>
> (b) In the absence of any person described in paragraph (a), on the cashier, treasurer, secretary, or general manager;
>
> (c) In the absence of any person described in paragraph (a) or paragraph (b), on any director; or
>
> (d) In the absence of any person described in paragraph (a), paragraph (b), or paragraph  (c) on any officer or business agent residing in the state.
>
> (2)    If a foreign corporation has none of the foregoing officers or agents in this state, service may be made on any agent transacting business for it in this state.
>
> (3)    As an alternative to all of the foregoing, process may be served on the agent designated by the corporation under s. 48.091. However, if service cannot be made on a registered agent because of failure to comply with s. 48.091, service of process shall be permitted on any employee at the corporation's place of business.
>
> (4)    This section does not apply to service of process on insurance companies.
>
> (5)    When a corporation engages in substantial and not isolated activities within this state, or has a business office within the state and is actually engaged in the transaction of business therefrom, service upon any officer or business agent while on corporate business within this state may personally be made, pursuant to this section, and it is not necessary in such case that the action, suit, or proceeding against

3

the corporation shall have arisen out of any transaction or operation connected with or incidental to the business being transacted within the state.

In the instant case, the complaint was served upon Curtis Mase, Esq., who is the registered agent for NCL, not Star Cruises Limited. Since, Mr. Mase has no relationship to Star Cruises Limited, such service is improper and the complaint must be dismissed.

**B. Plaintiff's Claims against Defendant Star Cruises Limited Must Be Dismissed as Star Cruises Limited was neither the owner of a vessel nor the Plaintiff's employer at the time of the alleged accident**

In the instant matter, the Plaintiff has improperly named Star Cruises as a party to the lawsuit. Star Cruises Limited is a Bermudan company whose principal activity is investment holding. It does not own or operate cruise vessels, nor does it employ any crewmembers. [Affidavit of Colin Veitch, attached hereto as Exhibit "A."]

Because Star Cruises Limited was not, and indeed could not have been, Plaintiff's employer or the owner of a vessel, it is entirely improper for the Plaintiff to maintain his claims for Jones Act Negligence and Unseaworthiness, premised as they are on allegations that Star Cruises Limited was the employer and/or the owner of a vessel. Because Star Cruises Limited neither employed the Plaintiff nor owned any vessel, it did not and could not commit any of the allegations contained in the Complaint. Accordingly, Star Cruises Limited is entitled to an order dismissing it as a party in this lawsuit.

MASE & GASSENHEIMER, P.A.
80 SW Eighth Street, Suite 2700, Miami, Florida 33130 (305) 377-3770

### C. The Complaint Must be Dismissed because there is no personal jurisdiction over Star Cruises Limited

Florida's long arm statute restricts jurisdiction over non-residents to specifically enumerated instances. Under Florida law, the plaintiff bears the burden of proving personal jurisdiction: "When a defendant raises through affidavits, documents or testimony a meritorious challenge to personal jurisdiction, the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." Jet Charter Serv. Inc. v. Koeck, 907 F. 2d 1110, 1112 (11th Cir. 1990). Florida's long-arm statute, Fla.Stat. ch. 48.193 (1993), provides in relevant part:

> (1)     Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
>> (a)          Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state....[2]

Star Cruises Limited does not conduct business in the State of Florida and does not have a registered agent in the State of Florida. Accordingly, there can be no personal jurisdiction on that basis.

---

[2]   The long-arm statute also provides, in section (f), that jurisdiction can exist where the defendant has committed an act or omission outside the state which has caused injury. This is not applicable to the instant case. Star Cruises Limited does not own or operate cruise ships and Star Cruises Limited does not employ crew members; accordingly, it can not have committed any act or omission which led to the boiler explosion aboard a vessel which caused injury to crewmembers.

MASE & GASSENHEIMER, P.A.
80 SW Eighth Street, Suite 2700, Miami, Florida  33130 (305) 377-3770

CASE NO. No. 03-12884 CA 25

WHEREFORE, Defendant Star Cruises Limited moves this Court for an order

dismissing the complaint with prejudice and/or striking it as a party defendant.

Respectfully submitted,

MASE & GASSENHEIMER, P.A.
Attorneys for Defendant
80 Southwest Eighth Street, Suite 2700
Miami, Florida 33131
Tel: (305) 377-3770
Fax: (305) 377-0080

By _____
CURTIS J. MASE
Florida Bar No. 478083
RACHEL S. COHEN
Florida Bar No. 0036810

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was

furnished by U.S. mail on this 17 day of June, 2003, to **William Huggett, Esq.,**

Attorney for Plaintiff, The Huggett Lawfirm, 66 West Flagler Street, Suite 400, Miami,

Florida 33130.

By _____
RACHEL S. COHEN

RSC/16438/#144814

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. No. 03-12884 CA 25

RIZALYN BAUTISTA, Individually and
as Personal Representative of the Estate
of MARI-JOHN BAUTISTA, and all
those claiming by and through her,

      Plaintiff,

vs.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

      Defendants.

_____/

## AFFIDAVIT OF COLIN VEITCH

STATE OF FLORIDA     )
                     ) ss.:
COUNTY OF MIAMI-DADE)

    Colin Veitch, being duly sworn, says:

    1.    I am Colin Veitch, President of Norwegian Cruise Line Limited ("NCL"),

a Bermuda company with its principal offices in Miami.  I also sit on the Board of

Directors at Star Cruises Limited.

    2.    I submit this affidavit  based on my personal knowledge of the two

entities.

    3.    Plaintiff has named "Star Cruises" and Norwegian Cruise Line Limited

(NCL) as Defendants in the Complaint in the above-styled action.



EXHIBIT

A

4.      There is no known entity which is known as Star Cruises. "Star Cruises" is not a legal entity. It is only a trade name.

5.      While Star Cruises Limited exists, it is a Bermudan company whose sole activity is investment holding.

6.      Star Cruises Limited does not own or operate cruise ships.

7.      Star Cruises Limited does not employ crew members.

8.      Star Cruises Limited does not conduct business in the State of Florida.

9.      Star Cruises Limited does not have a registered agent in the State of Florida.

10.     NCL is a wholly-owned Bermuda based subsidiary of Arrasas Limited, whose country of incorporation is the Isle of Man.

11.     Arrasas Limited is a wholly-owned subsidiary of Star Cruises Limited. NCL and Star Cruises Limited have always been and still are legally and financially separate and independent entities.

12.     Star Cruises Limited does not control and never has controlled the conduct of NCL's business.

13.     Star Cruises Limited has never provided any management services to NCL.

_____
                AFFIANT

SUBSCRIBED AND SWORN TO before me this _16_ day of _June_, 2003 by _Colin Veitch_ (to me known) (who produced _____ as

2

identification), and who did take an oath.



_____
Notary Public, State of Florida

My Commission Expires:

RSC/ps/16438/#144662

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

**03 - 21642**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CIV-SEITZ**

## I. (a) PLAINTIFFS

RIZALYN BAUTISTA, Individually and as Personal Representative of the Estate of MARI-JOHN BAUTISTA, and all those claiming by and through her,

## DEFENDANTS

Star Cruises and Norwegian Cruise Lines, Ltd.

**MAGISTRATE JUDGE
BANDSTRA**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

Dade  08- 21642-cv seitz | Bardstra

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William Huggett, Esq.
(305) 371-1821

ATTORNEYS (IF KNOWN)
Rachel S. Cohen, Esq.
Mase & Gassenheimer, P.A.
(305) 377-3770

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION     (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☑ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT     (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☑ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | B☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | A☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION     (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

LENGTH OF TRIAL
via ____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY     (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   X 6/17/03

SIGNATURE OF ATTORNEY OF RECORD   X

$150.00 884530

00/1/03

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____