NIGHT BOX
FILED 1

SEP 2 2 2003

11:15:54

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2          MIAMI DIVISION

3

     RIZALYN BAUTISTA,      CASE NO.: 03-21642-CIV-SEITZ/BANDSTRA
4    etc., et al.
     PAUL PERALTA,          CASE NO.: 03-21643-CIV-SEITZ/BANDSTRA
5    RAYMOND LOVINO,        CASE NO.: 03-21644-CIV-SEITZ/BANDSTRA
     RONALDO MARCELINO,     CASE NO.: 03-21645-CIV-SEITZ/BANDSTRA
6    ROLANDO TEJERO,        CASE NO.: 03-21646-CIV-SEITZ/BANDSTRA
     ABDI COMEDIA,          CASE NO.: 03-21647-CIV-SEITZ/BANDSTRA
7    CRISTINA L. VALENZUELA, CASE NO.: 03-21648-CIV-SEITZ/BANDSTRA
     etc., et al.,
8    MARILEN S. BERNAL,     CASE NO.: 03-21649-CIV-SEITZ/BANDSTRA
     etc., et al.,
9    WILLY I. VILLANUEVA,   CASE NO.: 03-21650-CIV-SEITZ/BANDSTRA
     etc., et al.
10   MARIA GRACIA L. ROSA,  CASE NO.: 03-21651-CIV-SEITZ/BANDSTRA
     etc., et al.,
11
                   Plaintiff(s),
12
     vs.
13
     NORWEGIAN CRUISE LINE, LTD.,          **ORIGINAL**
14   and STAR CRUISES,

15             Defendant(s).

16

17

18             200 South Biscayne Boulevard
               Miami, Florida
19             September 11, 2003
               Thursday, 11:20 a.m.

20

21      VIDEOTAPED DEPOSITION OF KJELL HJARTNES

22

23          Taken before Jan E. Reyna, Registered Professional
     Reporter and Notary Public in and for the State of Florida at
24   Large, pursuant to Notice of Taking Deposition filed in the
     above cause.
                        -   -   -

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

2

```
 1  APPEARANCES:

 2       THE HUGGETT LAWFIRM,
         By:  WILLIAM HUGGETT, ESQUIRE,
 3       66 West Flagler Street, Suite 400
         Miami, Florida  33130
 4       Appearing on behalf of the Plaintiff(s).

 5       MASE & GASSENHEIMER, P.A.,
         By:  CURTIS MASE, ESQUIRE,
 6       80 Southwest 8th Street, Suite 2700
         Miami, Florida  33131
 7       Appearing on behalf of the Defendant(s).

 8  ALSO PRESENT:

 9       TODD COHEN, Videographer,
         Video for the Legal Profession

10

11              I N D E X

12  KJELL HJARTNES                          Page

13

14   DIRECT EXAMINATION                      6
     BY MR. HUGGETT
15

16

17

18              E X H I B I T S

19

20  Plaintiff's Composite Exhibit No. 1

21

22

23

24

25
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

```
 1   THEREUPON:
 2              (The following proceedings were had:)        11:20:56
 3        MR. MASE:  On the record.                          11:20:57
 4        At 3:30 p.m. yesterday afternoon, or               11:20:59
 5   thereabouts -- I'll have to actually get a copy         11:21:03
 6   of the amended notice -- we received a revised          11:21:05
 7   notice of taking deposition indicating this             11:21:08
 8   deposition was going to be videoed, or                  11:21:10
 9   videotaped.                                             11:21:13
10        First, the defendant objects -- the                11:21:17
11   defendants object to the videotaping of this            11:21:21
12   deposition on the basis that it was not noticed         11:21:25
13   as a videotaped deposition.                             11:21:27
14        The amended notice was not timely, violates        11:21:30
15   the Federal Rules of Civil Procedure, and does          11:21:33
16   not provide reasonable or adequate notice to the        11:21:37
17   defendants of an intent to videotape.  While the        11:21:39
18   federal rules do provide for audio and video            11:21:43
19   recordation, they also mandate reasonable notice        11:21:47
20   in order preserve parties' due process rights.          11:21:50
21        The witness, though dressed in a shirt and         11:21:52
22   tie, would have dressed otherwise.  Presentation        11:21:55
23   is critical in a video.  I, as a lawyer, would          11:21:5
24   have prepared the witness otherwise, because            11:22
25   videotape testimony is more akin to live                11:
```

|   |   |   |
|---|---|---|
| 1 | testimony. | 11:22:03 |
| 2 | Therefore, I believe the due process rights | 11:22:06 |
| 3 | of the defendants have not been protected.  I do | 11:22:09 |
| 4 | not believe the videotape should be permitted. | 11:22:12 |
| 5 | I do not believe it should be useable in any | 11:22:14 |
| 6 | context, and I object. | 11:22:16 |
| 7 | MR. HUGGETT:  Do you want me to swap my | 11:22:19 |
| 8 | shirt with his? | 11:22:21 |
| 9 | THE WITNESS:  Mine's nicer. | 11:22:23 |
| 10 | MR. HUGGETT:  Well, then you'll be very | 11:22:25 |
| 11 | fine.  I think everbody will like your clothes. | 11:22:27 |
| 12 | MR. MASE:  Let me add one thing. | 11:22:27 |
| 13 | Pursuant to the Federal Rules of Civil | 11:22:50 |
| 14 | Procedure, Rule 26, I move on the record for | 11:22:53 |
| 15 | protective order as pertains to that aspect of | 11:22:55 |
| 16 | this deposition which is videotaped. | 11:22:59 |
| 17 | Subsequent to this deposition, I will | 11:23:00 |
| 18 | prepare and file a written motion for protective | 11:23:03 |
| 19 | order in accordance with the Federal Rules of | 11:23:05 |
| 20 | Civil Procedure, and that is the appropriate | 11:23:08 |
| 21 | motion to prohibit or quash the videotape | 11:23:10 |
| 22 | itself.  Thank you. | 11:23:13 |
| 23 | THE VIDEOGRAPHER:  Are you ready? | 11:23:13 |
| 24 | MR. MASE:  You can go whenever you're | 11:23:16 |
| 25 | ready. | 11:23:29 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | |
|---|---|
| 1 | THE VIDEOGRAPHER:  Standby. | 11:23:29 |
| 2 | THE COURT REPORTER:  We are here today, |
| 3 | September 11th, 2003, at approximately 11:25 |
| 4 | a.m. for the videotaped deposition of -- |
| 5 | MR. MASE:  Kjell Hjartnes. |
| 6 | THE COURT REPORTER:  -- Kjell Hjartnes, in |
| 7 | Case No. 03-21642 in the case of Bautista versus |
| 8 | Norwegian. |
| 9 | The videographer is Todd Cohen of Video for |
| 10 | the Legal Profession, Inc. The reporter is Jan |
| 11 | Reyna of Klein, Bury & Associates. |
| 12 | Would counsel announce their appearances |
| 13 | for the record, please. | 11:24:16 |
| 14 | MR. HUGGETT:  Bill Huggett for the | 11:24:17 |
| 15 | plaintiffs. | 11:24:18 |
| 16 | MR. MASE:  Curtis Mase on behalf of the | 11:24:19 |
| 17 | defendants, Norwegian Cruise Line and Star | 11:24:22 |
| 18 | Cruises. | 11:24:24 |
| 19 | THE COURT REPORTER:  Raise your right hand, |
| 20 | please. |
| 21 | THEREUPON: |
| 22 | KJELL HJARTNES |
| 23 | called as a witness on behalf of the Plaintiff herein |
| 24 | and, having been first duly sworn, was examined and |
| 25 | testified as follows: |

```
 1              THE WITNESS:  I do.                        11:24:35
 2              THE COURT REPORTER:  Thank you.
 3                 DIRECT EXAMINATION
 4   BY MR. HUGGETT:
 5       Q.   Tell us your name and address, please.      11:24:35
 6       A.   Kjell Hjartnes, K-J-E-L-L H-J-A-R-T-N-E-S,  11:24:37
 7   2120 Tallahassee, Weston, Florida.                   11:24:43
 8       Q.   And what is your position with the company  11:24:48
 9   that you work with?                                  11:24:53
10       A.   I am director of Human Resources, Marine    11:24:54
11   Operations.                                          11:24:59
12       Q.   When did you become that position?          11:24:59
13       A.   Sometime in the summer of 2002.             11:25:12
14       Q.   What were you before that?                  11:25:18
15       A.   I was superintendent of ship personnel.     11:25:20
16              THE WITNESS:  Ship personnel.             11:25:27
17              MR. MASE:  Mr. Hjartnes, I'll remind you  11:25:27
18         that even though the videographer has a        11:25:29
19         microphone on you, it's very important to speak 11:25:32
20         up so that Jan, the court reporter, can hear   11:25:34
21         you, because she's taking down stenographically 11:25:36
22         every question that Mr. Huggett asks you, my   11:25:40
23         objections, if any, and your testimony.  So    11:25:42
24         you've got to keep your voice up audibly so she 11:25:44
25         can catch it.  All right?                      11:25:48
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | THE WITNESS: Okay. | 11:25:50 |
| 2 | MR. MASE: Thank you. Excuse me. | 11:25:50 |
| 3 | BY MR. HUGGETT: | 11:25:50 |
| 4 | Q. And what were you before you were shipboard | 11:25:51 |
| 5 | superintendent of shipboard personnel? | 11:25:56 |
| 6 | A. I was safety management -- safety | 11:25:58 |
| 7 | management system officer of Norwegian Cruise Line. | 11:26:02 |
| 8 | Q. And who do you work for now? | 11:26:06 |
| 9 | A. Norwegian Cruise Line, Limited. | 11:26:08 |
| 10 | Q. Okay. And what is their relation to Star | 11:26:11 |
| 11 | Cruises, if any? | 11:26:14 |
| 12 | A. Star Cruises is the parent company of | 11:26:15 |
| 13 | Norwegian Cruise Line, Limited. | 11:26:19 |
| 14 | MR. MASE: Note my objection to the extent | 11:26:20 |
| 15 | that it calls for a legal conclusion. | 11:26:22 |
| 16 | Obviously, he's been permitted to answer, and I | 11:26:24 |
| 17 | will permit him to answer, but based on his | 11:26:26 |
| 18 | qualifications. | 11:26:27 |
| 19 | BY MR. HUGGETT: | 11:26:27 |
| 20 | Q. And how long have you been with Norwegian | 11:26:28 |
| 21 | Cruise Line? | 11:26:32 |
| 22 | A. Since 19 -- I believe it's 1980. | 11:26:33 |
| 23 | Q. Okay. Are you a Norwegian? | 11:26:39 |
| 24 | A. Yes, I am. | 11:26:42 |
| 25 | Q. And you speak Norwegian? | 11:26:44 |

| | | |
|---|---|---|
| 1 | A.   Yes, I do. | 11:26:45 |
| 2 | Q.   What was your background before you came | 11:26:48 |
| 3 | with the company? | 11:26:50 |
| 4 | A.   I'm sorry? | 11:26:53 |
| 5 | Q.   What was your background before you came | 11:26:54 |
| 6 | with the company? | 11:26:56 |
| 7 | A.   Before I started with Norwegian Cruise | 11:26:57 |
| 8 | Line? | 11:26:57 |
| 9 | Q.   Yes, sir. | 11:26:59 |
| 10 | A.   I worked for the Norwegian Government at | 11:27:00 |
| 11 | the Norwegian Mission to United Nations. | 11:27:04 |
| 12 | Q.   Okay.  Could you tell me your level of | 11:27:11 |
| 13 | education? | 11:27:13 |
| 14 | A.   Equal to maritime college in the United | 11:27:21 |
| 15 | States.  My education is from Norway. | 11:27:23 |
| 16 | Q.   Okay.  So that roughly in our -- you would | 11:27:25 |
| 17 | have gone through what we consider high school and | 11:27:29 |
| 18 | then on to a college specializing in maritime | 11:27:31 |
| 19 | affairs? | 11:27:35 |
| 20 | A.   Yes. | 11:27:35 |
| 21 | Q.   Okay.  And how long is that college? | 11:27:39 |
| 22 | A.   Two years. | 11:27:42 |
| 23 | Q.   All right.  Has this company been known by, | 11:27:48 |
| 24 | to your knowledge, any other names? | 11:27:50 |
| 25 | MR. MASE:  The company being NCL? | 11:27:54 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | |
|---|---|
| 1 | MR. HUGGETT:  Yeah. | 11:27:56 |
| 2 | THE WITNESS:  Yes. | 11:27:57 |
| 3 | BY MR. HUGGETT: | 11:27:57 |
| 4 | Q.   What were they? | 11:27:58 |
| 5 | A.   Kloster Cruise, Limited, Norwegian | 11:28:01 |
| 6 | Caribbean lines. | 11:28:06 |
| 7 | Q.   Uh-hmm. | 11:28:07 |
| 8 | A.   And then Norwegian Cruise Lines. | 11:28:14 |
| 9 | MR. MASE:  Once again, to the extent this | 11:28:17 |
| 10 | calls for a legal conclusion in terms of him | 11:28:18 |
| 11 | describing successor corps, et cetera, I'm | 11:28:23 |
| 12 | concerned about his qualification, and I | 11:28:25 |
| 13 | objection on that basis, but obviously let him | 11:28:26 |
| 14 | answer. | 11:28:26 |
| 15 | Go ahead. | 11:28:26 |
| 16 | BY MR. HUGGETT: | 11:28:26 |
| 17 | Q.   Were you with the company throughout the | 11:28:28 |
| 18 | '80s and the '90s? | 11:28:31 |
| 19 | A.   Yes, I was. | 11:28:32 |
| 20 | Q.   Okay.  And was it ever known as Kloster | 11:28:33 |
| 21 | Cruises or Kloster Cruise AS? | 11:28:37 |
| 22 | A.   Yes. | 11:28:44 |
| 23 | Q.   Okay.  And how long has it owned or | 11:28:46 |
| 24 | operated the NORWAY? | 11:28:47 |
| 25 | A.   Since 1979, to the best of my recollection. | 11:28:55 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | Q.    And are -- are you here as the company | 11:29:03 |
| 2 | representative or the person designated to speak on | 11:29:28 |
| 3 | certain areas? | 11:29:31 |
| 4 | A.    Yes, I am. | 11:29:33 |
| 5 | Q.    Okay.  And did you learn yesterday that we | 11:29:35 |
| 6 | were going to do this by video? | 11:29:43 |
| 7 | A.    No, I did not. | 11:29:45 |
| 8 | Q.    Mr. Mase told us that he learned yesterday | 11:29:46 |
| 9 | afternoon.  He didn't call you and tell you? | 11:29:51 |
| 10 | MR. MASE:  Don't answer that question -- | 11:29:53 |
| 11 | well, actually, go ahead, you can answer that. | 11:29:55 |
| 12 | THE WITNESS:  No, I was not notified. | 11:29:58 |
| 13 | MR. MASE:  Let me be clear on the record. | 11:30:00 |
| 14 | What I said was that the notice bore the | 11:30:02 |
| 15 | time of 3:30 p.m. I did not indicate that I, or | 11:30:05 |
| 16 | any other attorney in my office, became aware of | 11:30:09 |
| 17 | it until a few minutes ago, and I will represent | 11:30:12 |
| 18 | here and on the record that I became aware of it | 11:30:14 |
| 19 | when I walked into this room. | 11:30:16 |
| 20 | And I've checked with my office.  Nobody | 11:30:17 |
| 21 | else seemed to know about it either. | 11:30:19 |
| 22 | BY MR. HUGGETT: | 11:30:19 |
| 23 | Q.    Do you understand from what he says that | 11:30:22 |
| 24 | the notice arrives three-something yesterday? | 11:30:24 |
| 25 | A.    I heard what he said, yes. | 11:30:27 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | Q.   Were you in your office at three-something | 11:30:28 |
| 2 | yesterday? | 11:30:31 |
| 3 | A.   No, I was not. | 11:30:39 |
| 4 | Q.   Were you available by phone? | 11:30:40 |
| 5 | A.   Probably. | 11:30:51 |
| 6 | Q.   Does Mr. Mase's office have your home | 11:30:57 |
| 7 | phone? | 11:31:04 |
| 8 | A.   You would have to ask him. | 11:31:04 |
| 9 | Q.   He ever contact you at home? | 11:31:07 |
| 10 | A.   Not that I recall. | 11:31:09 |
| 11 | Q.   Okay.  If he had called you at home, what | 11:31:14 |
| 12 | would you have done in regard to being | 11:31:17 |
| 13 | video-depositioned different? | 11:31:19 |
| 14 | MR. MASE:  Objection, speculative. | 11:31:20 |
| 15 | THE WITNESS:  I don't know. | 11:31:22 |
| 16 | BY MR. HUGGETT: | 11:31:22 |
| 17 | Q.   Okay.  You feel -- okay.  Well, do you | 11:31:27 |
| 18 | have -- | 11:31:27 |
| 19 | MR. HUGGETT:  Can I borrow yours? | 11:31:41 |
| 20 | BY MR. HUGGETT: | 11:31:41 |
| 21 | Q.   Have you read the copy of the Plaintiff's | 11:31:49 |
| 22 | Notice of Taking Rule 30 (b)(6) Deposition? | 11:31:53 |
| 23 | A.   Yes, I have. | 11:31:59 |
| 24 | Q.   Okay.  I'm going to hand you a copy.  There | 11:32:01 |
| 25 | are a number of items, and -- of one through 13, that | 11:32:04 |

| | |
|---|---|
| 1 | talk about -- that we'd like to talk about, at any | 11:32:19 |
| 2 | rate, and I'll hand you a copy. | 11:32:23 |
| 3 | There's a page in between them.  And you've | 11:32:27 |
| 4 | seen that page, right? | 11:32:34 |
| 5 | A.    Yes, I have. | 11:32:40 |
| 6 | Q.    Okay.  Number one, if I could direct your | 11:32:42 |
| 7 | attention to that, dealing with each injured seaman, | 11:32:49 |
| 8 | or deceased seaman, whose claims are brought in this | 11:32:53 |
| 9 | case, and it asks questions -- it asks then about: | 11:32:58 |
| 10 | The dates and locations the agreement to arbitrate | 11:33:01 |
| 11 | which the defendant relies on was negotiated. | 11:33:05 |
| 12 | Are you the person most knowledgeable of | 11:33:10 |
| 13 | that area? | 11:33:12 |
| 14 | A.    Within NCL, probably. | 11:33:24 |
| 15 | Q.    Okay.  Now, you say "within NCL."  Are | 11:33:28 |
| 16 | there other -- who else would be knowledgeable of | 11:33:33 |
| 17 | that? | 11:33:40 |
| 18 | MR. MASE:  Objection, speculative, lack of | 11:33:41 |
| 19 | foundation, inadequate predicate. | 11:33:43 |
| 20 | THE WITNESS:  I don't know. | 11:33:47 |
| 21 | BY MR. HUGGETT: | 11:33:47 |
| 22 | Q.    Okay.  Now, does the parent corporation | 11:33:47 |
| 23 | have any knowledge of that to your knowledge? | 11:33:50 |
| 24 | A.    I don't know. | 11:33:52 |
| 25 | Q.    Don't you meet with Nils Nordh on occasion | 11:33:54 |

```
1   to deal with matters of this nature?                11:33:58

2       A.   No, I do not.                              11:34:01

3       Q.   Last time we took your deposition didn't we 11:34:05

4   review the protocol document in which you and Nils  11:34:08

5   Nordh, Mr. Kritzman, Mr. Bru, and so forth, had     11:34:12

6   repeated meetings about Norwegian Seaman's Union,   11:34:17

7   rights and benefit of Filipinos, and so forth?      11:34:22

8       A.   Yes.                                        11:34:25

9       Q.   Okay.  So you do -- you do -- refreshed    11:34:27

10  your memory -- then meet with Mr. Nordh about, and  11:34:30

11  others, concerning various matters concerning       11:34:34

12  Filipino employees?                                 11:34:39

13          MR. MASE:  Objection to the form of the     11:34:40

14      question.                                        11:34:43

15          THE WITNESS:  I believe we're referring to  11:34:51

16      two different things.                            11:34:53

17  BY MR. HUGGETT:                                      11:34:53

18      Q.   Okay.  My question at the moment is:  Have  11:34:54

19  you met with Mr. Nils Nordh from time to time       11:34:56

20  concerning Norwegian employees?                     11:35:01

21          MR. MASE:  Did you finish your answer,      11:35:03

22      Mr. Hjartnes, to the last question?  If you did, 11:35:05

23      you can go ahead and answer that.                11:35:09

24          THE WITNESS:  Yeah.                          11:35:09

25          MR. MASE:  I was just concerned.  Okay.  Go  11:35:10
```

| | | |
|---|---|---|
| 1 | ahead. | 11:35:13 |
| 2 | THE WITNESS:  Yes. | 11:35:13 |
| 3 | BY MR. HUGGETT: | 11:35:13 |
| 4 | Q.    And who is he? | 11:35:14 |
| 5 | A.    He is the executive vice president for | 11:35:15 |
| 6 | marine operations and new building at Star Cruises in | 11:35:19 |
| 7 | Port Klang, Malaysia. | 11:35:26 |
| 8 | THE COURT REPORTER:  At Star Cruises in? | 11:35:26 |
| 9 | THE WITNESS:  In Port Klang, or Port Klang, | 11:35:26 |
| 10 | Malaysia. | 11:35:26 |
| 11 | BY MR. HUGGETT: | 11:35:26 |
| 12 | Q.    And when you had those meetings with him, | 11:35:30 |
| 13 | does he come here or do you go there? | 11:35:33 |
| 14 | A.    Both. | 11:35:35 |
| 15 | Q.    Okay.  And have you also traveled to the | 11:35:39 |
| 16 | Philippines to do business regarding Philippine | 11:35:42 |
| 17 | seamen? | 11:35:47 |
| 18 | A.    Yes, I have. | 11:35:47 |
| 19 | Q.    Now, the second part of the question deals | 11:35:55 |
| 20 | with, as to our claimants whose claims are brought, | 11:35:57 |
| 21 | are you the person that would be most knowledgeable | 11:36:04 |
| 22 | of -- from NCL, of the participants in the | 11:36:07 |
| 23 | negotiations regarding the agreement to arbitrate? | 11:36:11 |
| 24 | MR. MASE:  Was that a question or a | 11:36:13 |
| 25 | statement? | 11:36:15 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | | |
|---|---|---|
| 1 | MR. HUGGETT:  Yeah, asked. | 11:36:15 |
| 2 | MR. MASE:  I object.  It's no question. | 11:36:18 |
| 3 | MR. HUGGETT:  Okay.  I'll rephrase it. | 11:36:19 |
| 4 | BY MR. HUGGETT: | 11:36:19 |
| 5 | Q.    Look at the question 1 (b), sir. | 11:36:22 |
| 6 | A.    Yes. | 11:36:28 |
| 7 | Q.    Are you the person most knowledgeable of | 11:36:28 |
| 8 | that? | 11:36:31 |
| 9 | A.    I think you need to clarify what -- what | 11:36:32 |
| 10 | agreement to arbitrate you're referring to. | 11:36:35 |
| 11 | Q.    Okay.  Are you aware of any agreements to | 11:36:37 |
| 12 | arbitrate that these seamen are -- are subject to? | 11:36:44 |
| 13 | A.    Yes, I am. | 11:36:47 |
| 14 | Q.    And what is that? | 11:36:49 |
| 15 | A.    Standard POEA -- | 11:36:50 |
| 16 | THE COURT REPORTER:  Standard -- | 11:36:50 |
| 17 | THE WITNESS:  -- standard POEA contract. | 11:36:50 |
| 18 | BY MR. HUGGETT: | 11:36:50 |
| 19 | Q.    Okay, standard POEA contract. | 11:36:56 |
| 20 | And are you the person most knowledgeable | 11:36:59 |
| 21 | of the participants in the negotiations for that | 11:37:04 |
| 22 | standard POEA contract? | 11:37:07 |
| 23 | A.    Within NCL, yes. | 11:37:09 |
| 24 | Q.    Okay.  Could you describe for me your role | 11:37:11 |
| 25 | in that? | 11:37:24 |

| | | |
|---|---|---|
| 1 | A.   I don't have a role in that. | 11:37:25 |
| 2 | Q.   Okay.  What -- what do you do or what is | 11:37:26 |
| 3 | the basis of your knowledge for that? | 11:37:28 |
| 4 | A.   If I can -- | 11:37:43 |
| 5 | Q.   Please. | 11:37:44 |
| 6 | A.   -- describe how the POEA is -- or what the | 11:37:45 |
| 7 | POEA's role is, in order to -- for us to do, to hire | 11:37:53 |
| 8 | seafarers in the Philippines, we have to be | 11:38:00 |
| 9 | accredited with POEA through an accredited and | 11:38:03 |
| 10 | certified manning agent. | 11:38:12 |
| 11 | Even though I -- we don't -- I don't, on | 11:38:16 |
| 12 | behalf of Norwegian Cruise Line, or anybody else, do | 11:38:20 |
| 13 | business directly with POEA, we do business with them | 11:38:24 |
| 14 | or through our manning agents. | 11:38:31 |
| 15 | Q.   Okay.  I guess I -- that wasn't quite -- my | 11:38:32 |
| 16 | question is:  What's the source of your information | 11:38:35 |
| 17 | and your knowledge? | 11:38:38 |
| 18 | MR. MASE:  About item number two that | 11:38:39 |
| 19 | you're referring to, right? | 11:38:40 |
| 20 | MR. HUGGETT:  Yeah. | 11:38:41 |
| 21 | MR. MASE:  The second half of whatever it | 11:38:41 |
| 22 | is there. | 11:38:42 |
| 23 | MR. HUGGETT:  1 (b). | 11:38:43 |
| 24 | MR. MASE:  1 (b). | 11:38:43 |
| 25 | THE WITNESS:  About the participants in the | 11:38:46 |

| | |
|---|---|
| 1    negotiations? | 11:38:48 |
| 2  BY MR. HUGGETT: | 11:38:48 |
| 3      Q.   Yes. | 11:38:49 |
| 4      A.   I don't know who participated in the | 11:38:49 |
| 5  negotiations. | 11:38:52 |
| 6      Q.   Okay.  Is your knowledge -- do I understand | 11:38:52 |
| 7  that you don't have any direct role, but you do it | 11:38:59 |
| 8  all through the manning agency? | 11:39:02 |
| 9      A.   Yes. | 11:39:06 |
| 10     Q.   Okay.  So you, you, personally, or any -- | 11:39:06 |
| 11  have never participated in any of those negotiations? | 11:39:12 |
| 12         MR. MASE:  Mr. Huggett, may I ask you, as | 11:39:18 |
| 13     you're doing this, because this is a corporate | 11:39:20 |
| 14     deposition, can we interpret you in this context | 11:39:23 |
| 15     to mean "NCL" unless you say and "you, | 11:39:26 |
| 16     personally," just so that we're clear, because I | 11:39:29 |
| 17     think that it's going to get confusing. | 11:39:31 |
| 18         MR. HUGGETT:  I'll try to clarify that. | 11:39:33 |
| 19         MR. MASE:  Your question was fine.  You did | 11:39:34 |
| 20     it both ways.  I'm just trying to make sure | 11:39:36 |
| 21     we've got it. | 11:39:39 |
| 22         THE WITNESS:  And I will answer, Norwegian | 11:39:39 |
| 23     Cruise Line does not participate in the | 11:39:41 |
| 24     negotiations or the finalization of the POEA | 11:39:44 |
| 25     contracts. | 11:39:49 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

18

| | | |
|---|---|---|
| 1 | MR. MASE:  And you, personally?  Because he | 11:39:49 |
| 2 | asked that. | 11:39:50 |
| 3 | THE WITNESS:  I personally do not | 11:39:51 |
| 4 | participate. | 11:39:52 |
| 5 | MR. MASE:  Okay.  Excuse me. | 11:39:53 |
| 6 | BY MR. HUGGETT: | 11:39:53 |
| 7 | Q.   And what is the source of all that you've | 11:39:54 |
| 8 | learned, therefore, about what's happened? | 11:39:57 |
| 9 | A.   Well, I'm -- I'm quite familiar with the | 11:39:59 |
| 10 | mission statement and the terms and conditions of | 11:40:05 |
| 11 | POEA. | 11:40:09 |
| 12 | MR. MASE:  He wants to know how you're | 11:40:09 |
| 13 | familiar; that's what he's asking you. | 11:40:11 |
| 14 | THE WITNESS:  I have read their rules and | 11:40:12 |
| 15 | regulations, terms and conditions. | 11:40:19 |
| 16 | BY MR. HUGGETT: | 11:40:19 |
| 17 | Q.   Uh-huh.  Any other sources besides reading | 11:40:21 |
| 18 | the terms? | 11:40:23 |
| 19 | A.   As to their negotiations? | 11:40:29 |
| 20 | Q.   Yes. | 11:40:31 |
| 21 | A.   No. | 11:40:46 |
| 22 | Q.   Okay.  Number two reads:  The unions of | 11:40:46 |
| 23 | which defendants contend the subject seamen were | 11:40:50 |
| 24 | members, including the dates the seamen joined the | 11:40:53 |
| 25 | unions and any documents they signed reflecting their | 11:40:56 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | intent to join a union. | 11:40:58 |
| 2 | Are you the person most knowledgeable | 11:40:59 |
| 3 | within NCL of those items? | 11:41:04 |
| 4 | A.   I would assume so, yes. | 11:41:16 |
| 5 | Q.   Okay.  And what would be the source of your | 11:41:18 |
| 6 | knowledge of that? | 11:41:20 |
| 7 | A.   As director of human resources, I'm very | 11:41:23 |
| 8 | much involved in the hiring process of Filipino and | 11:41:27 |
| 9 | other seafarers. | 11:41:31 |
| 10 | Q.   Okay.  Do you ever -- have you ever | 11:41:32 |
| 11 | personally traveled and -- have you personally | 11:41:37 |
| 12 | interviewed any of the seamen about their membership | 11:41:42 |
| 13 | or nonmembership in a union? | 11:41:46 |
| 14 | A.   No. | 11:41:48 |
| 15 | Q.   And have you personally interviewed or | 11:41:50 |
| 16 | talked to anyone who's been in a union or is -- | 11:41:52 |
| 17 | claims to be in a union, a Philippine seaman union? | 11:41:55 |
| 18 | A.   Can you repeat that question? | 11:42:04 |
| 19 | Q.   Yes.  Have you ever talked to anyone who | 11:42:06 |
| 20 | claims to have -- be a member of a Philippine seaman | 11:42:09 |
| 21 | union? | 11:42:13 |
| 22 | A.   Yes, I have. | 11:42:14 |
| 23 | Q.   Who would that be? | 11:42:15 |
| 24 | A.   I -- I don't recall any -- any names. | 11:42:20 |
| 25 | Q.   Okay.  Do you recall their positions? | 11:42:24 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

1    A.   well, if can clarify?                          11:42:29

2    Q.   Sure.                                          11:42:34

3    A.   All our crew members belonging to the deck     11:42:35

4  and engine department are members of AMOSUP,          11:42:40

5  A-M-O-S-U-P.                                           11:42:55

6    Q.   And how do you know that?                       11:42:55

7    A.   Because they're enrolled in the union's        11:42:57

8  benefit program.                                       11:43:02

9    Q.   Have you ever -- okay.  The union's --          11:43:03

10       MR. MASE:  wait, wait.  Did you finish your     11:43:06

11    answer?                                             11:43:07

12       THE WITNESS:  No.                                11:43:08

13       MR. HUGGETT:  Go ahead.                          11:43:08

14       MR. MASE:  Finish your answer, please.           11:43:09

15       THE WITNESS:  which we pay to AMOSUP on          11:43:10

16    their behalf.                                       11:43:13

17  BY MR. HUGGETT:                                        11:43:13

18    Q.   Okay.                                          11:43:14

19       MR. HUGGETT:  Read that back to me.

20       THE COURT REPORTER:  The last part?

21       MR. HUGGETT:  Yeah.

22       (Thereupon, the pending portion was read by

23  the reporter as above-recorded.)

24       MR. HUGGETT:  No, no, before that.  The

25    whole answer.

| | |
|---|---|
| 1 | (Thereupon, the pending portion was read by | |
| 2 | the reporter as above-recorded.) | |
| 3 | MR. HUGGETT:  Okay. | 11:43:56 |
| 4 | BY MR. HUGGETT: | 11:43:56 |
| 5 | Q.    You're stating that NCL pays an outfit | 11:43:57 |
| 6 | called AMOSUP some money for people in a -- in that | 11:44:05 |
| 7 | union; is that right? | 11:44:09 |
| 8 | A.    Yes, we do. | 11:44:12 |
| 9 | Q.    And do you have any knowledge whether these | 11:44:12 |
| 10 | particular men in this case are members of that | 11:44:13 |
| 11 | union? | 11:44:15 |
| 12 | A.    Yes, I do. | 11:44:20 |
| 13 | Q.    And how do you know that? | 11:44:21 |
| 14 | A.    We have paid their benefits -- | 11:44:24 |
| 15 | THE COURT REPORTER:  We have -- | 11:44:24 |
| 16 | THE WITNESS:  We have paid their benefits | 11:44:28 |
| 17 | on their behalf. | 11:44:28 |
| 18 | BY MR. HUGGETT: | 11:44:28 |
| 19 | Q.    Okay.  And do you have any documents that | 11:44:30 |
| 20 | reflect that? | 11:44:34 |
| 21 | MR. MASE:  To that reflect what? | 11:44:36 |
| 22 | MR. HUGGETT:  To reflect that the NCL has | 11:44:38 |
| 23 | paid AMOSUP benefits on behalf of the ten seamen | 11:44:41 |
| 24 | in this case. | 11:44:46 |
| 25 | THE WITNESS:  Not the ten, no. | 11:44:46 |

| | |
|---|---|
| 1 | BY MR. HUGGETT: | 11:44:46 |
| 2 | Q. Oh, okay. And what documents that you have | 11:44:48 |
| 3 | that they reflect? Could you describe them? What do | 11:44:54 |
| 4 | they reflect? | 11:44:58 |
| 5 | A. They reflect that we have paid their | 11:44:58 |
| 6 | pension fund, the Provident fund. | 11:45:02 |
| 7 | Q. Okay. | 11:45:04 |
| 8 | A. They reflect that we have paid their Social | 11:45:04 |
| 9 | Security, and their medical benefits. | 11:45:07 |
| 10 | Q. Now, those are something that you pay to | 11:45:12 |
| 11 | this outfit called AMOSUP? | 11:45:15 |
| 12 | A. Yes. | 11:45:17 |
| 13 | Q. But do you have any knowledge that the ten | 11:45:20 |
| 14 | seamen, or the deceased ones, and the live ones, were | 11:45:23 |
| 15 | members of that union? | 11:45:27 |
| 16 | A. The five deceased ones were members of that | 11:45:29 |
| 17 | union. | 11:45:32 |
| 18 | Q. And what is the source of your knowledge of | 11:45:34 |
| 19 | that? | 11:45:36 |
| 20 | A. Like I said, we have paid their benefits | 11:45:37 |
| 21 | through -- to AMOSUP, to the union. | 11:45:42 |
| 22 | Q. Okay. But not the five -- not the live | 11:45:45 |
| 23 | ones? | 11:45:51 |
| 24 | A. No. They are catering personnel. | 11:45:52 |
| 25 | Q. They're what? | 11:45:52 |

| | | |
|---|---|---|
| 1 | THE COURT REPORTER:  I'm sorry? | 11:45:52 |
| 2 | THE WITNESS:  They belong to the catering/ | 11:45:53 |
| 3 | hotel department. | 11:45:57 |
| 4 | BY MR. HUGGETT: | 11:45:57 |
| 5 | Q.   Okay.  And have you produced any documents | 11:45:59 |
| 6 | that show that NCL paid money on behalf of those, as | 11:46:01 |
| 7 | you say, five who have died?  Actually it's six who | 11:46:06 |
| 8 | have died. | 11:46:10 |
| 9 | A.   Have I produced documents to that effect? | 11:46:13 |
| 10 | Q.   Yeah. | 11:46:16 |
| 11 | A.   No, I have not. | 11:46:16 |
| 12 | Q.   And what documents would there be? | 11:46:17 |
| 13 | A.   We would have a monthly listing of benefits | 11:46:27 |
| 14 | paid to AMOSUP. | 11:46:32 |
| 15 | Q.   Okay.  And would that list names? | 11:46:34 |
| 16 | A.   Yes, it would. | 11:46:36 |
| 17 | Q.   Okay.  And where do you get those names? | 11:46:37 |
| 18 | A.   I'm sorry? | 11:46:41 |
| 19 | Q.   And where do you -- where does NCL get | 11:46:42 |
| 20 | those names from? | 11:46:46 |
| 21 | A.   From our payroll system. | 11:46:48 |
| 22 | Q.   Okay.  And is that -- are the names given | 11:46:49 |
| 23 | to you by AMOSUP? | 11:46:53 |
| 24 | A.   No. | 11:46:56 |
| 25 | Q.   Okay.  How do you get them? | 11:46:57 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | A.    These are crew members serving onboard our | 11:46:58 |
| 2 | vessels. | 11:47:03 |
| 3 | Q.    Okay.  Do you have any knowledge that | 11:47:04 |
| 4 | those, as you say, five deceased seamen knew that | 11:47:05 |
| 5 | they were in a union? | 11:47:11 |
| 6 | A.    No, I don't. | 11:47:16 |
| 7 | Q.    Okay.  Do you have any evidence of any kind | 11:47:17 |
| 8 | that those -- well, let me clarify first.  You're | 11:47:21 |
| 9 | saying five.  Actually six died. | 11:47:26 |
| 10 | Is the five you -- how do you -- how are | 11:47:28 |
| 11 | you categorizing the five? | 11:47:30 |
| 12 | A.    They belong to the deck and engine | 11:47:33 |
| 13 | compliment. | 11:47:37 |
| 14 | Q.    Okay.  Which are they?  Do have you a list | 11:47:39 |
| 15 | of them there? | 11:47:44 |
| 16 | A.    Yes, I do.  It's Mr. Bautista. | 11:47:45 |
| 17 | Q.    Uh-huh. | 11:48:02 |
| 18 | A.    Mr. Valenzuela, Mr. Bernal. | 11:48:03 |
| 19 | Q.    Uh-huh. | 11:48:07 |
| 20 | A.    Mr. Villanueva, and Mr. Rosal. | 11:48:08 |
| 21 | Q.    Okay.  These are deck and engine people? | 11:48:14 |
| 22 | A.    Yes.  Actually, all engine personnel. | 11:48:17 |
| 23 | Q.    Okay, engine personnel. | 11:48:20 |
| 24 | Now, there's one more that died named | 11:48:22 |
| 25 | Tejaro.  What was he, do you know? | 11:48:25 |

| | | |
|---|---|---|
| 1 | A.    He was hotel. | 11:48:27 |
| 2 | Q.    Hotel, okay. | 11:48:30 |
| 3 |       And the other living ones, are they all | 11:48:34 |
| 4 | hotel, too? | 11:48:37 |
| 5 | A.    Yes, they are. | 11:48:37 |
| 6 | Q.    Now, what is the difference in the hotel | 11:48:38 |
| 7 | person and the deck and engine person as far as being | 11:48:41 |
| 8 | in the union, to your knowledge? | 11:48:45 |
| 9 | A.    The AMOSUP is a union for -- well, let me | 11:48:55 |
| 10 | tell you what it stands for.  It stands for | 11:49:10 |
| 11 | Associated Marine Officers and Seafarer's Union of | 11:49:12 |
| 12 | the Philippines, and only our deck and engine | 11:49:16 |
| 13 | personnel are part of AMOSUP. | 11:49:26 |
| 14 | Q.    Okay.  And the catering people, are they | 11:49:31 |
| 15 | part of any union that you know of? | 11:49:34 |
| 16 | A.    The CBA'S negotiated with Norwegian | 11:49:40 |
| 17 | Seaman's Union.  I'm sorry, Norwegian seafarer's | 11:49:46 |
| 18 | Union. | 11:49:49 |
| 19 | Q.    I'm sorry, I'm not sure that I understood | 11:49:51 |
| 20 | your answer as it relates to the question. | 11:49:54 |
| 21 |       The question is:  Do you have any knowledge | 11:49:55 |
| 22 | whether the catering personnel who are involved in | 11:50:02 |
| 23 | this lawsuit, either dead or alive, were in any | 11:50:06 |
| 24 | union? | 11:50:11 |
| 25 | A.    In the Philippines, no. | 11:50:11 |

| | | |
|---|---|---|
| 1 | Q.   Okay.  Your -- is it your understanding | 11:50:13 |
| 2 | that they are not or is -- you simply don't know | 11:50:20 |
| 3 | whether they are? | 11:50:23 |
| 4 | A.   I don't know that they are. | 11:50:24 |
| 5 | Q.   But to your knowledge, any information you | 11:50:25 |
| 6 | have, they're not in the union? | 11:50:29 |
| 7 | A.   That's correct. | 11:50:31 |
| 8 | Q.   Okay.  Let me go back to the deck and | 11:50:31 |
| 9 | engine people.  Do you have any evidence of any kind | 11:50:35 |
| 10 | that any of these five people ever joined the union? | 11:50:43 |
| 11 | A.   No, I don't. | 11:50:46 |
| 12 | Q.   Do you have any knowledge or documents of | 11:50:48 |
| 13 | any kind that show that those five deck and engine | 11:50:52 |
| 14 | crewmen, now deceased, ever voted in any union vote | 11:50:58 |
| 15 | or election? | 11:51:06 |
| 16 | A.   No, I don't. | 11:51:06 |
| 17 | Q.   Do you have any knowledge or information | 11:51:06 |
| 18 | or -- that they ever were aware of any of their union | 11:51:09 |
| 19 | benefits or their union obligations?  I'm speaking of | 11:51:15 |
| 20 | a Philippine union. | 11:51:26 |
| 21 | A.   No, I do not have any documentation. | 11:51:29 |
| 22 | Q.   Okay.  Do you have any documentation or any | 11:51:32 |
| 23 | evidence that these deck-and-engine Filipino seamen | 11:51:41 |
| 24 | involved herein ever attended any Philippine union | 11:51:47 |
| 25 | meeting? | 11:51:52 |

| | | |
|---|---|---|
| 1 | A.   No, I don't. | 11:51:52 |
| 2 | Q.   Do have any knowledge or evidence of | 11:51:54 |
| 3 | whether any of these deck and engine Filipinos agreed | 11:51:57 |
| 4 | to any of the actions of that union, or disagreed? | 11:52:04 |
| 5 | A.   No, I don't. | 11:52:10 |
| 6 | Q.   Do you have any knowledge or information or | 11:52:11 |
| 7 | evidence that any of those five deck and engine | 11:52:13 |
| 8 | seamen were even aware of the existence of a -- how | 11:52:19 |
| 9 | do you call it, AMOSUP union? | 11:52:25 |
| 10 | A.   No, I don't. | 11:52:35 |
| 11 | Q.   Okay.  Let's -- you also mentioned a -- did | 11:52:42 |
| 12 | you say Norwegian Seaman's Union? | 11:52:47 |
| 13 | A.   Yes, I did. | 11:52:51 |
| 14 | Q.   Okay.  And could you tell me what that is? | 11:52:52 |
| 15 | MR. MASE:  Seafarer's Union, I thought he | 11:52:54 |
| 16 | said. | 11:52:54 |
| 17 | THE WITNESS:  I corrected it. | 11:52:54 |
| 18 | BY MR. HUGGETT: | 11:52:54 |
| 19 | Q.   What's the correct word? | 11:52:54 |
| 20 | A.   Norwegian Seafarer's Union. | 11:52:57 |
| 21 | MR. MASE:  Excuse me. | 11:52:57 |
| 22 | BY MR. HUGGETT: | 11:52:57 |
| 23 | Q.   Okay.  Has it ever changed its name? | 11:53:03 |
| 24 | A.   Yes. | 11:53:06 |
| 25 | Q.   When was that? | 11:53:06 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | |
|---|---|
| 1   A.   I believe earlier this year, I believe it | 11:53:07 |
| 2  was in May, April or May. | 11:53:10 |
| 3   Q.   Okay.  Response to political correctness of | 11:53:12 |
| 4  name? | 11:53:15 |
| 5   A.   I don't know. | 11:53:15 |
| 6   Q.   Seafarers would represent both men and | 11:53:18 |
| 7  women more correctly? | 11:53:21 |
| 8   A.   We can speculate. | 11:53:22 |
| 9   Q.   Okay.  You don't know, though? | 11:53:24 |
| 10   A.   I don't know. | 11:53:25 |
| 11   Q.   Okay.  Well, we'll call it the NSU; is that | 11:53:26 |
| 12  all right? | 11:53:26 |
| 13   A.   That's all right with me. | 11:53:28 |
| 14   Q.   You -- you know what that is? | 11:53:30 |
| 15   A.   Yes, I do. | 11:53:31 |
| 16   Q.   All right.  And would you describe for me | 11:53:33 |
| 17  what that union is? | 11:53:35 |
| 18   A.   NSU is an affiliated union of the ITF | 11:53:38 |
| 19  representing our seafarers.  It's the union that we | 11:53:47 |
| 20  negotiate our collective bargaining agreement with. | 11:53:51 |
| 21   Q.   Okay.  Now, you say they represent the ITF? | 11:53:56 |
| 22  That's -- | 11:53:59 |
| 23   A.   No, I did not.  I said it's an affiliated | 11:53:59 |
| 24  association. | 11:54:02 |
| 25   Q.   Affiliate, okay. | 11:54:02 |

| | |
|---|---|
| 1 | And could you give me the full name of the | 11:54:04 |
| 2 | ITF? | 11:54:05 |
| 3 |    A.   International Transport Workers' | 11:54:06 |
| 4 | Federation. | 11:54:11 |
| 5 |    Q.   Okay.  And where are they based? | 11:54:14 |
| 6 |    A.   To my knowledge, their headquarter's in | 11:54:15 |
| 7 | London. | 11:54:19 |
| 8 |    Q.   Okay.  Now, the -- were any of the ten | 11:54:21 |
| 9 | seamen in this case, either deck and engine or | 11:54:29 |
| 10 | catering, alive or dead, a member of that NSU? | 11:54:33 |
| 11 |    MR. MASE:  Object to form. | 11:54:37 |
| 12 | BY MR. HUGGETT: | 11:54:37 |
| 13 |    Q.   Norwegian Seafarer's Union. | 11:54:40 |
| 14 |    MR. MASE:  You can answer. | 11:54:42 |
| 15 | BY MR. HUGGETT: | 11:54:42 |
| 16 |    Q.   Or its predecessor, the Norwegian Seaman's | 11:54:43 |
| 17 | Union. | 11:54:43 |
| 18 |    A.   As a part of the collective bargaining | 11:54:47 |
| 19 | agreement, they pay membership dues to NSU. | 11:54:57 |
| 20 |    Q.   Okay.  They pay dues to NSU? | 11:55:06 |
| 21 |    A.   Yes, they do. | 11:55:12 |
| 22 |    Q.   Okay.  Do you have any other evidence or | 11:55:14 |
| 23 | knowledge that these ten men in this case, other than | 11:55:17 |
| 24 | that they pay dues, through deductions, I presume -- | 11:55:21 |
| 25 | I didn't -- wait a second. | 11:55:27 |

| | | |
|---|---|---|
| 1 | Are those dues paid through mandatory | 11:55:28 |
| 2 | deductions from their pay? | 11:55:33 |
| 3 | A.    Yes, they are. | 11:55:34 |
| 4 | Q.    Okay.  Do you have any knowledge or | 11:55:35 |
| 5 | evidence that other than that deduction, mandatory | 11:55:38 |
| 6 | deduction from their pay, that these ten men are part | 11:55:41 |
| 7 | of the Norwegian Seaman's Union? | 11:55:46 |
| 8 | MR. MASE:  You're asking him if he has any | 11:55:50 |
| 9 | evidence? | 11:55:51 |
| 10 | MR. HUGGETT:  Yes, any knowledge, any | 11:55:52 |
| 11 | documents. | 11:55:53 |
| 12 | MR. MASE:  Objection.  Objection to the | 11:55:54 |
| 13 | form. | 11:55:56 |
| 14 | THE WITNESS:  No, I don't. | 11:55:58 |
| 15 | BY MR. HUGGETT: | 11:55:58 |
| 16 | Q.    Okay.  You have no knowledge or no | 11:56:01 |
| 17 | documents or no evidence that any of the ten men in | 11:56:05 |
| 18 | this case ever joined the Norwegian seafarer's Union | 11:56:12 |
| 19 | or its predecessors? | 11:56:19 |
| 20 | A.    No, I don't. | 11:56:28 |
| 21 | Q.    You have no knowledge and no evidence or | 11:56:30 |
| 22 | documents that they ever attended a meeting of the | 11:56:33 |
| 23 | NSU? | 11:56:37 |
| 24 | A.    No, I don't. | 11:56:39 |
| 25 | Q.    You have no knowledge and no evidence that | 11:56:40 |

| | | |
|---|---|---|
| 1 | any of the ten men in this case ever voted in any | 11:56:43 |
| 2 | election or any vote of the NSU? | 11:56:49 |
| 3 | A.   No, I don't. | 11:56:52 |
| 4 | Q.   You have no knowledge of whether the ten | 11:56:53 |
| 5 | men in this case were ever visited by or discussed | 11:56:56 |
| 6 | matters with an NSU representative? | 11:57:04 |
| 7 | A.   Specific knowledge, no. | 11:57:07 |
| 8 | Q.   And do you have any knowledge or evidence | 11:57:15 |
| 9 | that the ten seamen in this case voluntary agreed to | 11:57:18 |
| 10 | have these union dues deducted from the their pay? | 11:57:27 |
| 11 | A.   It's part of their payroll which they sign | 11:57:38 |
| 12 | for. | 11:57:45 |
| 13 | Q.   And when would they sign that? | 11:57:46 |
| 14 | A.   When they receive their pay. | 11:57:48 |
| 15 | Q.   Okay.  Could you describe that document or | 11:57:50 |
| 16 | whatever it is?  I take it they're paid in cash? | 11:57:54 |
| 17 | I'm double questioning you. | 11:58:04 |
| 18 | A.   Well, the -- | 11:58:04 |
| 19 | Q.   Are they paid in cash or check? | 11:58:08 |
| 20 | A.   They're paid in cash, but those belonging | 11:58:10 |
| 21 | to the engine department also had allotments which | 11:58:14 |
| 22 | were sent directly to the Philippines. | 11:58:17 |
| 23 | Q.   Okay.  Some of their money is sent home to | 11:58:19 |
| 24 | their family? | 11:58:22 |
| 25 | A.   Yes. | 11:58:23 |

| | | |
|---|---|---|
| 1 | Q. All right. And that's done by wire? | 11:58:23 |
| 2 | A. Yes. | 11:58:25 |
| 3 | Q. Do they get a copy of that? | 11:58:26 |
| 4 | A. Of the wire? | 11:58:29 |
| 5 | Q. Do they get a copy of any evidence that | 11:58:30 |
| 6 | you're sending a percent home for the family? | 11:58:32 |
| 7 | MR. MASE: An allotment form. | 11:58:35 |
| 8 | THE WITNESS: They have an allotment form. | 11:58:36 |
| 9 | BY MR. HUGGETT: | 11:58:36 |
| 10 | Q. Okay. Did they sign that and say I agree | 11:58:37 |
| 11 | to have some of my money sent home? | 11:58:40 |
| 12 | A. Prior to leaving the Philippines, yes. | 11:58:42 |
| 13 | Q. Okay. The allotment money sent home has | 11:58:45 |
| 14 | nothing to do with the union; that's just normal | 11:58:47 |
| 15 | taking care of the family? | 11:58:51 |
| 16 | A. No, it has nothing to do with it. | 11:58:52 |
| 17 | Q. Okay. So my question is: Aside from the | 11:58:53 |
| 18 | allotment, the money that goes home for the family -- | 11:58:56 |
| 19 | A. Uh-huh. | 11:58:59 |
| 20 | Q. -- how are they paid? How do they receive | 11:59:00 |
| 21 | their money? | 11:59:02 |
| 22 | A. In cash. | 11:59:03 |
| 23 | Q. In cash. And do they sign a long slip or | 11:59:03 |
| 24 | do they sign an individual slip, or what do they | 11:59:06 |
| 25 | sign -- | 11:59:06 |

| | | |
|---|---|---|
| 1 | A.    Yes. | 11:59:06 |
| 2 | Q.    -- when they get that cash? | 11:59:09 |
| 3 | A.    They sign their pay envelope and pay slip, | 11:59:10 |
| 4 | which reflects deduction of union dues. | 11:59:15 |
| 5 | THE COURT REPORTER:   Reflects deduction of? | 11:59:15 |
| 6 | THE WITNESS:   Union dues. | 11:59:15 |
| 7 | BY MR. HUGGETT: | 11:59:15 |
| 8 | Q.    And do they keep the envelope? | 11:59:20 |
| 9 | A.    Yes, they do. | 11:59:21 |
| 10 | Q.    Do you keep a copy? | 11:59:22 |
| 11 | A.    Yes, we do. | 11:59:24 |
| 12 | Q.    And what is it -- and do you keep a copy of | 11:59:25 |
| 13 | the -- you, meaning NCL -- keep a copy of the pay | 11:59:29 |
| 14 | slip or the other document besides the envelope? | 11:59:33 |
| 15 | A.    Which is referred to as trial register. | 11:59:36 |
| 16 | Trial register. | 11:59:39 |
| 17 | Q.    Trial register? | 11:59:40 |
| 18 | A.    Which they sign. | 11:59:42 |
| 19 | Q.    Okay.  And you're saying -- are you telling | 11:59:43 |
| 20 | me that these two documents, the envelope and the | 11:59:49 |
| 21 | trial register, reflect the deduction for union dues? | 11:59:52 |
| 22 | A.    The pay envelope reflects deduction of | 11:59:59 |
| 23 | union dues. | 12:00:04 |
| 24 | Q.    Okay.  And this is done onboard? | 12:00:05 |
| 25 | A.    Yes, it is. | 12:00:09 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | Q. So, at the time the man signs that, he's | 12:00:09 |
| 2 | already here, or he's already on the ship working? | 12:00:13 |
| 3 | A. Yes, he is. | 12:00:16 |
| 4 | Q. Do you have any knowledge or evidence or | 12:00:18 |
| 5 | documents that show that he agreed to that deduction | 12:00:22 |
| 6 | prior to him getting on the ship? | 12:00:27 |
| 7 | A. As part of our hiring procedures, each | 12:00:31 |
| 8 | seafarer is given a copy of this, the CBA that | 12:00:36 |
| 9 | pertains to him or her prior to joining the vessel. | 12:00:39 |
| 10 | Q. Okay. And who does that? | 12:00:46 |
| 11 | A. The manning agent. | 12:00:48 |
| 12 | Q. The manning agent. Do you -- have you ever | 12:00:49 |
| 13 | personally witnessed that procedure? | 12:00:51 |
| 14 | A. Yes, I have. | 12:00:52 |
| 15 | Q. You have. Tell me those occasions. | 12:00:53 |
| 16 | A. I can't recall specific occasions, but, | 12:00:57 |
| 17 | yes, I have witnessed -- | 12:01:00 |
| 18 | Q. Are we talking once or twice, or many? | 12:01:01 |
| 19 | A. Many. | 12:01:05 |
| 20 | Q. Okay. And tell me what -- what you've seen | 12:01:06 |
| 21 | when that's happened? Describe your experiences. | 12:01:10 |
| 22 | A. It's -- it's part of the documentation | 12:01:14 |
| 23 | where they get their contract, sign their contract, | 12:01:17 |
| 24 | they get their travel instructions, airline tickets, | 12:01:24 |
| 25 | and a copy of the CBA. | 12:01:27 |

KLEIN, BURY, REIF & APPLEBAUM (305) 373-8404

| | |
|---|---|
| 1 | Q.   Okay.  Is there anything -- is that a | 12:01:31 |
| 2 | particular -- is that done right as they're going to | 12:01:33 |
| 3 | get on the plane? | 12:01:36 |
| 4 | A.   No. | 12:01:37 |
| 5 | Q.   When is it done? | 12:01:37 |
| 6 | A.   During documentations, usually, in general, | 12:01:38 |
| 7 | I would say three to four days prior to departure. | 12:01:41 |
| 8 | Q.   Okay.  And have they already signed their | 12:01:45 |
| 9 | contract at that time? | 12:01:47 |
| 10 | A.   That's part of the process. | 12:01:50 |
| 11 | Q.   Okay.  And do you participate in that or | 12:01:52 |
| 12 | just watch? | 12:01:55 |
| 13 | A.   I just watch.  I do not participate. | 12:01:56 |
| 14 | Q.   Okay.  And tell me -- and one of the things | 12:01:58 |
| 15 | that you see or you saw is that they get a copy of | 12:02:03 |
| 16 | the -- you call it CBA, Collective Bargaining | 12:02:10 |
| 17 | Agreement? | 12:02:14 |
| 18 | A.   Yes. | 12:02:15 |
| 19 | Q.   What did I do with mine? | 12:02:15 |
| 20 | When you watched -- I'm sorry, let's strike | 12:03:04 |
| 21 | that. | 12:03:07 |
| 22 | This CBA, does it inform the seaman how | 12:03:08 |
| 23 | much money will be deducted from his pay? | 12:03:16 |
| 24 | A.   Yes, it does. | 12:03:19 |
| 25 | Q.   Okay.  Does he sign a copy of this CBA or | 12:03:20 |

| | | |
|---|---|---|
| 1 | is it just a pamphlet handed to him? | 12:03:32 |
| 2 | A. I don't know. It's -- I don't know. | 12:03:35 |
| 3 | Q. Don't recall? | 12:03:37 |
| 4 | A. I don't recall exactly how they do it. | 12:03:37 |
| 5 | Q. Is it in English or is it in any of the | 12:03:40 |
| 6 | Philippine dialects? | 12:03:44 |
| 7 | A. It's in English. | 12:03:45 |
| 8 | Q. Okay. Is it explained to him? Did you | 12:03:46 |
| 9 | witness it being explained to him or did you simply | 12:03:49 |
| 10 | witness it being handed to him? | 12:03:52 |
| 11 | A. I don't recall. A requirement for being | 12:03:54 |
| 12 | hired is that they speak and understand English. | 12:04:00 |
| 13 | Q. Okay. So you don't recall sitting here | 12:04:03 |
| 14 | today whether this CBA booklet was explained or gone | 12:04:15 |
| 15 | over in this process that you have been witnessing? | 12:04:32 |
| 16 | A. As I do not speak Tegalo, I wouldn't know | 12:04:37 |
| 17 | what they were discussing. | 12:04:42 |
| 18 | Q. Okay. Good point. | 12:04:44 |
| 19 | The orientation proceedings -- is that what | 12:04:54 |
| 20 | you call them? | 12:04:57 |
| 21 | A. No. | 12:04:57 |
| 22 | Q. These meetings? | 12:04:58 |
| 23 | A. No, I referred to documentation process. | 12:04:59 |
| 24 | Q. Documentation process, okay. | 12:05:02 |
| 25 | These documentation processes that you | 12:05:03 |

| | | |
|---|---|---|
| 1 | watched, were they all in a foreign language that you | 12:05:05 |
| 2 | didn't -- | 12:05:10 |
| 3 | A.    I don't recall. | 12:05:11 |
| 4 | Q.    Well, you mentioned Tegalo, which is one of | 12:05:12 |
| 5 | the Philippine dialects.  Was it your understanding | 12:05:14 |
| 6 | that the ones that you watched were being conducted | 12:05:19 |
| 7 | in Tegalo? | 12:05:22 |
| 8 | A.    It was probably half and half; half | 12:05:24 |
| 9 | English, half Tegalo, which is -- | 12:05:26 |
| 10 | Q.    Okay.  Do you know whether there's more | 12:05:29 |
| 11 | than one dialect within the Philippines? | 12:05:31 |
| 12 | A.    Yes. | 12:05:33 |
| 13 | Q.    And those dialects don't understand each | 12:05:33 |
| 14 | other? | 12:05:36 |
| 15 | A.    I can't speak to it. | 12:05:37 |
| 16 | Q.    Okay.  The part that you were able to | 12:05:39 |
| 17 | understand, were you able to understand some parts | 12:05:44 |
| 18 | being in English? | 12:05:46 |
| 19 | A.    I do understand English, if that's the | 12:05:49 |
| 20 | question. | 12:05:51 |
| 21 | Q.    Well, I mean were you paying attention and | 12:05:52 |
| 22 | following what went along? | 12:05:55 |
| 23 | A.    No. | 12:05:56 |
| 24 | Q.    You know, I listen to a lot of speeches, | 12:05:56 |
| 25 | and I don't always pay attention to them. | 12:06:00 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

```
 1        A.    No, I was not.  I was merely there        12:06:00
 2   observing it.                                        12:06:02
 3        Q.    Okay.  So you wouldn't be able to tell us 12:06:03
 4   yes or no, from your knowledge, whether these CBA    12:06:05
 5   booklets were in any way explained?                  12:06:11
 6        A.    No, I wouldn't.                            12:06:12
 7        Q.    And you would be -- unable to tell us      12:06:14
 8   whether these CBA booklets were required to be read? 12:06:16
 9        A.    Repeat that question, please.             12:06:29
10        Q.    Sure.                                      12:06:31
11              Many of the affidavits that your manning  12:06:32
12   agents have filed have stated that some of the       12:06:38
13   documents were required to be read, and that some of 12:06:42
14   these men -- you know Lope Perigotos (phonetic), for 12:06:47
15   instance?  You know him?                             12:06:48
16        A.    Yes, I do.                                 12:06:52
17        Q.    Have you read his affidavit in this case? 12:06:52
18        A.    No, I have not.                            12:06:52
19              I'm sorry.  You're talking about something 12:06:57
20   different than I am talking about.                   12:07:00
21        Q.    Okay.                                      12:07:01
22        A.    I'm saying that I have watched a          12:07:02
23   documentation process.  I have not been part of the  12:07:04
24   predeparture orientation.                            12:07:06
25        Q.    Okay.  What's the difference in the two, to 12:07:09
```

| | |
|---|---|
| 1 | your knowledge? | 12:07:10 |
| 2 | A.   The predeparture orientation is where they | 12:07:11 |
| 3 | go through all the documents they have received, the | 12:07:14 |
| 4 | contract -- | 12:07:20 |
| 5 | Q.   Uh-huh. | 12:07:20 |
| 6 | A.   -- the allotment note, the CBA, the | 12:07:21 |
| 7 | standard POEA contract, any travel information they | 12:07:25 |
| 8 | need, and a lot of other things that is required by | 12:07:30 |
| 9 | POEA as part of the predeparture orientation. | 12:07:37 |
| 10 | Q.   Now, so I understand, you have -- | 12:07:48 |
| 11 | distinguishing for us, you have not participated in | 12:07:54 |
| 12 | that predeparture orientation process? | 12:07:56 |
| 13 | A.   No, I have not. | 12:07:58 |
| 14 | Q.   Or, nor have you witnessed it? | 12:08:00 |
| 15 | A.   No, I have not. | 12:08:01 |
| 16 | Q.   So whatever you know about that is what | 12:08:02 |
| 17 | someone else told you? | 12:08:05 |
| 18 | A.   I also know the requirements, but as to -- | 12:08:06 |
| 19 | yes, by people telling me what they do. | 12:08:09 |
| 20 | Q.   Okay.  The process that you're describing | 12:08:12 |
| 21 | is called a documentation, so we can distinguish | 12:08:17 |
| 22 | between these? | 12:08:21 |
| 23 | A.   Yes. | 12:08:21 |
| 24 | Q.   Documentation process? | 12:08:21 |
| 25 | A.   Yes. | 12:08:23 |

| | | |
|---|---|---|
| 1 | Q.   And at this documentation process you'd be | 12:08:24 |
| 2 | unable to say whether the CBA was explained or read | 12:08:48 |
| 3 | by the seaman, anything other than handed out? | 12:08:53 |
| 4 | A.   That's correct. | 12:08:57 |
| 5 | Q.   Now, as to the five -- the ten seamen in | 12:08:58 |
| 6 | this case, did you witness or participate in the | 12:09:05 |
| 7 | documentation process for them? | 12:09:09 |
| 8 | A.   I don't recall. | 12:09:10 |
| 9 | Q.   So you'd be unable to tell us anything of | 12:09:14 |
| 10 | your own knowledge about the actual documentation | 12:09:17 |
| 11 | process or the predeparture orientation process for | 12:09:24 |
| 12 | any of the ten seamen in this case of your own | 12:09:28 |
| 13 | knowledge? | 12:09:32 |
| 14 | A.   That's correct. | 12:09:32 |
| 15 | Q.   And you have no knowledge or evidence that | 12:09:40 |
| 16 | the seamen, in general, did anything other than | 12:09:43 |
| 17 | receive a copy of the CBA? | 12:09:47 |
| 18 | A.   As I was not there, I -- yes, that's | 12:09:56 |
| 19 | correct. | 12:09:59 |
| 20 | Q.   Okay. | 12:09:59 |
| 21 | MR. HUGGETT:  Let me find that, Curtis. | 12:09:59 |
| 22 | Just a second. | 12:09:59 |
| 23 | Did you attach that to one of your many | 12:10:14 |
| 24 | documents? | 12:10:17 |
| 25 | MR. MASE:  What's that? | 12:10:17 |

| | |
|---|---|
| 1 | MR. HUGGETT:  This CBA. | 12:10:17 |
| 2 | MR. MASE:  I don't know.  I can certainly | 12:10:19 |
| 3 | get it for you if it's an issue.  Talking about | 12:10:20 |
| 4 | making a phone call. | 12:10:24 |
| 5 | MR. HUGGETT:  No, you don't need to send | 12:10:24 |
| 6 | for it. | 12:10:26 |
| 7 | MR. MASE:  I mean, I don't know whether we | 12:10:27 |
| 8 | did or didn't.  To be frank, I wasn't aware that | 12:10:28 |
| 9 | the Norwegian Seafarer's Union CBA was going to | 12:10:30 |
| 10 | be a material issue.  I mean I would think we | 12:10:34 |
| 11 | did.  Heck if I know. | 12:10:37 |
| 12 | MR. HUGGETT:  Well, you attached it to | 12:10:37 |
| 13 | something. | 12:10:39 |
| 14 | MR. MASE:  See if you've got it.  If you | 12:10:39 |
| 15 | don't have it, I can make a phone call.  I'll | 12:10:42 |
| 16 | certainly get it for you. | 12:10:44 |
| 17 | MR. HUGGETT:  Well, we'll come back that. | 12:11:25 |
| 18 | BY MR. HUGGETT: | 12:11:25 |
| 19 | Q.   Let's work around that. | 12:11:27 |
| 20 | Other than the fact that that CBA was | 12:11:28 |
| 21 | handed to the seaman on some occasion that you | 12:11:30 |
| 22 | wish -- watched, you have no -- no other knowledge or | 12:11:33 |
| 23 | information or evidence that they knew in advance of | 12:11:41 |
| 24 | the day that the money was deducted about this union | 12:11:45 |
| 25 | dues going to be deducted.  Would that be fair to | 12:11:51 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

```
 1  say?                                                        12:11:58
 2       A.    Yeah, that would be fair.  That would be         12:11:58
 3  fair.                                                       12:12:00
 4       Q.    Okay.  Now, number -- number three, asks         12:12:26
 5  whether -- about, quote, the Tripartite Working Group       12:12:37
 6  which defendant contends prepared the document              12:12:42
 7  containing the agreement to arbitrate upon which            12:12:45
 8  defendants relied in removing these cases to federal        12:12:47
 9  case and moving to compel arbitration.  Have you read       12:12:50
10  that one?                                                   12:12:53
11       A.    Yes.                                             12:12:59
12       Q.    Are you the person with the most knowledge       12:13:01
13  of that at NCL?                                             12:13:03
14       A.    Probably.                                        12:13:12
15       Q.    All right, sir.  Do you have any knowledge,      12:13:13
16  personal knowledge or documentation which reflects         12:13:22
17  the dates that the Tripartite Working Group met?           12:13:25
18       A.    No, I do not.                                    12:13:30
19       Q.    Okay.  Do you have any documentation or         12:13:33
20  evidence or personal knowledge of the persons who          12:13:37
21  attended any meetings of this group?                       12:13:42
22       A.    No, I do not.                                    12:13:45
23       Q.    Do have you any personal knowledge or           12:13:46
24  documentation of the -- whether or not there was a         12:13:50
25  transcript of the meeting, any of the meetings?           12:13:55
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | A.    No, I do not. | 12:13:57 |
| 2 | Q.    Do have you any personal knowledge or | 12:13:59 |
| 3 | documentation of whether there are minutes, recorded | 12:14:01 |
| 4 | minutes of any of their meetings? | 12:14:05 |
| 5 | A.    I do not. | 12:14:07 |
| 6 | Q.    Okay.  Do you have any documentation or | 12:14:09 |
| 7 | personal knowledge of -- of who attended any of these | 12:14:12 |
| 8 | meetings? | 12:14:18 |
| 9 | A.    No, I do not. | 12:14:19 |
| 10 | Q.    Do you have any personal knowledge or | 12:14:20 |
| 11 | documentation of -- of the agenda, or what these -- | 12:14:24 |
| 12 | what any of these meetings discussed? | 12:14:31 |
| 13 | A.    No, I do not. | 12:14:34 |
| 14 | Q.    Do you have any personal knowledge or | 12:14:35 |
| 15 | documentation of rulings, decrees, or resolutions | 12:14:37 |
| 16 | that these -- that any of these -- at any of these | 12:14:45 |
| 17 | meetings of this group? | 12:14:48 |
| 18 | Shall I rephrase that? | 12:14:54 |
| 19 | A.    Please do. | 12:14:56 |
| 20 | Q.    Do you have any personal knowledge or any | 12:14:56 |
| 21 | documentation of resolutions that this group might | 12:15:00 |
| 22 | have come to? | 12:15:03 |
| 23 | A.    Well, yes, there are memorandums that come | 12:15:07 |
| 24 | out on occasions as a result of these meetings. | 12:15:12 |
| 25 | Q.    All right.  Okay.  Do have you any of | 12:15:16 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | those? | 12:15:17 |
| 2 | A.   With me, no, I don't. | 12:15:18 |
| 3 | Q.   Do you have any in your office? | 12:15:19 |
| 4 | A.   I probably do. | 12:15:22 |
| 5 | Q.   Can you tell me in general what they | 12:15:23 |
| 6 | reflect? | 12:15:26 |
| 7 | A.   Any time there's a change in the standard | 12:15:27 |
| 8 | terms and conditions on the POEA contract, they would | 12:15:30 |
| 9 | send out the memorandum informing us. | 12:15:33 |
| 10 | Q.   Okay. | 12:15:33 |
| 11 | A.   And informing the seafarers about that. | 12:15:35 |
| 12 | Q.   And is that sent directly to you? | 12:15:40 |
| 13 | A.   It would be sent to my office. | 12:15:42 |
| 14 | Q.   Sent your office.  Do you know what's the | 12:15:45 |
| 15 | last time you received one? | 12:15:47 |
| 16 | A.   No, I don't. | 12:15:48 |
| 17 | Q.   Do you know what's the first time you | 12:15:48 |
| 18 | received one? | 12:15:50 |
| 19 | A.   No, I don't. | 12:15:51 |
| 20 | Q.   Do you make any notation of what you | 12:15:51 |
| 21 | receive? | 12:15:53 |
| 22 | A.   I'm not quite sure I understand what your | 12:15:57 |
| 23 | question is. | 12:16:02 |
| 24 | Q.   Well, do you either record that you've | 12:16:03 |
| 25 | received them or do you make notes or send out memos | 12:16:05 |

| | | |
|---|---|---|
| 1 | about what you've received? | 12:16:08 |
| 2 | A.    Normally, not.  I can would file it under | 12:16:13 |
| 3 | POEA. | 12:16:18 |
| 4 | Q.    Okay.  And do you have any knowledge of, | 12:16:19 |
| 5 | personal knowledge or documentary evidence of who was | 12:16:27 |
| 6 | at any of these meetings? | 12:16:37 |
| 7 | MR. MASE:  Which meetings? | 12:16:39 |
| 8 | MR. HUGGETT:  Any of the meetings of the | 12:16:40 |
| 9 | Tripartite Working Group, if I've pronounced it | 12:16:43 |
| 10 | correctly. | 12:16:46 |
| 11 | THE WITNESS:  Tripartite. | 12:16:49 |
| 12 | MR. MASE:  He wants to know if you have any | 12:16:52 |
| 13 | knowledge of the people who were there. | 12:16:55 |
| 14 | THE WITNESS:  No, I don't. | 12:16:57 |
| 15 | BY MR. HUGGETT: | 12:16:57 |
| 16 | Q.    Did I mispronounce it?  How do you | 12:17:00 |
| 17 | pronounce it? | 12:17:04 |
| 18 | A.    Tripartite Working Group. | 12:17:04 |
| 19 | Q.    Tripartite Working Group, okay. | 12:17:08 |
| 20 | So -- and I take it then you have no | 12:17:11 |
| 21 | personal knowledge or documentary evidence of -- of | 12:17:18 |
| 22 | what groups or organizations attended those meetings? | 12:17:25 |
| 23 | A.    No, I don't. | 12:17:29 |
| 24 | Q.    And you have no personal knowledge or | 12:17:30 |
| 25 | documentation of whether these ten seamen attended | 12:17:34 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | any of those meetings? | 12:17:39 |
| 2 |     A.   No, I don't. | 12:17:41 |
| 3 |     Q.   It's probably your -- you have no knowledge | 12:17:45 |
| 4 | or documentation of whether these ten seamen in this | 12:17:48 |
| 5 | case even knew what a Tripartite Working Group was? | 12:17:54 |
| 6 |     A.   No, I don't. | 12:17:59 |
| 7 |       MR. HUGGETT:  I want to be sure I'm saying | 12:18:41 |
| 8 |     that name correctly, Curtis. | 12:18:44 |
| 9 |       MR. MASE:  Which is that, Tripartite? | 12:18:46 |
| 10 |       MR. HUGGETT:  Yeah, it's in -- | 12:18:48 |
| 11 |       MR. MASE:  No, I think Tripartite Working | 12:18:57 |
| 12 |     Group is the correct phraseology.  That's the | 12:18:59 |
| 13 |     way I always understood it. | 12:19:01 |
| 14 |       MR. HUGGETT:  Okay. | 12:19:01 |
| 15 |       MR. MASE:  So I think you all pronounced it | 12:19:01 |
| 16 |     correctly. | 12:19:01 |
| 17 |       MR. HUGGETT:  I accept your -- | 12:19:03 |
| 18 |       MR. MASE:  I'm not an expert on it, I'm the | 12:19:05 |
| 19 |     first to tell you that. | 12:19:07 |
| 20 | BY MR. HUGGETT: | 12:19:07 |
| 21 |     Q.   Do you have any personal knowledge or | 12:19:13 |
| 22 | documentary of how long this Tripartite group has | 12:19:22 |
| 23 | been in existence? | 12:19:28 |
| 24 |     A.   No, I don't. | 12:19:34 |
| 25 |     Q.   Other than to receive some memos from them, | 12:19:38 |

| | | |
|---|---|---|
| 1 | do you have any personal knowledge of them? | 12:19:41 |
| 2 | A.   Well, let me just clarify, the memorandums | 12:19:51 |
| 3 | do not come from the Tripartite Working Group. | 12:19:55 |
| 4 | Q.   Oh, they don't. | 12:19:58 |
| 5 | A.   It comes from the POEA. | 12:19:59 |
| 6 | Q.   Okay. | 12:19:59 |
| 7 | A.   This is the working group that formulates | 12:20:00 |
| 8 | the memorandums, and the memorandums are sent out by | 12:20:04 |
| 9 | the POEA. | 12:20:09 |
| 10 | Q.   So other than receiving a memo from the | 12:20:09 |
| 11 | POEA saying that this is a memo from the "Partite" | 12:20:17 |
| 12 | group, you have no knowledge of them? | 12:20:20 |
| 13 | A.   It wouldn't say memo from the Tripartite | 12:20:23 |
| 14 | group.  It would be a memorandum from POEA. | 12:20:26 |
| 15 | Q.   Oh, okay.  So I'm -- stand corrected then. | 12:20:30 |
| 16 | You've never received any document from the | 12:20:32 |
| 17 | Tripartite Working Group itself? | 12:20:36 |
| 18 | A.   No, I have not. | 12:20:38 |
| 19 | Q.   What you are describing that you've | 12:20:39 |
| 20 | received is a memorandum or a letter or a | 12:20:41 |
| 21 | correspondence from the POEA stating that this | 12:20:43 |
| 22 | "Partite" group did something? | 12:20:49 |
| 23 | Did I understand it now correctly? | 12:20:53 |
| 24 | A.   No. | 12:20:55 |
| 25 | Q.   Make me understand it, or help me to | 12:20:55 |

| | | |
|---|---|---|
| 1 | understand it. | 12:20:58 |
| 2 | A. Well, the -- I may be -- well, I hope I'm | 12:20:59 |
| 3 | correct in -- I'm assuming that the memorandum sent | 12:21:05 |
| 4 | out by the POEA is a result of the work done by the | 12:21:08 |
| 5 | Tripartite Working Group. | 12:21:13 |
| 6 | Q. But it -- but the -- so we're understanding | 12:21:14 |
| 7 | each other, the paper, the memo that you're receiving | 12:21:17 |
| 8 | comes from the POEA? | 12:21:21 |
| 9 | A. Yes. | 12:21:23 |
| 10 | Q. It does not come directly from the | 12:21:23 |
| 11 | Tripartite Working Group? | 12:21:27 |
| 12 | A. Exactly. | 12:21:27 |
| 13 | Q. So, the memos that you're talking about are | 12:21:29 |
| 14 | one group writing a memo about the actions of another | 12:21:33 |
| 15 | group; is that fair to say? | 12:21:38 |
| 16 | A. No. | 12:21:39 |
| 17 | Q. Then I guess I don't understand. You're | 12:21:41 |
| 18 | telling me that the POEA sends some memo that the | 12:21:44 |
| 19 | Tripartite Working Group has taken some action, or | 12:21:49 |
| 20 | has done something, or considered something? | 12:21:52 |
| 21 | A. No, POEA have taken some action, presumably | 12:21:54 |
| 22 | as a result of work done by the Tripartite working | 12:22:03 |
| 23 | Group. | 12:22:06 |
| 24 | Q. Why do you say "presumably"? | 12:22:06 |
| 25 | A. Well, I'm not a participant in the meeting, | 12:22:08 |

```
 1    so I can't state that as a fact.                    12:22:11

 2          MR. MASE:  Okay.  Neither one of us wants      12:22:14

 3       you to speculate, so I'll just caution you as to  12:22:16

 4       that.                                             12:22:16

 5    BY MR. HUGGETT:                                       12:22:16

 6       Q.   Are you telling me that you really don't     12:22:19

 7    know whether -- how, and by which the POEA refers to 12:22:21

 8    the Tripartite Working Group, it's just your         12:22:29

 9    assumption?                                          12:22:33

10       A.   No, that's not what I said.                  12:22:33

11       Q.   Well, I don't really understand what you're  12:22:38

12    saying.  What I'm trying to ask you, and what I'm    12:22:41

13    trying to understand is:  what's your source of      12:22:43

14    knowledge about what this Tripartite Working Group   12:22:46

15    does?                                                12:22:46

16          Could you explain that?                        12:22:53

17          MR. MASE:  I'm going to object, no             12:22:58

18       predicate.                                        12:23:01

19          THE WITNESS:  I don't want to speculate in     12:23:01

20       what they do.                                     12:23:03

21    BY MR. HUGGETT:                                       12:23:03

22       Q.   Well, that's not my question at all.  My     12:23:05

23    question is:  what's the source of your knowledge?   12:23:07

24          MR. MASE:  As to the Tripartite Working        12:23:10

25       Group?                                            12:23:13
```

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | | |
|---|---|---|
| 1 | MR. HUGGETT:  Yeah. | 12:23:13 |
| 2 | THE WITNESS:  The rules and regulation of | 12:23:15 |
| 3 | the POEA. | 12:23:17 |
| 4 | BY MR. HUGGETT: | 12:23:17 |
| 5 | Q.    Okay.  You've read some rules and | 12:23:19 |
| 6 | regulations of the POEA; is that correct? | 12:23:23 |
| 7 | A.    That's correct. | 12:23:25 |
| 8 | Q.    And does that -- those rules and | 12:23:25 |
| 9 | regulations refer to a Tripartite Working Group? | 12:23:28 |
| 10 | A.    Yes, it does. | 12:23:32 |
| 11 | Q.    And does it refer to -- simply refer to the | 12:23:33 |
| 12 | group, or does it refer to action taken on such a | 12:23:46 |
| 13 | date? | 12:23:51 |
| 14 | A.    It refers to the group. | 12:23:53 |
| 15 | Q.    Okay.  And can you give me any example as | 12:23:55 |
| 16 | to how, or when, or where, or why they refer to a | 12:24:00 |
| 17 | group? | 12:24:03 |
| 18 | A.    I don't have the documents in front of me, | 12:24:03 |
| 19 | so, no, I cannot. | 12:24:06 |
| 20 | Q.    Okay.  Are they separate organizations to | 12:24:12 |
| 21 | your knowledge or do you not know? | 12:24:14 |
| 22 | Let me be clear.  If you don't know of your | 12:24:18 |
| 23 | own knowledge or of documents that you have, you can | 12:24:22 |
| 24 | just say I don't know. | 12:24:25 |
| 25 | A.    I didn't quite understand your question. | 12:24:27 |

```
 1      Q.    Okay.  Do you know whether or not these are      12:24:29
 2  two separate organizations, the POEA and the             12:24:34
 3  Tripartite Working Group?                                12:24:38
 4      A.    I don't know.                                   12:24:42
 5      Q.    Okay.  Would it be fair to say that             12:24:43
 6  whatever you do know comes from reading the rules and    12:24:51
 7  regulations of the POEA?                                 12:24:55
 8      A.    That's fair.                                    12:24:57
 9      Q.    Okay.  Now, are the rules and regulations       12:24:58
10  of the POEA that you're referring to bound up in any     12:25:08
11  single volume?                                           12:25:17
12      A.    I don't know that for sure.                     12:25:23
13      Q.    Okay.  Have you ever read them?                 12:25:27
14      A.    Yes, I have.                                    12:25:29
15      Q.    What form did you read them in?  Was it an      12:25:31
16  email or was it a booklet?                               12:25:34
17      A.    They're available on-line.                      12:25:36
18      Q.    On-line, okay.                                  12:25:37
19            And do you know the web site or how to read    12:25:39
20  them?  Is that how you read them?                        12:25:41
21      A.    I have read them on-line.  I have read the     12:25:44
22  hard copy of them.                                       12:25:47
23      Q.    Okay.  They have a hard copy?                   12:25:48
24      A.    I have a hard copy.                             12:25:49
25      Q.    You have a hard copy?                           12:25:51
```

52

| | | |
|---|---|---|
| 1 | Okay.  Is that dated? | 12:25:53 |
| 2 | A.   I don't recall. | 12:25:57 |
| 3 | Q.   Do you know whether these rules and | 12:25:57 |
| 4 | regulations change from time to time? | 12:26:01 |
| 5 | A.   I don't know. | 12:26:03 |
| 6 | Q.   Have they ever changed, to your knowledge? | 12:26:05 |
| 7 | A.   Not that I recall. | 12:26:10 |
| 8 | Q.   Within your different jobs in the company, | 12:26:14 |
| 9 | which you described a few of at the beginning of this | 12:26:16 |
| 10 | depo, how long have you been dealing with the POEA? | 12:26:20 |
| 11 | Is that -- | 12:26:28 |
| 12 | A.   Like I said before, I don't deal directly | 12:26:29 |
| 13 | with POEA.  We do all the dealing with POEA through | 12:26:31 |
| 14 | the manning agents. | 12:26:34 |
| 15 | Q.   Okay.  I'll rephrase it. | 12:26:35 |
| 16 | What part of your job now calls for you to | 12:26:38 |
| 17 | learn or come into contact with or deal with the POEA | 12:26:43 |
| 18 | through your manning agencies? | 12:26:50 |
| 19 | A.   Can you rephrase that? | 12:26:58 |
| 20 | Q.   I'm trying to find out -- I take it back | 12:27:00 |
| 21 | when you were a radio officer, you didn't have any | 12:27:03 |
| 22 | contact or knowledge of the POEA? | 12:27:06 |
| 23 | A.   Correct. | 12:27:08 |
| 24 | Q.   Okay.  At what point in time in your | 12:27:10 |
| 25 | various duties with the company did you begin to come | 12:27:13 |

```
 1   into contact with the POEA?                              12:27:15
 2       A.    When I started working in the human            12:27:17
 3   resource department or -- I'm sorry, in ship             12:27:19
 4   personnel.                                               12:27:21
 5       Q.    Ship personnel.                                12:27:22
 6             That was roughly in 2000?                       12:27:23
 7       A.    Yeah, the end of 1999, beginning of 2000.      12:27:25
 8       Q.    When you replaced Mr. Bach?                     12:27:28
 9       A.    That's correct.                                12:27:29
10       Q.    Okay.  Now, could you tell me at this time     12:27:33
11   what duties that you have in regards to the POEA?        12:27:36
12       A.    I'm not quite sure I understand exactly        12:27:52
13   what your question is.                                   12:27:56
14       Q.    Okay.  I'll try to rephrase it.                12:27:57
15             What do you do, what are your job              12:28:02
16   requirements, what are you -- what are you acting on     12:48:00
17   in a day-to-day process in regards to anything          12:48:00
18   involving the POEA?                                      12:48:00
19       A.    In the day-to-day work, I don't deal           12:48:00
20   directly with POEA.  I make sure, at least try to        12:48:00
21   make sure that we comply with all the requirements of    12:48:00
22   the POEA.                                                12:48:00
23       Q.    Okay.  Is that part of your job, to make       12:48:00
24   sure that you're -- comply with their requirements?      12:48:00
25       A.    Yes, it is.                                    12:48:02
```

| | |
|---|---|
| 1 | Q.   Are you the head man, so to speak, for | 12:48:02 |
| 2 | that; the buck stops here? | 12:48:02 |
| 3 | A.   I don't know. | 12:48:02 |
| 4 | Q.   Okay.  So then if we can then finish with | 12:48:02 |
| 5 | No. 3, the Tripartite Working Group, your sole source | 12:48:02 |
| 6 | of information or knowledge of that comes through | 12:48:02 |
| 7 | things that you read as sent by POEA? | 12:48:02 |
| 8 | A.   Can you repeat that? | 12:48:02 |
| 9 | Q.   Yeah.  Referring to the Tripartite working | 12:48:02 |
| 10 | Group, we've tried to talk about some of the things | 12:48:02 |
| 11 | that you know about it. | 12:48:02 |
| 12 | My question, trying to be a finalized | 12:48:02 |
| 13 | question is:  Your sole source of knowledge of what | 12:48:02 |
| 14 | that group does or what it consists of, does that | 12:48:03 |
| 15 | come through things that you read as sent to you by | 12:48:03 |
| 16 | the POEA? | 12:48:03 |
| 17 | A.   I think that's a fair statement. | 12:48:03 |
| 18 | Q.   Okay.  Now, let's move to No. 4. | 12:48:03 |
| 19 | MR. MASE:   No.  Let's take a little break | 12:48:03 |
| 20 | for a second.  Stretch a little bit. | 12:48:03 |
| 21 | THE VIDEOGRAPHER:  Standby. | 12:48:03 |
| 22 | (Thereupon, a brief recess was taken, after | |
| 23 | which the following proceedings were had:) | |
| 24 | THE VIDEOGRAPHER:  And we're back on. | 12:48:03 |
| 25 | MR. HUGGETT:  Read me the last question and | |

| | |
|---|---|
| 1 | answer. | |
| 2 | (Thereupon, the pending portion was read by | |
| 3 | the reporter as above-recorded.) | |
| 4 | MR. MASE:  Stretched? | 12:48:03 |
| 5 | THE WITNESS:  Yeah. | 12:48:03 |
| 6 | BY MR. HUGGETT: | |
| 7 | Q.    Number -- I call your attention to No. 4. | 12:48:03 |
| 8 | It's in parts, so I'll take it in parts. | 12:48:07 |
| 9 | Are you the person most knowledgeable | 12:48:07 |
| 10 | within NCL of the persons or entities who represented | 12:48:07 |
| 11 | Defendant Norwegian Cruise Lines or its interest in | 12:48:07 |
| 12 | the Tripartite Working Group? | 12:48:07 |
| 13 | A.    Yes. | 12:48:07 |
| 14 | Q.    Okay.  Are you the person most | 12:48:07 |
| 15 | knowledgeable who -- of, at NCL, who would know about | 12:48:07 |
| 16 | who represented NCL in drafting the document | 12:48:07 |
| 17 | containing the agreement to arbitrate? | 12:48:07 |
| 18 | A.    Yes. | 12:48:07 |
| 19 | Q.    Okay.  In the -- you may have answered this | 12:48:07 |
| 20 | in the prior question.  In the -- do you have any | 12:48:07 |
| 21 | knowledge of whether NCL or its -- anybody | 12:48:07 |
| 22 | representing it, was represented on the Tripartite | 12:48:09 |
| 23 | working Group? | 12:48:09 |
| 24 | A.    Yes.  There was no representation from NCL. | 12:48:09 |
| 25 | Q.    Okay.  was there any representation of any | 12:48:09 |

```
 1    of the manning agencies that you used?                   12:48:09
 2         A.   I don't know.                                   12:48:09
 3         Q.   Okay.  These manning agencies that we're --     12:48:09
 4    these are like Magsaysay and CF Sharp?                    12:48:09
 5         A.   That's correct.                                 12:48:09
 6         Q.   And there is a -- does -- there's a             12:48:09
 7    financial relationship between the two entities?          12:48:09
 8              MR. MASE:  Which entities?                       12:48:09
 9              MR. HUGGETT:  The manning agencies and NCL.      12:48:09
10              MR. MASE:  If by "financial relationship,"       12:48:09
11         your question, does NCL pay those agencies --         12:48:09
12              MR. HUGGETT:  Yeah.                              12:48:09
13              MR. MASE:  -- I'll stipulate on the record       12:48:09
14         that they do.  And I just -- the term "financial     12:48:11
15         relationship" sounds strange.                        12:48:11
16              THE WITNESS:  We have a manning agreement.       12:48:11
17              MR. MASE:  Sure.                                 12:48:11
18    BY MR. HUGGETT:
19         Q.   Okay.  Did they do certain work for NCL, is     12:48:11
20    that correct, and in return they get paid a certain       12:48:11
21    amount of money?                                          12:48:11
22         A.   They do certain things on behalf of the         12:48:11
23    Norwegian Cruise Line.                                    12:48:11
24         Q.   Okay.                                           12:48:11
25              MR. MASE:  And they get paid.                    12:48:11
```

```
 1            THE WITNESS:  And they get paid.
 2   BY MR. HUGGETT:
 3       Q.    And they get paid for that?                    12:48:11
 4       A.    Yes, they do.                                  12:48:11
 5       Q.    Now -- now, that document which contains       12:48:11
 6   the agreement to arbitrate, are you familiar with        12:48:11
 7   that?                                                    12:48:11
 8       A.    Are you referring to Memorandum No. 9?         12:48:11
 9       Q.    Let me just phrase as it's in No. 4 there.
10            The document containing the agreement to        12:48:13
11   arbitrate upon which defendant relies in removing        12:48:13
12   these cases to federal court and to compel               12:48:13
13   arbitration?                                             12:48:13
14            MR. MASE:  You're going to need to tell him     12:48:13
15       what that document is, because he doesn't know       12:48:13
16       what we relied upon --                               12:48:13
17            MR. HUGGETT:  You don't --
18            MR. MASE:  -- as an entity.                     12:48:13
19            MR. HUGGETT:  You don't know?                   12:48:13
20            MR. MASE:  You're going to have to ask him      12:48:13
21       to assume or something like that, because I          12:48:13
22       don't know that --                                   12:48:13
23            MR. HUGGETT:  Let me find out.
24            MR. MASE:  Sure.  Ask him.
25   BY MR. HUGGETT:
```

58

| | | |
|---|---|---|
| 1 | Q.    Do you know -- | 12:48:13 |

         Q.    Do you know --                      12:48:13
         A.    You tell me which document it is, and I   12:48:13
will answer.                                       12:48:13
         Q.    Do you know what document as -- sitting  12:48:13
here today, do you know what -- what document that  12:48:13
your company, NCL, claims that seamen are supposed to  12:48:13
arbitrate under?                                   12:48:15
         A.    No, I don't.                        12:48:15
         Q.    You don't?                          12:48:15
         A.    No.                                 12:48:15
         Q.    Okay.  Who would know that?         12:48:15
         A.    My attorney.                        12:48:15
         Q.    Okay.  Are any of your actions in complying  12:48:15
with the rules and regulation of the "POE" directed  12:48:15
towards seeing that seaman's claims are arbitrated?  12:48:15
         A.    Yes.                                12:48:15
         Q.    Okay.                               12:48:15
         A.    If you don't mind, if I can elaborate on  12:48:15
that?                                              12:48:15
         Q.    Please.                             12:48:15
         A.    Part of doing business in the Philippines  12:48:15
is that you have to be accredited with POEA.  And  12:48:15
part of getting the accreditation is that we accept  12:48:15
that we will uphold and follow the laws of the    12:48:15
Philippines, as it pertains to their overseas     12:48:17

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

```
 1   workers.                                              12:48:17
 2        Q.   Okay.                                        12:48:17
 3             MR. MASE:  Are you finished?                 12:48:17
 4             THE WITNESS:  I'm finished.                  12:48:17
 5   BY MR. HUGGETT:
 6        Q.   And thus, it's part of your duties to see    12:48:17
 7   that any claims are arbitrated?                        12:48:17
 8        A.   It's part of my duty to make sure that we    12:48:17
 9   follow the -- the laws that we have accepted.          12:48:17
10        Q.   Do you know which laws pertain to            12:48:17
11   arbitration that affect your company?                  12:48:17
12        A.   Yes, I do.                                   12:48:17
13        Q.   Which are they?                              12:48:17
14        A.   I'm assuming you're referring to Memorandum  12:48:17
15   No. 9 of 2000.                                         12:48:17
16        Q.   Let me see that.                             12:48:17
17             MR. MASE:  I think he's actually asking      12:48:17
18        you, because he phrased that sort of as a         12:48:17
19        question.  Sometimes it doesn't it sound like     12:48:19
20        it.                                               12:48:19
21             THE WITNESS:  Okay.                          12:48:19
22             MR. MASE:  I think he's asking you what      12:48:19
23        laws pertain -- I'm going to paraphrase his       12:48:19
24        question for him.  I think he was asking you      12:48:19
25        what laws pertain to arbitration that your        12:48:19
```

```
1      company -- using his words -- is required to        12:48:19
2      enforce.  I think that was kind of what he         12:48:19
3      asked.                                              12:48:19
4            MR. HUGGETT:  I'll accept that.               12:48:19
5            THE WITNESS:  Memorandum No. 9, paragraph 5   12:48:19
6      of 2000.                                            12:48:19
7  BY MR. HUGGETT:
8      Q.    Okay.                                         12:48:19
9      A.    And which was part of our accreditation.      12:48:19
10     Q.    Okay.                                         12:48:19
11           MR. MASE:  I know we -- I know we gave you    12:48:19
12     that.                                               12:48:19
13           MR. HUGGETT: Yeah, of course.  I'm going      12:48:19
14     to look at it hopefully.  Got so many documents.    12:48:19
15           MR. MASE:  Think you have a lot of            12:48:19
16     documents now, wait until you see my merits         12:48:21
17     disclosure.                                         12:48:21
18           (Informal discussion off the record.)        12:48:21
19  BY MR. HUGGETT:
20     Q.    All right.  My question is then:  I have      12:48:21
21  Memorandum Circular No. 9 in front of me.  You're     12:48:21
22  familiar with that, I take it?                         12:48:21
23     A.    Yes, I am.                                    12:48:21
24     Q.    And as the -- in your position as human      12:48:21
25  resources, you're inquired -- are you saying you're   12:48:21
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | required to enforce this? | 12:48:21 |
| 2 |     A.   I'm required to make sure that we -- we | 12:48:21 |
| 3 | comply with the agreement we have with the POEA. | 12:48:21 |
| 4 |     Q.   Okay.  And does this Memorandum No. 9 refer | 12:48:21 |
| 5 | to arbitration? | 12:48:21 |
| 6 |     A.   Yes, it does. | 12:48:21 |
| 7 |     Q.   Okay.  I'm going to hand you mine and you | 12:48:21 |
| 8 | may look at --- and you can -- would you tell me | 12:48:22 |
| 9 | which paragraph refers to arbitration? | 12:48:22 |
| 10 |     A.   I'm sorry, I was mistaken.  This refers to | 12:48:22 |
| 11 | the predeparture orientation seminar. | 12:48:22 |
| 12 |     Q.   To the predeparture orientation seminar, is | 12:48:22 |
| 13 | that what you said? | 12:48:22 |
| 14 |     A.   Yeah. | |
| 15 |     Q.   Okay. | |
| 16 |     A.   Or Briefing. | 12:48:22 |
| 17 |     THE COURT REPORTER:  Or? | 12:48:22 |
| 18 |     THE WITNESS:  Or Briefing. | 12:48:22 |
| 19 | BY MR. HUGGETT: | |
| 20 |     Q.   My question is:  What persons or entities | 12:48:22 |
| 21 | within NCL knows about the drafting of the document | 12:48:22 |
| 22 | containing the agreement to arbitrate? | 12:48:26 |
| 23 |     A.   About the drafting? | 12:48:28 |
| 24 |     Q.   Yeah. | 12:48:30 |
| 25 |     A.   I don't know anything about the drafting. | 12:48:30 |

| | | |
|---|---|---|
| 1 | Q.   You know nothing about the drafting? | 12:48:31 |
| 2 | Do you know anything about how the | 12:48:34 |
| 3 | agreement to arbitrate came about? | 12:48:36 |
| 4 | A.   No. | 12:48:41 |
| 5 | Q.   Do you know anything or have any personal | 12:48:41 |
| 6 | knowledge or any documentation about the formulation | 12:48:45 |
| 7 | and agreement of the final language of this agreement | 12:48:54 |
| 8 | to arbitrate? | 12:48:58 |
| 9 | A.   No. | 12:48:59 |
| 10 | Q.   Do you know anything about whether NCL had | 12:49:00 |
| 11 | any input into that agreement to arbitrate? | 12:49:04 |
| 12 | A.   We had no input in that. | 12:49:08 |
| 13 | Q.   You had no input? | 12:49:11 |
| 14 | A.   No. | 12:49:13 |
| 15 | Q.   How do you know that? | 12:49:13 |
| 16 | A.   As being the, at the time, superintendent | 12:49:18 |
| 17 | of ship personnel, and now the director of human | 12:49:21 |
| 18 | resources, I would know if we did.  We're not part of | 12:49:24 |
| 19 | the POEA, nor are we part of the Tripartite Working | 12:49:27 |
| 20 | Group. | 12:49:32 |
| 21 | Q.   Okay.  So you don't have any knowledge | 12:49:33 |
| 22 | then, or any documentation, as to whether these ten | 12:49:40 |
| 23 | seamen had any participation in deciding upon the | 12:49:49 |
| 24 | agreement to arbitrate? | 12:49:56 |
| 25 | A.   No, I don't. | 12:50:01 |

| | | |
|---|---|---|
| 1 | Q. Okay. And NCL has, and you, as its | 12:50:02 |
| 2 | representative here, have no knowledge about whether | 12:50:09 |
| 3 | any of these ten seamen even knew about an agreement | 12:50:15 |
| 4 | to arbitrate prior to the time they got on the | 12:50:21 |
| 5 | vessel? | 12:50:25 |
| 6 | A. It's part of their contract -- | 12:50:28 |
| 7 | Q. Okay. | 12:50:31 |
| 8 | A. -- which they sign prior to leaving the | 12:50:31 |
| 9 | Philippines. | 12:50:33 |
| 10 | Q. Okay. My -- and I think you have -- I have | 12:50:33 |
| 11 | a packet here, and would you take me through this | 12:50:38 |
| 12 | packet. This one relates to one of the seamen. | 12:50:45 |
| 13 | It has one page contract, Department Order | 12:50:49 |
| 14 | No. 4, Circular No. 9, and standard terms and | 12:50:53 |
| 15 | conditions. It's part of the attachments of your | 12:50:57 |
| 16 | company to the pleadings. You may want it show it to | 12:51:00 |
| 17 | your lawyer. | 12:51:04 |
| 18 | MR. MASE: When you say -- you want him to | 12:51:04 |
| 19 | take you through it, or you want to ask him | 12:51:04 |
| 20 | questions? I'm sorry. | 12:51:08 |
| 21 | MR. HUGGETT: I want to ask him questions | 12:51:08 |
| 22 | about it. | 12:51:09 |
| 23 | MR. MASE: Okay. | |
| 24 | MR. HUGGETT: I'm identifying it. | 12:51:10 |
| 25 | MR. MASE: Of course. | 12:51:12 |

```
 1            THE WITNESS:  Okay.                      12:52:51
 2   BY MR. HUGGETT:
 3       Q.   What I've handed you is part of the      12:52:53
 4   attachments of the defendant to its notice to    12:52:55
 5   removal.  We'll mark it when you're through and   12:53:01
 6   attach it as Composite Exhibit 1.                 12:53:04
 7            Are you familiar with all those documents?  12:53:10
 8       A.   Yes, I am.                               12:53:12
 9            (The document referred to was thereupon
10       marked "Plaintiff's Composite Exhibit No. 1 for
11       Identification," a copy of which is attached
12       hereto.)
13   BY MR. HUGGETT:                                   12:53:13
14       Q.   And those documents, so we know in the text  12:53:13
15   what we're talking about, are a one-page contract of  12:53:16
16   employment relating to Abdi Comedia; a one page   12:53:19
17   Department Order No. 4; a two-page memorandum      12:53:25
18   Circular No. 9; one, two, three, four, five, six -- a  12:53:32
19   six-page NXA, called Standard Terms and Conditions  12:53:41
20   Governing Employment of Filipino Seafarers Onboard  12:53:48
21   Ocean-Going Vessels; and a blank form, one page   12:53:53
22   contract of employment; and a document labeled    12:53:56
23   Department Order No. 5, Series of 2000, Department of  12:54:04
24   Labor and Employment.                             12:54:06
25            You're familiar with those?              12:54:09
```

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

```
 1      A.    Yes.                                        12:54:10
 2      Q.    Okay.  Are you the person who would be most 12:54:11
 3 knowledgeable of whether Defendant Norwegian Cruise    12:54:27
 4 Lines participated at all in drafting those            12:54:29
 5 documents?                                             12:54:32
 6      A.    Yes.                                        12:54:36
 7      Q.    Okay.  Did Norwegian Cruise Lines have any  12:54:36
 8 participation at all in drafting those documents?      12:54:42
 9      A.    No.                                         12:54:45
10      Q.    Okay.  Do these documents contain the       12:54:45
11 agreement to arbitrate upon which the defendants rely  12:54:49
12 in removing these case?                                12:54:57
13           MR. MASE:  Objection.  Calls for a legal     12:54:59
14      conclusion, lack of predicate.                    12:55:00
15           THE WITNESS:  As I don't know what they      12:55:03
16      have relied upon, I can't answer that question.   12:55:04
17 BY MR. HUGGETT:
18      Q.    Aren't you the person that is to decide     12:55:07
19 whether you're in compliance with these rules?         12:55:11
20      A.    Okay.  Yes.                                 12:55:26
21      Q.    Then, are these the documents that -- that, 12:55:28
22 in your position as -- with human resources that you   12:55:34
23 would rely on in stating or believing or enforcing,    12:55:38
24 having the company to act as believing that they       12:55:43
25 would arbitrate?                                       12:55:48
```

```
 1        A.    Uh-huh.  Yes.                          12:55:50
 2        Q.    Okay.  Certainly you know that there have  12:55:52
 3   been hundreds, if not thousands of Filipino seamen  12:55:56
 4   that have brought regular tort claims and litigation  12:56:00
 5   in the United States before?                   12:56:02
 6             MR. MASE:  I'm sorry.  Repeat that for me?  12:56:07
 7             MR. HUGGETT:  Yeah.
 8   BY MR. HUGGETT:
 9        Q.    You're aware, aren't you, that there are  12:56:09
10   many, many Filipino seamen who brought claims for  12:56:11
11   injuries in Miami courts and didn't arbitrate?  12:56:16
12             MR. MASE:  Objection to form.  Lack of  12:56:20
13        qualification on the part of the witness.  12:56:26
14             THE WITNESS:  If that's what you're telling  12:56:27
15        me, that's --
16   BY MR. HUGGETT:
17        Q.    Well, you know that for a fact, don't you?  12:56:28
18        A.    I have not been involved in any cases  12:56:30
19   involving Filipino seafarers.                  12:56:34
20        Q.    Okay.  Are you aware from any source that  12:56:36
21   Filipino seamen in the past have brought claims in  12:56:39
22   the United States for injuries?  Surely you're aware  12:56:42
23   of that.                                       12:56:46
24        A.    Yes.                                 12:56:46
25        Q.    And is it part of your job or duties at  12:56:47
```

```
 1   this time, as a result of the documents that we're      12:56:51

 2   looking at, to ensure that your company arbitrates      12:56:58

 3   those rather than litigates those in Miami court?        12:57:00

 4        A.    It's part of my job to make sure that we      12:57:05

 5   comply with the requirements we have in the             12:57:10

 6   Philippines, and one of them is to arbitrate            12:57:15

 7   disputes --                                             12:57:19

 8        Q.    Okay.                                         12:57:19

 9        A.    -- in the Philippines.                        12:57:20

10        Q.    When did that start?                          12:57:21

11        A.    I don't -- I don't recall.                    12:57:26

12        Q.    Well, was it a month ago or many, many        12:57:28

13   years ago?                                              12:57:32

14        A.    My involvement has been since 2000.           12:57:38

15        Q.    Okay.  And within the time that's your        12:57:41

16   involvement, when did they begin to require the         12:57:46

17   arbitration?                                            12:57:48

18        A.    We have required it the whole time.  It's     12:57:49

19   part of the process of being accredited, is that we     12:57:52

20   promise the Filipino government that we will comply      12:58:01

21   with their laws.                                        12:58:05

22        Q.    And where did you promise that?               12:58:06

23        A.    When we got the reaccreditation.              12:58:07

24        Q.    All right.  Is that in writing?               12:58:12

25        A.    I have -- I have to look at the documents.    12:58:16
```

```
 1        Q.    You don't know then sitting here today?      12:58:26
 2        A.    I know that one of the requirements for us   12:58:29
 3   to be accredited as a principal, foreign principal      12:58:31
 4   with POEA, we have to accept their Standard Terms and   12:58:36
 5   Conditions.                                             12:58:41
 6        Q.    Okay.  And my question is:  Do you know      12:58:42
 7   whether that acceptance and agreement is in writing     12:58:45
 8   or not?                                                 12:58:52
 9        A.    I don't know.                                12:58:52
10        Q.    Did you have anything to do with making      12:58:52
11   that agreement or that acceptance?                      12:58:54
12        A.    Yes, I did.                                  12:58:56
13        Q.    Okay.  And do you know when that was,        12:58:58
14   roughly?                                                12:59:00
15        A.    We changed manning agents in -- I believe   12:59:03
16   it was in the summer of 2001.                           12:59:14
17        Q.    Okay.  And at that time was that, to your    12:59:17
18   knowledge, the first time that NCL agreed to obligate   12:59:23
19   itself to arbitrate claims?                             12:59:28
20        A.    We agreed to comply with POEA's Standard     12:59:31
21   Terms and Conditions or exceed them.                    12:59:38
22        Q.    Well, we're talking about arbitration as     12:59:41
23   one of those conditions now, and what I'm trying to     12:59:44
24   get at is:  when did that begin, if you know?           12:59:47
25        A.    I -- I don't recall.                         12:59:50
```

| | | |
|---|---|---|
| 1 | Q.   You don't know? | 12:59:51 |
| 2 | Was it during your period of time that | 12:59:52 |
| 3 | since you took the office of superintendent of | 12:59:55 |
| 4 | shipboard personnel in 2000 or '99, late '99? | 12:59:59 |
| 5 | A.   I don't remember. | 13:00:04 |
| 6 | Q.   And who would know that? | 13:00:09 |
| 7 | A.   I -- I don't know. | 13:00:12 |
| 8 | Q.   Okay.  Is it your testimony that at all | 13:00:14 |
| 9 | times that you can recall since you've been -- since | 13:00:19 |
| 10 | late '99, when you assumed the role of superintendent | 13:00:23 |
| 11 | of shipboard personnel, that you -- that NCL has been | 13:00:26 |
| 12 | required to arbitrate any claims? | 13:00:33 |
| 13 | A.   Yes. | 13:00:34 |
| 14 | Q.   Okay.  Do you know whether there was a time | 13:00:35 |
| 15 | when arbitration was not required? | 13:00:38 |
| 16 | A.   I don't know. | 13:00:40 |
| 17 | Q.   Okay.  And of the documents that you look | 13:00:41 |
| 18 | at, which one requires arbitration? | 13:00:45 |
| 19 | A.   The standard POEA -- POEA Standard Terms | 13:00:48 |
| 20 | and Conditions. | 13:00:54 |
| 21 | Q.   Okay.  And is there a particular number | 13:00:54 |
| 22 | within there? | 13:00:58 |
| 23 | A.   Section 29. | 13:01:04 |
| 24 | Q.   Okay.  Now, what are your duties in regard | 13:01:07 |
| 25 | to seeing that these obligations in your hand are | 13:01:15 |

| | | |
|---|---|---|
| 1 | complied with? | 13:01:18 |
| 2 | A.   I'm not directly involved in arbitration as | 13:01:31 |
| 3 | that is handled by our manning agents and their | 13:01:36 |
| 4 | attorneys -- | 13:01:39 |
| 5 | Q.   Okay. | 13:01:39 |
| 6 | A.   -- on behalf of Norwegian cruise line. | 13:01:40 |
| 7 | Q.   Are you involved in any aspect of enforcing | 13:01:43 |
| 8 | those doc -- those rules and regulations, or those | 13:01:46 |
| 9 | terms of any of those documents? | 13:01:50 |
| 10 | A.   Yes. | 13:01:53 |
| 11 | Q.   Which are they? | 13:01:54 |
| 12 | A.   Pretty much all of them. | 13:02:02 |
| 13 | Q.   Okay.  And is there any other document that | 13:02:03 |
| 14 | requires arbitration besides this Standard Terms and | 13:02:15 |
| 15 | Conditions that you know of? | 13:02:18 |
| 16 | A.   In our grievance procedure. | 13:02:27 |
| 17 | Q.   What is your grievance procedure? | 13:02:40 |
| 18 | A.   It's part of the -- part of the CBA. | 13:02:46 |
| 19 | Q.   Part of the CBA. | 13:02:49 |
| 20 | And what does the grievance procedure say? | 13:02:51 |
| 21 | A.   I -- I can't recall exactly what it states, | 13:02:54 |
| 22 | I would have to see it. | 13:02:58 |
| 23 | Q.   Do you know, in general, what it requires? | 13:02:59 |
| 24 | A.   I don't want to freestyle it.  I would like | 13:03:05 |
| 25 | to have it in front of me. | 13:03:09 |

```
 1      Q.    By raising it, are you saying that there's          13:03:10
 2  some requirements in there that Philippine seamen            13:03:13
 3  arbitrate their injury claims, or you don't know?           13:03:21
 4      A.    It doesn't pertain to any -- it pertains to         13:03:28
 5  all seafarers.                                               13:03:31
 6      Q.    Okay, all seafarers.                               13:03:33
 7            Are you saying that you believe there's            13:03:35
 8  something in your grievance procedures in the CBA           13:03:37
 9  that requires an arbitration of any seafarer, any or        13:03:39
10  all?                                                         13:03:44
11      A.    It outlines their right to file a grievance        13:03:51
12  through the union.                                           13:03:54
13      Q.    Okay.  Does it outline any other                   13:03:56
14  procedures, to your knowledge?                               13:03:58
15      A.    I would have to see the document.                  13:04:01
16      Q.    Okay.  Sitting here today you don't know           13:04:03
17  whether there are other procedures allowed under the        13:04:05
18  CBA?                                                         13:04:09
19      A.    NO.                                                13:04:11
20      Q.    Now, do you have any knowledge yourself, or        13:04:18
21  as the representative of NCL, how the terms of this         13:04:53
22  standard terms NXA were arrived at?                          13:04:59
23      A.    Can you repeat that?                               13:05:04
24      Q.    Yeah.                                              13:05:06
25            MR. HUGGETT:  Yeah.  Can you read that             13:05:06
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | |
|---|---|---|
| 1 | back? | 13:05:07 |
| 2 | (Thereupon, the last question was read back | |
| 3 | by the reporter.) | |
| 4 | BY MR. HUGGETT: | 13:05:27 |
| 5 | Q. That's the six-page document you have in | 13:05:28 |
| 6 | your hand. | 13:05:30 |
| 7 | A. The standard terms, and what? I -- | 13:05:31 |
| 8 | Q. I'll say it again. Do you have any | 13:05:34 |
| 9 | knowledge as to how the standard terms and conditions | 13:05:38 |
| 10 | governing the employment of Filipino seafarers | 13:05:43 |
| 11 | onboard ocean-going vessel was arrived at? | 13:05:47 |
| 12 | A. No. | 13:05:50 |
| 13 | Q. Okay. Did -- do you have any knowledge of | 13:05:52 |
| 14 | whether NCL or its manning agencies had any input | 13:05:57 |
| 15 | into what these terms are? | 13:06:01 |
| 16 | A. NCL did not have any opinion put on it. | 13:06:04 |
| 17 | Q. Okay. | |
| 18 | A. I can't speak for the manning agency. | 13:06:07 |
| 19 | Q. Okay. So you don't -- so NCL has no -- | 13:06:09 |
| 20 | nothing to do with it pursuant to your testimony -- | 13:06:12 |
| 21 | A. That's correct. | 13:06:14 |
| 22 | Q. -- and your knowledge? | 13:06:15 |
| 23 | And you don't know whether the manning | 13:06:18 |
| 24 | agencies that represent NCL had anything to do with | 13:06:20 |
| 25 | arriving at these terms? | 13:06:23 |

|   |   |   |
|---|---|---|
| 1 | A.    That's correct. | 13:06:24 |
| 2 | Q.    And likewise, you don't know whether these | 13:06:25 |
| 3 | seamen had anything -- these ten seamen in this case | 13:06:33 |
| 4 | had anything to do with arriving at those terms? | 13:06:37 |
| 5 | A.    No, I don't. | 13:06:40 |
| 6 | Q.    And, in fact, you don't have any knowledge | 13:06:44 |
| 7 | or documentation whether any seamen in the | 13:06:49 |
| 8 | Philippines had anything to do with negotiating or | 13:06:53 |
| 9 | arriving at these terms? | 13:06:58 |
| 10 | A.    No, I don't. | 13:06:58 |
| 11 | Q.    Now, No. 5, are you the person most | 13:07:04 |
| 12 | knowledgeable of whether any individual Philippine | 13:07:11 |
| 13 | seafarer has ever been allowed to negotiate the terms | 13:07:17 |
| 14 | of his contract of employment with Defendant | 13:07:20 |
| 15 | Norwegian Cruise Lines either directly or through its | 13:07:25 |
| 16 | manning agencies? | 13:07:29 |
| 17 | A.    I would say so. | 13:07:33 |
| 18 | Q.    You're the person most knowledgeable? | 13:07:34 |
| 19 | A.    I would believe so, yes. | 13:07:37 |
| 20 | Q.    And do you -- can you -- do you have any | 13:07:39 |
| 21 | knowledge that any individual seaman has ever been | 13:07:40 |
| 22 | allowed to negotiate his terms? | 13:07:45 |
| 23 | A.    No. | 13:07:47 |
| 24 | Q.    They have not been allowed? | 13:07:49 |
| 25 | MR. MASE:   Objection to form. | 13:07:50 |

| | | |
|---|---|---|
| 1 | THE WITNESS: I have no knowledge -- | 13:07:52 |
| 2 | BY MR. HUGGETT: | |
| 3 | Q. Oh, You have no knowledge, okay. | |
| 4 | A. -- of ever being allowed to do that. | 13:07:53 |
| 5 | Q. You can't say yes or no whether any | 13:07:56 |
| 6 | Philippine seaman was ever allowed to change, modify, | 13:07:58 |
| 7 | negotiate any of these terms? | 13:08:04 |
| 8 | A. I can say to my knowledge, that has not | 13:08:06 |
| 9 | happened. | 13:08:09 |
| 10 | Q. Oh, okay, it's not happened? All right. | 13:08:09 |
| 11 | A. To my knowledge. | 13:08:11 |
| 12 | Q. Therefore, to your knowledge, as to all | 13:08:17 |
| 13 | Philippine seamen, if they want to work, they take | 13:08:19 |
| 14 | these conditions? | 13:08:24 |
| 15 | A. That's correct. | 13:08:25 |
| 16 | Q. Okay. For them, it would be -- | 13:08:26 |
| 17 | A. I'm sorry. Can I clarify that? If they | 13:08:33 |
| 18 | want to work on Norwegian Cruise Line, that's the | 13:08:35 |
| 19 | contract we're offering. | 13:08:38 |
| 20 | Q. They got to take it or leave it? | 13:08:39 |
| 21 | A. If you want to put it that way, yes. | 13:08:42 |
| 22 | Q. Is that a yes or a no? | 13:08:45 |
| 23 | A. Yes. | 13:08:47 |
| 24 | Q. Okay. No. 6, are you the person most | 13:08:47 |
| 25 | knowledgeable about whether any individual Philippine | 13:09:00 |

KLEIN, BURY, REIF & APPLEBAUM (305) 373-8404

75

```
 1  seafarer has been allowed to negotiate the particular   13:09:03
 2  argument to arbitrate, which I think you referred to    13:09:08
 3  as No. 29 in the standard terms?                        13:09:12
 4       A.   Am I the person who would have the most       13:09:13
 5  knowledge?                                              13:09:15
 6       Q.   Yes.                                          13:09:15
 7       A.   I would think so.                             13:09:16
 8       Q.   So you are that person?                       13:09:17
 9       A.   I believe so.                                 13:09:19
10       Q.   And to your knowledge then, the answer is     13:09:20
11  the same, no Philippine seaman has ever been allowed    13:09:22
12  to negotiate the agreement to arbitrate?                13:09:26
13       A.   To my knowledge.                              13:09:28
14       Q.   Okay.  And you're the most knowledgeable?     13:09:31
15  That's a yes?                                           13:09:35
16       A.   I believe so.                                 13:09:36
17       Q.   All righty.  Now, I may have asked you        13:09:37
18  this.  Do you know approximately when the agreement     13:09:46
19  to arbitrate portion of this packet of papers came      13:09:50
20  into existence?                                         13:09:57
21            MR. MASE:  Are you talking about the          13:09:58
22       Standard Terms and Conditions --                   13:09:59
23            MR. HUGGETT:  Yes, No. 29, specifically.      13:10:01
24            THE WITNESS:  I don't recall exactly when     13:10:03
25       it happened.                                       13:10:05
```

```
 1   BY MR. HUGGETT:                                          13:10:05
 2       Q.   Was there ever a time, even though you may      13:10:06
 3   not recall the date, when it didn't exist, when that    13:10:08
 4   wasn't a part of the package that NCL required?         13:10:12
 5       A.   It may have been in a different form, but       13:10:17
 6   we have always given the seafarers the opportunity to   13:10:20
 7   arbitrate and to file a claim with the National Labor   13:10:25
 8   Commission in the Philippines.                          13:10:29
 9       Q.   Well, when you say "always," how far back       13:10:32
10   does that go?                                           13:10:34
11       A.   Well, as far back as I can speak, beginning     13:10:35
12   of 2000.                                                13:10:38
13       Q.   Okay.  Now, the way you've phrased it, I        13:10:39
14   need to ask you a little further.  You say "given       13:10:44
15   them the opportunity."  Has it always, since 2000,      13:10:48
16   when you began to be knowledgeable, been required, to   13:10:51
17   your understanding, that they arbitrate?                13:10:54
18       A.   If they have a grievance, yes, it has to be     13:10:58
19   arbitrated by the National Labor Arbitration Board in   13:11:01
20   the Philippines.                                        13:11:05
21       Q.   Well, let's broad -- let's be more             13:11:07
22   specific.  If they have a claim for injuries based      13:11:10
23   upon an accident or negligence, a tort, is that         13:11:12
24   required to be arbitrated?                              13:11:16
25            MR. MASE:  Objection, calls for a legal         13:11:18
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

```
 1        conclusion.                                        13:11:19
 2             THE WITNESS:  I can't -- I can't speak to     13:11:20
 3        that.
 4   BY MR. HUGGETT:
 5        Q.   You don't know?                               13:11:23
 6        A.   I don't know.                                 13:11:24
 7        Q.   Okay.  What you -- what you -- what you do     13:11:25
 8   know, and you are saying, is that any -- any            13:11:34
 9   grievance is required to be arbitrated?                 13:11:37
10        A.   Yes.                                          13:11:43
11        Q.   Okay.  And since you've been working --       13:11:44
12   since you've been knowledgeable since the beginning     13:11:50
13   of 2000, there's never been any other means of          13:11:52
14   bringing a grievance besides arbitration, like a        13:11:59
15   lawsuit?                                                13:12:09
16             MR. MASE:  Objection, calls for a legal       13:12:09
17        conclusion.                                        13:12:12
18             THE WITNESS:  Has there been lawsuits since   13:12:13
19        I started working, that's your question; yes?      13:12:15
20   BY MR. HUGGETT:
21        Q.   No, my question is to you -- since you've     13:12:18
22   told us that you don't know really the procedures       13:12:20
23   before the end of -- the beginning of 2000; is that     13:12:23
24   correct?
25        A.   That's correct.                               13:12:25
```

```
1      Q.    So since you've become knowledgeable, since    13:12:26
2   the beginning of 2000, have there been any other         13:12:29
3   means available for a seaman to bring a grievance         13:12:32
4   besides arbitration?                                      13:12:37
5      A.    Are you speaking of the Filipino seafarers?      13:12:38
6      Q.    Good point.  Yes, speaking of Filipinos.         13:12:42
7         MR. MASE:  Objection, calls for a legal             13:12:47
8      conclusion.                                            13:12:49
9         THE WITNESS:  Like I said earlier, the             13:12:52
10      arbitration clause may have been in a different       13:12:56
11      form at one point, but I -- I can't -- I can't        13:12:57
12      be more specific.                                     13:13:03
13  BY MR. HUGGETT:
14      Q.    Well, I'm just asking you to tell me what       13:13:04
15   you know or you don't know.  Is it your knowledge, or    13:13:08
16   do you not know, since you've -- and I'm limiting my     13:13:10
17   question to the period of time since the beginning of    13:13:15
18   2000 -- that the only available means for a Filipino     13:13:18
19   to bring a grievance has been through arbitration?       13:13:23
20      A.    I don't know.                                   13:13:31
21      Q.    Don't know, okay.                               13:13:32
22         Certainly you're aware and you know that           13:13:38
23   other nationalities are allowed to bring lawsuits for    13:13:42
24   grievances?                                              13:13:48
25      A.    Yes, I am.                                      13:13:48
```

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

```
 1      Q.   Norwegians, for instance, are allowed to,      13:13:49
 2  you being a Norwegian and a former representative of    13:13:53
 3  the Norwegian government?                               13:13:56
 4      A.   Yes, I do.                                     13:13:58
 5      Q.   And that is correct, they are allowed to do    13:13:59
 6  that?                                                   13:14:02
 7      A.   I -- I would assume so.                        13:14:05
 8      Q.   Why are Filipinos different?                   13:14:12
 9           MR. MASE:  Objection to form.                  13:14:15
10           THE WITNESS:  Because it's part of their       13:14:20
11      contract that claims and disputes has to be         13:14:24
12      arbitrated in the Philippines.  And us, being       13:14:27
13      accredited with the POEA, we have to abide by       13:14:32
14      that.                                               13:14:35
15  BY MR. HUGGETT:                                         
16      Q.   And it's your testimony that NCL, and you      13:14:41
17  don't know about the manning agencies, had nothing to   13:14:44
18  do with how that requirement came about?                13:14:48
19      A.   That's correct.                                13:14:51
20      Q.   And is it your testimony that the manning      13:14:54
21  agencies may have had something to do, but you don't    13:14:56
22  know?                                                   13:14:59
23      A.   I don't know.                                  13:14:59
24      Q.   And you don't know whether any Philippines     13:15:01
25  seafarer has had anything to do with how that came      13:15:09
```

| | | |
|---|---|---|
| 1 | about? | 13:15:12 |
| 2 | A.   No, I don't. | 13:15:12 |
| 3 | Q.   Okay.  Your predecessor, Lou Bach, used to | 13:15:16 |
| 4 | go to court on occasion when lawsuits were tried.  Do | 13:15:53 |
| 5 | you do that function? | 13:15:57 |
| 6 | A.   I do a -- I've done depositions, yes. | 13:16:00 |
| 7 | Q.   Okay.  Have you ever gone to court and sat | 13:16:04 |
| 8 | in as the court representative? | 13:16:06 |
| 9 | A.   No, I have not. | 13:16:08 |
| 10 | Q.   Okay.  And are you familiar that a number | 13:16:10 |
| 11 | of Philippine seamen have settled a claim for | 13:16:16 |
| 12 | injuries in litigation this very calendar year? | 13:16:22 |
| 13 | A.   No, I'm not. | 13:16:26 |
| 14 | Q.   You're not? | 13:16:28 |
| 15 | Who, within the company, would know that? | 13:16:29 |
| 16 | MR. MASE:  That they had settled cases? | 13:16:35 |
| 17 | MR. HUGGETT:  Yeah. | 13:16:37 |
| 18 | THE WITNESS:  Legal department. | 13:16:37 |
| 19 | BY MR. HUGGETT: | |
| 20 | Q.   Legal.  Is that Mr. Kritzman or Mr. Lara? | 13:16:38 |
| 21 | A.   Or Mr. -- I'm sorry. | 13:16:43 |
| 22 | Q.   Lara.  You know Mr. Richard Lara? | 13:16:44 |
| 23 | MR. MASE:  Richard's outside.  He works in | 13:16:48 |
| 24 | my firm. | 13:16:50 |
| 25 | MR. HUGGETT:  I know he does, but he also | 13:16:51 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

```
 1        meets on all these committees that he meets          13:16:53
 2        with, doesn't he?                                    13:16:55
 3             THE WITNESS:  I -- you lost me.                  13:16:55
 4   BY MR. HUGGETT:
 5        Q.   Oh, come on.  Let's look at back at this         13:16:56
 6   protocol that we looked at the last time we took your     13:17:00
 7   deposition.                                               13:17:02
 8        A.   Oh, is that what you're talking about?          13:17:02
 9   Okay.                                                     13:17:04
10        Q.   Richard Lara --                                 13:17:05
11        A.   Yes.                                            13:17:05
12        Q.   -- regularly meets with you and Nil Nordh       13:17:06
13   and others concerning company legal matters, does he     13:17:09
14   not?                                                      13:17:14
15             MR. MASE:  Well, don't answer that              13:17:14
16        question.                                           13:17:15
17             MR. HUGGETT:  Don't answer that.  Okay.         13:17:16
18   BY MR. HUGGETT:
19        Q.   Okay.  And does Mr. --                          13:17:17
20             MR. MASE:  Attorney/client privilege.           13:17:17
21   BY MR. HUGGETT:
22        Q.   Does Mr. Kritzman also regularly meet with      13:17:18
23   you and other members of the company concerning          13:17:22
24   seaman union matters?                                    13:17:28
25             MR. MASE:  You can answer if he regularly       13:17:29
```

```
 1        meets with you, but not what the topic is.  The      13:17:31
 2        question is going to be modified to protect the      13:17:33
 3        attorney/client privilege:  Does he regularly        13:17:36
 4        meet with you?                                        13:17:38
 5             THE WITNESS:  Robert Kritzman or Richard         13:17:39
 6        Lara?                                                 13:17:41
 7             MR. MASE:  Kritzman is who he's talking          13:17:42
 8        about.
 9             THE WITNESS:  Kritzman?                          13:17:45
10             MR. HUGGETT:  Kritzman, yes.  Is that a yes     13:17:45
11        or a no?                                              13:17:47
12             THE WITNESS:  We meet regularly.                 13:17:48
13   BY MR. HUGGETT:
14        Q.   Okay.                                            13:17:50
15        A.   Or we did, at least up till he --               13:17:51
16             THE COURT REPORTER:  I'm sorry?
17             THE WITNESS:  Yeah, we do meet regularly.        13:17:55
18   BY MR. HUGGETT:
19        Q.   Okay.  Now, are you aware that in the            13:18:00
20   calendar year of 19 -- of 2003, that NCL has settled      13:18:06
21   numerous claims of Filipino seafarers who are             13:18:13
22   claiming injuries through the court system of the US?     13:18:18
23        A.   I have not been involved in any of them,        13:18:21
24   no.                                                       13:18:23
25        Q.   Well, you are involved in other case, just     13:18:24
```

| | | |
|---|---|---|
| 1 | not Filipinos? | 13:18:27 |
| 2 | A.   I'm involved in some cases. | 13:18:28 |
| 3 | Q.   None of them involve Filipinos? | 13:18:30 |
| 4 | A.   Not that I can recall. | 13:18:36 |
| 5 | Q.   Well, do you know why that a number of | 13:18:44 |
| 6 | Filipino seamen have been able to settle their claim | 13:18:49 |
| 7 | in litigation and not arbitrate, as recently as 2003? | 13:18:54 |
| 8 | A.   No, I -- I don't know. | 13:18:58 |
| 9 | Q.   You don't know that? | 13:18:59 |
| 10 | A.   No. | 13:19:11 |
| 11 | Q.   Do you know of any Filipino seafarer who | 13:19:12 |
| 12 | has successfully rec -- arbitrated a claim and | 13:19:16 |
| 13 | received money from NCL in the year 2003? | 13:19:20 |
| 14 | A.   I'm sorry.  Can you rephrase it? | 13:19:27 |
| 15 | Q.   Do you know of any Filipino seafarer who | 13:19:29 |
| 16 | has successfully arbitrated a claim against NCL and | 13:19:32 |
| 17 | received money in the calendar year 2003? | 13:19:37 |
| 18 | A.   Yes. | 13:19:39 |
| 19 | Q.   How many? | 13:19:40 |
| 20 | A.   I couldn't tell you.  I don't know. | 13:19:40 |
| 21 | Q.   Do you know the number -- Do you know the | 13:19:44 |
| 22 | amount of money paid? | 13:19:47 |
| 23 | A.   No. | 13:19:48 |
| 24 | Q.   Do you have any personal knowledge of that | 13:19:49 |
| 25 | or is that just what somebody told you? | 13:19:50 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

|   |   |   |
|---|---|---|
| 1 | A.    No, I have personal knowledge of it. | 13:19:52 |
| 2 | Q.    Can you tell me what your personal | 13:19:55 |
| 3 | knowledge is? | 13:19:56 |
| 4 | A.    I get copies of the -- of the decisions by | 13:19:57 |
| 5 | the National Arbitration, the Labor Arbitration | 13:20:00 |
| 6 | Board. | 13:20:04 |
| 7 | Q.    Okay.  And does that include the appeals? | 13:20:04 |
| 8 | A.    Yes. | 13:20:07 |
| 9 | Q.    Okay.  And do you oversee whether anybody | 13:20:08 |
| 10 | actually received any payment? | 13:20:12 |
| 11 | A.    No, I don't. | 13:20:13 |
| 12 | Q.    Do you know whether any seaman actually | 13:20:13 |
| 13 | received any payment? | 13:20:16 |
| 14 | A.    Yes, I do. | 13:20:19 |
| 15 | Q.    Okay.  Can you tell me your knowledge of | 13:20:20 |
| 16 | that? | 13:20:23 |
| 17 | A.    I received copies of the correspondence. | 13:20:23 |
| 18 | Q.    Now, you told me about decisions of a court | 13:20:32 |
| 19 | and correspondence.  Who is the correspondence from? | 13:20:33 |
| 20 | A.    From our -- | 13:20:37 |
| 21 | THE COURT REPORTER:  From? | |
| 22 | THE WITNESS:  From our attorneys in the | 13:20:40 |
| 23 | Philippines to our attorneys. | 13:20:42 |
| 24 | BY MR. HUGGETT: | |
| 25 | Q.    That would be Del Lasario's firm? | 13:20:43 |

| | | |
|---|---|---|
| 1 | A.    It could be, not necessarily.  It could be | 13:20:47 |
| 2 | either Magsaysay attorney, it could be the attorney | 13:20:52 |
| 3 | for CF Sharp. | 13:20:53 |
| 4 | Q.    But you frequently correspond with the Del | 13:20:54 |
| 5 | Lasario firm? | 13:21:00 |
| 6 | A.    I do not, no. | 13:21:01 |
| 7 | Q.    Does that -- do you receive correspondence | 13:21:02 |
| 8 | from them? | 13:21:03 |
| 9 | A.    Rarely. | 13:21:03 |
| 10 | Q.    Sometimes? | 13:21:04 |
| 11 | A.    I may have.  I don't know. | 13:21:07 |
| 12 | Q.    Can you tell me who represents the P & I | 13:21:11 |
| 13 | Club, the insurance company in the Philippines? | 13:21:16 |
| 14 | MR. MASE:  If that knowledge flows from | 13:21:21 |
| 15 | conversations which you've had with me or other | 13:21:23 |
| 16 | attorneys in my office, do not answer on the | 13:21:26 |
| 17 | basis of the attorney/client privilege. | 13:21:28 |
| 18 | THE WITNESS:  I know Pandiman (ph) is P & I | 13:21:32 |
| 19 | Club representative. | 13:21:36 |
| 20 | BY MR. HUGGETT: | |
| 21 | Q.    I understand about Pandiman.  My question | 13:21:37 |
| 22 | is:  Do you know, based upon your knowledge of long | 13:21:39 |
| 23 | working, at least since 2000, that Mr. Del Lazaro's | 13:21:43 |
| 24 | firm represents the insurance company, don't you? | 13:21:49 |
| 25 | You know that, don't you? | 13:21:53 |

| | | |
|---|---|---|
| 1 | A.   Do I know that?  Yes, I know that. | 13:21:53 |
| 2 | Q.   Okay.  And from time to time he has | 13:21:56 |
| 3 | represented or acted on behalf of Norwegian Cruise | 13:21:59 |
| 4 | Line? | 13:22:03 |
| 5 | A.   I don't know that. | 13:22:04 |
| 6 | Q.   You don't know that? | 13:22:05 |
| 7 | A.   No. | 13:22:06 |
| 8 | Q.   You don't know whether he is in this case? | 13:22:06 |
| 9 | A.   I believe he is. | 13:22:10 |
| 10 | Q.   Okay. | 13:22:11 |
| 11 | (Thereupon, a brief recess was taken, after | |
| 12 | which the following proceedings were had:) | |
| 13 | MR. HUGGETT:  What did I ask last? | |
| 14 | (Thereupon, the pending question was read | |
| 15 | by the reporter as above-recorded.) | |
| 16 | MR. HUGGETT:  And the answer was? | |
| 17 | (Thereupon, the pending answer was read by | |
| 18 | the reporter as above-recorded.) | 13:23:35 |
| 19 | BY MR. HUGGETT: | 13:23:37 |
| 20 | Q.   Okay.  No. 7, are you the person with the | 13:23:37 |
| 21 | most knowledgeable -- most knowledge of whether any | 13:23:41 |
| 22 | Philippine seafarer was ever able to eliminate from | 13:23:45 |
| 23 | his contract of employment the agreement to | 13:23:47 |
| 24 | arbitrate? | 13:23:52 |
| 25 | A.   I believe I am. | 13:23:53 |

| | | |
|---|---|---|
| 1 | Q.    And do you know if that's ever happened? | 13:23:53 |
| 2 | A.    Not to my knowledge. | 13:23:57 |
| 3 | Q.    Okay.  And are you able to explain then how | 13:23:59 |
| 4 | or why various Philippine seamen in the year 2000 | 13:24:01 |
| 5 | have successfully brought claims in US courts? | 13:24:09 |
| 6 | MR. MASE:  Objection, calls for a legal | 13:24:14 |
| 7 | conclusion on the part of the witness; lack of | 13:24:16 |
| 8 | qualification. | 13:24:17 |
| 9 | THE WITNESS:  I'm not. | 13:24:18 |
| 10 | BY MR. HUGGETT: | |
| 11 | Q.    You're certainly aware that other offices | 13:24:22 |
| 12 | besides mine have represented Philippine seamen?  I'm | 13:24:26 |
| 13 | not the only guy in town. | 13:24:29 |
| 14 | A.    Do I have personal knowledge?  No, I know | 13:24:29 |
| 15 | you're not the only -- but I have no personal | 13:24:34 |
| 16 | knowledge of -- knowledge of who has represented | 13:24:36 |
| 17 | Filipino seafarers. | |
| 18 | THE COURT REPORTER:  I'm sorry? | |
| 19 | BY MR. HUGGETT: | |
| 20 | Q.    In claims against NCL, let's put it that | 13:24:39 |
| 21 | way.  Are there other lawyers besides me that have | 13:24:43 |
| 22 | ever brought claims for Philippine seamen against | 13:24:46 |
| 23 | Norwegian Cruise Lines since you've been in your | 13:24:50 |
| 24 | position in the beginning of 2000? | 13:24:52 |
| 25 | A.    I believe so. | 13:24:53 |

1    Q.    Okay.  And my particular office has settled          13:24:54

2  four cases involving Philippine seamen, Jaime Aquino,        13:25:02

3  Armando Salvo, Diasato Cinco, and Jose Portasa, in           13:25:08

4  the year 2003, all of whom are Filipinos, and all of         13:25:14

5  whom brought a claim in the United States courts.            13:25:20

6         Do you know whether or not those seamen               13:25:22

7  that I've just mentioned, who actually received money        13:25:25

8  from NCL for claims, tort claims, were able to               13:25:31

9  eliminate from their contract the agreement to               13:25:39

10 arbitrate?                                                    13:25:42

11   A.    I have no knowledge of any of those people,          13:25:42

12 and I have no knowledge of their contracts.                  13:25:45

13         THE COURT REPORTER:  Of their?                       13:25:52

14         THE WITNESS:  Contracts.                             13:25:54

15 BY MR. HUGGETT:

16   Q.    All right.  What's the first occasion that           13:25:55

17 you ever heard about or can recall that NCL attempted        13:26:12

18 to remove the cases to federal court and send them to        13:26:21

19 the Philippines for arbitration?                             13:26:26

20         MR. MASE:  I'm sorry.  Say that -- what's            13:26:27

21     the first occasion he can recall?                        13:26:29

22         MR. HUGGETT:  Uh-huh.                                13:26:31

23         MR. MASE:  If that information comes to you          13:26:32

24     through attorneys for NCL, I'm going to instruct         13:26:35

25     you not to answer that.  If you have other               13:26:38

```
 1        knowledge, go ahead and answer.                    13:26:39
 2             THE WITNESS:  I think I saw it on the news.    13:26:41
 3   BY MR. HUGGETT:
 4        Q.   Okay.  Obviously, you're not -- I've          13:26:46
 5   misphrased my question.  I'm not speaking of this       13:26:50
 6   case.  Maybe you were.                                  13:26:55
 7             My question is:  what's the first occasion    13:26:56
 8   that you know of that NCL has attempted to remand --    13:26:59
 9   to send a case to federal court for the purpose of      13:27:05
10   enforcing arbitration in the Philippines, in any        13:27:10
11   NCL-Filipino claim?                                     13:27:14
12        A.   Like I said earlier, this is probably the     13:27:19
13   first case, because I have not been involved in any     13:27:21
14   cases involving Filipinos.                              13:27:24
15        Q.   Okay.  So this is the first case that you     13:27:26
16   know of?                                                13:27:29
17        A.   Yes.                                          13:27:29
18        Q.   All right.  And other than the lawyers, is    13:27:30
19   there any person more knowledgeable than you of that    13:27:38
20   matter, eliminating lawyers?                            13:27:43
21        A.   Probably not.                                 13:27:50
22        Q.   Okay.  So you would be, aside from the        13:27:52
23   lawyers with the company, you would be the person       13:27:55
24   most knowledgeable of -- of attempts by NCL to take     13:27:58
25   the case, a Filipino's case to federal court and send   13:28:06
```

| | |
|---|---|
| 1 | it to the Philippines for arbitration? | 13:28:12 |
| 2 | A.    That -- that, I don't know. | 13:28:14 |
| 3 | MR. MASE:  Objection to the form of the | 13:28:15 |
| 4 | question. | 13:28:17 |
| 5 | BY MR. HUGGETT: | |
| 6 | Q.    Do you know if you're the most -- person | 13:28:18 |
| 7 | most knowledgeable of that, aside from attorneys? | 13:28:22 |
| 8 | A.    I can't answer that question. | 13:28:37 |
| 9 | Q.    Is that because you don't know? | 13:28:44 |
| 10 | A.    I don't know. | 13:28:46 |
| 11 | Q.    Do you know of anyone else within NCL that | 13:28:47 |
| 12 | deals with the claims by Filipino seamen, excluding | 13:28:53 |
| 13 | the lawyers, of course, besides yourself? | 13:28:59 |
| 14 | A.    Other people? | 13:29:04 |
| 15 | Q.    Yes. | 13:29:05 |
| 16 | A.    Yeah, there could be several other people. | 13:29:07 |
| 17 | Q.    And who would they be? | 13:29:10 |
| 18 | A.    Toni Gartland would be one of them. | 13:29:12 |
| 19 | Q.    Okay.  Who else? | 13:29:16 |
| 20 | A.    George Chesney. | 13:29:19 |
| 21 | THE COURT REPORTER:  George -- | 13:29:23 |
| 22 | THE WITNESS:  Chesney. | 13:29:26 |
| 23 | BY MR. HUGGETT: | |
| 24 | Q.    Anyone else? | 13:29:27 |
| 25 | A.    Could be a thousand other people.  I just | 13:29:32 |

91

| | | |
|---|---|---|
| 1 | don't know. | 13:29:34 |
| 2 | Q.   These are the ones that you know? | 13:29:35 |
| 3 | A.   Yeah. | 13:29:37 |
| 4 | Q.   Okay.  And these are -- Toni Gartland is | 13:29:38 |
| 5 | basically a claims adjuster? | 13:29:44 |
| 6 | A.   No, she's not.  She's director of human | 13:29:45 |
| 7 | resources. | 13:29:49 |
| 8 | Q.   Okay.  Director of human -- how long has | 13:29:49 |
| 9 | she been in that position? | 13:29:54 |
| 10 | A.   I don't know. | 13:29:58 |
| 11 | Q.   Was she a claims adjuster at any time? | 13:30:01 |
| 12 | A.   Toni Gartland? | 13:30:04 |
| 13 | Q.   Yeah. | 13:30:06 |
| 14 | A.   No, not to my knowledge. | 13:30:06 |
| 15 | Q.   Okay.  Is she above you or below you in the | 13:30:08 |
| 16 | hierarchy? | 13:30:11 |
| 17 | A.   We're (indicating) -- | 13:30:12 |
| 18 | Q.   Equal? | 13:30:12 |
| 19 | A.   -- on the same level. | 13:30:13 |
| 20 | Q.   Okay.  And what is Mr. George Chesney's | 13:30:15 |
| 21 | position? | 13:30:18 |
| 22 | A.   He's vice president of human resources. | 13:30:18 |
| 23 | Q.   He's under you in the chain of command? | 13:30:21 |
| 24 | A.   No, he's above me. | 13:30:24 |
| 25 | Q.   Oh, okay.  I'm sorry. | 13:30:25 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | | |
|---|---|---|
| 1 | Tell me the name of your position again. | 13:30:27 |
| 2 | A.   Director of human resources. | 13:30:29 |
| 3 | Q.   Okay.  And you report to Mr. Chesney then? | 13:30:31 |
| 4 | A.   Yes, I do. | 13:30:39 |
| 5 | Q.   All right. | |
| 6 | THE VIDEOGRAPHER:  I need to change the | 13:30:45 |
| 7 | tape. | 13:30:47 |
| 8 | MR. HUGGETT:  Okay.  We'll take a break to | 13:30:47 |
| 9 | change our tape. | 13:30:50 |
| 10 | (Thereupon, a brief recess was taken, after | |
| 11 | which the following proceedings were had:) | 13:38:16 |
| 12 | THE VIDEOGRAPHER:  We're back on tape. | 13:38:17 |
| 13 | MR. HUGGETT:  Okay.  Be sure to attach that | 13:38:20 |
| 14 | document, please, madame reporter.  I usually | 13:38:22 |
| 15 | forget. | 13:38:25 |
| 16 | What was the last question and answer so I | |
| 17 | can -- | |
| 18 | (Thereupon, the last question and answer | |
| 19 | was read by the reporter as above recorded.) | |
| 20 | BY MR. HUGGETT: | |
| 21 | Q.   Oh, yes.  Okay.  Was Mr. Chesney the | 13:38:56 |
| 22 | individual who was with you on the day you were | 13:38:58 |
| 23 | talking to my clients in the hospital? | 13:39:00 |
| 24 | A.   Which day are you referring to, when you | 13:39:06 |
| 25 | and I met? | 13:39:08 |

```
 1       Q.    Yes.                                          13:39:09

 2       A.    Mr. Chesney was there, yes.                   13:39:10

 3       Q.    Okay.  Now -- all right.  I think I asked,    13:39:16

 4  but let me finish it.                                    13:39:31

 5             Is there any other person that would          13:39:33

 6  know -- have more knowledge about why certain            13:39:38

 7  Filipino seamen have been able to bring a claim          13:39:46

 8  without arbitration in the current period of time,       13:39:50

 9  and why some are not?                                    13:39:56

10       A.    I don't know.                                 13:39:57

11       Q.    You don't know who that person would be?      13:39:59

12       A.    I don't know if there would be anybody or     13:40:01

13  who it would be.                                         13:40:03

14       Q.    Okay.  Is there --                            13:40:05

15       A.    Excuse me.                                    13:40:08

16             MR. MASE:  Hang on a second.  He's going to   13:40:09

17       get something to drink.  He's coughing.            13:40:10

18             THE WITNESS:  I'm sorry.                       13:40:28

19  BY MR. HUGGETT:

20       Q.    Is there anyone within the NCL who is in      13:40:36

21  charge of, or responsible for, or has the most           13:40:40

22  knowledge of handling seamen's claims?                   13:40:44

23       A.    Our legal and claims department.              13:40:46

24       Q.    And who is the head of that?                  13:40:48

25       A.    Robert Kritzman.                              13:40:58
```

| | | |
|---|---|---|
| 1 | Q.   Okay.   You said that like there may be | 13:41:00 |
| 2 | someone else? | 13:41:08 |
| 3 | MR. MASE:   There's a little bit of a | |
| 4 | question here, and I think Mr. Hjartnes doesn't | |
| 5 | know exactly how to answer the question. | |
| 6 | During the relevant time period to which | 13:41:09 |
| 7 | you are referring, Robert Kritzman was the | 13:41:12 |
| 8 | general counsel of the company. | 13:41:15 |
| 9 | Today, the general counsel of the company | 13:41:15 |
| 10 | is a fellow by the name Mark Warren, | 13:41:18 |
| 11 | W-A-R-R-E-N. He would be the individual who is | 13:41:20 |
| 12 | in charge of the legal and claims department. | 13:41:23 |
| 13 | MR. HUGGETT:   Is he a lawyer? | 13:41:26 |
| 14 | MR. MASE:   Yes. | 13:41:27 |
| 15 | MR. HUGGETT:   Where did he come from? | 13:41:27 |
| 16 | THE COURT REPORTER:   I'm sorry. | |
| 17 | MR. MASE:   You don't put this on. | |
| 18 | MR. HUGGETT:   You don't have to put that | |
| 19 | on. | 13:41:41 |
| 20 | (Thereupon, a brief discussion was held off | 13:41:46 |
| 21 | the record.) | 13:41:50 |
| 22 | MR. HUGGETT:   Okay.   On the record. | 13:41:50 |
| 23 | BY MR. HUGGETT: | |
| 24 | Q.   No. 8, if you'd look at that.   Do you have | 13:41:53 |
| 25 | any knowledge -- are you -- are you the person most | 13:42:04 |

| | | |
|---|---|---|
| 1 | knowledgeable, if anyone, in NCL who would have names | 13:42:06 |
| 2 | and addresses of union representatives which may have | 13:42:12 |
| 3 | represented the seamen in negotiating the agreement | 13:42:17 |
| 4 | to arbitrate? | 13:42:21 |
| 5 | A.    Probably, yes. | 13:42:21 |
| 6 | Q.    And do you know of any such persons? | 13:42:29 |
| 7 | A.    Yes, I do. | 13:42:31 |
| 8 | Q.    Okay.  Who would they be? | 13:42:33 |
| 9 | A.    Captain Oca. | 13:42:36 |
| 10 | Q.    How do you spell it? | 13:42:41 |
| 11 | A.    O-C-A. | 13:42:42 |
| 12 | Q.    Okay. | |
| 13 | A.    Gregory Oca. | 13:42:44 |
| 14 | Q.    Okay. | |
| 15 | A.    He's a member of the Board of the POEA. | 13:42:47 |
| 16 | Q.    Okay.  Anyone else? | 13:42:51 |
| 17 | A.    Not that I know of. | 13:42:54 |
| 18 | Q.    Okay.  The only person you know that | 13:42:57 |
| 19 | claims, or to your knowledge represents seamen in | 13:43:00 |
| 20 | negotiating the agreement to arbitrate is this | 13:43:06 |
| 21 | Gregory Oca, O-C-A? | 13:43:08 |
| 22 | A.    That's the only one I know of, yes. | 13:43:10 |
| 23 | Q.    And are there any others that you've heard | 13:43:12 |
| 24 | about that you don't know their names? | 13:43:15 |
| 25 | A.    No, there's not. | 13:43:17 |

| | | |
|---|---|---|
| 1 | Q. All right. And what is -- now, you say | 13:43:18 |
| 2 | Gregory Oca is a member of the POEA? | 13:43:23 |
| 3 | A. He's a -- he's a Board -- a member of the | 13:43:25 |
| 4 | Board of the POEA. | 13:43:31 |
| 5 | Q. Do you know who all the Board is? | 13:43:31 |
| 6 | A. Off the top of my head, no, I don't. | 13:43:33 |
| 7 | Q. And what is Mr. Gregory Oca's employer? | 13:43:37 |
| 8 | A. AMOSUP. He's the president of AMOSUP. | 13:43:45 |
| 9 | Q. Okay. And do you know his background? | 13:43:53 |
| 10 | When you say captain, is he seafarer? | 13:43:59 |
| 11 | A. He's a sea captain, yes, he is. | 13:44:02 |
| 12 | Q. Okay. | |
| 13 | A. He's long retired. | 13:44:02 |
| 14 | Q. Do you know who employed him when he was a | 13:44:04 |
| 15 | sea captain? | 13:44:06 |
| 16 | A. I don't know. | 13:44:06 |
| 17 | Q. Do you know if he ever worked for NCL? | 13:44:07 |
| 18 | A. No, he never worked for NCL. | 13:44:10 |
| 19 | Q. How do you know that? | 13:44:13 |
| 20 | A. I think I would have known if he did work | 13:44:15 |
| 21 | for NCL. | 13:44:19 |
| 22 | Q. Is he a Filipino? | 13:44:20 |
| 23 | A. Yes, he is. | 13:44:22 |
| 24 | Q. Does NCL have any Philippine captains? | 13:44:28 |
| 25 | A. In a position of captain, no, we don't. | 13:44:33 |

| | | |
|---|---|---|
| 1 | Q.    Have they ever, to your knowledge? | 13:44:35 |
| 2 | A.    Not to my knowledge, no, they're not. | 13:44:38 |
| 3 | Q.    I think we discussed AMOSUP under No. 2, | 13:44:50 |
| 4 | but just to be sure, you have no knowledge or | 13:44:55 |
| 5 | information that any of these ten seamen had any | 13:45:03 |
| 6 | connection to AMOSUP? | 13:45:07 |
| 7 | MR. MASE:  When you say "any connection," | 13:45:08 |
| 8 | would that -- I mean he already testified he | 13:45:10 |
| 9 | thinks they're in it. | 13:45:12 |
| 10 | MR. HUGGETT:  I don't think he quite said | 13:45:13 |
| 11 | that. | 13:45:15 |
| 12 | MR. MASE:  I'm sorry.  Maybe you should ask | 13:45:15 |
| 13 | him. | 13:45:17 |
| 14 | MR. HUGGETT:  I'll -- I'll reask the | 13:45:17 |
| 15 | question. | 13:45:18 |
| 16 | MR. MASE:  Okay. | 13:45:19 |
| 17 | BY MR. HUGGETT: | |
| 18 | Q.    Do you have any -- would you be the person | 13:45:20 |
| 19 | most knowledgeable of, in NCL, of relations with | 13:45:25 |
| 20 | AMOSUP or knowledge about AMOSUP? | 13:45:33 |
| 21 | A.    I believe so, yes. | 13:45:35 |
| 22 | Q.    Okay.  Do you have any evidence or | 13:45:37 |
| 23 | documents that you know of that indicate that these | 13:45:40 |
| 24 | ten seamen are members of AMOSUP? | 13:45:47 |
| 25 | A.    Like I've said before, five of them are | 13:45:50 |

```
 1   aware, members of AMOSUP.                          13:45:53
 2       Q.   Oh, yes.  And those -- and your only      13:45:57
 3   knowledge there was because union dues are deducted? 13:45:58
 4       A.   No, that was not my testimony.            13:46:02
 5       Q.   Okay.  I guess my memory is getting old.  13:46:04
 6            Do you have any knowledge whether the five 13:46:09
 7   deck and engine crew ever went to an AMOSUP meeting? 13:46:15
 8       A.   No, I don't.                              13:46:21
 9       Q.   Do have you any knowledge or evidence     13:46:22
10   whether any of the five deck and engine crew which  13:46:24
11   union dues are deducted from ever voted in an AMOSUP 13:46:31
12   vote of any kind?                                   13:46:36
13       A.   No, I don't.                              13:46:37
14       Q.   Do you have any knowledge or evidence     13:46:39
15   whether those Philippine seamen that you state are in 13:46:41
16   the deck and engine department and get deductions   13:46:49
17   made ever attended any AMOSUP meeting?              13:46:53
18       A.   No I don't.                               13:46:58
19       Q.   Do you have any knowledge or information  13:46:59
20   whether any of those five seamen had a union card?  13:47:03
21       A.   No, I don't.                              13:47:25
22       Q.   Do you have any knowledge or evidence that 13:47:28
23   any of the five seamen in the deck and engine crew  13:47:33
24   that we're talking about here had ever heard of     13:47:37
25   AMOSUP?                                             13:47:41
```

| | | |
|---|---|---|
| 1 | A.    No, I don't. | 13:47:41 |
| 2 | Q.    Okay.  Do you have any knowledge that any | 13:47:46 |
| 3 | of the five seamen involved here had ever met | 13:47:50 |
| 4 | Mr. -- Captain Gregory Oca? | 13:47:54 |
| 5 | A.    No, I don't.  Can I elaborate on seafarers' | 13:48:07 |
| 6 | relationship with AMOSUP? | 13:48:12 |
| 7 | Q.    If you'd like.  Your privilege is to | 13:48:13 |
| 8 | explain your answer. | 13:48:16 |
| 9 | A.    Okay.  As you know, I've have been in this | 13:48:18 |
| 10 | business for quite some time and have traveled to the | 13:48:22 |
| 11 | Philippines many times, and I can tell you that every | 13:48:25 |
| 12 | Filipino seafarer from the deck and engine | 13:48:31 |
| 13 | department, the deck and engine department knows | 13:48:34 |
| 14 | exactly what AMOSUP is and what they stand for and | 13:48:37 |
| 15 | who they are. | 13:48:40 |
| 16 | Q.    Really? | 13:48:41 |
| 17 | A.    That's where they go and get their | 13:48:41 |
| 18 | Provident books validated. | 13:48:44 |
| 19 | Q.    Their which books? | |
| 20 | A.    Their pension fund books validated. | 13:48:45 |
| 21 | THE COURT REPORTER:  What did you say? | |
| 22 | THE WITNESS:  Provident fund. | 13:48:48 |
| 23 | BY MR. HUGGETT: | 13:48:53 |
| 24 | Q.    Okay.  Now -- | 13:48:54 |
| 25 | A.    But do I have any specific knowledge as to | 13:48:54 |

| | | |
|---|---|---|
| 1 | these five individuals, no, I don't. | 13:48:57 |
| 2 | Q. Okay. Now, what's the basis for your | 13:49:01 |
| 3 | statement that you know for -- that you know that all | 13:49:04 |
| 4 | the Filipino seamen know what AMOSUP is? | 13:49:07 |
| 5 | A. That's a personal opinion. | 13:49:11 |
| 6 | Q. Oh, it's an opinion. | 13:49:13 |
| 7 | A. Yes. | 13:49:14 |
| 8 | Q. Can you tell us what it's based upon? | 13:49:14 |
| 9 | A. Based on my experience. | 13:49:16 |
| 10 | Q. Well, can you give me an example? | 13:49:18 |
| 11 | A. I have met with a lot of seafarers from the | 13:49:20 |
| 12 | Philippines, particularly deck and engine, and at | 13:49:23 |
| 13 | least I haven't met one to date that doesn't know | 13:49:27 |
| 14 | what AMOSUP is. | 13:49:29 |
| 15 | Q. So your testimony is they know what it is? | 13:49:31 |
| 16 | A. Yes. | 13:49:34 |
| 17 | Q. Okay. But as to these, any of these in | 13:49:38 |
| 18 | this case, you don't have any knowledge? | 13:49:40 |
| 19 | A. I have no personal knowledge. | 13:49:42 |
| 20 | Q. Okay. Do you know if any -- do you have | 13:49:50 |
| 21 | any knowledge or documents whether any member of | 13:49:54 |
| 22 | AMOSUP ever explained to these ten seamen their | 13:49:59 |
| 23 | rights or obligations? | 13:50:07 |
| 24 | A. No, I don't. | 13:50:12 |
| 25 | Q. Do you have any knowledge whether any | 13:50:15 |

| | | |
|---|---|---|
| 1 | AMOSUP member ever discussed with these ten seamen | 13:50:22 |
| 2 | anything about arbitration? | 13:50:31 |
| 3 | A.    No, I don't. | 13:50:33 |
| 4 | Q.    Do you have -- okay, eight. | 13:50:40 |
| 5 | Number nine, are you the person with the | 13:51:06 |
| 6 | most knowledge of the names and addresses of any POEA | 13:51:08 |
| 7 | representatives participated in negotiating the | 13:51:14 |
| 8 | agreements to arbitrate that the defendants presently | 13:51:18 |
| 9 | seek to enforce against the subject seafarers? | 13:51:23 |
| 10 | A.    Probably. | 13:51:26 |
| 11 | Q.    Okay.  And can you tell me who; what those | 13:51:29 |
| 12 | names and addresses are? | 13:51:34 |
| 13 | A.    No, I cannot. | 13:51:35 |
| 14 | Q.    You did mention that Mr. Oca was a member | 13:51:39 |
| 15 | of the Board of the POEA.  Would he be one of those | 13:51:41 |
| 16 | representatives who participated in negotiating the | 13:51:45 |
| 17 | agreement to arbitrate, or you don't know? | 13:51:49 |
| 18 | A.    I don't know. | 13:51:53 |
| 19 | Q.    You don't know, okay. | 13:51:54 |
| 20 | You have then no knowledge or no | 13:52:02 |
| 21 | documentary evidence of who within the POEA did the | 13:52:06 |
| 22 | negotiating of agreements to arbitrate? | 13:52:13 |
| 23 | A.    No, I don't. | 13:52:15 |
| 24 | Q.    Do you have any knowledge of who within the | 13:52:16 |
| 25 | POEA formulated or drafted this agreement to | 13:52:19 |

| | | |
|---|---|---|
| 1 | arbitrate? | 13:52:22 |
| 2 | A.   No, I don't. | 13:52:23 |
| 3 | Q.   Do you know whether or not anyone, any one | 13:52:27 |
| 4 | of these ten seamen involved here, had any | 13:52:31 |
| 5 | participation in negotiating that agreement to | 13:52:38 |
| 6 | arbitrate? | 13:52:42 |
| 7 | A.   No, I don't. | 13:52:49 |
| 8 | Q.   Okay.  Number ten, are you the person | 13:52:53 |
| 9 | within NCL with the most knowledge of the | 13:52:56 |
| 10 | circumstances under which the subject seafarers, | 13:52:59 |
| 11 | meaning our claimants here, entered into the | 13:53:02 |
| 12 | contracts of employment with Defendant Norwegian | 13:53:05 |
| 13 | Cruise Line? | 13:53:07 |
| 14 | A.   Can you explain the word "circumstance" -- | 13:53:09 |
| 15 | Q.   Yeah. | 13:53:15 |
| 16 | A.   -- what you mean by that? | 13:53:16 |
| 17 | Q.   How, the method, the manner, the dates, the | 13:53:19 |
| 18 | times, the places, the who was there, where they | 13:53:22 |
| 19 | were, things like that, what they were told? | 13:53:25 |
| 20 | A.   I wasn't there, so I can't tell you.  And | 13:53:32 |
| 21 | to my knowledge, nobody else from NCL were there at | 13:53:36 |
| 22 | the time of their actual employment. | 13:53:39 |
| 23 | Q.   Okay.  Do you -- have you read the | 13:53:43 |
| 24 | affidavits which are attached of various manning | 13:54:02 |
| 25 | agencies which represent NCL, which are attached to | 13:54:08 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

| | | |
|---|---|---|
| 1 | this case? | 13:54:13 |
| 2 | A.    No, I have not. | 13:54:14 |
| 3 | Q.    Okay.  I'm looking at a packet of them | 13:54:17 |
| 4 | which were filed with me Tuesday.  There's an | 13:54:20 |
| 5 | affidavit of Lope Paragotos.  Now, you know who he | 13:54:24 |
| 6 | is, right? | 13:54:29 |
| 7 | A.    Yes, I do. | 13:54:30 |
| 8 | Q.    And there's one of Nicholas Torres from | 13:54:32 |
| 9 | CF Sharp.  You know who he is? | 13:54:35 |
| 10 | A.    Yes, I do. | 13:54:37 |
| 11 | Q.    And there's Hapey Ballaga (ph) from | 13:54:38 |
| 12 | CF Sharp. | 13:54:39 |
| 13 | A.    Ballaga.  Ballaga. | 13:54:41 |
| 14 | Q.    Ballaga.  Is that a man or a woman? | 13:54:44 |
| 15 | A.    Man. | 13:54:48 |
| 16 | Q.    My Spanish pronunciation. | 13:54:49 |
| 17 | MR. MASE:  Wasn't bad. | 13:54:52 |
| 18 | MR. HUGGETT:  Ballaga.  Okay. | 13:54:54 |
| 19 | THE WITNESS:  What did you say, Ballaga? | 13:54:57 |
| 20 | BY MR. HUGGETT: | |
| 21 | Q.    And Jack Jickie (ph), Jickie Illagon (ph). | 13:54:59 |
| 22 | How do you say that? | 13:55:01 |
| 23 | A.    Jickie Illagon. | 13:55:03 |
| 24 | Q.    Jickie Illagon -- | 13:55:04 |
| 25 | A.    Yes. | 13:55:06 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| | | | | |
|---|---|---|---|---|
| 1 | Q. | -- of CS Sharp, you know that person? | | 13:55:06 |
| 2 | A. | Yes. | | 13:55:10 |
| 3 | Q. | A man or women? | | 13:55:11 |
| 4 | A. | Man. | | 13:55:12 |
| 5 | Q. | These are all men, okay. | | 13:55:12 |
| 6 | | And Herbert Tria, you know him? | | 13:55:17 |
| 7 | A. | I'm sorry? | | 13:55:19 |
| 8 | Q. | Herbert A. Tria, an associate of the law | | 13:55:20 |
| 9 | firm of Del Rosario & Del Rosario. | | | 13:55:24 |
| 10 | A. | I don't know who that is. | | 13:55:26 |
| 11 | Q. | And do you know Patricia A. Santo Tomas? | | 13:55:31 |
| 12 | A. | Yes, I know who it is. | | 13:55:37 |
| 13 | Q. | Do you work with her -- | | 13:55:38 |
| 14 | A. | No, I don't. | | 13:55:41 |
| 15 | Q. | -- in the course of your work? | | 13:55:42 |
| 16 | A. | No, I do not. | | 13:55:43 |
| 17 | Q. | And do you know Maidsel Carpio (ph)? | | 13:55:51 |
| 18 | A. | No, I don't. | | 13:55:55 |
| 19 | Q. | Who is the assistant manager of Magsaysay? | | 13:55:56 |
| 20 | A. | What did you say the name was? | | 13:56:02 |
| 21 | Q. | Here, I'll hand you an affidavit.  Maybe I | | 13:56:03 |
| 22 | mispronounced that Philippine name. | | | 13:56:05 |
| 23 | A. | Maidsel Carpio -- no. | | 13:56:13 |
| 24 | Q. | Don't know her? | | 13:56:14 |
| 25 | A. | I don't know her. | | 13:56:15 |

KLEIN, BURY, REIF & APPLEBAUM   (305) 373-8404

| 1 | Q.    Who's the person within NCL that deals the | 13:56:16 |
| 2 | most frequently with the manning agencies regarding | 13:56:20 |
| 3 | Filipino seamen? | 13:56:24 |
| 4 | A.    That would probably be me. | 13:56:24 |
| 5 | Q.    Okay.  And you don't know this person? | 13:56:26 |
| 6 | A.    No.  I can't even say I've seen the name | 13:56:31 |
| 7 | before. | 13:56:36 |
| 8 | Q.    All right.  Now, you've read none of their | 13:56:36 |
| 9 | affidavits? | 13:56:51 |
| 10 | A.    No, I have not. | 13:56:52 |
| 11 | Q.    Okay.  As to those persons that you know -- | 13:56:56 |
| 12 | we've just gone over their names -- would they be the | 13:56:59 |
| 13 | ones that might know the circumstances under which | 13:57:02 |
| 14 | the subject seafarers entered into contracts of | 13:57:04 |
| 15 | employment with NCL? | 13:57:07 |
| 16 | MR. MASE:  Object to form.  Lack of | 13:57:09 |
| 17 | foundation. | 13:57:11 |
| 18 | You can answer. | 13:57:12 |
| 19 | THE WITNESS:  Probably. | 13:57:18 |
| 20 | BY MR. HUGGETT: | |
| 21 | Q.    Okay.  Do you -- does NCL pay these people | 13:57:19 |
| 22 | to negotiate the circumstances?  I mean to conduct | 13:57:29 |
| 23 | circum -- conduct the entering of contracts of | 13:57:35 |
| 24 | employment? | 13:57:39 |
| 25 | A.    Yes, we do, we pay them a processing fee. | 13:57:39 |

```
 1        Q.    Okay.  And is that by -- by person?        13:57:43

 2        A.    Yes, by person.                            13:57:48

 3        Q.    X dollars per seaman?                      13:57:50

 4        A.    Yes.                                        13:57:56

 5        Q.    And do you in any way monitor how they do  13:57:57

 6    it, or what they do?                                 13:58:01

 7              I'll rephrase.                              13:58:07

 8              Does NCL in any way monitor or supervise   13:58:09

 9    the manner and the method in which its agents, the   13:58:16

10    manning agencies, like Magsaysay, process the seamen 13:58:21

11    in entering their contracts of employment?           13:58:27

12        A.    I'm not quite sure I understand the        13:58:37

13    question you're asking.                              13:58:40

14        Q.    Okay.                                      13:58:41

15        A.    Do we physically monitor them?  No, we do  13:58:41

16    not.                                                 13:58:45

17        Q.    Okay.                                      13:58:45

18        A.    But do we follow-up and make sure that the 13:58:45

19    proper paperwork is attached to -- with the contracts 13:58:49

20    with whatever they bring aboard, yes, we do.         13:58:52

21        Q.    So NCL does see that you have the proper   13:58:54

22    pieces of paper?                                     13:58:59

23        A.    That's correct.                            13:59:00

24        Q.    Other than that, do you do any checking or 13:59:01

25    monitoring as how, why, and under what circumstances 13:59:07
```

| | | |
|---|---|---|
| 1 | those papers are entered into? | 13:59:10 |
| 2 | A. We visit the manning agents frequently, and | 13:59:17 |
| 3 | we go through their procedures; in other words, we -- | 13:59:23 |
| 4 | you want to call it audit them, yes, we do. | 13:59:27 |
| 5 | Q. And do you ever check on what they tell the | 13:59:33 |
| 6 | people about their rights and their obligations? | 13:59:39 |
| 7 | A. We -- | 13:59:49 |
| 8 | Q. Would that be your job to do that? | 13:59:54 |
| 9 | A. It could be. | 13:59:56 |
| 10 | Q. Have you ever done that? | 13:59:57 |
| 11 | A. I have gone through their predeparture | 14:00:00 |
| 12 | orientation, the contents of what they -- what they | 14:00:07 |
| 13 | go through. | 14:00:15 |
| 14 | Q. Correct me if I'm wrong, you told us | 14:00:15 |
| 15 | earlier that you had -- you tell us now that you've | 14:00:18 |
| 16 | gone through the contents of the paper of what they | 14:00:21 |
| 17 | do, but you've never seen one happen; is that | 14:00:24 |
| 18 | correct? | 14:00:25 |
| 19 | A. Exactly. | 14:00:26 |
| 20 | Q. Do you know of any NCL people that have | 14:00:26 |
| 21 | ever monitored the actual happening of one of those | 14:00:30 |
| 22 | predeparture orientation meetings? | 14:00:34 |
| 23 | A. I -- No. | 14:00:39 |
| 24 | Q. So it would be fair to say that you have no | 14:00:41 |
| 25 | knowledge what of your agents actually do or say to | 14:00:44 |

| | | |
|---|---|---|
| 1 | the seamen within the actual predeparture orientation | 14:00:47 |
| 2 | meeting? | 14:00:54 |
| 3 | A.    That would be correct. | 14:00:54 |
| 4 | Q.    And you have -- it would be fair to say | 14:00:55 |
| 5 | that you have no knowledge of, other than seeing the | 14:00:58 |
| 6 | piece of paper, of what they actually say to the | 14:01:02 |
| 7 | people, or promise to the people, or talk to the | 14:01:04 |
| 8 | people, to the seamen? | 14:01:09 |
| 9 | A.    Well, I think we have to go on the | 14:01:14 |
| 10 | assumption that they follow the outline of what they | 14:01:18 |
| 11 | tell them during the predeparture orientation. | 14:01:23 |
| 12 | Q.    Yes.  By that you mean you rely on the | 14:01:26 |
| 13 | piece of paper that they tell you that they follow? | 14:01:30 |
| 14 | A.    I rely on the people. | 14:01:32 |
| 15 | Q.    But you've never, you, nor anyone you know | 14:01:35 |
| 16 | of, have ever actually checked to see if they do what | 14:01:39 |
| 17 | they say they're doing on paper? | 14:01:42 |
| 18 | A.    I said I have not, and I don't recall | 14:01:44 |
| 19 | anybody else having done it. | 14:01:52 |
| 20 | Q.    Okay.  Now, looking at number 11, it's | 14:02:05 |
| 21 | similar to ten.  It asks, number 11 asks if you're | 14:02:15 |
| 22 | the person most knowledgeable at NCL of documents | 14:02:17 |
| 23 | that were furnished to the subject seamen as their | 14:02:21 |
| 24 | contracts of employment, and by whom and when, and | 14:02:25 |
| 25 | are you that person most knowledgeable? | 14:02:29 |

| | | |
|---|---|---|
| 1 | A.    Probably. | 14:02:36 |
| 2 | Q.    Okay.  And you're appearing here today as | 14:02:39 |
| 3 | that person? | 14:02:42 |
| 4 | A.    Yes. | 14:02:42 |
| 5 | Q.    Okay. | 14:02:43 |
| 6 | MR. MASE:  Same person. | 14:02:44 |
| 7 | BY MR. HUGGETT: | |
| 8 | Q.    And is it -- would it be accurate then, as | 14:02:50 |
| 9 | before, that you have no knowledge of what documents | 14:02:54 |
| 10 | were furnished to them, by whom, other than seeing | 14:02:59 |
| 11 | the documents after the fact? | 14:03:02 |
| 12 | A.    That's correct. | 14:03:06 |
| 13 | Q.    Okay.  Looking at the Exhibit 1 that you | 14:03:06 |
| 14 | have there, which refers to a packet of paper for | 14:03:50 |
| 15 | Abdi Comedia, is it your understanding that his | 14:03:54 |
| 16 | contract of employment was signed March 25th of 2003; | 14:04:04 |
| 17 | is that -- or March 10th? | 14:04:10 |
| 18 | I see those two dates on the front there. | 14:04:12 |
| 19 | Can you help me understand which was the date that | 14:04:22 |
| 20 | he, quote, signed the contract? | 14:04:25 |
| 21 | A.    It appears to me that he signed the | 14:04:27 |
| 22 | contract on March 10th. | 14:04:31 |
| 23 | Q.    Okay.  Is this the basic document signed | 14:04:39 |
| 24 | March the 10th that this seaman, Abdi Comedia, | 14:04:42 |
| 25 | obligated himself to follow those rules and | 14:04:47 |

| | | |
|---|---|---|
| 1 | regulations set out and receive that money? | 14:04:49 |
| 2 | A.   I'm sorry? | 14:04:55 |
| 3 | Q.   Is this -- is this the contract that Abdi | 14:04:56 |
| 4 | Comedia signed? | 14:05:02 |
| 5 | A.   It appears that way. | 14:05:04 |
| 6 | Q.   Okay.  Are there any -- okay.  Now, | 14:05:05 |
| 7 | attached to that is department order four, and | 14:05:12 |
| 8 | memorandum circular nine; is that correct? | 14:05:16 |
| 9 | A.   Yes. | 14:05:18 |
| 10 | Q.   What you know -- what you, as the corporate | 14:05:20 |
| 11 | rep here know about these is simply that you received | 14:05:23 |
| 12 | .these papers after some point after he had signed | 14:05:26 |
| 13 | them; is that correct? | 14:05:29 |
| 14 | A.   That's correct. | 14:05:30 |
| 15 | Q.   And you didn't -- we've already established | 14:05:31 |
| 16 | that you didn't monitor or oversee the actual | 14:05:34 |
| 17 | signing? | 14:05:42 |
| 18 | A.   That's correct. | 14:05:42 |
| 19 | Q.   Now -- and we see that the -- or at least | 14:05:47 |
| 20 | it appears to us here after the fact that the date -- | 14:05:50 |
| 21 | the date on the -- at least the only date that I see | 14:06:00 |
| 22 | on the, quote, standard terms and conditions | 14:06:05 |
| 23 | governing the employment of Filipino seafarers -- | |
| 24 | THE COURT REPORTER:  I'm sorry.  Governing | |
| 25 | -- | |

| | | |
|---|---|---|
| 1 | MR. HUGGETT:  Yeah, I want to just -- | |
| 2 | BY MR. HUGGETT: | |
| 3 | Q.    -- standard terms and conditions governing | 14:06:07 |
| 4 | the employment of Filipino seafarers onboard | 14:06:15 |
| 5 | ocean-going vessels is the date of March 25th; is | 14:06:19 |
| 6 | that correct? | 14:06:26 |
| 7 | A.    That's correct. | 14:06:26 |
| 8 | Q.    Is it your understanding, as the person | 14:06:27 |
| 9 | most knowledgeable, that Abdi Comedia signed this -- | 14:06:31 |
| 10 | these standard terms? | 14:06:37 |
| 11 | A.    Yes. | 14:06:49 |
| 12 | Q.    Okay.  He's supposed to, at any rate? | 14:06:51 |
| 13 | A.    I'm sorry? | 14:06:54 |
| 14 | Q.    He is supposed to sign them? | 14:06:54 |
| 15 | A.    Yes, he is. | 14:06:56 |
| 16 | Q.    Is he supposed to sign memorandum -- | 14:06:57 |
| 17 | department order number four? | 14:07:04 |
| 18 | A.    I don't know -- I don't know, and I don't | 14:07:22 |
| 19 | think we have a requirement to sign that one. | 14:07:24 |
| 20 | Q.    Okay.  Do you have any knowledge personally | 14:07:28 |
| 21 | as to whether department order number four was | 14:07:30 |
| 22 | explained to him? | 14:07:33 |
| 23 | A.    It's part of his contract, so I would -- I | 14:07:34 |
| 24 | would -- I don't know. | 14:07:40 |
| 25 | Q.    Okay.  Do you have any knowledge whether | 14:07:41 |

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

1   memorandum circular number nine, series of 2000, two    14:07:44

2   pages, was explained to the seamen?                     14:07:49

3        A.   None other than we rely on our manning        14:07:51

4   agents to do that on our behalf.                        14:07:54

5        Q.   Okay.  Would it be your understanding then    14:07:56

6   that this packet of papers is signed and explained on   14:08:11

7   different days?                                          14:08:17

8        A.   I honestly don't have an opinion on that.     14:08:21

9        Q.   Okay.  Does it -- well, we -- you've told     14:08:27

10  us that you don't monitor the process other than to     14:08:31

11  rely on the manning agencies, but that you do receive   14:08:34

12  papers afterwards and check on them?                    14:08:38

13       A.   Yes.                                          14:08:40

14       Q.   Therefore, in receiving this packet of        14:08:42

15  papers for Abdi Comedia, does it appear to you in       14:08:45

16  examining them afterwards that he has signed them on    14:08:50

17  different days?                                          14:08:54

18       A.   Yes.                                          14:08:54

19       Q.   And would it appear then, in monitoring       14:08:55

20  them afterwards, that he signed his contract before     14:08:58

21  the standard terms and conditions are explained and     14:09:02

22  signed?                                                 14:09:05

23       A.   I -- I don't know.  I don't know the answer   14:09:22

24  to your question.  It may have been explained.  It      14:09:24

25  was -- it appears to be signed on a different day,      14:09:26

| | |
|---|---|
| 1 | but whether it was explained or not, I can't answer | 14:09:28 |
| 2 | to that, but if you read the contract, the POEA | 14:09:31 |
| 3 | standard terms and conditions is part of his | 14:09:37 |
| 4 | contract. | 14:09:40 |
| 5 |     Q.   Right.  And my point is, it does appear | 14:09:40 |
| 6 | that he signed his contract and put his John Henry on | 14:09:43 |
| 7 | the dotted line before the fine print of the standard | 14:09:47 |
| 8 | terms were either explained or signed? | 14:09:54 |
| 9 |     A.   I wouldn't say that.  I can't make that -- | 14:09:57 |
| 10 |     Q.   You don't know that, do you? | 14:10:00 |
| 11 |     A.   I can't make that qualification that it | 14:10:00 |
| 12 | wasn't explained. | 14:10:03 |
| 13 |     Q.   I didn't say it wasn't explained, I said | 14:10:04 |
| 14 | that there was different dates. | 14:10:07 |
| 15 |     A.   Yes. | 14:10:08 |
| 16 |     Q.   Okay.  And it does appear -- you only | 14:10:08 |
| 17 | know -- you weren't there? | 14:10:14 |
| 18 |     A.   Exactly. | 14:10:15 |
| 19 |     Q.   And you didn't monitor, right?  You only -- | 14:10:16 |
| 20 | you only can review the papers afterwards? | 14:10:18 |
| 21 |     A.   Correct. | 14:10:21 |
| 22 |     Q.   And the review of the papers afterwards | 14:10:21 |
| 23 | tells us only that he signed his contract March the | 14:10:25 |
| 24 | 10th, and that he signed the standard terms and | 14:10:33 |
| 25 | conditions containing the arbitration contract some | 14:10:39 |

| | | |
|---|---|---|
| 1 | 15 days later, correct? | 14:10:44 |
| 2 | A.   Can I draw that conclusion from this?  No, | 14:10:50 |
| 3 | I cannot. | 14:10:53 |
| 4 | Q.   No, is that what appears -- is that what | 14:10:53 |
| 5 | these papers show us? | 14:10:55 |
| 6 | MR. MASE:  Objection to the form of the | 14:10:56 |
| 7 | question. | 14:10:57 |
| 8 | THE WITNESS:  All I can tell you is that it | 14:10:57 |
| 9 | was approved by POEA on the 25th of March. | 14:10:58 |
| 10 | BY MR. HUGGETT: | |
| 11 | Q.   Okay.  Now, that's -- okay.  That's the | 14:11:01 |
| 12 | date that the stamp is on the front page, right? | 14:11:07 |
| 13 | A.   And also on the third to the last page. | 14:11:13 |
| 14 | Q.   Okay.  Do you -- do you know, other than | 14:11:15 |
| 15 | the 25th, what date the seafarer signed it? | 14:11:19 |
| 16 | A.   No, I don't. | 14:11:22 |
| 17 | Q.   All right.  Let's look at No. 12.  Are you | 14:11:27 |
| 18 | the person most knowledgeable at NCL of the manning | 14:11:47 |
| 19 | agencies used by or acting for NCL in connection with | 14:11:51 |
| 20 | discussing the -- either the regular terms or the | 14:11:57 |
| 21 | amended terms and conditions governing the employment | 14:12:01 |
| 22 | of Filipino seafarers as referenced in memorandum | 14:12:06 |
| 23 | circular number nine? | 14:12:08 |
| 24 | A.   I would think I am, yes. | 14:12:18 |
| 25 | Q.   Okay.  And who are the various manning | 14:12:20 |

| | | |
|---|---|---|
| 1 | agencies used by NCL in discussing the amended terms | 14:12:26 |
| 2 | and conditions? | 14:12:31 |
| 3 | A.    CF Sharp for deck and engine, and | 14:12:32 |
| 4 | Magsaysay, M-A-G-S-A-Y-S-A-Y, for catering. | 14:12:37 |
| 5 | Q.    Any others? | 14:12:45 |
| 6 | A.    In the Philippines, no. | 14:12:47 |
| 7 | Q.    Okay.  And do you know who within those | 14:12:56 |
| 8 | manning agencies discusses these amended standard | 14:12:58 |
| 9 | terms with the Filipino seamen? | 14:13:03 |
| 10 | A.    I know of a number of people that may | 14:13:11 |
| 11 | partake, but, no, I don't know exactly who.  I know | 14:13:15 |
| 12 | who signed this contract with Comedia, which is Lope | 14:13:17 |
| 13 | Paragatos. | 14:13:23 |
| 14 | Q.    Uh-hmm.  Other than reading it here on the | 14:13:23 |
| 15 | paper afterwards, do you have any knowledge of who | 14:13:25 |
| 16 | actually signed with any of these ten men? | 14:13:30 |
| 17 | A.    No, I don't. | 14:13:32 |
| 18 | Q.    Do you have any knowledge who actually did | 14:13:33 |
| 19 | the discussing or the explaining of the amended | 14:13:35 |
| 20 | terms? | 14:13:38 |
| 21 | A.    No, I don't. | 14:13:38 |
| 22 | Q.    Now, looking at No. 13, are you the person | 14:14:09 |
| 23 | most knowledgeable of the procedures used by NCL to | 14:14:16 |
| 24 | comply with paragraph five of memorandum circular | 14:14:21 |
| 25 | number nine in connection with employing the | 14:14:25 |

| | |
|---|---|
| 1 | seafarers? | 14:14:27 |
| 2 |    A.    Probably. | 14:14:38 |
| 3 |    Q.    Okay.  And can you tell me what NCL does to | 14:14:38 |
| 4 | require that its manning agencies comply with No. | 14:14:44 |
| 5 | 9 -- No. 5 of memorandum circular nine? | 14:14:52 |
| 6 |    A.    We require that they comply with the POEA | 14:14:56 |
| 7 | requirements.  I know at CF Sharp we receive a | 14:15:06 |
| 8 | document stating that crew member named X, whatever | 14:15:11 |
| 9 | his name is, has gone through the predeparture | 14:15:18 |
| 10 | orientation as required by POEA. | 14:15:26 |
| 11 |    Q.    Okay.  And is that also that you simply | 14:15:31 |
| 12 | receive paperwork afterward and review it?  Is that | 14:15:36 |
| 13 | the extent of the procedures used to insure that they | 14:15:42 |
| 14 | comply? | 14:15:48 |
| 15 |    A.    No, not entirely.  I mean we -- part of our | 14:15:56 |
| 16 | agreement with the manning agent is that they -- they | 14:16:08 |
| 17 | comply with POEA requirements.  They're also being | 14:16:12 |
| 18 | audited by POEA on a regular basis. | 14:16:18 |
| 19 |       Like I said earlier, we visit them quite | 14:16:20 |
| 20 | frequently, we discuss procedures with them.  So I | 14:16:27 |
| 21 | think we base our part of compliance on a variety of | 14:16:35 |
| 22 | things, not just a piece of paper. | 14:16:45 |
| 23 |    Q.    Okay.  But you never sit in on those | 14:16:46 |
| 24 | discussions, is that correct, to your knowledge? | 14:16:49 |
| 25 |    A.    No, I do not. | 14:16:50 |

| | | |
|---|---|---|
| 1 | Q.   Okay. | 14:16:51 |
| 2 | A.   Have I seen them take place?  Yes, I have. | 14:16:52 |
| 3 | Q.   You told us you had seen the document -- | 14:16:57 |
| 4 | let me make sure I get it correct.  You had not seen | 14:17:03 |
| 5 | the predeparture orientation -- | 14:17:06 |
| 6 | A.   No. | 14:17:08 |
| 7 | Q.   -- but you had seen a -- what was it, a | 14:17:09 |
| 8 | documentation day, or what was your word? | 14:17:11 |
| 9 | A.   That was not my testimony.  I said I have | 14:17:12 |
| 10 | -- I have not sat in on a predeparture. | 14:17:14 |
| 11 | Q.   Okay.  Not sat in on one? | 14:17:17 |
| 12 | A.   Exactly.  I haven't -- | 14:17:19 |
| 13 | Q.   Now, when you say you've -- are you now | 14:17:21 |
| 14 | saying you've seen one? | 14:17:22 |
| 15 | A.   I have seen them take place. | 14:17:24 |
| 16 | Q.   Oh. | 14:17:25 |
| 17 | A.   I have not participated in one. | 14:17:25 |
| 18 | Q.   You mean you saw a bunch of men walk in a | 14:17:27 |
| 19 | room and -- | 14:17:30 |
| 20 | A.   Yes. | 14:17:30 |
| 21 | Q.   -- somebody from the -- | |
| 22 | A.   Actually they are already sitting there. | 14:17:30 |
| 23 | Q.   Okay.  And what did you see? | 14:17:32 |
| 24 | A.   The representative from the manning agency | 14:17:34 |
| 25 | was giving the presentation and going through all the | 14:17:37 |

| | | |
|---|---|---|
| 1 | predeparture -- | 14:17:40 |
| 2 | Q.   Okay.  But you didn't -- | 14:17:42 |
| 3 | A.   -- documentation. | 14:17:43 |
| 4 | Q.   -- listen? | 14:17:44 |
| 5 | A.   No, I didn't. | 14:17:45 |
| 6 | Q.   Okay.  You have no way to tell us what he | 14:17:46 |
| 7 | said or that kind of thing? | 14:17:47 |
| 8 | A.   No, I don't. | 14:17:49 |
| 9 | Q.   Okay.  What was the one that you said you | 14:17:50 |
| 10 | had further witnessed, it was -- we initially | 14:17:58 |
| 11 | today -- a document? | 14:18:02 |
| 12 | A.   Documentation process. | 14:18:03 |
| 13 | Q.   Documentation process.  Now, how is that | 14:18:04 |
| 14 | different from the predeparture? | 14:18:11 |
| 15 | A.   That's when you fill out all the papers, | 14:18:13 |
| 16 | and you go through all the paperwork from medical to | 14:18:15 |
| 17 | contracts, to allotment.  These are prior to | 14:18:19 |
| 18 | documents going to POEA for approval. | 14:18:26 |
| 19 | Q.   You're saying that the documents are | 14:18:34 |
| 20 | signed -- by processed, meaning signed before they go | 14:18:38 |
| 21 | for approval? | 14:18:40 |
| 22 | A.   Exactly. | 14:18:41 |
| 23 | Q.   Okay.  And you've witnessed that one? | 14:18:41 |
| 24 | A.   Yes, I have. | 14:18:43 |
| 25 | Q.   But -- and part of it was in Philippine | 14:18:47 |

```
 1   dialect and part of it was in English?              14:18:49

 2       A.   Yes.                                        14:18:52

 3       Q.   Can you tell us any names or addresses of   14:18:52

 4   people who did that?                                 14:18:55

 5       A.   I'm sorry.  Who --                           14:18:58

 6       Q.   I'll rephrase.                              14:19:00

 7            Can you tell us as to our ten seafarers the 14:19:01

 8   names and addresses of any persons who did that      14:19:05

 9   documentation process?                               14:19:10

10       A.   For those particular seafarers, no, I       14:19:11

11   cannot.                                              14:19:14

12       Q.   Okay.  And can you tell us for our          14:19:15

13   particular seafarers who did the predeparture        14:19:17

14   orientation process?                                 14:19:22

15       A.   No, I can't.                                14:19:23

16       Q.   Would we have to rely on someone from the   14:19:31

17   manning agencies to find that out?                   14:19:34

18       A.   Yes.                                        14:19:42

19            MR. HUGGETT:  Okay.  Want to break?         14:19:44

20            MR. MASE:  Good spot?

21            MR. HUGGETT:  2:18.                          14:19:54

22            MR. MASE:  Yeah.  It's a good spot for you? 14:19:55

23            MR. HUGGETT:  Yeah, well we covered those    14:19:57

24       things, yes.                                     14:19:58

25            MR. MASE:  Okay.                            14:19:59
```

1        MR. HUGGETT:  Okay.  We'll take a break.    14:19:59

2     We'll go off the record.                          14:20:01

3        (Thereupon, the deposition was adjourned at

4     2:20 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8                                      _____
                                              WITNESS
9
10
      SWORN TO AND SUBSCRIBED BEFORE ME THIS _____
11    DAY OF _____, 2003.
12
13
                         Notary Public-State of Florida
14                       My Commission No.
                         Expires:
15
16
17
18
19
20
21
22
23
24
25

1                    <u>CERTIFICATE OF OATH</u>

2

3

4

5   STATE OF FLORIDA)

6                : SS

7   COUNTY  OF  DADE)

8

9             I, the undersigned authority, certify

10  that KJELL HJARTNES personally appeared before me and

11  was duly sworn.

12

13            WITNESS my hand and official seal this

14  _____ day of _____, 2003.

15

16

17                      _____
                        Jan E. Reyna
18                      Notary Public-State of Florida
                        My Commission No. DD185951
19                      Expires:  May 29, 2007

20

21

22

23

24

25

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)

                : SS

COUNTY  OF  DADE)


        I, JAN E. REYNA, a Registered Professional

Reporter, certify that I was authorized to and did

stenographically report the deposition of

KJELL HJARTNES; and that the transcript is a true

record of my stenographic notes.


        I further certify that I am not a relative,

employee, attorney, or counsel of any of the

parties', nor am I a relative or employee of any of

the parties' attorney or counsel connected with the

action, nor am I financially interested in the

action.


        Dated this _____ day of

_____, 2003.



                        _____
                        Jan E. Reyna
                        Registered Professional Reporter

September 11, 2003


KJELL HJARTNES
C/O  MASE & GASSENHEIMER, P.A.
     CURTIS MASE, ESQUIRE
     80 Southwest 8th Street, Suite 2700
     Miami, Florida  33131
     Appearing on behalf of the Defendant(s).

In Re:  BAUTISTA vs. NORWEGIAN CRUISE LINE, LTD.


        With reference to the deposition of
KJELL HJARTNES taken on September 11, 2003 in
connection with the above-styled cause, please be
advised that the transcript of your deposition has
been completed and is awaiting signature.

        Please arrange to stop by our office for
the purpose of reading and signing the transcript of
the deposition.  Office hours are from 9:00 a.m.
until 4:00 p.m., Monday through Friday.
        PLEASE TELEPHONE IN ADVANCE.

        If this has not been taken care of,
however, within the next 30 days, or by the time of
trial, whichever comes first, we shall conclude that
the reading and subscribing of the deposition have
been waived and shall then proceed to send the
original transcript to the ordering counsel for
filing with the proper Court.



        Sincerely yours,


        Jan E. Reyna,
        Registered Professional Reporter
        Klein, Bury & Associates
        One Southeast Third Avenue, Ste. 1250
        Miami, Florida 33131
        (305) 373-8404

(  )  Read
(  )  Unsigned

KLEIN, BURY, REIF & APPLEBAUM  (305) 373-8404

ERRATA SHEET

In Re:  BAUTISTA vs. NORWEGIAN CRUISE LINE

         (PLEASE DO NOT WRITE ON TRANSCRIPT.  ENTER ANY CHANGES IN THE FORMAT BELOW.)

  Page    Line        Change

1) ____/_____/_____
2) ____/_____/_____
3) ____/_____/_____
4) ____/_____/_____
5) ____/_____/_____
6) ____/_____/_____
7) ____/_____/_____
8) ____/_____/_____
9) ____/_____/_____
10) ____/_____/_____
11) ____/_____/_____
12) ____/_____/_____
13) ____/_____/_____
14) ____/_____/_____
15) ____/_____/_____
16) ____/_____/_____
17) ____/_____/_____
18) ____/_____/_____
19) ____/_____/_____
20) ____/_____/_____


        Signature of Deponent _____


STATE OF FLORIDA)
COUNTY OF DADE)

    I DO HEREBY CERTIFY THAT:

      _____ appeared before me and stated
that she has read the above-referenced deposition and
made the changes indicated above; further, that this
Errata Sheet was signed in my presence on the _____
day of   _____, 2003.

                        _____
                        Notary Public
                        State of Florida at Large
                        My Commission Expires:

| | | | |
|---|---|---|---|
| **'80s** - 9:18<br>**'90s** - 9:18<br>**'99** - 69:4, 69:10 | **29** - 69:23, 75:3, 75:23, 122:19<br>**2:18** - 119:21<br>**2:20** - 120:4 | **58**:13<br>**actual** - 40:10, 102:22, 107:21, 108:1, 110:16<br>**add** - 4:12 | **announce** - 5:12<br>**answer** - 7:16, 7:17, 9:14, 10:10, 10:11, 13:21, 13:23, 17:22, 20:11, 20:14, 20:25, 25:20, 29:14, 55:1, 58:3, |

**0**

- **03-21642** - 5:7
- **03-21642-civ-seitz/bandstra** - 1:3
- **03-21643-civ-seitz/bandstra** - 1:4
- **03-21644-civ-seitz/bandstra** - 1:5
- **03-21645-civ-seitz/bandstra** - 1:5
- **03-21646-civ-seitz/bandstra** - 1:6
- **03-21647-civ-seitz/bandstra** - 1:6
- **03-21648-civ-seitz/bandstra** - 1:7
- **03-21649-civ-seitz/bandstra** - 1:8
- **03-21650-civ-seitz/bandstra** - 1:9
- **03-21651-civ-seitz/bandstra** - 1:10

**3**

- **3** - 54:5, 125:6
- **30** - 11:22, 124:14
- **305** - 124:23
- **33130** - 2:3
- **33131** - 2:6, 124:5, 124:22
- **373-8404** - 124:23
- **3:30** - 3:4, 10:15

**4**

- **4** - 54:18, 55:7, 57:9, 63:14, 64:17, 125:7
- **400** - 2:3
- **4:00** - 124:12

**address** - 6:5
**addresses** - 95:2, 101:6, 101:12, 119:3, 119:8
**adequate** - 3:16
**adjourned** - 120:3
**adjuster** - 91:5, 91:11
**Advance** - 124:13
**advance** - 41:23
**advised** - 124:9
**affairs** - 8:19
**affect** - 59:11
**affidavit** - 38:17, 103:5, 104:21
**affidavits** - 38:11, 102:24, 105:9
**Affiliate** - 28:25
**affiliated** - 28:18, 28:23
**afternoon** - 3:4, 10:9
**afterwards** - 1:12:12, 1:12:16, 1:12:20, 113:20, 113:22, 115:15
**agencies** - 52:18, 56:1, 56:3, 56:9, 56:11, 72:14, 72:24, 73:16, 79:17, 79:21, 102:25, 105:2, 106:10, 112:11, 114:19, 115:1, 115:8, 116:4, 119:17
**agency** - 17:8, 72:18, 117:24

65:16, 75:10, 81:15, 81:17, 81:25, 85:16, 86:16, 86:17, 88:25, 89:1, 90:8, 92:16, 92:18, 94:5, 99:8, 105:18, 112:23, 113:1
**answered** - 55:19
**appeals** - 84:7
**appear** - 112:15, 112:19, 113:5, 113:16
**Appearances** - 2:1
**appearances** - 5:12
**appeared** - 122:10, 125:20
**appearing** - 109:2
**Appearing** - 2:4, 2:7, 124:5
**appropriate** - 4:20
**approval** - 118:18, 118:21
**approved** - 114:9
**April** - 28:2
**Aquino** - 88:2

**1**

- **1** - 2:20, 15:5, 16:23, 16:24, 64:6, 64:10, 109:13, 125:5
- **10** - 125:10
- **10th** - 109:17, 109:22, 109:24, 113:24
- **11** - 1:18, 108:20, 108:21, 124:1, 124:8, 125:10
- **11:20** - 1:19
- **11:25** - 5:3
- **11th** - 5:3
- **12** - 114:17, 125:11
- **1250** - 124:22
- **13** - 11:25, 115:22, 125:11
- **14** - 125:12
- **15** - 114:1, 125:12
- **16** - 125:13
- **17** - 125:13
- **18** - 125:14
- **19** - 7:22, 82:20, 125:14
- **1979** - 9:25
- **1980** - 7:22
- **1999** - 53:7

**5**

- **5** - 60:5, 64:23, 73:11, 116:5, 125:7

**6**

- **6** - 2:14, 74:24, 125:8
- **64** - 2:20
- **66** - 2:3

**7**

- **7** - 86:20, 125:8

**8**

- **8** - 94:24, 125:9
- **80** - 2:6, 124:4
- **8th** - 2:6, 124:4

**9**

- **9** - 57:8, 59:15, 60:5, 60:21, 61:4, 63:14, 64:18, 116:5, 125:9
- **9:00** - 124:12

**agenda** - 43:11
**agent** - 16:10, 34:11, 34:12, 116:16
**agents** - 16:14, 38:12, 52:14, 68:15, 70:3, 106:9, 107:2, 107:25, 112:4
**ago** - 10:17, 67:12, 67:13
**agree** - 32:10
**agreed** - 27:3, 31:9, 34:5, 68:18, 68:20
**Agreement** - 35:17
**agreement** - 12:10, 14:23, 15:10, 28:20, 29:19, 42:7, 55:17, 56:16, 57:6, 57:10, 61:3, 61:22, 62:3, 62:7, 62:11, 62:24, 63:3, 65:11, 68:7, 68:11, 75:12, 75:18, 86:23, 88:9, 95:3, 95:20, 101:17, 101:25, 102:5, 116:16
**agreements** - 15:11, 101:8, 101:22
**ahead** - 9:15, 10:11, 13:23, 14:1, 20:13, 89:1
**airline** - 34:24
**akin** - 3:25

**arbitrate** - 12:10, 14:23, 15:10, 15:12, 42:7, 55:17, 57:6, 57:11, 58:7, 61:22, 62:3, 62:8, 62:11, 62:24, 63:4, 65:11, 65:25, 66:11, 67:6, 68:19, 69:12, 71:3, 75:2, 75:12, 75:19, 76:7, 76:17, 83:7, 86:24, 88:10, 95:4, 95:20, 101:8, 101:17, 101:22, 102:1, 102:6
**arbitrated** - 58:15, 59:7, 76:19, 76:24, 77:9, 79:12, 83:12, 83:16
**arbitrates** - 67:2
**Arbitration** - 76:19, 84:5
**arbitration** - 42:9, 57:13, 59:11, 59:25, 61:5, 61:9, 67:17, 68:22, 69:15, 69:18, 70:2, 70:14, 71:9, 77:14, 78:4, 78:10, 78:19, 88:19, 89:10, 90:1, 93:8, 101:2, 113:25
**area** - 12:13
**areas** - 10:3
**argument** - 75:2
**Armando** - 88:3
**arrange** - 124:11
**arrived** - 71:22, 72:11
**arrives** - 10:24
**arriving** - 72:25, 73:4, 73:9
**Aside** - 32:17
**aside** - 89:22, 90:7
**aspect** - 4:15, 70:7
**assistant** - 104:19
**associate** - 104:8
**Associated** - 25:11
**Associates** - 5:11, 124:21
**association** - 28:24
**assume** - 19:4, 57:21, 79:7
**assumed** - 69:10
**assuming** - 48:3, 59:14
**assumption** - 49:9, 108:10
**attach** - 40:23, 64:6, 92:13
**attached** - 41:12, 64:11, 102:24, 102:25, 106:19, 110:7
**attachments** - 63:15, 64:4
**attempted** - 88:17, 89:8
**attempts** - 89:24
**attended** - 26:24, 30:22, 42:21, 43:7, 45:22, 45:25, 98:17
**attention** - 12:7, 37:21, 37:25, 55:7
**attorney** - 10:16, 58:12, 85:2, 123:15, 123:17

**2**

- **2** - 97:3, 125:6
- **20** - 125:15
- **200** - 1:17
- **2000** - 53:6, 53:7, 59:15, 60:6, 64:23, 67:14, 69:4, 76:12, 76:15, 77:13, 77:23, 78:2, 78:18, 85:23, 87:4, 87:24, 112:1
- **2001** - 68:16
- **2002** - 6:13
- **2003** - 1:18, 5:3, 82:20, 83:7, 83:13, 83:17, 88:4, 109:16, 121:11, 122:14, 123:22, 124:1, 124:8, 125:22
- **2007** - 122:19
- **2120** - 6:7
- **25th** - 109:16, 111:5, 114:9, 114:15
- **26** - 4:14
- **2700** - 2:6, 124:4

**A**

**Abdi** - 1:6, 64:16, 109:15, 109:24, 110:3, 111:9, 112:15
**abide** - 79:13
**able** - 37:16, 37:17, 38:3, 83:6, 86:22, 87:3, 88:8, 93:7
**aboard** - 106:20
**above-recorded** - 20:23, 21:2, 55:3, 86:15, 86:18
**above-referenced** - 125:21
**above-styled** - 124:9
**accept** - 46:17, 58:23, 60:4, 68:4
**acceptance** - 68:7, 68:11
**accepted** - 59:9
**accident** - 76:23
**accordance** - 4:19
**accreditation** - 58:23, 60:9
**accredited** - 16:9, 58:22, 67:19, 68:3, 79:13
**accurate** - 109:8
**act** - 65:24
**acting** - 53:16, 114:19
**action** - 48:19, 48:21, 50:12, 123:18, 123:19
**actions** - 27:4, 48:14,

**al** - 1:4, 1:7, 1:8, 1:9, 1:10
**alive** - 25:23, 29:10
**allotment** - 32:7, 32:8, 32:13, 32:18, 39:6, 118:17
**allotments** - 31:21
**allowed** - 71:17, 73:13, 73:22, 73:24, 74:4, 74:6, 75:1, 75:11, 78:23, 79:1, 79:5
**amended** - 3:6, 3:14, 114:21, 115:1, 115:8, 115:19
**Amosup** - 20:4, 20:5, 20:15, 21:6, 21:23, 22:11, 22:21, 23:14, 23:23, 25:9, 25:13, 27:9, 96:8, 97:3, 97:6, 97:20, 97:24, 98:1, 98:7, 98:11, 98:17, 98:25, 99:6, 99:14, 100:4, 100:14, 100:22, 101:1
**amount** - 56:21, 83:22

Attorney/client - 81:20
attorney/client - 82:3,
85:17
attorneys - 70:4, 84:22,
84:23, 85:16, 88:24, 90:7
audibly - 6:24
audio - 3:18
audit - 107:4
audited - 116:18
authority - 122:9
authorized - 123:9
available - 11:4, 51:17,
78:3, 78:18
Avenue - 124:22
awaiting - 124:10
aware - 10:16, 10:18,
15:11, 26:18, 27:8, 41:8,
66:9, 66:20, 66:22, 78:22,
82:19, 87:11, 98:1

**B**

b)(6 - 11:22
Bach - 53:8, 80:3
background - 8:2, 8:5,
96:9
bad - 103:17
Ballaga - 103:11, 103:13,
103:14, 103:18, 103:19
bargaining - 28:20, 29:18
Bargaining - 35:16
base - 116:21
Based - 100:9
based - 7:17, 29:5, 76:22,
85:22, 100:8
basic - 109:23
basis - 3:12, 9:13, 16:3,
85:17, 100:2, 116:18
Bautista - 1:3, 5:7, 24:16,
124:6, 125:2
became - 10:16, 10:18
become - 6:12, 78:1
began - 76:16
begin - 52:25, 67:16,
68:24
beginning - 52:9, 53:7,
76:11, 77:12, 77:23, 78:2,
78:17, 87:24
behalf - 2:4, 2:7, 5:16,
5:23, 16:12, 20:16, 21:17,
21:23, 23:6, 56:22, 70:6,
86:3, 112:4, 124:5
belong - 23:2, 24:12
belonging - 20:3, 31:20
Below - 125:3
below - 91:15
benefit - 13:7, 20:8
benefits - 21:14, 21:16,
21:23, 22:9, 22:20, 23:13,
26:19
Bernal - 1:8, 24:18
best - 9:25
between - 12:3, 39:22,
56:7
Bill - 5:14
Biscayne - 1:17
bit - 54:20, 94:3
blank - 64:21
Board - 76:19, 84:6, 95:15,
96:3, 96:4, 98:5, 101:15
booklet - 36:14, 51:16
booklets - 38:5, 38:8
books - 99:18, 99:19,
99:20
bore - 10:14
borrow - 11:19
Boulevard - 1:17
bound - 51:10
break - 54:19, 92:8,
119:19, 120:1

brief - 54:22, 86:11, 92:10,
94:20
Briefing - 61:16, 61:18
bring - 78:3, 78:19, 78:23,
93:7, 106:20
bringing - 77:14
broad - 76:21
brought - 12:8, 14:20,
66:4, 66:10, 66:21, 87:5,
87:22, 88:5
Bru - 13:5
buck - 54:2
building - 14:6
bunch - 117:18
Bury - 5:11, 124:21
business - 14:16, 16:13,
58:21, 99:10

**C**

C/o - 124:3
calendar - 80:12, 82:20,
83:17
cannot - 50:19, 101:13,
114:3, 119:11
Captain - 95:9, 99:4
captain - 96:10, 96:11,
96:15, 96:25
captains - 96:24
card - 98:20
care - 32:15, 124:14
Caribbean - 9:6
Carpio - 104:17, 104:23
case - 5:7, 12:9, 21:10,
21:24, 29:9, 29:23, 30:18,
31:1, 31:5, 31:9, 38:17,
40:6, 40:12, 42:9, 46:5,
65:12, 73:3, 82:25, 86:8,
89:6, 89:9, 89:13, 89:15,
89:25, 100:18, 103:1
Case - 1:3, 1:4, 1:5, 1:6,
1:7, 1:8, 1:9, 1:10, 5:7
cases - 42:8, 57:12, 66:18,
80:16, 83:2, 88:2, 88:18,
89:14
cash - 31:16, 31:19, 31:20,
32:22, 32:23, 33:2
catch - 6:25
categorizing - 24:11
catering - 22:24, 23:2,
25:14, 25:22, 29:10, 115:4
caution - 49:3
Cba - 34:8, 34:25, 35:16,
35:22, 35:25, 36:14, 38:4,
38:8, 39:6, 40:2, 40:17,
41:1, 41:9, 41:20, 70:18,
70:19, 71:8, 71:18
Cba's - 25:16
certain - 10:3, 56:19,
56:20, 56:22, 93:6
Certainly - 66:2, 78:22
certainly - 41:2, 41:16,
87:11
Certificate - 122:1, 123:1
certified - 16:10
Certify - 125:19
certify - 122:9, 123:9,
123:14
cetera - 9:11
Cf - 56:4, 85:3, 103:9,
103:12, 115:3, 116:7
chain - 91:23
Change - 125:4
change - 44:7, 52:4, 74:6,
92:6, 92:9
changed - 27:23, 52:6,
68:15
Changes - 125:3
changes - 125:21
charge - 93:21, 94:12

check - 31:19, 107:5,
112:12
checked - 10:20, 108:16
checking - 106:24
Chesney - 90:20, 90:22,
92:3, 92:21, 93:2
Chesney's - 91:20
Cinco - 88:3
Circular - 60:21, 63:14,
64:18
circular - 110:8, 112:1,
114:23, 115:24, 116:5
circum - 105:23
circumstance - 102:14
circumstances - 102:10,
105:13, 105:22, 106:25
Civil - 3:15, 4:13, 4:20
claim - 76:7, 76:22, 80:11,
83:6, 83:12, 83:16, 88:5,
89:11, 93:7
claimants - 14:20, 102:11
claiming - 82:22
claims - 12:8, 14:20,
19:17, 19:20, 58:6, 58:15,
59:7, 66:4, 66:10, 66:21,
68:19, 69:12, 71:3, 79:11,
82:21, 87:5, 87:20, 87:22,
88:8, 90:12, 91:5, 91:11,
93:22, 93:23, 94:12, 95:19
clarify - 15:9, 17:18, 20:1,
24:8, 47:2, 74:17
clause - 78:10
clear - 10:13, 17:16, 50:22
clients - 92:23
clothes - 4:11
Club - 85:13, 85:19
Cohen - 2:9, 5:9
collective - 28:20, 29:18
Collective - 35:16
college - 8:14, 8:18, 8:21
Comedia - 1:6, 64:16,
109:15, 109:24, 110:4,
111:9, 112:15, 115:12
command - 91:23
commission - 76:8
Commission - 121:14,
122:18, 125:25
committees - 81:1
company - 6:8, 7:12, 8:3,
8:6, 8:23, 8:25, 9:17, 10:1,
52:8, 52:25, 58:6, 59:11,
60:1, 63:16, 65:24, 67:2,
80:15, 81:13, 81:23, 85:13,
85:24, 89:23, 94:8, 94:9
compel - 42:9, 57:12
completed - 124:10
compliance - 65:19,
116:21
complied - 70:1
compliment - 24:13
comply - 53:21, 53:24,
61:3, 67:5, 67:20, 68:20,
115:24, 116:4, 116:6,
116:14, 116:17
complying - 58:13
Composite - 2:20, 64:6,
64:10
concerned - 9:12, 13:25
concerning - 13:11, 13:20,
81:13, 81:23
conclude - 124:15
conclusion - 7:15, 9:10,
65:14, 77:1, 77:17, 78:8,
87:7, 114:2
Conditions - 64:19, 68:5,
68:21, 69:20, 70:15, 75:22
conditions - 18:10, 18:15,
44:8, 63:15, 68:23, 72:9,
74:14, 110:22, 111:3,
112:21, 113:3, 113:25,

114:21, 115:2
conduct - 105:22, 105:23
conducted - 37:6
confusing - 17:17
connected - 123:17
connection - 97:6, 97:7,
114:19, 115:25, 124:9
consider - 8:17
considered - 48:20
consists - 54:14
contact - 11:9, 52:17,
52:22, 53:1
contain - 65:10
containing - 42:7, 55:17,
57:10, 61:22, 113:25
contains - 57:5
contend - 18:23
contends - 42:6
contents - 107:12, 107:16
context - 4:6, 17:14
contract - 15:17, 15:19,
15:22, 34:23, 35:9, 39:4,
39:7, 44:8, 63:6, 63:13,
64:15, 64:22, 73:14, 74:19,
79:11, 86:23, 88:9, 109:16,
109:20, 109:22, 110:3,
111:23, 112:20, 113:2,
113:4, 113:6, 113:23,
113:25, 115:12
Contracts - 88:14
contracts - 17:25, 88:12,
102:12, 105:14, 105:23,
106:11, 106:19, 108:24,
118:17
conversations - 85:15
copies - 84:4, 84:17
copy - 3:5, 11:21, 11:24,
12:2, 32:3, 32:5, 33:10,
33:12, 33:13, 34:8, 34:25,
35:15, 35:25, 40:17, 51:22,
51:23, 51:24, 51:25, 64:11
corporate - 17:13, 110:10
corporation - 12:22
corps - 9:11
Correct - 52:23, 107:14,
113:21
correct - 26:7, 27:19, 40:4,
40:14, 40:19, 46:12, 48:3,
50:6, 50:7, 53:9, 56:5,
56:20, 72:21, 73:1, 74:15,
77:24, 77:25, 79:5, 79:19,
106:23, 107:18, 108:3,
109:12, 110:8, 110:13,
110:14, 110:18, 111:6,
111:7, 114:1, 116:24, 117:4
corrected - 27:17, 47:15
correctly - 28:7, 45:10,
46:8, 46:16, 47:23
correctness - 28:3
correspond - 85:4
correspondence - 47:21,
84:17, 84:19, 85:7
coughing - 93:17
counsel - 5:12, 94:8, 94:9,
123:15, 123:17, 124:16
County - 122:7, 123:6,
125:18
course - 60:13, 63:25,
90:13, 104:15
court - 6:20, 57:12, 67:3,
80:4, 80:7, 80:8, 82:22,
84:18, 88:18, 89:9, 89:25
Court - 1:1, 5:2, 5:6, 5:19,
6:2, 14:8, 15:16, 20:20,
21:15, 23:1, 33:5, 61:17,
82:16, 84:21, 87:18, 88:13,
90:21, 94:16, 99:21, 110:24,
124:17
courts - 66:11, 87:5, 88:5
covered - 119:23

crew - 20:3, 24:1, 98:7, 98:10, 98:23, 116:8
crewmen - 26:14
Cristina - 1:7
critical - 3:23
Cruise - 1:13, 5:17, 7:7, 7:9, 7:13, 7:21, 8:7, 9:5, 9:8, 9:21, 16:12, 17:23, 55:11, 56:23, 65:3, 65:7, 73:15, 74:18, 86:3, 87:23, 102:13, 124:6, 125:2
cruise - 70:6
Cruises - 1:14, 5:18, 7:11, 7:12, 9:21, 14:6, 14:8
Cs- 104:1
current - 93:8
Curtis - 2:5, 5:16, 40:21, 46:8, 124:4

**D**

Dade - 122:7, 123:6, 125:18
date - 50:13, 76:3, 100:13, 109:19, 110:20, 110:21, 111:5, 114:12, 114:15
Dated - 123:21
dated - 52:1
dates - 12:10, 18:24, 42:17, 102:17, 109:18, 113:14
day-to-day - 53:17, 53:19
days - 35:7, 112:7, 112:17, 114:1, 124:14
Dd185961 - 122:18
dead - 25:23, 29:10
deal - 13:1, 52:12, 52:17, 53:19
dealing - 12:7, 52:10, 52:13
deals - 14:19, 90:12, 105:1
deceased - 12:8, 22:14, 22:16, 24:4, 26:14
decide - 65:18
deciding - 62:23
decisions - 84:4, 84:18
deck - 20:3, 24:12, 24:21, 25:7, 25:12, 26:8, 26:13, 26:23, 27:3, 27:7, 29:9, 98:7, 98:10, 98:16, 98:23, 99:12, 99:13, 100:12, 115:3
deck-and-engine - 26:23
decrees - 43:15
deducted - 31:10, 35:23, 41:24, 41:25, 98:3, 98:11
deduction - 30:5, 30:6, 33:4, 33:5, 33:21, 33:22, 34:5
deductions - 29:24, 30:2, 98:16
Defendant - 55:11, 65:3, 73:14, 102:12
defendant - 3:10, 12:11, 42:6, 57:11, 64:4
Defendant(s - 1:15, 2:7, 124:5
defendants - 3:11, 3:17, 4:3, 5:17, 18:23, 42:8, 65:11, 101:8
Del - 84:25, 85:4, 85:23, 104:9
department - 20:4, 23:3, 31:21, 53:3, 80:18, 93:23, 94:12, 98:16, 99:13, 110:7, 111:17, 111:21
Department - 63:13, 64:17, 64:23
departure - 35:7
depo - 52:10
Deponent - 125:16

deposition - 3:7, 3:8, 3:12, 3:13, 4:16, 4:17, 5:4, 13:3, 17:14, 81:7, 120:3, 123:10, 124:8, 124:9, 124:12, 124:15, 125:21
Deposition - 1:21, 1:24, 11:22, 123:1
depositioned - 11:13
depositions - 80:6
Describe - 34:21
describe - 15:24, 16:6, 22:3, 28:16, 31:15
described - 52:9
describing - 9:11, 39:20, 47:19
designated - 10:2
dialect - 37:11, 119:1
dialects - 36:6, 37:5, 37:13
Di as a to - 88:3
died - 23:7, 23:8, 24:9, 24:24
difference - 25:6, 38:25
different - 11:13, 13:16, 38:20, 52:8, 76:5, 78:10, 79:8, 112:7, 112:17, 112:25, 113:14, 118:14
Direct - 2:14, 6:3
direct - 12:6, 17:7
directed - 58:14
directly - 16:13, 31:22, 44:12, 48:10, 52:12, 53:20, 70:2, 73:15
director - 6:10, 19:7, 62:17, 91:6
Director - 91:8, 92:2
disagreed - 27:4
disclosure - 60:17
discuss - 116:20
discussed - 31:5, 43:12, 97:3, 101:1
discusses - 115:8
discussing - 36:17, 114:20, 115:1, 115:19
discussion - 60:18, 94:20
discussions - 116:24
disputes - 67:7, 79:11
distinguish - 39:21
distinguishing - 39:11
District - 1:1
Division - 1:2
doc - 70:8
document - 13:4, 31:15, 33:14, 42:6, 47:16, 55:16, 57:5, 57:10, 57:15, 58:2, 58:4, 58:5, 61:21, 64:9, 64:22, 70:13, 71:15, 72:5, 92:14, 109:23, 116:8, 117:3, 118:11
documentary - 45:5, 45:21, 46:22, 101:21
documentation - 26:21, 26:22, 34:22, 36:23, 36:25, 38:23, 39:21, 40:1, 40:7, 40:10, 42:16, 42:19, 42:24, 43:3, 43:6, 43:11, 43:15, 43:21, 45:25, 46:4, 62:6, 62:22, 73:7, 117:8, 118:3, 119:9
Documentation - 36:24, 39:24, 118:12, 118:13
documentations - 35:8
documents - 18:25, 21:19, 22:2, 22:5, 23:9, 23:12, 26:12, 30:11, 30:17, 30:22, 33:20, 34:5, 38:13, 39:3, 40:24, 50:18, 50:23, 60:14, 60:16, 64:7, 64:14, 65:5, 65:8, 65:10, 65:21, 67:1, 67:25, 69:17, 70:9, 97:23, 100:21, 108:22, 109:9,

109:11, 118:18, 118:19
dollars - 106:3
done - 11:12, 32:1, 33:24, 35:2, 35:5, 48:4, 48:20, 48:22, 80:6, 107:10, 108:19
dotted - 113:7
double - 31:17
down - 6:21
drafted - 101:25
drafting - 55:16, 61:21, 61:23, 61:25, 62:1, 65:4, 65:8
draw - 114:2
dressed - 3:21, 3:22
drink - 93:17
due - 8:7
dues - 29:19, 29:20, 29:24, 30:1, 31:10, 33:4, 33:6, 33:21, 33:23, 41:25, 98:3, 98:11
duly - 5:24, 122:11
during - 69:2, 108:11
During - 35:6, 94:6
duties - 52:25, 53:11, 59:6, 66:25, 69:24
duty - 59:8

**E**

education - 8:13, 8:15
effect - 23:9
eight - 101:4
either - 10:21, 25:23, 29:9, 44:24, 73:15, 85:2, 113:8, 114:20
elaborate - 58:18, 99:5
election - 26:15, 31:2
eliminate - 86:22, 88:9
eliminating - 89:20
email - 51:16
employed - 96:14
employee - 123:15, 123:16
employees - 13:12, 13:20
employer - 96:7
employing - 115:25
employment - 64:16, 64:22, 72:10, 73:14, 86:23, 102:12, 102:22, 105:15, 105:24, 106:11, 108:24, 109:16, 110:23, 111:4, 114:21
Employment - 64:20, 64:24
end - 53:7, 77:23
enforce - 60:2, 61:1, 101:9
enforcing - 65:23, 70:7, 89:10
engine - 20:4, 24:12, 24:21, 24:22, 24:23, 25:7, 25:12, 26:9, 26:13, 26:23, 27:3, 27:7, 29:9, 31:21, 98:7, 98:10, 98:16, 98:23, 99:12, 99:13, 100:12, 115:3
English - 36:5, 36:7, 36:12, 37:9, 37:18, 37:19, 119:1
enrolled - 20:7
ensure - 67:2
Enter- 125:3
entered - 102:11, 105:14, 107:1
entering - 105:23, 106:11
entirely - 116:15
entities - 55:10, 56:7, 56:8, 61:20
entity - 57:18
envelope - 33:3, 33:8, 33:14, 33:20, 33:24
Equal - 8:14, 91:18

Errata - 125:1, 125:22
Esquire - 2:2, 2:5, 124:4
established - 110:15
et - 1:4, 1:7, 1:8, 1:9, 1:10, 9:11
etc - 1:4, 1:7, 1:8, 1:9, 1:10
everbody - 4:11
evidence - 24:7, 26:9, 26:23, 27:2, 27:7, 29:22, 30:5, 30:9, 30:17, 30:21, 30:25, 31:8, 32:5, 34:4, 40:15, 41:23, 42:20, 45:5, 45:21, 97:22, 98:9, 98:14, 98:22, 101:21
Exactly - 48:12, 107:19, 113:18, 117:12, 118:22
exactly - 36:4, 53:12, 70:21, 75:24, 94:5, 99:14, 115:11
Examination - 2:14, 6:3
examined - 5:24
examining - 112:16
example - 50:15, 100:10
exceed - 68:21
excluding - 90:12
Excuse - 7:2, 18:5, 27:21, 93:15
executive - 14:5
Exhibit - 2:20, 64:6, 64:10, 109:13
exist - 76:3
existence - 27:8, 46:23, 75:20
experience - 100:9
experiences - 34:21
expert - 46:18
Expires - 121:14, 122:19, 125:25
explain - 49:16, 87:3, 99:8, 102:14
explained - 36:8, 36:9, 36:14, 38:5, 40:2, 100:22, 112:11, 112:2, 112:6, 112:21, 112:24, 113:1, 113:8, 113:12, 113:13
explaining - 115:19
extent - 7:14, 9:9, 116:13

**F**

fact - 41:20, 49:1, 66:17, 73:6, 109:11, 110:20
fair - 41:25, 42:2, 42:3, 48:15, 51:5, 51:8, 54:17, 107:24, 108:4
familiar - 18:9, 18:13, 57:6, 60:22, 64:7, 64:25, 80:10
family - 31:24, 32:6, 32:15, 32:18
far - 25:7, 76:9, 76:11
federal - 3:15, 4:13, 4:19
federal - 3:18, 42:8, 57:12, 88:18, 89:9, 89:25
Federation - 29:4
fee - 105:25
fellow - 94:10
few - 10:17, 52:9
file - 4:18, 45:2, 71:11, 76:7
filed - 1:24, 38:12, 103:4
filing - 124:17
Filipino - 13:12, 19:8, 26:23, 64:20, 66:3, 66:10, 66:19, 66:21, 67:20, 72:10, 78:5, 78:18, 82:21, 83:6, 83:11, 83:15, 87:17, 90:12, 93:7, 96:22, 99:12, 100:4, 105:3, 110:23, 111:4, 114:22, 115:9

filipino - 89:11
Filipino's- 89:25
Filipinos- 13:7, 27:3, 78:6, 79:8, 83:1, 83:3, 88:4, 89:14
fill - 118:15
final - 62:7
finalization - 17:24
finalized - 54:12
financial - 56:7, 56:10, 56:14
financially - 123:18
fine - 4:11, 17:19, 113:7
Finish- 20:14
finish - 13:21, 20:10, 54:4, 93:4
finished - 59:3, 59:4
firm - 80:24, 84:25, 85:5, 85:24, 104:9
first - 5:24, 24:8, 44:17, 46:19, 68:18, 88:16, 88:21, 89:7, 89:13, 89:15, 124:15
First- 3:10
five - 22:16, 22:22, 23:7, 24:4, 24:9, 24:10, 24:11, 26:10, 26:13, 27:7, 40:5, 64:18, 97:25, 98:6, 98:10, 98:20, 98:23, 99:3, 100:1, 115:24
Flagler- 2:3
Florida- 1:1, 1:18, 1:23, 2:3, 2:6, 6:7, 121:13, 122:5, 122:18, 123:4, 124:5, 124:22, 125:18, 125:24
flows - 85:14
follow - 58:24, 59:9, 106:18, 108:10, 108:13, 109:25
follow-up - 106:18
following - 3:2, 37:22, 54:23, 86:12, 92:11
follows - 5:25
foreign - 37:1, 68:3
forget - 92:15
form - 13:13, 29:11, 30:13, 32:7, 32:8, 51:15, 64:21, 66:12, 73:25, 76:5, 78:11, 79:9, 90:3, 105:16, 114:6
Format- 125:13
former - 79:2
formulated - 101:25
formulates - 47:7
formulation - 62:6
forth - 13:5, 13:7
foundation - 12:19, 105:17
four - 35:7, 64:18, 88:2, 110:7, 111:17, 111:21
frank - 41:8
freestyle - 70:24
frequently - 85:4, 105:2, 107:2, 116:20
Friday- 124:12
front - 50:18, 60:21, 70:25, 109:18, 114:12
full - 29:1
function - 80:5
fund - 22:6, 99:20, 99:22
furnished - 108:23, 109:10

## G

Gartland- 90:18, 91:4, 91:12
Gassenheimer- 2:5, 124:3
general - 35:6, 40:16, 44:5, 70:23, 94:8, 94:9
George - 90:20, 90:21, 91:20
given - 23:22, 34:8, 76:6, 76:14
governing - 72:10, 110:23,

111:3, 114:21
Governing - 64:20, 110:24
Government - 8:10
government - 67:20, 79:3
Gracia - 1:10
Gregory - 95:13, 95:21, 96:2, 96:7, 99:4
grievance - 70:16, 70:17, 70:20, 71:8, 71:11, 76:18, 77:9, 77:14, 78:3, 78:19
grievances - 78:24
Group- 42:5, 42:17, 45:9, 45:18, 45:19, 46:5, 46:12, 47:3, 47:17, 48:5, 48:11, 48:19, 48:23, 49:8, 49:14, 49:25, 50:9, 51:3, 54:5, 54:10, 55:12, 55:23, 62:20
group - 42:21, 43:17, 43:21, 46:22, 47:7, 47:12, 47:14, 47:22, 48:14, 48:15, 50:12, 50:14, 50:17, 54:14
groups - 45:22
guess - 16:15, 48:17, 98:5
guy - 87:13

## H

half - 16:21, 37:8, 37:9
hand - 5:19, 11:24, 12:2, 61:7, 69:25, 72:6, 104:21, 122:13
handed - 36:1, 36:10, 40:3, 41:21, 64:3
handled - 70:3
handling - 93:22
Hang- 93:16
Hapey- 103:11
hard - 51:22, 51:23, 51:24, 51:25
head - 54:1, 93:24, 96:6
headquarter's - 29:6
hear - 6:20
heard - 10:25, 88:17, 95:23, 98:24
Heck- 41:11
held - 94:20
help - 47:25, 109:19
Henry- 113:6
Herbert - 104:6, 104:8
Hereby - 125:19
herein - 5:23, 26:24
hereto - 64:12
hierarchy - 91:16
high - 8:17
himself - 109:25
hire - 16:7
hired - 36:12
hiring - 19:8, 34:7
Hjartnes - 1:21, 2:12, 5:5, 5:6, 5:22, 6:6, 6:17, 13:22, 94:4, 122:10, 123:11, 124:3, 124:8
hmm - 9:7, 115:14
home - 11:6, 11:9, 11:11, 31:23, 32:6, 32:11, 32:13, 32:18
honestly - 112:8
hope - 48:2
hopefully - 60:14
hospital - 92:23
hotel - 23:3, 25:1, 25:4, 25:6
Hotel - 25:2
hours - 124:12
Huggett- 2:2, 2:14, 4:7, 4:10, 5:14, 6:4, 6:22, 7:3, 7:19, 9:1, 9:3, 9:16, 10:22, 11:16, 11:19, 11:20, 12:21, 13:17, 14:3, 14:11, 15:1, 15:3, 15:4, 15:18, 16:20,

16:23, 17:2, 17:12, 17:18, 18:6, 18:16, 20:13, 20:17, 20:19, 20:21, 20:24, 21:3, 21:4, 21:18, 21:22, 22:1, 23:4, 27:18, 27:22, 29:12, 29:15, 30:10, 30:15, 32:9, 33:7, 40:21, 41:1, 41:5, 41:12, 41:17, 41:18, 45:8, 45:15, 48:7, 46:10, 46:14, 46:17, 46:20, 49:5, 49:21, 50:1, 50:4, 54:25, 55:6, 56:9, 56:12, 56:18, 57:2, 57:17, 57:19, 57:23, 57:25, 59:5, 60:4, 60:7, 60:13, 60:19, 61:19, 63:21, 63:24, 64:2, 64:13, 65:17, 66:7, 66:8, 66:16, 71:25, 72:4, 74:2, 75:23, 76:1, 77:4, 77:20, 78:13, 79:15, 80:17, 80:19, 80:25, 81:4, 81:17, 81:18, 81:21, 82:10, 82:13, 82:18, 84:24, 85:20, 86:13, 86:16, 86:19, 87:10, 87:19, 88:15, 88:22, 89:3, 90:5, 90:23, 92:8, 92:13, 92:20, 93:19, 94:13, 94:15, 94:18, 94:22, 94:23, 97:10, 97:14, 97:17, 99:23, 103:1:8, 103:20, 105:20, 109:7, 111:1, 111:2, 114:10, 119:19, 119:21, 119:23, 120:1
human - 19:7, 53:2, 60:24, 62:17, 65:22, 91:6, 91:8, 91:22, 92:2
Human- 6:10
hundreds - 66:3

## I

identification - 64:11
identifying - 63:24
Illagon - 103:21, 103:23, 103:24
important - 6:19
inadequate - 12:19
Inc - 5:10
include - 84:7
including - 18:24
indicate - 10:15, 97:23
indicated - 125:21
indicating - 3:7, 91:17
individual - 32:24, 73:12, 73:21, 74:25, 92:22, 94:11
individuals - 100:1
inform - 35:22
Informal - 60:18
information - 16:16, 26:5, 26:17, 27:6, 39:7, 41:23, 54:6, 88:23, 97:5, 98:19
informing - 44:9, 44:11
injured - 12:7
injuries - 66:11, 66:22, 76:22, 80:12, 82:22
injury - 71:3
input - 62:11, 62:12, 62:13, 72:14
inquired - 60:25
instance - 38:15, 79:1
instruct - 88:24
instructions - 34:24
insurance - 85:13, 85:24
insure - 116:13
intent - 3:17, 19:1
interest - 55:11
interested - 123:18
international - 29:3
interpret - 17:14
interviewed - 19:12, 19:15
involve - 83:3

involved - 19:8, 25:22, 26:24, 66:18, 70:2, 70:7, 82:23, 82:25, 83:2, 89:13, 99:3, 102:4
involvement - 67:14, 67:16
involving - 53:18, 66:19, 88:2, 89:14
issue - 41:3, 41:10
item - 16:18
items - 11:25, 19:3
itf - 28:18, 28:21, 29:2
itself - 4:22, 47:17, 68:19

## J

Jack- 103:21
Jaime- 88:2
Jan- 1:23, 5:10, 6:20, 122:17, 123:8, 123:24, 124:20
Jickie- 103:21, 103:23, 103:24
job - 52:16, 53:15, 53:23, 66:25, 67:4, 107:8
Jobs - 52:8
John- 113:6
join - 19:1
joined - 18:24, 26:10, 30:18
joining - 34:9
Jose- 88:3

## K

keep - 6:24, 33:8, 33:10, 33:12, 33:13
kind - 24:7, 26:9, 26:13, 60:2, 98:12, 118:7
Kjell- 1:21, 2:12, 5:5, 5:6, 5:22, 6:6, 122:10, 123:11, 124:3, 124:8
Klang- 14:7, 14:9
Kloster- 9:5, 9:20, 9:21
knowledge - 8:24, 12:23, 16:3, 16:17, 17:6, 19:6, 21:9, 22:13, 22:18, 24:3, 25:8, 25:21, 26:5, 26:12, 26:17, 27:2, 27:6, 29:6, 29:23, 30:4, 30:10, 30:16, 30:21, 30:25, 31:4, 31:7, 31:8, 34:4, 38:4, 39:1, 40:10, 40:13, 40:15, 41:22, 42:12, 42:15, 42:16, 42:20, 42:23, 43:2, 43:7, 43:10, 43:14, 43:20, 45:4, 45:5, 45:13, 45:21, 45:24, 46:3, 46:21, 47:1, 47:12, 49:14, 49:23, 50:21, 50:23, 52:6, 52:22, 54:6, 54:13, 55:21, 62:6, 62:21, 63:2, 68:18, 71:14, 71:20, 72:9, 72:13, 72:22, 73:6, 73:21, 74:1, 74:3, 74:8, 74:11, 74:12, 75:5, 75:10, 75:13, 78:15, 83:24, 84:1, 84:3, 84:15, 85:14, 85:22, 86:21, 87:2, 87:14, 87:16, 88:11, 88:12, 89:1, 91:14, 93:6, 93:22, 94:25, 95:19, 97:1, 97:2, 97:4, 97:20, 98:3, 98:6, 98:9, 98:14, 98:19, 98:22, 99:2, 99:25, 100:18, 100:19, 100:21, 100:25, 101:6, 101:20, 101:24, 102:9, 102:21, 107:25, 108:5, 109:9, 111:20, 111:25, 115:15, 115:18, 116:24
knowledgeable - 12:12,

12:16, 14:21, 15:7, 15:20,
19:2, 55:9, 55:15, 65:3,
73:12, 73:18, 74:25, 75:14,
76:16, 77:12, 78:1, 86:21,
89:19, 89:24, 90:7, 95:1,
97:19, 108:22, 108:25,
111:9, 114:18, 115:23
  **known** - 8:23, 9:20, 96:20
  **knows** - 61:21, 99:13
  **Kritzman** - 13:5, 80:20,
  81:22, 82:5, 82:7, 82:9,
  82:10, 93:25, 94:7

## L

  **labeled** - 64:22
  **labor** - 76:7
  **Labor** - 64:24, 76:19, 84:5
  **lack** - 12:18, 65:14, 87:7
  **Lack** - 66:12, 105:16
  **language** - 37:1, 62:7
  **Lara** - 80:20, 80:22, 81:10,
  82:6
  **Large** - 1:24, 125:24
  **Lasario** - 85:5
  **Lasario's** - 84:25
  **Last** - 13:3
  **last** - 13:22, 20:20, 44:15,
  54:25, 72:2, 81:6, 86:13,
  92:16, 92:18, 114:13
  **late** - 69:4, 69:10
  **law** - 104:8
  **Lawfirm** - 2:2
  **laws** - 58:24, 59:9, 59:10,
  59:23, 59:25, 67:21
  **lawsuit** - 25:23, 77:15
  **lawsuits** - 77:18, 78:23,
  80:4
  **lawyer** - 3:23, 63:17, 94:13
  **lawyers** - 87:21, 89:18,
  89:20, 89:23, 90:13
  **Lazaro's** - 85:23
  **learn** - 10:5, 52:17
  **learned** - 10:8, 18:8
  **least** - 53:20, 82:15, 85:23,
  100:13, 110:19, 110:21
  **leave** - 74:20
  **leaving** - 32:12, 63:8
  **Legal** - 2:9, 5:10, 80:18,
  80:20
  **legal** - 7:15, 9:10, 65:13,
  76:25, 77:16, 78:7, 81:13,
  87:6, 93:23, 94:12
  **letter** - 47:20
  **level** - 8:12, 91:19
  **likewise** - 73:2
  **Limited** - 7:9, 7:13, 9:5
  **limiting** - 78:16
  **Line** - 1:13, 5:17, 7:7, 7:9,
  7:13, 7:21, 8:8, 16:12,
  17:23, 56:23, 74:18, 86:4,
  102:13, 124:8, 125:2, 125:4
  **line** - 51:17, 51:18, 51:21,
  70:6, 113:7
  **lines** - 9:6
  **Lines** - 9:8, 55:11, 65:4,
  65:7, 73:15, 87:23
  **list** - 23:15, 24:14
  **listen** - 37:24, 118:4
  **listing** - 23:13
  **litigates** - 67:3
  **litigation** - 66:4, 80:12,
  83:7
  **live** - 3:25, 22:14, 22:22
  **living** - 25:3
  **locations** - 12:10
  **London** - 29:7
  **look** - 60:14, 61:8, 67:25,
  69:17, 81:5, 94:24, 114:17
  **Look** - 15:5

  **looked** - 81:6
  **Looking** - 109:13
  **looking** - 67:2, 103:3,
  108:20, 115:22
  **Lope** - 38:14, 103:5, 115:12
  **lost** - 81:3
  **Lou** - 80:3
  **Lovino** - 1:5
  **Ltd** - 1:13, 124:6

## M

  **madame** - 92:14
  **Magsaysay** - 56:4, 85:2,
  104:19, 106:10, 115:4
  **Maidsel** - 104:17, 104:23
  **Malaysia** - 14:7, 14:10
  **man** - 34:1, 54:1, 103:14,
  104:3
  **Man** - 103:15, 104:4
  **management** - 7:6, 7:7
  **manager** - 104:19
  **mandate** - 3:19
  **mandatory** - 30:1, 30:5
  **manner** - 102:17, 106:9
  **manning** - 16:10, 16:14,
  17:8, 34:11, 34:12, 38:11,
  52:14, 52:18, 56:1, 56:3,
  56:9, 56:16, 68:15, 70:3,
  72:14, 72:18, 72:23, 73:16,
  79:17, 79:20, 102:24, 105:2,
  106:10, 107:2, 112:3,
  112:11, 114:18, 114:25,
  115:8, 116:4, 116:16,
  117:24, 119:17
  **Marcelino** - 1:5
  **March** - 109:16, 109:17,
  109:22, 109:24, 111:5,
  113:23, 114:9
  **Maria** - 1:10
  **Marilen** - 1:3
  **Marine** - 6:10, 25:11
  **marine** - 14:6
  **maritime** - 8:14, 8:18
  **mark** - 64:5
  **Mark** - 94:10
  **marked** - 64:10
  **Mase** - 2:5, 3:3, 4:12, 4:24,
  5:5, 5:16, 6:17, 7:2, 7:14,
  8:25, 9:9, 10:8, 10:10,
  10:13, 11:14, 12:18, 13:13,
  13:21, 13:25, 14:24, 15:2,
  16:18, 16:21, 16:24, 17:12,
  17:19, 18:1, 18:5, 18:12,
  20:10, 20:14, 21:21, 27:15,
  27:21, 29:11, 29:14, 30:8,
  30:12, 32:7, 40:25, 41:2,
  41:7, 41:14, 45:7, 45:12,
  46:9, 46:11, 46:15, 46:18,
  49:2, 49:17, 49:24, 54:19,
  55:4, 56:8, 56:10, 56:13,
  56:17, 56:25, 57:14, 57:18,
  57:20, 57:24, 59:3, 59:17,
  59:22, 60:11, 60:15, 63:18,
  63:23, 63:25, 65:13, 66:6,
  66:12, 73:25, 75:21, 76:25,
  77:16, 78:7, 79:9, 80:16,
  80:23, 81:15, 81:20, 81:25,
  82:7, 85:14, 87:6, 88:20,
  88:23, 90:3, 93:16, 94:3,
  94:14, 94:17, 97:7, 97:12,
  97:16, 103:17, 105:16,
  109:6, 114:6, 119:20,
  119:22, 119:25, 124:3,
  124:4
  **Mase's** - 11:6
  **material** - 41:10
  **matter** - 89:20
  **matters** - 13:1, 13:11,
  31:6, 81:13, 81:24

  **mean** - 17:15, 37:21, 41:7,
  41:10, 97:8, 102:16, 105:22,
  108:12, 116:15, 117:18
  **meaning** - 33:13, 102:11,
  118:20
  **means** - 77:13, 78:3, 78:18
  **medical** - 22:9, 118:16
  **meet** - 12:25, 13:10, 81:22,
  82:4, 82:12, 82:17
  **meeting** - 26:25, 30:22,
  42:25, 48:25, 98:7, 98:17,
  108:2
  **meetings** - 13:6, 14:12,
  36:22, 42:21, 42:25, 43:4,
  43:8, 43:12, 43:17, 43:24,
  45:6, 45:7, 45:8, 45:22,
  46:1, 107:22
  **meets** - 81:1, 81:12, 82:1
  **member** - 19:20, 29:10,
  95:15, 96:2, 96:3, 100:21,
  101:1, 101:14, 116:8
  **members** - 18:24, 20:3,
  20:4, 21:10, 22:15, 22:16,
  24:1, 81:23, 97:24, 98:1
  **membership** - 19:12,
  29:19
  **memo** - 47:10, 47:11,
  47:13, 48:7, 48:14, 48:18
  **memorandum** - 44:9,
  47:14, 47:20, 48:3, 64:17,
  110:8, 111:16, 112:1,
  114:22, 115:24, 116:5
  **Memorandum** - 57:8,
  59:14, 60:5, 60:21, 61:4
  **memorandums** - 43:23,
  47:2, 47:8
  **memory** - 13:10, 98:5
  **memos** - 44:25, 46:25,
  48:13
  **men** - 21:10, 28:6, 29:23,
  30:6, 30:17, 31:1, 31:5,
  38:14, 104:5, 115:16,
  117:18
  **mention** - 101:14
  **mentioned** - 27:11, 37:4,
  88:7
  **merely** - 38:1
  **merits** - 60:16
  **met** - 13:19, 42:17, 92:25,
  99:3, 100:11, 100:13
  **method** - 102:17, 106:9
  **Miami** - 1:2, 1:18, 2:3, 2:6,
  66:11, 67:3, 124:5, 124:22
  **microphone** - 6:19
  **might** - 43:21, 105:13
  **mind** - 58:18
  **mine** - 35:19, 61:7, 87:12
  **Mine's** - 4:9
  **minutes** - 10:17, 43:3,
  43:4
  **misphrased** - 89:5
  **mispronounce** - 45:16
  **mispronounced** - 104:22
  **Mission** - 8:11
  **mission** - 18:10
  **mistaken** - 61:10
  **modified** - 82:2
  **modify** - 74:6
  **moment** - 13:18
  **Monday** - 124:12
  **money** - 21:6, 23:6, 31:23,
  32:11, 32:13, 32:18, 32:21,
  35:23, 41:24, 56:21, 83:13,
  83:17, 83:22, 88:7, 110:1
  **monitor** - 106:5, 106:8,
  106:15, 110:16, 112:10,
  113:19
  **monitored** - 107:21
  **monitoring** - 106:25,
  112:19

  **month** - 67:12
  **monthly** - 23:13
  **most** - 12:12, 14:21, 15:7,
  15:20, 19:2, 42:12, 55:9,
  55:14, 65:2, 73:11, 73:18,
  74:24, 75:4, 75:14, 86:21,
  89:24, 90:6, 90:7, 93:21,
  94:25, 97:19, 101:6, 102:9,
  105:2, 108:22, 108:25,
  111:9, 114:18, 115:23
  **motion** - 4:18, 4:21
  **move** - 4:14, 54:18
  **moving** - 42:9

## N

  **name** - 6:5, 27:23, 28:4,
  29:1, 46:8, 92:1, 94:10,
  94:20, 104:22, 105:6,
  116:9
  **named** - 24:24, 116:8
  **names** - 8:24, 19:24,
  23:15, 23:17, 23:20, 23:22,
  95:1, 95:24, 101:6, 101:12,
  105:12, 119:3, 119:8
  **national** - 76:7
  **National** - 76:19, 84:5
  **nationalities** - 78:23
  **Nations** - 8:11
  **nature** - 13:1
  **Ncl** - 8:25, 12:14, 12:15,
  14:22, 15:23, 17:15, 19:3,
  21:5, 21:22, 23:6, 23:19,
  33:13, 42:13, 55:10, 55:15,
  55:16, 55:21, 55:24, 56:9,
  56:11, 56:19, 58:6, 61:21,
  62:10, 63:1, 68:18, 69:11,
  71:21, 72:14, 72:16, 72:19,
  72:24, 76:4, 79:16, 82:20,
  83:13, 83:16, 87:20, 88:8,
  88:17, 88:24, 89:8, 89:11,
  89:24, 90:11, 93:20, 95:1,
  96:17, 96:18, 96:21, 96:24,
  97:19, 102:9, 102:21,
  102:25, 105:1, 105:15,
  105:21, 106:8, 106:21,
  107:20, 108:22, 114:18,
  114:19, 115:1, 115:23,
  116:3
  **Ncl-filipino** - 89:11
  **necessarily** - 85:1
  **need** - 15:9, 39:8, 41:5,
  57:14, 76:14, 92:6
  **negligence** - 76:23
  **negotiate** - 28:20, 73:13,
  73:22, 74:7, 75:1, 75:12,
  105:22
  **negotiated** - 12:11, 25:16
  **negotiating** - 73:8, 95:3,
  95:20, 101:7, 101:16,
  101:22, 102:5
  **negotiations** - 14:23,
  15:21, 17:1, 17:5, 17:11,
  17:24, 18:19
  **never** - 17:11, 47:16,
  77:13, 96:18, 107:17,
  108:15, 116:23
  **new** - 14:6
  **news** - 89:2
  **next** - 124:14
  **nicer** - 4:9
  **Nicholas** - 103:8
  **Nil** - 81:12
  **Nile** - 12:25, 13:4, 13:19
  **nine** - 101:5, 110:8, 112:1,
  114:23, 115:25, 116:5
  **nobody** - 102:21
  **Nobody** - 10:20
  **None** - 83:3, 112:3
  **none** - 105:8

nonmembership - 19:13
Nordh - 12:25, 13:5, 13:10, 13:19, 81:12
normal - 32:14
Normally - 45:2
Norway - 8:15, 9:24
Norwegian - 1:13, 5:8, 5:17, 7:7, 7:9, 7:13, 7:20, 7:23, 7:25, 8:7, 8:10, 8:11, 9:5, 9:8, 13:6, 13:20, 16:12, 17:22, 25:16, 25:17, 27:12, 27:20, 29:13, 29:16, 30:7, 30:18, 41:9, 55:11, 56:23, 65:3, 65:7, 70:6, 73:15, 74:18, 79:2, 79:3, 86:3, 87:23, 102:12, 124:6, 125:2
Norwegians - 79:1
Notary - 1:23, 121:13, 122:18, 125:24
notation - 44:20
Note - 7:14
note - 39:6
notes - 44:25, 123:12
nothing - 32:14, 32:16, 62:1, 72:20, 79:17
Notice - 1:24, 11:22
notice - 3:6, 3:7, 3:14, 3:16, 3:19, 10:14, 10:24, 64:4
noticed - 3:12
notified - 10:12
Nsu - 28:11, 28:18, 29:10, 29:19, 29:20, 30:23, 31:2, 31:6
number - 11:25, 16:18, 42:4, 69:21, 80:10, 83:5, 83:21, 108:20, 108:21, 111:17, 111:21, 112:1, 114:23, 115:10, 115:25
Number - 12:6, 18:22, 55:7, 101:5, 102:8
numerous - 82:21
Nxa - 64:19, 71:22

## O

Oath - 122:1
object - 3:11, 4:6, 15:2, 49:17
Object - 29:11, 105:16
objection - 7:14, 9:13
Objection - 11:14, 12:18, 13:13, 30:12, 65:13, 66:12, 73:25, 76:25, 77:16, 78:7, 79:9, 87:6, 90:3, 114:6
objections - 6:23
objects - 3:10
obligate - 68:18
obligated - 109:25
obligations - 26:19, 69:25, 100:23, 107:6
observing - 38:2
Obviously - 7:16, 89:4
obviously - 9:13
Oca - 95:9, 95:11, 95:13, 95:21, 96:2, 99:4, 101:14
Oca's - 96:7
occasion - 12:25, 41:21, 80:4, 88:16, 88:21, 89:7
occasions - 34:15, 34:16, 43:24
Ocean - 64:21
ocean - 72:11, 111:5
Ocean-going - 64:21
ocean-going - 72:11, 111:5
offering - 74:19
Office - 124:12
office - 10:16, 10:20, 11:1, 11:6, 44:3, 44:13, 44:14,

69:3, 85:16, 88:1, 124:11
officer - 7:7, 52:21
Officers - 25:11
offices - 87:11
official - 122:13
old - 98:5
on-line - 51:17, 51:21
On-line - 51:18
Onboard - 64:20
onboard - 24:1, 33:24, 72:11, 111:4
once - 34:18
Once - 9:9
One - 124:22
one - 4:12, 11:25, 12:6, 24:24, 35:14, 37:4, 37:11, 40:23, 42:10, 44:15, 44:18, 48:14, 49:2, 63:12, 63:13, 64:15, 64:16, 64:18, 64:21, 67:6, 68:2, 68:23, 69:18, 78:11, 90:18, 95:22, 100:13, 101:15, 102:3, 103:8, 107:17, 107:21, 111:19, 117:11, 117:14, 117:17, 118:9, 118:23
one-page - 64:15
ones - 22:14, 22:16, 22:23, 25:3, 37:6, 91:2, 105:13
operated - 9:24
Operations - 6:11
operations - 14:6
opinion - 72:16, 100:5, 100:6, 112:8
opportunity - 76:6, 76:15
order - 3:20, 4:15, 4:19, 16:7, 110:7, 111:17, 111:21
Order - 63:13, 64:17, 64:23
ordering - 124:16
organizations - 45:22, 50:20, 51:2
orientation - 36:19, 38:24, 39:2, 39:9, 39:12, 40:11, 61:11, 61:12, 107:12, 107:22, 108:1, 108:11, 116:10, 117:5, 119:14
original - 124:16
otherwise - 3:22, 3:24
outfit - 21:5, 22:11
outline - 71:13, 108:10
outlines - 71:11
outside - 80:23
overseas - 58:25
oversee - 84:9, 110:16
own - 40:10, 40:12, 50:23
owned - 9:23

## P

package - 76:4
packet - 63:11, 63:12, 75:19, 103:3, 109:14, 112:6, 112:14
page - 12:3, 12:4, 63:13, 64:15, 64:16, 64:17, 64:19, 64:21, 72:5, 114:12, 114:13
Page - 2:12, 125:4
pages - 112:2
paid - 21:14, 21:16, 21:23, 22:5, 22:8, 22:20, 23:6, 23:14, 30:1, 31:16, 31:19, 31:20, 32:20, 56:20, 56:25, 57:1, 57:3, 83:22
pamphlet - 36:1
Pandiman - 85:18, 85:21
paper - 48:7, 106:22, 107:16, 108:6, 108:13, 108:17, 109:14, 115:15, 116:22
papers - 75:19, 107:1, 110:12, 112:6, 112:12,

112:15, 113:20, 113:22, 114:5, 118:15
paperwork - 106:19, 116:12, 118:16
Paragatos - 115:13
Paragotos - 103:5
paragraph - 60:5, 61:9, 115:24
paraphrase - 59:23
parent - 7:12, 12:22
Part - 58:21, 70:19
part - 14:19, 20:20, 25:13, 25:15, 29:18, 30:6, 31:11, 34:7, 34:22, 35:10, 37:16, 38:23, 39:9, 52:16, 53:23, 58:23, 59:6, 59:8, 60:9, 62:18, 62:19, 63:6, 63:15, 64:3, 66:13, 66:25, 67:4, 67:19, 70:18, 76:4, 79:10, 87:7, 111:23, 113:3, 116:15, 116:21, 118:25, 119:1
partake - 115:11
participant - 48:25
participants - 14:22, 15:21, 16:25
participate - 17:23, 18:4, 35:11, 35:13, 40:6
participated - 17:4, 17:11, 39:11, 65:4, 101:7, 101:16, 117:17
participation - 62:23, 65:8, 102:5
particular - 21:10, 35:2, 69:21, 75:1, 88:1, 119:10, 119:13
particularly - 100:12
parties' - 3:20, 123:16, 123:17
Partite - 47:11, 47:22
parts - 37:17, 55:8
past - 66:21
Patricia - 104:11
Paul - 1:4
pay - 20:15, 22:10, 29:19, 29:20, 29:24, 30:2, 30:6, 31:10, 31:14, 33:3, 33:13, 33:22, 35:23, 37:25, 56:11, 105:21, 105:25
paying - 37:21
payment - 84:10, 84:13
payroll - 23:21, 31:11
pays - 21:5
pending - 20:22, 21:1, 55:2, 86:14, 86:17
pension - 22:6, 99:20
people - 21:6, 24:21, 25:14, 26:9, 26:10, 39:19, 45:13, 88:11, 90:14, 90:16, 90:25, 105:21, 107:6, 107:20, 108:7, 108:8, 108:14, 115:10, 119:4
per - 106:3
Peralta - 1:4
percent - 32:6
Perigotos - 38:14
period - 69:2, 78:17, 93:8, 94:6
permit - 7:17
permitted - 4:4, 7:16
person - 10:2, 12:12, 14:21, 15:7, 15:20, 19:2, 25:7, 42:12, 55:9, 55:14, 65:2, 65:18, 73:11, 73:18, 74:24, 75:4, 75:8, 86:20, 89:19, 89:23, 90:6, 93:5, 93:11, 94:25, 95:18, 97:18, 101:5, 102:8, 104:1, 105:1, 105:5, 106:1, 106:2, 108:22, 108:25, 109:3, 109:6, 111:8, 114:18, 115:22

personal - 42:16, 42:20, 42:23, 43:2, 43:7, 43:10, 43:14, 43:20, 45:5, 45:21, 45:24, 46:21, 47:1, 62:5, 83:24, 84:1, 84:2, 87:14, 87:15, 100:5, 100:19
personally - 17:10, 17:16, 18:1, 18:3, 19:11, 19:15, 34:13, 111:20, 122:10
personnel - 6:15, 6:16, 7:5, 22:24, 24:22, 24:23, 25:13, 25:22, 53:4, 53:5, 62:17, 69:4, 69:11
persons - 42:20, 55:10, 61:20, 95:6, 105:11, 119:8
pertain - 59:10, 59:23, 59:25, 71:4
pertains - 4:15, 34:9, 58:25, 71:4
ph - 85:18, 103:11, 103:21, 104:17
Philippine - 14:16, 19:17, 19:20, 26:20, 26:24, 36:6, 37:5, 71:2, 73:12, 74:6, 74:13, 74:25, 75:11, 80:11, 86:22, 87:4, 87:12, 87:22, 88:2, 96:24, 98:15, 104:22, 118:25
Philippines - 14:16, 16:8, 25:12, 25:25, 31:22, 32:12, 37:11, 58:21, 58:25, 63:9, 67:6, 67:9, 73:8, 76:8, 76:20, 79:12, 79:24, 84:23, 85:13, 88:19, 89:10, 90:1, 99:11, 100:12, 115:6
phone - 11:4, 11:7, 41:4, 41:15
phonetic - 38:14
phrase - 57:9
phrased - 59:18, 76:13
phraseology - 46:12
physically - 106:15
piece - 108:6, 108:13, 116:22
pieces - 106:22
place - 117:2, 117:15
places - 102:18
Plaintiff - 5:23
Plaintiff's - 2:20, 11:21, 64:10
Plaintiff(s - 1:11, 2:4
plaintiffs - 5:15
plane - 35:3
pleadings - 63:16
Pm - 3:4, 10:15, 120:4, 124:12
Poe - 58:14
Poea - 15:15, 15:17, 15:19, 15:22, 16:6, 16:9, 16:13, 17:24, 18:11, 39:7, 39:9, 44:8, 45:3, 47:5, 47:9, 47:11, 47:14, 47:21, 48:4, 48:8, 48:18, 48:21, 49:7, 50:3, 50:6, 51:2, 51:7, 51:10, 52:10, 52:13, 52:17, 52:22, 53:1, 53:11, 53:18, 53:20, 53:22, 54:7, 54:16, 58:22, 61:3, 62:19, 68:4, 69:19, 79:13, 95:15, 96:2, 96:4, 101:6, 101:15, 101:21, 101:25, 113:2, 114:9, 116:6, 116:10, 116:17, 116:18, 118:18
Poea's - 16:7, 68:20
point - 36:18, 52:24, 78:6, 78:11, 110:12, 113:5
political - 28:3
Port - 14:7, 14:9
Portasa - 88:3
portion - 20:22, 21:1, 55:2,

75:19
  **position** - 6:8, 6:12, 60:24, 65:22, 87:24, 91:9, 91:21, 92:1, 96:25
  **positions** - 19:25
  **predecessor** - 29:16, 80:3
  **predecessors** - 30:19
  **predeparture** - 38:24, 39:2, 39:9, 39:12, 40:11, 61:11, 61:12, 107:11, 107:22, 108:1, 108:11, 116:9, 117:5, 117:10, 118:1, 118:14, 119:13
  **predicate** - 12:19, 49:18, 65:14
  **prepare** - 4:18
  **prepared** - 3:24, 42:6
  **presence** - 125:22
  **Present** - 2:8
  **Presentation** - 3:22
  **presentation** - 117:25
  **presently** - 101:8
  **preserve** - 3:20
  **president** - 14:5, 91:22, 96:8
  **presumably** - 48:21, 48:24
  **presume** - 29:24
  **Pretty** - 70:12
  **principal** - 68:3
  **print** - 113:7
  **privilege** - 81:20, 82:3, 85:17, 99:7
  **procedure** - 34:13, 70:16, 70:17, 70:20
  **Procedure** - 3:15, 4:14, 4:20
  **procedures** - 34:7, 71:8, 71:14, 71:17, 77:22, 107:3, 115:23, 116:13, 116:20
  **proceed** - 124:16
  **proceedings** - 3:2, 36:19, 54:23, 86:12, 92:11
  **process** - 3:20, 4:2, 19:8, 35:10, 36:15, 36:23, 36:24, 38:23, 39:12, 39:20, 39:24, 40:1, 40:7, 40:11, 53:17, 67:19, 106:10, 112:10, 118:12, 118:13, 119:9, 119:14
  **processed** - 118:20
  **processes** - 36:25
  **processing** - 105:25
  **produced** - 23:5, 23:9
  **Profession** - 2:9, 5:10
  **Professional** - 1:23, 123:8, 123:25, 124:21
  **program** - 20:8
  **prohibit** - 4:21
  **promise** - 67:20, 67:22, 108:7
  **pronounce** - 45:17
  **pronounced** - 45:9, 46:15
  **pronunciation** - 103:16
  **proper** - 106:19, 106:21, 124:17
  **protect** - 82:2
  **protected** - 4:3
  **protective** - 4:15, 4:18
  **protocol** - 13:4, 81:6
  **provide** - 3:16, 3:18
  **Provident** - 22:6, 99:18, 99:22
  **Public** - 1:23, 121:13, 122:18, 125:24
  **Public-state** - 121:13, 122:18
  **purpose** - 89:9, 124:11
  **pursuant** - 1:24, 72:20
  **Pursuant** - 4:13
  **put** - 72:16, 74:21, 87:20,

94:17, 94:18, 113:6

**Q**

  **qualification** - 9:12, 66:13, 87:8, 113:11
  **qualifications** - 7:18
  **quash** - 4:21
  **questioning** - 31:17
  **questions** - 12:9, 63:20, 63:21
  **quite** - 16:15, 18:9, 44:22, 50:25, 53:12, 97:10, 99:10, 106:12, 116:19
  **quote** - 42:5, 109:20, 110:22

**R**

  **radio** - 52:21
  **Raise** - 5:19
  **raising** - 71:1
  **Rarely** - 85:9
  **rate** - 12:2, 111:12
  **rather** - 67:3
  **Raymond** - 1:5
  **Re** - 124:6, 125:2
  **reaccreditation** - 67:23
  **read** - 11:21, 18:14, 20:22, 21:1, 38:8, 38:13, 38:17, 40:2, 42:9, 50:5, 51:13, 51:15, 51:19, 51:20, 51:21, 54:7, 54:15, 55:2, 71:25, 72:2, 86:14, 86:17, 92:19, 102:23, 105:8, 113:2, 125:21
  **Read** - 20:19, 54:25, 124:24
  **reading** - 18:17, 51:6, 115:14, 124:11, 124:15
  **reads** - 18:22
  **ready** - 4:23, 4:25
  **Really** - 99:16
  **really** - 49:6, 49:11, 77:22
  **reask** - 97:14
  **reasonable** - 3:16, 3:19
  **rec** - 83:12
  **receive** - 31:14, 32:20, 40:17, 44:21, 46:25, 85:7, 110:1, 112:11, 116:7, 116:12
  **received** - 3:6, 39:3, 44:15, 44:18, 44:25, 45:1, 47:16, 47:20, 83:13, 83:17, 84:10, 84:13, 84:17, 88:7, 110:11
  **receiving** - 47:10, 48:7, 112:14
  **recently** - 83:7
  **recess** - 54:22, 86:11, 92:10
  **recollection** - 9:25
  **record** - 3:3, 4:14, 5:13, 10:13, 10:18, 44:24, 56:13, 60:18, 94:21, 94:22, 120:2, 123:12
  **recordation** - 3:19
  **recorded** - 20:23, 21:2, 43:3, 55:3, 86:15, 86:18, 92:19
  **refer** - 50:9, 50:11, 50:12, 50:16, 61:4
  **reference** - 124:8
  **referenced** - 114:22, 125:21
  **referred** - 33:15, 36:23, 64:9, 75:2
  **referring** - 13:15, 15:10, 16:19, 51:10, 57:8, 59:14, 92:24, 94:7
  **Referring** - 54:9

  **refers** - 49:7, 50:14, 61:9, 61:10, 109:14
  **reflect** - 21:20, 21:21, 21:22, 22:3, 22:4, 22:5, 22:8, 33:21, 44:6
  **reflecting** - 18:25
  **reflects** - 33:4, 33:22, 42:16
  **Reflects** - 33:5
  **refreshed** - 13:9
  **regard** - 11:12, 69:24
  **regarding** - 14:16, 14:23, 105:2
  **regards** - 53:11, 53:17
  **register** - 33:15, 33:16, 33:17, 33:21
  **Registered** - 1:23, 123:8, 123:25, 124:21
  **regular** - 66:4, 114:20, 116:18
  **regularly** - 81:12, 81:22, 81:25, 82:3, 82:12, 82:17
  **regulation** - 50:2, 58:14
  **regulations** - 18:15, 50:6, 50:9, 51:7, 51:9, 52:4, 70:8, 110:1
  **relates** - 25:20, 63:12
  **relating** - 64:16
  **relation** - 7:10
  **relations** - 97:19
  **relationship** - 56:7, 56:10, 56:15, 99:6
  **relative** - 123:14, 123:16
  **relevant** - 94:6
  **relied** - 42:8, 57:16, 65:16
  **relies** - 12:11, 57:11
  **rely** - 65:11, 65:23, 108:12, 108:14, 112:3, 112:11, 119:16
  **remand** - 89:8
  **remember** - 69:5
  **remind** - 6:17
  **removal** - 64:5
  **remove** - 88:18
  **removing** - 42:8, 57:11, 65:12
  **rep** - 110:11
  **repeat** - 19:18, 54:8, 71:23
  **Repeat** - 38:9, 66:6
  **repeated** - 13:6
  **rephrase** - 15:3, 43:18, 52:15, 52:19, 53:14, 83:14, 106:7, 119:6
  **replaced** - 53:8
  **report** - 92:3, 123:10
  **reporter** - 5:10, 6:20, 20:23, 21:2, 55:3, 72:3, 86:15, 86:18, 92:14, 92:19
  **Reporter** - 1:23, 5:2, 5:6, 5:19, 6:2, 14:8, 15:16, 20:20, 21:15, 23:1, 33:5, 61:17, 82:16, 84:21, 87:18, 88:13, 90:21, 94:16, 99:21, 110:24, 123:9, 123:25, 124:21
  **Reporter's** - 123:1
  **represent** - 10:17, 28:6, 28:21, 72:24, 102:25
  **representation** - 55:24, 55:25
  **representative** - 10:2, 31:6, 63:2, 71:21, 79:2, 80:8, 85:19, 117:24
  **representatives** - 95:2, 101:7, 101:16
  **represented** - 55:10, 55:16, 55:22, 86:3, 87:12, 87:16, 95:3
  **representing** - 28:19, 55:22

  **represents** - 85:12, 85:24, 95:19
  **require** - 67:16, 116:4, 116:6
  **required** - 38:8, 38:13, 39:8, 60:1, 61:1, 61:2, 67:18, 69:12, 69:15, 76:4, 76:16, 76:24, 77:9, 116:10
  **requirement** - 36:11, 79:18, 111:19
  **requirements** - 39:18, 53:16, 53:21, 53:24, 67:5, 68:2, 71:2, 116:7, 116:17
  **requires** - 69:18, 70:14, 70:23, 71:9
  **resolutions** - 43:15, 43:21
  **resource** - 53:3
  **Resources** - 6:10
  **resources** - 19:7, 60:25, 62:18, 65:22, 91:7, 91:22, 92:2
  **Response** - 28:3
  **responsible** - 93:21
  **result** - 43:24, 48:4, 48:22, 67:1
  **retired** - 96:13
  **return** - 56:20
  **review** - 13:4, 113:20, 113:22, 116:12
  **revised** - 3:6
  **Reyna** - 1:23, 5:11, 122:17, 123:8, 123:24, 124:20
  **Richard** - 80:22, 81:10, 82:5
  **Richard's** - 80:23
  **rights** - 3:20, 4:2, 13:7, 100:23, 107:6
  **righty** - 75:17
  **Rizalyn** - 1:3
  **Robert** - 82:5, 93:25, 94:7
  **Rolando** - 1:6
  **role** - 15:24, 16:1, 16:7, 17:7, 69:10
  **Ronaldo** - 1:5
  **room** - 10:19, 117:19
  **Rosa** - 1:10
  **Rosal** - 24:20
  **Rosario** - 104:9
  **roughly** - 8:16, 53:6, 68:14
  **Rule** - 4:14, 11:22
  **Rules** - 3:15, 4:13, 4:19
  **rules** - 3:18, 18:14, 50:2, 50:5, 50:8, 51:6, 51:9, 52:3, 58:14, 65:19, 70:8, 109:25
  **rulings** - 43:15

**S**

  **safety** - 7:6
  **Salvo** - 88:3
  **Santo** - 104:11
  **sat** - 80:7, 117:10, 117:11
  **saw** - 35:15, 89:2, 117:18
  **school** - 8:17
  **sea** - 96:11, 96:15
  **seafarer** - 34:8, 71:9, 73:13, 75:1, 79:25, 83:11, 83:15, 86:22, 96:10, 99:12, 114:15
  **Seafarer's** - 25:11, 27:15, 27:20, 29:13, 41:9
  **seafarer's** - 25:17, 30:18
  **Seafarers** - 28:6, 64:20
  **seafarers** - 16:8, 19:9, 28:19, 44:11, 66:19, 71:5, 71:6, 72:10, 76:6, 78:5, 82:21, 87:17, 100:11, 101:9, 102:10, 105:14, 110:23, 111:4, 114:22, 116:1, 119:7, 119:10, 119:13

**seafarers'** - 99:5
**seal** - 122:13
**seaman** - 12:7, 12:8, 19:17, 19:20, 35:22, 40:3, 41:21, 73:21, 74:6, 75:11, 78:3, 81:24, 84:12, 106:3, 109:24
**seaman's** - 58:15
**Seaman's** - 13:6, 25:17, 27:12, 29:16, 30:7
**seamen** - 14:17, 15:12, 18:23, 18:24, 19:12, 21:23, 22:14, 24:4, 26:23, 27:8, 29:9, 31:9, 40:5, 40:12, 40:16, 45:25, 46:4, 58:6, 62:23, 63:3, 63:12, 66:3, 66:10, 66:21, 71:2, 73:3, 73:7, 74:13, 80:11, 83:6, 87:4, 87:12, 87:22, 88:2, 88:6, 90:12, 93:7, 95:3, 95:19, 97:5, 97:24, 98:15, 98:20, 98:23, 99:3, 100:4, 100:22, 101:1, 102:4, 105:3, 106:10, 108:1, 108:8, 108:23, 112:2, 115:9
**seamen's** - 93:22
**second** - 14:19, 16:21, 29:25, 40:22, 54:20, 93:16
**Section** - 69:23
**Security** - 22:9
**see** - 35:15, 59:6, 59:16, 60:16, 70:22, 71:15, 106:21, 108:16, 109:18, 110:19, 110:21, 117:23
**See** - 41:14
**seeing** - 58:15, 69:25, 108:5, 109:10
**seek** - 101:9
**seminar** - 61:11, 61:12
**send** - 41:5, 44:9, 44:25, 88:18, 89:9, 89:25, 124:16
**sending** - 32:6
**sends** - 48:18
**Sent** - 44:14
**sent** - 31:22, 31:23, 32:11, 32:13, 44:12, 44:13, 47:8, 48:3, 54:7, 54:15
**separate** - 50:20, 51:2
**September** - 1:18, 5:3, 124:1, 124:8
**series** - 112:1
**Series** - 64:23
**serving** - 24:1
**set** - 110:1
**settle** - 83:6
**settled** - 80:11, 80:16, 82:20, 88:1
**several** - 90:16
**Shall** - 43:18
**shall** - 124:15, 124:16
**Sharp** - 56:4, 85:3, 103:9, 103:12, 104:1, 115:3, 116:7
**Sheet** - 125:1, 125:22
**ship** - 6:15, 34:2, 34:6, 53:3, 62:17
**Ship** - 6:16, 53:5
**shipboard** - 7:4, 7:5, 69:4, 69:11
**shirt** - 3:21, 4:8
**show** - 23:6, 26:13, 34:5, 63:16, 114:5
**sign** - 31:11, 31:13, 32:10, 32:23, 32:24, 32:25, 33:3, 33:18, 34:23, 35:25, 63:8, 111:14, 111:16, 111:19
**Signature** - 125:16
**signature** - 124:10
**signed** - 18:25, 35:8, 109:16, 109:20, 109:21, 109:23, 110:4, 110:12,

111:9, 112:6, 112:16, 112:20, 112:22, 112:25, 113:6, 113:8, 113:23, 113:24, 114:15, 115:12, 115:16, 118:20, 125:22
**signing** - 110:17, 124:11
**signs** - 34:1
**similar** - 108:21
**simply** - 26:2, 36:9, 50:11, 110:11, 116:11
**Sincerely** - 124:19
**single** - 51:11
**sit** - 116:23
**site** - 51:19
**Sitting** - 71:16
**sitting** - 36:13, 58:4, 68:1, 117:22
**six** - 23:7, 24:9, 64:18, 64:19, 72:5
**six-page** - 64:19, 72:5
**slip** - 32:23, 32:24, 33:3, 33:14
**Social** - 22:8
**sole** - 54:5, 54:13
**someone** - 39:17, 94:2, 119:16
**Sometime** - 6:13
**Sometimes** - 59:19, 85:10
**sorry** - 8:4, 23:1, 23:18, 25:17, 25:19, 35:20, 38:19, 53:3, 61:10, 63:20, 66:6, 74:17, 80:21, 82:16, 83:14, 87:18, 88:20, 91:25, 93:18, 94:16, 97:12, 104:7, 110:2, 110:24, 111:13, 119:5
**sort** - 59:18
**sound** - 59:19
**sounds** - 56:15
**source** - 16:16, 18:7, 19:5, 22:18, 49:13, 49:23, 54:5, 54:13, 66:20
**sources** - 18:17
**South** - 1:17
**Southeast** - 124:22
**Southern** - 1:1
**Southwest** - 2:6, 124:4
**Spanish** - 103:16
**speaking** - 26:19, 78:5, 78:6, 89:5
**specializing** - 8:18
**specific** - 34:16, 76:22, 78:12, 99:25
**Specific** - 31:7
**specifically** - 75:23
**speculate** - 28:8, 49:3, 49:19
**speculative** - 11:14, 12:18
**speeches** - 37:24
**spell** - 95:10
**spot** - 119:20, 119:22
**Ss-** 122:6, 123:5
**stamp** - 114:12
**stand** - 47:15, 99:14
**Standard** - 15:15, 15:16, 64:19, 68:4, 68:20, 69:19, 70:14, 75:22
**standard** - 15:17, 15:19, 15:22, 39:7, 44:7, 63:14, 69:19, 71:22, 72:7, 72:9, 75:3, 110:22, 111:3, 111:10, 112:21, 113:3, 113:7, 113:24, 115:8
**Standby** - 5:1, 54:21
**stands** - 25:10
**Star** - 1:14, 5:17, 7:10, 7:12, 14:6, 14:8
**start** - 67:10
**started** - 8:7, 53:2, 77:19
**State** - 1:23, 122:5, 123:4, 125:18, 125:24

**state** - 49:1, 98:15, 121:13, 122:18
**statement** - 14:25, 18:10, 54:17, 100:3
**States** - 1:1, 8:15, 66:5, 66:22, 88:5
**states** - 70:21
**stating** - 21:5, 47:21, 65:23, 116:8
**Ste** - 124:22
**stenographic** - 123:12
**stenographically** - 6:21, 123:10
**stipulate** - 56:13
**stop** - 124:11
**stops** - 54:2
**strange** - 56:15
**Street** - 2:3, 2:6, 124:4
**Stretch** - 54:20
**Stretched** - 55:4
**strike** - 35:20
**styled** - 124:9
**subject** - 15:12, 18:23, 101:9, 102:10, 105:14, 108:23
**Subscribed** - 121:10
**subscribing** - 124:15
**Subsequent** - 4:17
**successfully** - 83:12, 83:16, 87:5
**successor** - 9:11
**Suite** - 2:3, 2:6, 124:4
**summer** - 6:13, 68:16
**superintendent** - 6:15, 7:5, 62:16, 69:3, 69:10
**supervise** - 106:8
**supposed** - 58:6, 111:12, 111:14, 111:16
**Surely** - 66:22
**swap** - 4:7
**sworn** - 5:24, 122:11
**Sworn** - 121:10
**system** - 7:7, 23:21, 82:22

**T**

**Tallahassee** - 6:7
**tape** - 92:7, 92:9, 92:12
**Tegalo** - 36:16, 37:4, 37:7, 37:9
**Tejaro** - 24:25
**Tejero** - 1:6
**Telephone** - 124:13
**ten** - 21:23, 21:25, 22:13, 29:8, 29:23, 30:6, 30:17, 31:1, 31:4, 31:9, 40:5, 40:12, 45:25, 46:4, 62:22, 63:3, 73:3, 97:5, 97:24, 100:22, 101:1, 102:4, 102:8, 108:21, 115:16, 119:7
**term** - 56:14
**Terms** - 64:19, 68:4, 68:21, 69:19, 70:14, 75:22
**terms** - 9:10, 18:10, 18:15, 18:16, 44:8, 63:14, 70:9, 71:21, 71:22, 72:7, 72:9, 72:15, 72:25, 73:4, 73:9, 73:13, 73:22, 74:7, 75:3, 110:22, 111:3, 111:10, 112:21, 111:3, 113:8, 113:24, 114:20, 114:21, 115:1, 115:9, 115:20
**testified** - 5:25, 97:8
**testimony** - 3:25, 4:1, 6:23, 69:8, 72:20, 79:16, 79:20, 98:4, 100:15, 117:9
**text** - 64:14
**thereabouts** - 3:5
**therefore** - 18:8
**Therefore** - 4:2, 74:12,

112:14
**thereupon** - 64:9
**Thereupon-** 3:1, 5:21, 20:22, 21:1, 54:22, 55:2, 72:2, 86:11, 86:14, 86:17, 92:10, 92:18, 94:20, 120:3
**thinks** - 97:9
**Third-** 124:22
**third** - 114:13
**thousand** - 90:25
**thousands** - 66:3
**three** - 10:24, 11:1, 35:7, 42:4, 64:18
**three-something** - 10:24, 11:1
**throughout** - 9:17
**Thursday-** 1:19
**tickets** - 34:24
**tie** - 3:22
**timely** - 3:14
**today** - 5:2, 36:14, 58:5, 68:1, 71:16, 109:2, 118:11
**Today-** 94:9
**Todd-** 2:9, 5:9
**Tomas-** 104:11
**Toni-** 90:18, 91:4, 91:12
**took** - 13:3, 69:3, 81:6
**top** - 96:6
**topic** - 82:1
**Torres-** 103:8
**tort** - 66:4, 76:23, 88:8
**towards** - 58:15
**town** - 87:13
**Transcript-** 125:3
**transcript** - 42:25, 123:11, 124:9, 124:11, 124:16
**Transport-** 29:3
**travel** - 34:24, 39:7
**traveled** - 14:15, 19:11, 99:10
**Tria-** 104:6, 104:8
**trial** - 33:15, 33:21, 124:15
**Tria-** 33:16, 33:17
**tried** - 54:10, 80:4
**Tripartite-** 42:5, 42:17, 45:9, 45:11, 45:18, 45:19, 46:5, 46:9, 46:11, 46:22, 47:3, 47:13, 47:17, 48:5, 48:11, 48:19, 48:22, 49:8, 49:14, 49:24, 50:9, 51:3, 54:5, 54:9, 55:12, 55:22, 62:19
**true** - 123:11
**try** - 17:18, 53:14, 53:20
**trying** - 17:20, 49:12, 49:13, 52:20, 54:12, 68:23
**Tuesday-** 103:4
**twice** - 34:18
**Two-** 8:22
**two** - 13:16, 16:18, 18:22, 33:20, 38:25, 51:2, 56:7, 64:17, 64:18, 109:18, 112:1
**two-page** - 64:17

**U**

**Uh-hmm** - 9:7, 115:14
**unable** - 38:7, 40:2, 40:9
**under** - 45:2, 58:7, 71:17, 91:23, 97:3, 102:10, 105:13, 106:25
**undersigned** - 122:9
**understood** - 25:19, 46:13
**union** - 19:1, 19:13, 19:16, 19:17, 19:21, 21:7, 21:11, 22:15, 22:17, 22:21, 24:5, 25:8, 25:9, 25:15, 25:24, 26:6, 26:10, 26:14, 26:18, 26:19, 26:20, 26:24, 27:4, 27:9, 28:17, 28:18, 28:19

31:10, 32:14, 33:4, 33:21,
33:23, 41:24, 71:12, 81:24,
95:2, 98:3, 98:11, 98:20
 **Union** - 13:6, 25:11, 25:17,
25:18, 27:12, 27:15, 27:20,
29:13, 29:17, 30:7, 30:18,
33:6, 41:9
 **union's** - 20:7, 20:9
 **unions** - 18:22, 18:25
 **United** - 1:1, 8:11, 8:14,
66:5, 66:22, 88:5
 **unless** - 17:15
 **Unsigned** - 124:24
 **up** - 6:20, 6:24, 51:10,
82:15, 106:18
 **uphold** - 58:24
 **useable** - 4:5

## V

 **Valenzuela** - 1:7, 24:18
 **validated** - 99:18, 99:20
 **variety** - 116:21
 **various** - 13:11, 52:25,
87:4, 102:24, 114:25
 **versus** - 5:7
 **vessel** - 34:9, 63:5, 72:11
 **vessels** - 24:2, 111:5
 **Vessels** - 64:21
 **vice** - 14:5, 91:22
 **video** - 3:18, 3:23, 10:6,
11:13
 **Video** - 2:9, 5:9
 **video-depositioned** -
11:13
 **videoed** - 3:8
 **videographer** - 5:9, 6:18
 **Videographer** - 2:9, 4:23,
5:1, 54:21, 54:24, 92:6,
92:12
 **videotape** - 3:17, 3:25,
4:4, 4:21
 **Videotaped** - 1:21
 **videotaped** - 3:9, 3:13,
4:16, 5:4
 **videotaping** - 3:11
 **Villanueva** - 1:9, 24:20
 **violates** - 3:14
 **visit** - 107:2, 116:19
 **visited** - 31:5
 **voice** - 6:24
 **volume** - 51:11
 **voluntary** - 31:9
 **vote** - 26:14, 31:2, 98:12
 **voted** - 26:14, 31:1, 98:11
 **vs** - 1:12, 124:6, 125:2

## W

 **Wait** - 20:10
 **wait** - 20:10, 29:25, 60:16
 **waived** - 124:16
 **walk** - 117:18
 **walked** - 10:19
 **wants** - 18:12, 45:12, 49:2
 **Warren** - 94:10, 94:11
 **watch** - 35:12, 35:13
 **watched** - 35:20, 37:1,
37:6, 38:22, 41:22
 **ways** - 17:20
 **web** - 51:19
 **West** - 2:3
 **Weston** - 6:7
 **whichever** - 124:15
 **whole** - 20:25, 67:18
 **William** - 2:2
 **Willy** - 1:9
 **wire** - 32:1, 32:4
 **wish** - 41:22
 **witness** - 3:21, 3:24, 5:23,

36:9, 36:10, 40:6, 66:13,
87:7
 **Witness** - 4:9, 6:1, 6:16,
7:1, 9:2, 10:12, 11:15,
12:20, 13:15, 13:24, 14:2,
14:9, 15:17, 16:25, 17:22,
18:3, 18:14, 20:12, 20:15,
21:16, 21:25, 23:2, 27:17,
30:14, 32:8, 33:6, 45:11,
45:14, 49:19, 50:2, 55:5,
56:16, 57:1, 59:4, 59:21,
60:5, 61:18, 64:1, 65:15,
66:14, 74:1, 75:24, 77:2,
77:18, 78:9, 79:10, 80:18,
81:3, 82:5, 82:9, 82:12,
82:17, 84:22, 85:18, 87:9,
88:14, 89:2, 90:22, 93:18,
99:22, 103:19, 105:19,
114:8, 121:8, 122:13
 **witnessed** - 34:13, 34:17,
39:14, 118:10, 118:23
 **witnessing** - 36:15
 **woman** - 103:14
 **women** - 28:7, 104:3
 **word** - 27:19, 102:14,
117:8
 **words** - 60:1, 107:3
 **workers** - 59:1
 **Workers'** - 29:3
 **works** - 80:23
 **Write** - 125:3
 **writing** - 48:14, 67:24,
68:7
 **written** - 4:18

## Y

 **year** - 28:1, 80:12, 82:20,
83:13, 83:17, 87:4, 88:4
 **years** - 8:22, 67:13
 **yesterday** - 3:4, 10:5,
10:8, 10:24, 11:2
 **yourself** - 71:20, 90:13

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION

CONTRACT OF EMPLOYMENT

KNOW ALL MEN BY THESE PRESENTS:

This Contract, entered into voluntarily by and between:

Name of Seafarer:     ABDI S COMEDIA
Address:
SIRB No.:   B8 L6 BULGARIA ST BARCELONA PESCANELLA HOMES IMUS CAVITE
License No.:   A359002                                      0017866-93
hereinafter referred to as the Employee.

and

Name of Agent:
For and behalf of   MAGSAYSAY MARITIME CORPORATION
                    NORWEGIAN CRUISE LINE   (Principal / Country)
for the following vessel:
Name of Vessel:
Official Number:   S/S NORWAY (HOTEL)   Gross Registered Tonnage (GRT):
Flag:                Year Built:                  Classification Society: 76,049.00
hereinafter referred to as the Employer.   1962

WITNESSETH

1   That the employee shall be employed on board under the following terms and conditions:

| | |
|---|---|
| 1.1 Duration of Contract | 10 months |
| 1.2 Position | COOK |
| 1.3 Basic Wage | $ 356.40 per month |
| 1.4 Hours of Work | Regular : 8 hours per day, Saturdays, Sundays and Holidays included. Overtime : 80.82 hours per month. |
| 1.5 Guaranteed Overtime | $ 334.83 per month |
| 1.6 Overtime Rate | $ 3.09 per hour, for work performed in addition to guaranteed OT in excess of 60.82 hours per month. |
| 1.7 Incentive Pay | $ 86.00 per month |
| 1.8 Leave Pay | $ 42.77 per month |
| 1.9 Union Dues | To be deducted from crew wages. |
| 2.0 POINT OF HIRE | MANILA |

2.   The herein terms and conditions in accordance with Department Order No. 4 and Memorandum Circular No. __9__, both Series of 2000, shall be strictly and faithfully observed.

3.   Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed and approved by the Philippine Overseas Employment Administration (POEA). Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On-Board Ocean-Going Vessels.

4.   Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this __10th__ day of __March, 2003__ 20____ at _____, Philippines.

ABDI S COMEDIA                                      LOPEZ C. PARAGATOS
_____                                      _____
Seafarer                                              For the Employer

Verified and approved by the POEA:

_____
Date

EXHIBIT
A

Republic of the Philippines
**DEPARTMENT OF LABOR AND EMPLOYMENT**
Intramuros, Manila

*4 7 5*

DEPARTMENT ORDER NO. __4__
*Series of 2000*

In view of recent developments in the international maritime industry affecting the recruitment and employment of Filipino seafarers on ocean-going vessels and cognizant of the Department's objective of ensuring the continued employment of our seafarers and maintaining the Philippine global comparative advantage in shipmanning, the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels is hereby amended reflecting the consensus of all the stakeholders as determined through the several tripartite consultations conducted by the Philippine Overseas Employment Administration.

The Philippine Overseas Employment Administration (POEA) shall formulate the guidelines for the implementation of the amended contract, a copy of which is hereto attached.

The amended rules shall take effect fifteen (15) days from date of publication in a newspaper of general circulation.

All Orders and issuances inconsistent herewith are hereby repealed and superseded accordingly.

For strict compliance.

BIENVENIDO E. LAGUESMA
Secretary

Manila, 31 May 2000

DISSEMINATED BY AS-RECORDS SECTION ON ___6/1___ 2000


EXHIBIT
"B"



**Philippine
Overseas
Employment
Administration**

Republic of the Philippines
Department of Labor & Employment

POEA Bldg. Ortigas Avenue Cor. EDSA Mandaluyong
P.O. Box 4061, Manila · Fax # 722-11 ... 722-11...1
Website address: http://www.arpl.com/poea
E-mail address: poea_adm & ...@net.com.ph
poea_vdp@com... gov. com.ph
Tel. 722-11-12 to 99

...Y CREW
...IN FILE

MEMORANDUM CIRCULAR NO __ **9**__
Series of 2000

| | |
|---|---|
| TO | ALL PRINCIPALS/EMPLOYERS, LICENSED MANNING AGENCIES AND FILIPINO SEAFARERS |
| SUBJECT | AMENDED STANDARD TERMS AND CONDITIONS GOVERNING THE EMPLOYMENT OF FILIPINO SEAFARERS ON BOARD OCEAN-GOING VESSELS |

Pursuant to Department Order No. 4, Series of 2000 the following guidelines on the implementation of the Amended Standard Terms and Conditions Governing the Employment of Filipino Seafarers on Board Ocean-Going Vessels are hereby issued:

1. The terms and conditions provided therein are the minimum requirements acceptable to the POEA for the employment of Filipino seafarers on board ocean-going vessels. The parties to the contract may therefore improve on the minimum terms and conditions provided such improvements shall be made in writing and appended to the contract of employment. Such improvements in the contract shall have prospective application

2. Effective 25 June 2000, manning agencies shall use and submit to the POEA the full text of the seafarer's employment contract herein attached including improvements, if any, for approval and processing

3. Manning agencies are directed to inform and provide copies of the amended standard terms and conditions to all its accredited principals

4. Every departing seafarer is required to show a copy of the processed and approved employment contract, including its improvements, if any at the POEA's Labor Assistance Center (LAC) at the international airports

5. Manning agencies are directed to include the discussion of the amended standard terms and conditions governing the employment of Filipino seafarers on board ocean-going vessels in the Pre-Departure Orientation Seminar/Briefing of all its hired seafarers





27/06/00  10:24  FAX 727 7780          POEA-ROCO                                  ☒03

All Circulars and issuances inconsistent herewith are hereby repealed and superseded accordingly.

For strict compliance.

REYNALDO A. REGALADO
Administrator

14 June 2000

STANDARD TERMS AND CONDITIONS                                    ANNEX A
GOVERNING THE EMPLOYMENT OF FILIPINO SEAFARERS
ON-BOARD OCEAN-GOING VESSELS*

**Definition of Terms:**
For purposes of this contract, the following terms are defined as follows:

1. Point of Hire - refers to the place indicated in the contract of employment which shall be the basis for determining commencement and termination of contract.
2. Convenient Port - any port where it is practicable, economical, safe and convenient to repatriate the seafarer.
3. Philippine Port - refers to any Philippine airport or seaport.
4. Basic Wage - refers to the salary of the seafarer exclusive of overtime, leave pay and other bonuses.
5. Departure - refers to the actual departure from the point of hire of the seafarer through air, sea or land travel transport to join his vessel to a Philippine or foreign port.
6. Regular Working Hours - refers to the seafarer's eight (8) hour working hours within the period of 24 hours.
7. Dental Treatment - covers tooth extraction or dental surgery, if necessary, due to accident.
8. Shipwreck - refers to the damage or destruction of a vessel at sea caused by collision, storm, grounding or any other marine peril at sea or in port rendering the vessel absolutely unnavigable or unable to pursue her voyage.
9. Compassionate Ground - refers to incidence of death of an immediate member of the seafarer's family which includes his parents, spouse and children if the seafarer is married or his parents if the seafarer is single.
10. Principal - any person, partnership or corporation hiring Filipino seafarers to work on board ocean-going vessels.
11. Work-Related Injury - injury(ies) resulting in disability or death arising out of and in the course of employment.
12. Work-Related Illness - any sickness resulting to disability or death as a result of an occupational disease listed under Section 32-A of this Contract with the conditions set therein satisfied.

**SECTION 1.     DUTIES**

A. Duties of the Employer/Agency/Master:
   1. To faithfully comply with the stipulated terms and conditions of this contract, particularly the prompt payment of wages, remittance of allotment and the expeditious settlement of valid claims of the seafarer.
   2. To make operational on board the vessel the grievance machinery provided in this contract and ensure its free access at all times by the seafarer.
   3. To provide a seaworthy vessel for the seafarer and take all reasonable precautions to prevent accident and injury to the crew including provision of safety equipment, fire prevention, safe and proper navigation of the vessel and such other precautions necessary to avoid accident, injury or sickness to the seafarer.
   4. To observe the Code of Ethics for Seafarers and conduct himself in the traditional decorum of a master.

B. Duties of the Seafarer:
   1. To faithfully comply with and observe the terms and conditions of this contract, violation of which shall be subject to disciplinary action pursuant to Section 33 of this contract;
   2. To abide by the Code of Discipline as provided in the POEA rules and regulations governing overseas contract workers and the Code of Ethics for Seafarers;
   3. to be obedient to the lawful commands of the Master or any person who shall lawfully succeed him and to comply with company policy including safety policy and procedures and any instructions given in connection therewith;
   4. to be diligent in his duties relating to the vessel, its stores and cargo, whether on board, in boats or ashore; and
   5. to conduct himself in an orderly and respectful manner towards passengers and shippers stevedores, port authorities and other persons on official business with the ship.

**SECTION 2.     COMMENCEMENT /DURATION OF CONTRACT**

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this contract.
B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to the mutual consent of both parties.

**SECTION 3.     FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION**

The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed at the expense of the employer.

**SECTION 4.     BAGGAGE ALLOWANCE**

The seafarer travelling by air to join a vessel or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines. The cost of the excess baggage shall be for the account of the seafarer.

**SECTION 5.     HYGIENE AND VACCINATION**

A. The seafarer shall keep his quarters and other living spaces - such as messrooms, toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master. The work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.
B. The seafarer shall submit to the order of the master or to the laws of any country within the territorial jurisdiction of which the vessel may enter to have such vaccination or inoculation or to undertake measures safeguarding his health and of the whole crew.

**SECTION 6.     WAGES**

The seafarer shall be paid his monthly wages not later than 15 days of the succeeding month from the date of commencement of the contract until the date of arrival at point of hire upon termination of his employment pursuant to Section 18 of this Contract.

**SECTION 7.     PAYMENT ON BOARD**

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment. Advances shall be at the master's/employer's discretion and in accordance with the foregoing conditions.

**SECTION 8.     ALLOTMENTS AND REMITTANCES**

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank. The master/ employer/agency shall provide the seafarer with facilities to do so at no expense to the seafarer. The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary including backwages, if any.
B. The master/employer/agency may also provide facilities for the seafarer to remit any amount earned in excess of his allotment to his designated allottee in the Philippines through any authorized Philippine bank without any charge to him.
C. The allotments shall be paid to the designated allottee in Philippine currency at the rate of exchange indicated in the credit advice of the local authorized Philippine bank.

**SECTION 9.     ACCOUNT OF WAGES & CERTIFICATE OF EMPLOYMENT**

The seafarer, upon his discharge, shall be given a written account of his wages reflecting all deductions therefrom. Where a seafarer is landed in an emergency, the written account of his wages shall be given to him as soon as practicable thereafter. Upon the seafarer's request, he shall also be provided by his employer/agency his certificate of employment or service record without any charge.

**SECTION 10.     HOURS OF WORK**

A. The seafarer shall perform not more than forty-eight(48) hours of regular work a week. The hours of work shall be determined and prescribed by the master, provided that it conforms with customary international practices and standards and as prescribed in paragraph B below.
B. Regular working hours for the seafarer shall be eight (8) hours in every 24 hours, midnight to midnight, Monday to Sunday. The normal practice is as follows:
   1. the day worker shall observe the eight (8) regular working hours during the period from 0600 hours to 1800 hours.
   2. the steward personnel shall observe the eight (8) regular working hours during the period from 0600 hours to 2000 hours.
   3. the Radio Operator shall observe the eight (8) regular working hours in every twenty-four (24) hours, midnight to midnight, from Monday to Sunday as established by International Telecommunication Conventions and as prescribed by the master.
   4. for those who are on sea watch, their working hours shall be eight (8) hours per day. Staggering of working hours will be at the master's discretion.
C. The seafarer shall be allowed reasonable rest period in accordance with international standards.

**SECTION 11.     OVERTIME & HOLIDAYS**

A. The seafarer shall be compensated for all work performed in excess of the regular eight (8) hours as prescribed above. Overtime pay may be classified as open, fixed or guaranteed. In computing overtime, a fraction of the first hour worked shall be considered as one full hour. After the first hour overtime, any work performed which is less than thirty (30) minutes shall be considered as half an hour and more than thirty (30) minutes shall be considered one full hour.
B. Overtime work may be compensated at the following rates:
   1. Open overtime - not less than 125 percent (125%) of the basic hourly rate computed based on two hundred eight (208) regular working hours per month.
   2. Guaranteed or fixed overtime - not less than thirty percent (30%) of the basic monthly salary of the seafarer. This fixed rate overtime shall include overtime work performed on Sundays and holidays but shall not exceed one hundred five (105) hours a month.
   3. Overtime work for officers shall be computed based on the fixed overtime rate.
   4. For ratings, overtime work shall be based on guaranteed or open overtime rate, as mutually agreed upon by the contracting parties. Overtime work in excess of 105 hours a month for ratings shall be further compensated on the open overtime rate.
C. Any hours of work or duty including hours of watchkeeping performed by the seafarer on designated rest days including the paid rest day or holiday pay. The following shall be considered as holidays at sea and in port.

| Holiday | Date |
| --- | --- |
| New Year's Day | January 1 |
| Maundy Thursday | movable date |
| Good Friday | movable date |
| Araw ng Kagitingan (Bataan & Corregidor Day) | April 9 |
| Labor Day | May 1 |
| Independence Day | June 12 |
| National Heroes Day | Last Sunday of August |
| All Saints Day | November 1 |
| Bonifacio Day | November 30 |
| Christmas Day | December 25 |
| Rizal Day | December 30 |

D. Emergency Duty - No overtime work shall be considered for any work performed in case of emergency affecting the safety of the vessel, passenger, crew or cargo, of which the master shall be the sole judge, or for fire, boat, or emergency drill or work required to give assistance to other vessels or persons in immediate peril.

**SECTION 12.     LEAVE PAY**

The seafarer's leave pay shall be in accordance with the number of days leave per month as agreed upon. Days leave shall not be less than two and a half (2-1/2) days for each month of service and pro-rated. Leave pay shall be settled onboard or settled within two weeks after arrival of the seafarer at the point of hire.

**SECTION 13.     SHORE LEAVE**

The seafarer shall be allowed shore leave when practicable, upon the consent of the master or his deputy, taking into consideration the operations and safety of the vessel.

**SECTION 14.     VICTUALLING, VESSEL STORES AND PROVISIONS**

A. The seafarer shall be provided by the master/employer with subsistence consistent with good maritime standards and practices while on board the vessel

1

B. All stores and provisions issued to the seafarer are only for use and consumption on board the vessel and any unused or unconsumed stores or provisions shall remain the property of the employer. The seafarer shall not take ashore, sell, destroy or give away such stores and provisions.

**SECTION 15.    TRANSFER CLAUSE**

The seafarer agrees to be transferred at any port to any vessel owned or operated, manned or managed by the same employer, provided it is accredited to the same manning agent and provided further that the position of the seafarer and the rate of his wages and terms of service are in no way inferior and the total period of employment shall not exceed that originally agreed-upon.
Any form of transfer shall be documented and made available when necessary.

**SECTION 16.    GRIEVANCE MACHINERY**

A.  If the seafarer considers himself aggrieved, he shall make his complaint in accordance with the following procedures:
1.  The seafarer shall first approach the head of the Department in which he is assigned to explain his grievance.
    a.  In the Deck, Radio and Catering Department, the head is the Chiefmate.
    b.  In the Engine Department, the head is the Chief Engineer.
    c.  In the Catering and/or Hotel Department in a passenger ship, the head is the Chief Steward and/or Purser.
2.  The seafarer shall make his grievance in writing and in an orderly manner and shall choose a time when his complaint or grievance can be properly heard.
3.  The Department head shall deal with the complaint or grievance and where solution is not possible at his level, refer the complaint or grievance to the Master who shall handle the case personally.
4.  If no satisfactory result is achieved, the seafarer concerned may appeal to the management of the company or with the Philippine Overseas Labor Office or consular officer overseas. The master shall afford such facilities necessary to enable the seafarer to transmit his appeal.
5.  If after observing the grievance procedure the master finds that the seafarer violated the terms of his Contract or has committed breach of discipline, the master shall discipline the seafarer or, if warranted, terminate his employment.
6.  The seafarer may also seek the assistance of the highest ranking Filipino seafarer on board.
B.  When availed of by the seafarer, the grievance procedure and all actions or decisions agreed upon shall be properly documented for the protection and interest of both parties.
C.  The foregoing procedure shall be without prejudice to other modes of voluntary settlement of disputes and to the jurisdiction of the Philippine Overseas Employment Administration (POEA) or the National Labor Relations Commission (NLRC) over any unresolved complaints arising out of shipboard employment that shall be brought before it by the seafarer.

**SECTION 17.    DISCIPLINARY PROCEDURES**

The Master shall comply with the following disciplinary procedures against an erring seafarer:
A.  The Master shall furnish the seafarer with a written notice containing the following:
1.  Grounds for the charges as listed in Section 33 of this Contract or analogous act constituting the same.
2.  Date, time and place for a formal investigation of the charges against the seafarer concerned.
B.  The Master or his authorized representative shall conduct the investigation or hearing, giving the seafarer the opportunity to explain or defend himself against the charges. These procedures must be duly documented and entered into the ship's logbook.
C.  If after the investigation or hearing, the Master is convinced that imposition of a penalty is justified, the Master shall issue a written notice of penalty and the reasons for it to the seafarer, with copies furnished to the Philippine agent.
D.  Dismissal for just cause may be effected by the Master without furnishing the seafarer with a notice of dismissal if there is a clear and existing danger to the safety of the crew or the vessel. The Master shall send a complete report to the manning agency substantiated by witnesses, testimonies and any other documents in support thereof.

**SECTION 18.    TERMINATION OF EMPLOYMENT**

A.  The employment of the seafarer shall cease when the seafarer completes his period of contractual service aboard the vessel, signs-off from the vessel and arrives at the point of hire.
B.  The employment of the seafarer is also terminated when the seafarer arrives at the point of hire for any of the following reasons:
1.  when the seafarer signs-off and is disembarked for medical reasons pursuant to Section 20 (B)[5] of this Contract.
2.  when the seafarer signs-off due to shipwreck, ship's sale, lay-up of vessel, discontinuance of voyage or change of vessel principal in accordance with Sections 22, 23 and 26 of this Contract.
3.  when the seafarer, in writing, voluntarily resigns and signs off prior to expiration of contract pursuant to Section 19 (G) of this Contract.
4.  when the seafarer is discharged for just cause as provided for in Section 33 of this Contract.

**SECTION 19.    REPATRIATION**

A.  If the vessel is outside the Philippines upon the expiration of the contract, the seafarer shall continue his service on board until the vessel's arrival at a convenient port and/or after arrival of the replacement crew provided that, in any case, the continuance of such service shall not exceed three months. The seafarer shall be entitled to earned wages and benefits as provided in his contract.
B.  If the vessel arrives at a convenient port before the expiration of the contract, the master/ employer may repatriate the seafarer from such port, provided the unserved portion of his contract is not more than one (1) month. The seafarer shall be entitled only to his earned wages and earned leave pay and to his basic wages corresponding to the unserved portion of the contract, unless within 60 days from disembarkation, the seafarer is rehired at the same rate and position, in which case the seafarer shall be entitled only to his earned wages and earned leave pay.
C.  If the vessel arrives at a convenient port within a period of three (3) months before the expiration of his contract, the master/employer may repatriate the seafarer from such port provided that the seafarer shall be paid all his earned wages. In addition, the seafarer shall also be paid his leave pay for the entire contract period plus a termination pay equivalent to one (1) month of his basic pay, provided, however, that this mode of termination may only be exercised by the master/employer if the original contract period of the seafarer is at least ten (10) months; provided, further, that the conditions for this mode of termination shall not apply to dismissal for cause.

D.  The seafarer shall, if discharged at a port abroad for any reason other than for discipline, be accommodated ashore and in cases where it is not intended that he rejoin the vessel, shall be repatriated to the Philippines via sea or air or as may otherwise be directed by the employer/ master/agency.
E.  When the seafarer is discharged for any just cause, the employer shall have the right to recover the costs of his replacement and repatriation from the seafarer's wages and other earnings.
F.  The seafarer, when discharged and repatriated as directed by the employer/master/agency shall be entitled to basic wages from date of signing off until arrival at the point of hire except when the discharge is in accordance with the above or for disciplinary reasons.
If the seafarer delays or causes a detour and/or another destination other than the most-direct to the point of hire, all additional expenses shall be to the seafarer's account. The seafarer's basic wage shall be calculated based on the date of arrival by the most direct route.
G.  A seafarer who requests for early termination of his contract shall be liable for his repatriation cost as well as the transportation cost of his replacement. The employer may, in case of compassionate grounds, assume the transportation cost of the seafarer's replacement.

**SECTION 20.    COMPENSATION AND BENEFITS**

A.  COMPENSATION AND BENEFITS FOR DEATH
1.  In case of work-related death of the seafarer, during the term of his contract the employer shall pay his beneficiaries the Philippine Currency equivalent to the amount of Fifty thousand US dollars (US$50,000) and an additional amount of Seven thousand US dollar (US$7,000) to each child under the age of twenty-one (21) but not exceeding four (4) children at the exchange rate prevailing during the time of payment.
2.  Where death is caused by warlike activity while sailing within a declared war zone or war risk area, the compensation payable shall be doubled. The employer shall undertake appropriate war zone insurance coverage for this purpose.
3.  It is understood and agreed that the benefits mentioned above shall be separate and distinct from, and will be in addition to whatever benefits which seafarer is entitled to under Philippine laws from Social Security System, Overseas Workers Welfare Administration, Employees' Compensation Commission, Philippine Health Insurance Corporation and Pag-ibig, if applicable.
4.  The other liabilities of the employer when the seafarer dies as a results of work-related injury or illness during the term of employment are as follows:
    a.  The employer shall pay the deceased's beneficiary all outstanding obligations due the seafarer under this Contract.
    b.  The employer shall transport the remains and personal effects of the seafarer to the Philippines at employer's expense except if the death occurred in a port where local government laws or regulations do not permit the transport of such remains. In case death occurs at sea, the disposition of the remains shall be handled or dealt with in accordance with the master's best judgment. In all cases, the employer/master shall communicate with the manning agency to advise for disposition of seafarer's remains.
    c.  The employer shall pay the beneficiaries of the seafarer the Philippine currency equivalent to the amount of One Thousand US dollars (US$1,000) for burial expenses at the exchange rate prevailing during the time of payment.

B.  COMPENSATION AND BENEFITS FOR INJURY OR ILLNESS
The liabilities of the employer when the seafarer suffers work-related injury or illness during the term of his contract are as follows:
1.  The employer shall continue to pay the seafarer his wages during the time he is on board the vessel.
2.  If the injury or illness requires medical and/or dental treatment in a foreign port, the employer shall be liable for the full cost of such medical, serious dental, surgical and hospital treatment as well as board and lodging until the seafarer is declared fit to work or to be repatriated.
However, if after repatriation, the seafarer still requires medical attention arising from said injury or illness, he shall be so provided at cost to the employer until such time he is declared fit or the degree of his disability has been established by the company-designated physician.
3.  Upon sign-off from the vessel for medical treatment, the seafarer is entitled to sickness allowance equivalent to his basic wage until he is declared fit to work or the degree of permanent disability has been assessed by the company-designated physician but in no case shall this period exceed one hundred twenty (120) days.
For this purpose, the seafarer shall submit himself to a post-employment medical examination by a company-designated physician within three working days upon his return except when he is physically incapacitated to do so, in which case, a written notice to the agency within the same period is deemed as compliance. Failure of the seafarer to comply with the mandatory reporting requirement shall result in his forfeiture of the right to claim the above benefits.
If a doctor appointed by the seafarer disagrees with the assessment, a third doctor may be agreed jointly between the Employer and the seafarer. The third doctor's decision shall be final and binding on both parties.
4.  Those illnesses not listed in Section 32 of this Contract are disputably presumed as work related.
5.  Upon sign-off of the seafarer from the vessel for medical treatment, the employer shall bear the full cost of repatriation in the event the seafarer is declared (1) fit for repatriation; or (2) fit to work but the employer is unable to find employment for the seafarer on board his former vessel or another vessel of the employer despite earnest efforts.
6.  In case of permanent total or partial disability of the seafarer caused by either injury or illness the seafarer shall be compensated in accordance with the schedule of benefits enumerated in Section 32 of this Contract. Computation of his benefits arising from an illness or disease shall be governed by the rates and the rules of compensation applicable at the time the illness or disease was contracted.
C.  It is understood that computation of the total permanent or partial disability of the seafarer caused by the injury sustained resulting from warlike activities within the warzone area shall be based on the compensation rate payable within the warzone area as prescribed in this Contract.
D.  No compensation and benefits shall be payable in respect of any injury, incapacity, disability or death of the seafarer resulting from his wilful or criminal act or intentional breach of his duties, provided however, that the employer can prove that such injury, incapacity, disability or death is directly attributable to the seafarer.
A seafarer who knowingly conceals and does not disclose past medical condition, disability and history in the pre-employment medical examination constitutes fraudulent misrepresentation and shall disqualify him from any compensation and benefits. This may also be a valid ground for termination of employment and imposition of the appropriate administrative and legal sanctions.
E.  When requested, the principal shall furnish the seafarer a copy of all pertinent medical reports or any records at no cost to the seafarer.
F.  The seafarer or his successor in interest acknowledges that payment for injury, illness, incapacity, disability or death of the seafarer under this contract shall cover all claims arising from or in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country

2

**SECTION 21.    WAR AND WARLIKE OPERATIONS ALLOWANCE**

A.   If a war or warlike operations should arise during the term of this Contract in any country within the vessel's trading area, the seafarer may sail the vessel within and out of the trading area if required by the Master.

B.   If at the time of the signing of the contract, an area is declared a war or war-risk trading area and the seafarer binds himself in writing to sail into that area, the agreement shall be properly appended to the Contract for verification and approval by the Philippine Overseas Employment Administration (POEA). The seafarer shall comply with the agreement or shall bear his cost of repatriation when he opts not to sail into a war or war-risk trading area.

C.   The seafarer when sailing within a war-risk trading area shall be entitled to such premium pay as the POEA may determine through appropriate periodic issuances.

D.   The POEA shall be the sole authority to determine whether the vessel is within a war risk trading area. It shall also determine the amount of premium pay to which the seafarer shall be entitled to when sailing in that war-risk trading area.

**SECTION 22.    TERMINATION DUE TO SHIPWRECK**

Where the vessel is wrecked causing the termination of employment before the date indicated in the contract, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at employer's cost and one month basic wage as termination pay.

**SECTION 23.    TERMINATION DUE TO VESSEL SALE, LAY-UP OR DISCONTINUANCE OF VOYAGE**

Where the vessel is sold, laid up, or the voyage is discontinued necessitating the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's cost and one (1) month basic wage as termination pay, unless arrangements have been made for the seafarer to join another vessel belonging to the same principal to complete his contract in which case the seafarer shall be entitled to basic wages until the date of joining the other vessel.

**SECTION 24.    TERMINATION DUE TO UNSEAWORTHINESS**

A.   If the vessel is declared unseaworthy by a classification society, port state or flag state, the seafarer shall not be forced to sail with the vessel.

B.   If the vessel's unseaworthiness necessitates the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at cost to the employer and termination pay equivalent to one (1) month basic wage.

**SECTION 25    TERMINATION DUE TO REGULATION 1/4, CONTROL PROCE-DURES OF THE 1978 STCW CONVENTION, AS AMENDED**

If the seafarer is terminated and repatriated as a result of port state control procedures/actions in compliance with Regulation 1/4 of the 1978 STCW Convention, as amended, his termination shall be considered valid. However, he shall be entitled to repatriation, earned wages and other benefits.

**SECTION 26.    CHANGE OF PRINCIPAL**

A.   Where there is a change of principal of the vessel necessitating the termination of employment of the seafarer before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's expense and one month basic pay as termination pay.

B.   If by mutual agreement, the seafarer continues his service on board the same vessel, such service shall be treated as a new contract. The seafarer shall be entitled to earned wages only.

C.   In case arrangements has been made for the seafarer to join another vessel to complete his contract, the seafarer shall be entitled to basic wage until the date of joining the other vessel.

**SECTION 27.    LOSS OF OR DAMAGE TO CREW'S EFFECTS BY MARINE PERIL**

A.   The seafarer shall be reimbursed by the employer the full amount of loss or damage to his personal effects but in no case shall the amount exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000) if his personal effects are lost or damaged as a result of the wreck or loss or stranding or abandonment of the vessel or as a result of fire, flooding, collision or piracy.

B.   In case of partial loss, the amount shall be determined by mutual agreement of both parties but in no case it shall exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000).

C.   Reimbursement for loss or damage to the seafarer's personal effects shall not apply if such loss or damage is due to (a) the seafarer's own fault; (b) larceny or theft or (c) robbery.

D.   Payment of any reimbursement shall be computed at the rate of exchange prevailing at the time of payment.

**SECTION 28.    GENERAL SAFETY**

A.   The seafarer shall observe and follow any regulation or restriction that the master may impose concerning safety, drug and alcohol and environmental protection.

B.   The seafarer shall make use of all appropriate safety equipment provided him and must ensure that he is suitably dressed from the safety point of view for the job at hand.

**SECTION 29.    DISPUTE SETTLEMENT PROCEDURES**

In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If the parties are not covered by a collective bargaining agreement, the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 8042 otherwise known as the Migrant Workers and Overseas Filipinos Act of 1995 or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If there is no provision as to the voluntary arbitrators to be appointed by the parties, the same shall be appointed from the accredited voluntary arbitrators of the National Conciliation and Mediation Board of the Department of Labor and Employment.

The Philippine Overseas Employment Administration (POEA) shall exercise original and exclusive jurisdiction to hear and decide disciplinary action on cases, which are administrative in character, involving or arising out of violations of recruitment laws, rules and regulations involving employers, principals, contracting partners and Filipino seafarers.

**SECTION 30.    PRESCRIPTION OF ACTION**

All claims arising from this Contract shall be made within three (3) years from the date the cause of action arises, otherwise the same shall be barred.

**SECTION 31.    APPLICABLE LAW**

Any unresolved dispute, claim or grievance arising out of or in connection with this Contract, including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants where the Philippines is a signatory.

**SECTION 32.    SCHEDULE OF DISABILITY OR IMPEDIMENT FOR INJURIES SUFFERED AND DISEASES INCLUDING OCCUPATIONAL DISEASES OR ILLNESS CONTRACTED.**

**HEAD**

Traumatic head injuries that result to:

1.   Apperture unfilled with bone not over three (3) inches without brain injury...... Gr. 9
2.   Apperture unfilled with bone over three (3) inches without brain injury............ Gr. 3
3.   Severe paralysis of both upper or lower extremities or one upper and one lower extremity................................................................................................ Gr. 1
4.   Moderate paralysis of two (2) extremities producing moderate difficulty in movements with self-care activities....................................................... Gr. 6
5.   Slight paralysis affecting one extremity producing slight difficulty with self-care activities................................................................................................... Gr. 10
6.   Severe mental disorder or Severe Complex Cerebral function disturbance or post-traumatic psychoneurosis which require regular aid and attendance as to render worker permanently unable to perform any work ................................... Gr. 1
7.   Moderate mental disorder or moderate brain functional disturbance which limits worker to the activities of daily living with some directed care or attendance........ Gr. 6
8.   Slight mental disorder or disturbance that requires little attendance or aid and which interferes to a slight degree with the working capacity of the claimant...... Gr. 10
9.   Incurable imbecility ......................................................................................... Gr. 1

**FACE**

1.   Severe disfigurement of the face or head as to make the worker so repulsive as to greatly handicap him in securing or retaining employment, thereby being no permanent functional disorder.................. Gr. 2
2.   Moderate facial disfigurement involving partial ablation of the nose with big scars on face or head........................................................................... Gr. 5
3.   Partial ablation of the nose or partial avulsion of the scalp........................... Gr. 9
4.   Complete loss of the power of mastication and speech function..................... Gr. 1
5.   Moderate constriction of the jaw resulting in moderate degree of difficulty in chewing and moderate loss of the power or the expression of speech............. Gr. 6
6.   Slight disorder of mastication and speech function due to traumatic injuries to jaw or cheek bone................................................................... Gr. 12

**EYES**

1.   Blindness or total and permanent loss of vision of both eyes........................ Gr. 1
2.   Total blindness of one (1) eye and fifty percent (50%) loss of vision of the other eye................................................................................................ Gr. 5
3.   Loss of one (1) eye or total blindness of one eye.......................................... Gr. 7
4.   Fifty percent (50%) loss of vision of one eye................................................ Gr. 10
5.   Lagopthalmos, one eye................................................................................. Gr. 12
6.   Ectropion, one eye........................................................................................ Gr. 12
7.   Ephiphora, one eye....................................................................................... Gr. 12
8.   Ptosis, one eye............................................................................................. Gr. 12
NOTE: (Smeller's Chart - used to grade for near and distant vision).

**NOSE AND MOUTH**

1.   Considerable stricture of the nose (both sides) hindering breathing.................................................................................................. Gr. 11
2.   Loss of the sense of hakring in one ear......................................................... Gr. 11
3.   Injuries to the tongue (partial amputation or adhesion) or palate, causing defective speech................................................................................ Gr. 10
4.   Loss of three (3) teeth restored by prosthesis............................................... Gr. 14

**EARS**

1.   For the complete loss of the sense of hearing on both ears........................... Gr. 3
2.   Loss of two (2) external ears........................................................................ Gr. 8
3.   Complete loss of the sense of hearing in one ear.......................................... Gr. 11
4.   Loss of one external ear................................................................................ Gr. 12
5.   Loss of one half (1/2) of an external ear........................................................ Gr. 14

**NECK**

1.   Such injury to the throat as necessitates the wearing of a tracheal tube........................................................................................................... Gr. 8
2.   Loss of speech due to injury to the vocal cord............................................... Gr. 9
3.   Total stiffness of neck due to fracture or dislocation of the cervical spines............................................................................................ Gr. 8
4.   Moderate stiffness of two thirds (2/3) loss of motion of the neck.................................................................................................. Gr. 10
5.   Slight stiffness of neck or one third (1/3) loss of motion................................. Gr. 12

**CHEST-TRUNK-SPINE**

1.   Fracture of four (4) or more ribs resulting to severe limitation of chest expansion.................................................................................................. Gr. 6
2.   Fracture of four (4) or more ribs with intercostal neuralgia resulting in moderate limitation of chest expansion........................................................... Gr. 9
3.   Slight limitation of chest expansion due to simple rib functional without myositis or intercostal neuralgia........................................................................ Gr. 12
4.   Fracture of the dorsal or lumbar spines resulting to severe or total rigidity of the trunk or total loss of lifting power of heavy objects........................................ Gr. 6
5.   Moderate rigidity or two-thirds (2/3) loss of motion or lifting power of the trunk.... Gr. 8
6.   Slight rigidity or one third (1/3) loss of motion or lifting power of the trunk........... Gr. 11
7.   Injury to the spinal cord as to make walking impossible without the aid of a pair of crutches.............................................................................................. Gr. 4
8.   Injury to the spinal cord as to make walking impossible even with the aid of a pair of crutches.............................................................................................. Gr. 1
9.   Injury to the spinal cord resulting to incontinence of urine and faces............... Gr. 1

**ABDOMEN**

1.   Loss of the spleen......................................................................................... Gr. 8
2.   Loss of one kidney........................................................................................ Gr. 7
3.   Severe residuals or impairment of intra-abdominal organs which requires regular aid and attendance that will unable worker to seek any gainful employment........ Gr. 1
4.   Moderate residuals of disorder of the intra-abdominal organs secondary to trauma resulting to impairment of nutrition, moderate tenderness, nausea, vomiting, constipation or diarrhea................................................................................ Gr. 7
5.   Slight residuals or disorder of the intra-abdominal organs resulting in impairment of nutrition, slight tenderness and/or constipation or diarrhea............................ Gr. 12
6.   Inguinal hernia secondary to trauma or strain................................................ Gr. 12

3

## PELVIS

1. Fracture of the pelvic rings as to totally incapacitate worker to work ...................................................................... Gr. 1
2. Fracture of the pelvic ring resulting in deformity and lameness ........................................................................... Gr. 6

## URINARY AND GENERATIVE ORGANS

1. Total loss of penis.......................................................... Gr. 7
2. Total loss of both testicles ............................................ Gr. 7
3. Total loss of one testicle ............................................... Gr. 11
4. Scars on the penis or destruction of the parts of the cavernous body or urethra interfering with erection or markedly affecting coitus ...... Gr. 9
5. Loss of one breast ......................................................... Gr. 11
6. Prolapse of the uterus .................................................. Gr. 6
7. Great difficulty in urinating ........................................... Gr. 13
8. Incontinence of urine..................................................... Gr. 10

## THUMBS AND FINGERS

1. Total loss of one thumb including metacarpal bone ........ Gr. 9
2. Total loss of one thumb .................................................. Gr. 11
3. Total loss on one index finger including metacarpal bone ...... Gr. 10
4. Total loss of one index finger ....................................... Gr. 11
5. Total loss of one middle finger including metacarpal bone ...... Gr. 11
6. Total loss of one middle finger ....................................... Gr. 12
7. Total loss of one ring finger including metacarpal bone ...... Gr. 12
8. Total loss of one ring finger .......................................... Gr. 13
9. Total loss of one small finger including metacarpal bone ...... Gr. 13
10. Total loss of one small finger ....................................... Gr. 14
11. Loss of two (2) or more fingers. Compensation for the loss or loss of use of two (2) or more fingers or one (1) or more phalanges of two or more digits of a hand must be proportioned to the loss of the hand occasioned thereby but shall not exceed the compensation for the loss of a hand:

    a.  Loss of five (5) fingers of one hand.......................... Gr. 6
    b.  Loss of thumb, index fingers and any of 2 or more fingers of the same hand...................................................... Gr. 6
    c.  Loss of the thumb, index finger and any one of the remaining fingers of the same hand........................................ Gr. 7
    d.  Loss of thumb and index finger................................ Gr. 8
    e.  Loss of three (3) fingers of one hand not including thumb and index finger.................................................. Gr. 8
    f.  Loss of the index finger and any one of the other fingers of the same hand excluding thumb............................. Gr. 9
    g.  Loss of two (2) digits of one hand not including thumb and index finger.................................................. Gr. 10
12. Loss of ten (10) fingers of both hand............................ Gr. 3

## HANDS

1. Total loss of use of both hands or amputation of both hands at wrist joints or above......................................... Gr. 1
2. Amputation of a hand at carpo-metacarpal joint............. Gr. 5
3. Amputation between wrist and elbow joint..................... Gr. 5
4. Loss of grasping power for small objects between the fold of the finger of one hand................................................ Gr. 10
5. Loss of grasping power for large objects between fingers and palm of one hand....................................................... Gr. 10
6. Loss of opposition between the thumb and tips of the fingers of one hand.................................................... Gr. 10
7. Ankylosed wrist in normal position................................ Gr. 10
8. Ankylosed wrist in position one hand (1/2) flexed or half extended and/or severe limited action of a wrist........ Gr. 11

## SHOULDER AND ARM

1. Inability to turn forearm (forearm in normal position-supination).... Gr. 10
2. Inability to turn forearm (forearm in abnormal position-pronation).... Gr. 10
3. Disturbance of the normal carrying angle or weakness of an arm or a forearm due to deformity of moderate atrophy of muscles........ Gr. 11
4. Stiff elbow at full flexion or extension (one side).......... Gr. 7
5. Stiff elbow at right angle flexion................................ Gr. 8
6. Flail elbow joint........................................................... Gr. 9
7. Pseudoarthrosis of the humerus with muscular sprain or radial paralysis.... Gr. 8
8. Ankylosis of one (1) shoulder, the shoulder blade remaining mobile.... Gr. 9
9. Ankylosis of one shoulder, the shoulder blade remaining rigid.... Gr. 8
10. Unreduced dislocation of one (1) shoulder...................... Gr. 8
11. Ruptured biceps or pseudoarthrosis of the humerus, close (one side)........................................................ Gr. 11
12. Inability to raise arm more than halfway from horizontal to perpendicular.......................................................... Gr. 11
13. Ankylosis of the shoulder joint not permitting arm to be raised above a level with a shoulder and/or irreducible fracture of faulty union close bone............................................. Gr. 10
14. Total paralysis of both upper extremities..................... Gr. 1
15. Total paralysis of one upper extremity......................... Gr. 4
16. Amputation of one (1) upper extremity at or above the elbow.... Gr. 4
17. Scar the size of the palm in one extremity.................... Gr. 14

## LOWER EXTREMITIES

1. Loss of a big toe.......................................................... Gr. 12
2. Loss of a toe other than the big one............................ Gr. 14
3. Loss of ten (10) digits of both feet.............................. Gr. 5
4. Loss of a great toe of one foot + one toe..................... Gr. 12
5. Loss of two toes not including great toe or the toe next to it.... Gr. 12
6. Loss of three (3) toes excluding great toe of a foot...... Gr. 11
7. Loss of four (4) excluding great toe of a foot................ Gr. 9
8. Loss of great toe and two (2) other toes of the same foot.... Gr. 10
9. Loss of five digits of a foot........................................ Gr. 9
10. Loss of both feet at ankle joint or above...................... Gr. 1
11. Loss of one foot at ankle joint or above........................ Gr. 6
12. Depression of the arch of a foot resulting in weak foot.... Gr. 12
13. Loss of one half (1/2) metatarsus of one (1) foot........... Gr. 8
14. Loss of whole metatarsus or forepart of foot................. Gr. 7
15. Tearing of achilles tendon resulting in the impairment of active flexion and extension of a foot....................... Gr. 12
16. Malleolar fracture with displacement of the foot inward or outward.... Gr. 10
17. Complete immobility of an ankle joint in abnormal position.... Gr. 10
18. Complete immobility of an ankle joint in normal position.... Gr. 11
19. Total loss of a leg or amputation at or above the knee.... Gr. 3
20. Stretching leg of the ligaments of a knee resulting in instability of the joint........................................... Gr. 10
21. Ankylosis of a knee in genuvalgum of varum.................. Gr. 10
22. Pseudoarthrosis of a knee cap..................................... Gr. 10
23. Complete immobility of a knee joint in full extension...... Gr. 10
24. Complete immobility of a knee joint in strong flexion...... Gr. 7

25. Complete immobility of a hip joint in flexion of the thigh.... Gr. 5
26. Complete immobility of a hip joint in full extension of the thigh.... Gr. 9
27. Slight atrophy of calf of leg muscles without apparent shortening or joint lesion or disturbance of weight-bearing line.... Gr. 13
28. Shortening of a lower extremity from one to three centimeters with either joint lesion or disturbance of weight-bearing joint.... Gr. 13
29. Shortening of 3 to 6 cm. with slight atrophy of calf or thigh muscles........................................ Gr. 12
30. Shortening of 3 to 6 cm. with either joint lesion or disturbance of weight-bearing joint............................ Gr. 11
31. Irregular union of fracture with joint stiffness and with shortening of 6 to 9 cm. producing permanent lameness.... Gr. 9
32. Irregular union of fracture in a thigh or leg with shortening of 6 to 9 cms.... Gr. 10
33. Failure of fracture of both hips to unite....................... Gr. 1
34. Failure of fracture of a hip to unite............................ Gr. 1
35. Paralysis of both lower extremities............................. Gr. 1
36. Paralysis of one lower extremity................................ Gr. 3
37. Scar the size of a palm or larger left on an extremity.... Gr. 14

NOTE:  Any item in the schedule classified under Grade 1 shall be considered or shall constitute total and permanent disability.

### SCHEDULE OF DISABILITY ALLOWANCES

| Impediment Grade | | Impediment | |
|---|---|---|---|
| 1 | US$50,000 | x | 120.00% |
| 2 | " | x | 88.81% |
| 3 | " | x | 78.36% |
| 4 | " | x | 68.66% |
| 5 | " | x | 58.96% |
| 6 | " | x | 50.00% |
| 7 | " | x | 41.80% |
| 8 | " | x | 33.59% |
| 9 | " | x | 26.12% |
| 10 | " | x | 20.15% |
| 11 | " | x | 14.33% |
| 12 | " | x | 10.45% |
| 13 | " | x | 6.72% |
| 14 | " | x | 3.72% |

To be paid in Philippine Currency equivalent at the exchange rate prevailing during the time of payment.

SECTION 32-A.     OCCUPATIONAL DISEASES
For an occupational disease and the resulting disability or death to be compensable, all of the following conditions must be satisfied:
(1)   The seafarer's work must involve the risks described herein;
(2)   The disease was contracted as a result of the seafarer's exposure to the described risks;
(3)   The disease was contracted within a period of exposure and under such other factors necessary to contract it;
(4)   There was no notorious negligence on the part of the seafarer.
The following diseases are considered as occupational when contracted under working conditions involving the risks described herein:

| OCCUPATIONAL DISEASES | NATURE OF EMPLOYMENT |
|---|---|
| 1.  Cancer of the epithelial lining of the bladder.<br><br>(Papilloma of the bladder) | Work involving exposure to alpha-naphthylamine, beta-naphthylamin or benzidine or any part of the salts; and auramine or magenta |
| 2.  Cancer, epitheliomatous or ulceration of the skin or of the corneal surface of the eye due to tar, pitch, bitumen, mineral oil or paraffin, or compound product or residue of these substances. | The use or handling of, exposure to tar, pitch, bitumen, mineral oil (including paraffin) soot or any compound product or residue of any of these substances. |
| 3.  Deafness | Any industrial operation having excessive noise particularly in the higher frequencies. |
| 4.  Decompression sickness<br><br>  (a)  Caissons disease<br>  (b)  Aeroembolism | Any process carried on in compressed or rarefied air.<br><br><br>Any process carried on in rarefied air. |
| 5.  Dermatitis due to irritants and sensitizers | The use or handling of chemical agents which are skin irritants and sensitizers. |
| 6.  Infection (Brucellosis) | Any occupation involving the handling of contaminated food and drink particularly milk, butter and cheese of infected goats and cows. |
| 7.  Ionizing radiation disease, inflammation, ulceration or malignant disease of skin or subcutaneous tissues of the bones or leukemia, or anemia of the aplastic type due to X-rays, ionizing particle radium or radio-active substances. | Exposure to X-rays, ionizing particles of radium or other radioactive substances or other forms of radiant energy. |
| 8.  Poisoning and its sequelae caused by: | |
|   (a)  Ammonia | All work involving exposure to the risk concerned. |
|   (b)  Arsenic or its toxic compound. | All work involving exposure to the risk concerned. |
|   (c)  Benzene or its toxic homologues; nitro and aminotoxic-derivatives of benzane or its homologue. | All work involving exposure to the risk concerned. |
|   (d)  Beryllium or its toxic compounds | All work involving exposure to the risk concerned. |
|   (e)  Brass, zinc or nickel | All work involving exposure to the risk concerned. |
|   (f)  Carbon dioxide | All work involving exposure to the risk concerned. |
|   (g)  Carbon bisulfide | All work involving exposure to the risk concerned. |
|   (h)  Carbon monoxide | All work involving exposure to the risk concerned. |
|   (i)  Chlorine | All work involving exposure to the risk concerned. |

4

(j) Chrome of its toxic compounds — All work involving exposure to the risk concerned.
(k) Dinitrophenol or its homologue — All work involving exposure to the risk concerned.
(l) Halogen derivatives of hydrocarbon of the aliphatic series — All work involving exposure to the risk concerned.
(m) Lead or its toxic compounds — All work involving exposure to the risk concerned.
(n) Manganese or its toxic compounds — All work involving exposure to the risk concerned.
(o) Mercury or its toxic compounds — All work involving exposure to the risk concerned.
(p) Nitrous fumes — All work involving exposure to the risk concerned.
(q) Phosgene — All work involving exposure to the risk concerned.
(r) Phosphorous or its toxic compounds — All work involving exposure to the risk concerned.
(s) Sulfur dioxide — All work involving exposure to the risk concerned.

9. Diseases caused by abnormalities in temperature and humidity. — All work involving exposure to the risk concerned.
(a) Heat stroke/cramps/exhaustion — to excessive heat or cold.
(b) Chilblain/Frostbite/freezing — All work involving exposure to the risk concerned.
(c) Immersion foot/general hypothermia — All work involving exposure to the risk concerned.

10. Vascular disturbance in the upper extremities due to continuous vibration from pneumatic tools of power drills, riveting machines or hammers. — Any occupation causing repeated motions, vibrations and pressure of upper extremities.

11. Cardio-Vascular Diseases — Any of the following conditions must be met:
a. If the heart disease was known to have been present during employment, there must be proof that an acute exacerbation was clearly precipitated by the unusual strain by reasons of the nature of his work.
b. The strain of work that brings about an acute attack must be sufficient severity and must be followed within 24 hours by the clinical signs of a cardiac insult to constitute causal relationship.
c. If a person who was apparently asymptomatic before being subjected to strain at work showed signs and symptoms of cardiac injury during the performance of his work and such symptoms and signs persisted, it is reasonable to claim a causal relationship.

12. Cerebro-Vascular Accidents. — All of the following conditions must be met:
a. There must be a history, which should be proved, or trauma at work (to the head specially) due to unusual and extraordinary physical or mental strain or event, or undue exposure to noxious gases in industry.
b. There must be a direct connection between the trauma or exertion in the course of employment and the worker's collapse.
c. If the trauma or exertion then and there caused a brain hemorrhage, the injury may be considered as arising from work.

13. Pneumonia. — All of the following conditions must be met:
a. There must be an honest and definite history of wetting and chilling during the course of employment and also, of injury to the crest wall with or without rib fracture, or inhalation of noxious gases, fumes and other deleterious substances in the place of work.
b. There must be direct connection between the offending agent or event and the seafarer's illness.
c. The signs of consolidation should appear soon (within a few hours) and the symptoms of initial chilling and fever should at least be 24 hours after the injury or exposure.
d. The patient must manifest any of the following symptoms within a few days of the accident: (1) severe chill and fever (2) headache and pain, agonizing in character, in the side of the body; (3) short, dry, painful cough with blood-tinged expectoration; and (4) physical signs or consolidation, with fine rales.

14. Hernia. — All of the following conditions must be met:
a. The hernia should be of recent origin.
b. Its appearance was accompanied by pain discoloration and evidence of a tearing of the tissues.
c. The disease was immediately preceded by undue or severe strain arising out of and in the course of employment.
d. A protrusion of mass should appear in the area immediately following the alleged strain.

15. Bronchial Asthma. — All of the following conditions must be met:
a. There is no evidence of history of asthma before employment.
b. The allergen is present in the working conditions.
c. Sensitivity test to allergens in the working environment should yield positive results.
d. A provocative test should show positive results.

16. Osteoarthritis. — Any occupation involving: a) joint strain from carrying heavy loads, or unduly heavy physical labor, as among laborers and mechanics; b) minor or major injuries to the joint; c) excessive use or constant strenuous usage of a particular joint, as among sportsmen, particularly those who have engaged in the more active sports activities; d) extreme temperature changes (humidity, heat and cold exposures); and a) faulty work posture or use of vibratory tools.

17. Peptic Ulcer. — Any occupation involving prolonged emotional or physical stress, as among professional people, transport workers and the like.

18. Pulmonary Tuberculosis. — In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving constant exposure to harmful substances in the working environment, in the form of gases, fumes, vapors and dust, as in chemical and textile factories; overwork or fatigue; and exposure to rapid variations in temperature, high degree of humidity, and bad weather conditions.

19. Viral Hepatitis. — In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving exposure to a source of infection through ingestion of water, milk, or other foods contaminated with hepatitis virus; Provided that the physician determining the causal relationship between the employment and the illness should be able to indicate whether the disease, of the afflicted worker manifested itself while he was so employed, knowing the incubation period thereof.

20. Essential Hypertension. — Hypertension classified as primary or essential is considered compensable if it causes impairment of function of body organs like kidneys, heart, eyes and brain, resulting in permanent disability; Provided, that, the following documents substantiate it: (a) chest x-ray report, (b) EGG report (c) blood chemistry report, (d) funduscopy report, and (f) C-T scan.

21. Asbestosis. — All of the following conditions must be met:
a. The seafarer must have been exposed to Asbestos dust in the work place, as duly certified to by the employer, or by a medical institution, or competent medical practitioner acceptable to or accredited by the System;
b. The chest X-ray report of the employee must show findings of asbestos or asbestos-related disease, e.g. pleural plaques, pleural thickening, effusion, neoplasm and interstitial fibrosis; and
c. In case of element is discovered after the seafarer's retirement/separation from the company, the claim must be filed with the System within three (3) years from discovery.

Right column:

SECTION 33.     TABLE OF OFFENSES AND CORRESPONDING ADMINISTRATIVE PENALTIES

| OFFENSES | ADMINISTRATIVE PENALTIES | |
|---|---|---|
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| 1. Smuggling or violation of any custom rules and regulations of the Philippines and of foreign ports. | | |
| a. smuggling any taxable item. | Dismissal and to pay cost | 1st Offense: Minimum – one (1) year suspension from POEA Registry Maximum - two (2) years suspension 2nd Offense: Minimum two (2) years and one (1) day suspension Maximum - deleting from POEA Registry |
| b. possession or use of prohibited drugs, narcotics and other contraband | Dismissal | Deleting from POEA registry |
| c. gun-running or possession of explosives and the like | Dismissal | Deleting from POEA registry |
| d. abetting or conniving with others to commit smuggling | Dismissal | Minimum - 2 years suspension Maximum - 3 years suspension |
| e. misdeclaration of or failing to declare articles leading to their seizure and fine to vessel | Dismissal | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - deleting from POEA registry 2nd Offense: |
| f. misdeclaration of or failing to declare articles leading to their seizure but vessel not implicated | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Minimum - 2 years and 1 day suspension Maximum - 2 years suspension 3rd Offense: Minimum - 2 years and 1 day suspension Maximum - deleting from POEA registry |
| g. possession of pornographic materials leading to its seizure and fine to vessel | Dismissal | Same as 1(e) |
| h. any other violation which will not implicate vessel | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 1(f) |
| i. any other violation which will implicate the vessel | Dismissal | Minimum - 3 yrs suspension Maximum - deleting from POEA registry |
| 2. Desertion | | |
| a. deserting or attempting to desert | Dismissal and to pay cost | Permanent Deleting from POEA registry |
| b. advising, assisting or persuading another to desert | Dismissal and to pay cost | Minimum - 5 yrs suspension Maximum - Deleting from POEA registry |
| 3. Absence without leave | | |
| a. abandoning post or duty without being properly relieved | Dismissal and to pay cost | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - deleting from POEA registry Same as 3(a) |
| b. leaving the vessel without permission from responsible officers during working hours c. entrusting to others their assigned duties without authority of department head | Dismissal and to pay cost At the discretion of Master | 1st Offense: Minimum - 6 months suspension Maximum - 1 year suspension 2nd Offense: Minimum - 1 year and 1 day suspension Maximum - 2 years suspension 3rd Offense: Minimum - 2 years and 1 day suspension Maximum - deleting from POEA registry |
| d. leaving the vessel without permission | At the discretion of Master | Same as 3(c) |
| 4. Sleeping on post while on duty | Dismissal and to pay cost | Same as 3(a) |
| 5. Insubordination | | |
| a. any act of disobedience to lawful orders of a superior officer | Dismissal and to pay cost | Same as 3(a) |
| b. attempting to assault a superior officer | Dismissal and to pay cost | Same as 3(c) |
| c. assaulting a superior officer/ other persons on business with the ship without the use of deadly weapon | Dismissal and to pay cost | Same as 3(a) |
| d. assaulting a superior officer/ other persons on business with the ship with the use of deadly weapon | Dismissal and to pay cost | Deleting from POEA registry |
| e. behaving with disrespect | Dismissal and to pay cost | 1st Offense: |

5

| OFFENSES | AMINISTRATIVE PENALTIES | |
|---|---|---|
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| towards a superior officer * | | 1st Offense: Minimum - 8 months suspension Maximum - 1 year suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - 3 years suspension 3rd Offense: Minimum - 3 years and 1 day suspension Maximum - delisting from POEA registry |
| f.insulting a superior officer by words or deed | Dismissal and to pay cost | Same as 5(e) |
| g.inciting another to commit insubordination | Dismissal and to pay cost | Same as 5(e) |
| 6.Drunkenness a.drunk while on duty | Dismissal and to pay cost | 1st Offense: Minimum - 2 years suspension Maximum - 3 years suspension 2nd Offense: Minimum - 3 years and 1 day suspension Maximum - delisting from POEA registry |
| b.creating trouble on board due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(e) |
| c.failure to perform assigned jobs due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(e) |
| 7.Creating trouble outside the vessel's premises | Same as 6(c) | Same as 6(c) |
| 8.Gambling a.which results in fighting or any incident as to upset the harmonious relationship on board the vessel | Dismissal and to pay cost | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| b.any other form of gambling which is not purely recreational | At Master's discretion | Same as 5(e) |
| 9.Violation of company policies and regulations a.pilferage or theft of ship's store or cargo | Dismissal and to pay cost | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| b.embezzlement of company funds | Dismissal and to pay cost | Same as 9(a) |
| c.unauthorized disposal of company vessel's properties for personal gain | Dismissal and to pay cost | Same as 9(a) |
| d.any act of dishonesty with intention to defraud the company | Dismissal and to pay cost | Same as 9(a) |
| e.for gross negligence and failure to observe proper storage and cargo handling procedures resulting in delay of vessels and/or damage to cargoes | Dismissal and to pay cost | Same as 9(a) |
| f.failure to observe and comply with regulation and non-baggage shipment and acceptance of parcels on board | At Master's discretion | 1st Offense: Minimum - 6 months suspension Maximum - 1 year suspension 2nd Offense: Minimum - 1 year and 1 day suspension Maximum - 2 years suspension 3rd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| g.for failure to observe regulations on expiration of shore liberty | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | |
| h.for being left behind by vessel in foreign port without justifiable reason | Dismissal and to pay cost | Same as 9(f) |
| i.for disorderly conduct and/or disrespect towards passengers | Dismissal and to pay cost | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| j.for immorality so as to cast aspersion on the good name of the vessel and company | Dismissal and to pay cost | Same as 9(f) |

| OFFENSES | AMINISTRATIVE PENALTIES | |
|---|---|---|
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| k.for inflicting harm or injury to others | Dismissal and to pay cost | Same as 9(f) |
| 10.Incompetence and inefficiency | Dismissal and to pay cost | 1st Offense: Minimum - 2 years suspension Maximum - 3 years suspension 2nd Offense: Minimum - 3 years and 1 day suspension Maximum - delisting from POEA registry |
| 11.For inciting mutiny, malicious destruction of ship's property at any activity which will hamper the efficient operation of the vessel | Dismissal and to pay cost | 1st Offense: Minimum - 2 years suspension Maximum - 3 years suspension 2nd Offense: Minimum - 3 years and 1 day suspension Maximum - delisting from POEA registry |
| 12.Concerted action to breach approved contracts | Dismissal | 1st Offense: Minimum - 2 years suspension Maximum - 3 years suspension 2nd Offense: Disqualification from overseas employment |
| 13.Any activity which tends to destroy harmonious relationship of the company | Dismissal and to pay cost | same as 9(f) |
| 14.Grave abuse of authority a.grave abuse of authority (with the use of deadly weapon) resulting in harm or injury to subordinates | Dismissal and to pay cost | Delisting from POEA registry |
| b.grave abuse of authority (without the use of deadly weapon) resulting in harm or injury to subordinates | Dismissal and to pay cost | 1st Offense: Minimum - 2 years suspension Maximum - 3 years suspension 2nd Offense: Minimum - 3 years and 1 day suspension Maximum - delisting from POEA registry |
| c.any other case of abuse of authority | At Master's discretion | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - 3 years suspension |
| 15.For gross misbehaviour prejudicial to good order and discipline | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | 1st Offense: Minimum - 2 years suspension Maximum - 2 years suspension 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| 16.Causing through neglect, damage loss, spoilage or deterioration of vessel's stocks and property | At Master's discretion | Same as 15(c) |
| 17.Connivance with or cuddling of stowaway | Dismissal and to pay cost | Same as 16 |
| 18.For wilfully making false statement, reports, certification or spurious seafarer's documents for personal gain or with intent to mislead of defraud the company | Dismissal and to pay cost | Same as 16 |
| 19.Any other case as to cast aspersion on the good name of the company and vessel | At Master's discretion | Same as 15(c) |
| 20.Violation of safety and environmental rules/regulations | At Master's discretion | Minimum - 1 year suspension Maximum - 2 years suspension |
| 21.Failure to observe the drug and alcohol policy of the company | Dismissal | Minimum - 1 year suspension Maximum - 2 years suspension |

*This contract is pursuant to DOLE Department Order No. 4, and POEA Memorandum Circular No. 9, both Series of 2000.

SEAFARER

COPE C. PARAGATOS
EMPLOYER

DATE:

POEA APPROVAL

MAR 2 5 2003

8

Case Flow 00-06-FAX-Document 76 Entered on FLSD Docket 09/23/2003 Page 145 of 147

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION

## CONTRACT OF EMPLOYMENT

**KNOW ALL MEN BY THESE PRESENTS:**

    This Contract, entered into voluntarily by and between:

Name of Seafarer: _____
Address: _____
SIRB No.: _____ SRC No : _____
License No. _____
hereinafter referred to as the Employee

and

Name of Agent: _____
For and behalf of _____
(Principal/Country)

for the following vessel:
Name of Vessel: _____
Official Number: _____ Gross Registered Tonnage (GRT) _____
Flag: _____ Year Built: _____ Classification Society _____
hereinafter referred to as the Employer.

WITNESSETH

1. That the employee shall be employed on board under the following terms and conditions

    1.1 Duration of Contract: _____
    1.2 Position: _____
    1.3 Basic Monthly Salary: _____
    1.4 Hours of Work: _____
    1.5 Overtime: _____
    1.6 Vacation Leave with Pay: _____
    1.7 Point of Hire: _____

2. The herein terms and conditions in accordance with Department Order No 4 and Memorandum Circular No 9 , both Series of 2000, shall be strictly and faithfully observed

3. Any alterations or changes, in any part of this Contract shall be evaluated verified, processed and approved by the Philippine Overseas Employment Administration (POEA) Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels

4. Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

    IN WITNESS WHEREOF the parties have hereto set their hands this _____ day of _____
20_____ at _____ Philippines.

<br>

_____               _____
       Seafarer                                  For the Employer

Verified and approved by the POEA

<br>

_____               _____
       Date                                 Signature of POEA Official

SECTION A

MoorsStandard

 

Republic of the Philippines

# DEPARTMENT OF LABOR AND EMPLOYMENT

Intramuros, Manila

### Department Order No. 03
### Series of 2000

In compliance with the upgraded rate arrived at during the 28th Session of the Joint Maritime Commission of the International Labour Organization and after due consultations with industry associations and seafarer unions, the basic salary for Filipino Able Seaman is hereby upgraded under the following guidelines:

1. All shipowners and principals shall pay the Filipino Able Seaman on board ocean-going vessels a minimum basic wage of US$385 per month;

2. The upgraded minimum wage shall apply only to contracts executed by Able Seamen upon the date of effectivity of this Order; and

3. Shipboard employment contracts executed prior to the effectivity of the wage increase shall remain valid and unaffected by this Order until their expiration or termination.

This Order shall take effect on 01 July 2000.

For compliance.

BIENVENIDO E. LAGUESMA
Secretary

31 May 2000

### Department Order No. 04
### Series of 2000

In view of recent developments in the international maritime industry affecting the recruitment and employment of Filipino seafarers on ocean-going vessels and in support of the Department's objective of ensuring the continued employment of our seafarers and maintaining the Philippine global comparative advantage in shipmanning, the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels is hereby amended reflecting the consensus of all stakeholders as determined through the several tripartite consultations conducted by the Philippine Overseas Employment Administration.

The Philippine Overseas Employment Administration (POEA) shall formulate the guidelines for the implementation of the amended contract, a copy of which is hereto attached.

The amended rules shall take effect fifteen (15) days from date of publication in a newspaper of general circulation.

All Orders and issuances inconsistent herewith are hereby repealed and superseded accordingly.

For strict compliance.

BIENVENIDO E. LAGUESMA
Secretary

31 May 2000

ANNEX A

---

8. To conduct himself in an orderly and respectful manner towards passengers and shippers stevedores, port authorities and other persons on official business with the ship.

### SECTION 2. COMMENCEMENT/DURATION OF CONTRACT

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.

B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to the mutual consent of both parties.

### SECTION 3. FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION

The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed at the expense of the employer.

### SECTION 4. BAGGAGE ALLOWANCE

The seafarer traveling by air to join a vessel or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines. The cost of the excess baggage shall be for the account of the seafarer.

### SECTION 5. HYGIENE AND VACCINATION

A. The seafarer shall keep his quarters and other living spaces such as messrooms, toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master. The work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.

B. The seafarer shall submit to the order of the master at the laws of any country within the territorial jurisdiction of which the vessel may enter to have such vaccination or inoculation or to undertake measures safeguarding his health and of the whole crew.

### SECTION 6. WAGES

The seafarer shall be paid his monthly wages not later than 15 days of the succeeding month from the date of commencement of the contract until the date of arrival at point of hire upon termination of his employment pursuant to Section 18 of this Contract.

### SECTION 7. PAYMENT ON BOARD

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment. Advances shall be at the master's/employer's discretion and in accordance with the foregoing conditions.

### SECTION 8. ALLOTMENTS AND REMITTANCES

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank. The master/employer/agency shall provide the seafarer with facilities to do so at no cost to the seafarer. The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary including backwages, if any.

B. The master/employer/agency may also provide facilities for the seafarer

---

D. Emergency Duty - No overtime work shall be performed in case of emergency affecting passenger, crew or cargo, of which the safety or for fire, boat, or emergency drill or with other vessels or persons in immediate...

### SECTION 12. LEAVE PAY

The seafarer's leave pay shall be in accordance with... leave per month as agreed upon. Days leave and a half (2-1/2) days for each month of... pay shall be settled onboard or settled within... seafarer at the point of hire.

### SECTION 13. SHORE LEAVE

The seafarer shall be allowed shore leave to consent of the master or his deputy, taking... tions and safety of the vessel.

### SECTION 14. VICTUALLING, VESSEL S...

A. The seafarer shall be provided by the ... tence consistent with good maritime ... on board the vessel.

B. All stores and provisions issued to the ... consumption on board the vessel and ... stores or provisions shall remain the ... seafarer shall not take ashore, sell, des... and provisions

### SECTION 15. TRANSFER CLAUSE

The seafarer agrees to be transferred at an... operated, manned or managed by the s... accredited to the same manning agent and... tion of the seafarer and the rate of his wag... no way inferior and the total period of emp... originally agreed upon.

Any form of transfer shall be documente... necessary.

### SECTION 16. GRIEVANCE MACHINERY

A. If the seafarer considers himself aggri... plaint in accordance with the following

1. The seafarer shall first approach t... which he is assigned to explain hi...

   a. In the Deck, Radio and Caterin... Chiefmate.

   b. In the Engine Department, the i...

   c. In the Catering and/or Hotel De... the head is the Chief Steward o...

2. The Department head shall make his grie... derly manner and shall choose a ... grievance can be properly heard.

3. The Department head shall deal w... and where solution is not possible