CLOSED
CIVIL
CASE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RIZALYN BAUTISTA, etc., et al. | CASE NO. 03-21642-CIV-SEITZ/BANDSTRA |
| PAUL PERALTA | CASE NO. 03-21643-CIV-SEITZ/BANDSTRA |
| RAYMOND LOVINO | CASE NO. 03-21644-CIV-SEITZ/BANDSTRA |
| RONALDO MARCELINO | CASE NO. 03-21645-CIV-SEITZ/BANDSTRA |
| ROLANDO TEJERO | CASE NO. 03-21646-CIV-SEITZ/BANDSTRA |
| ABDI COMEDIA | CASE NO. 03-21647-CIV-SEITZ/BANDSTRA |
| CRISTINA L. VALENZUELA, etc., et al. | CASE NO. 03-21648-CIV-SEITZ/BANDSTRA |
| MARILEN S. BERNAL, etc., et al. | CASE NO. 03-21649-CIV-SEITZ/BANDSTRA |
| WILLY I. VILLANUEVA, etc., et al. | CASE NO. 03-21650-CIV-SEITZ/BANDSTRA |
| MARIA GARCIA L. ROSAL, etc., et al. | CASE NO. 03-21651-CIV-SEITZ/BANDSTRA |

Plaintiffs,

v.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

Defendants.



FILED by _____ D.C.

OCT 1 4 2003

CLARENCE MADDOX
CLERK, U.S. DIST. CT.
S.D. OF FLA. MIAMI

---

**ORDER GRANTING DEFENDANT NORWEGIAN CRUISE LINE, LTD.'S
MOTION TO COMPEL ARBITRATION,
DENYING PLAINTIFFS' MOTION FOR REMAND,
AND
DENYING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

THIS MATTER is before the Court on Defendant Norwegian Cruise Line, Ltd.'s ("NCL") Motion to Compel Arbitration [DE-10], and Plaintiffs' Motion for Remand [DE-13] and Motion for Attorneys' Fees [DE-19].[1]   Plaintiffs filed their three-count complaints alleging negligence and unseaworthiness under the Jones Act, 46 U.S.C. §688, and failure to provide maintenance, cure and unearned wages under the general maritime law of the United States.  Following removal of these cases to federal district court, NCL moved to compel arbitration pursuant to written arbitration agreements between the company and the Plaintiff seamen.  Plaintiffs contend that no enforceable arbitration agreements exist, and seek remand of their claims to state court along with an award of attorneys' fees

---

[1] These ten cases were initially filed as separate actions, but were transferred to the undersigned judge and consolidated for all pretrial purposes on July 14, 2003 [DE-9]. The motions submitted to the Court were separately filed by the parties in each case, and therefore, bear different docket numbers in each case. The docket numbers listed in this Order are for the lowest-numbered case, *Bautista v. Star Cruises and Norwegian Cruise Line, Ltd.*

-1-

due to Defendants' allegedly improper removal.  The parties' respective motions ask the Court to assess the balance between the protection of seamen, who have traditionally been viewed as the "wards of the courts,"[2] and the interests supporting enforcement of international arbitration agreements.  The Court has considered the parties' thorough papers, the arguments of counsel, and the amicus briefs submitted on behalf of Plaintiffs.  For the reasons stated below, the Court must grant NCL's Motion to Compel Arbitration and deny Plaintiffs' Motion for Remand and Motion for Attorneys' Fees.

## Background

These cases arise from the May 25, 2003 steam boiler explosion on board NCL's vessel, the S/S Norway, at the Port of Miami.  The explosion killed six of the Plaintiff seamen, and seriously injured four others.  On June 2, 2003, the four surviving seamen and the personal representatives of the six decedent crew members filed suit against NCL and Star Cruises in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  Plaintiffs' virtually identical complaints seek damages for negligence and unseaworthiness under the Jones Act, 46 U.S.C. §688, and for failure to provide maintenance, cure and unearned wages under the general maritime law of the United States.

On June 17, 2003, NCL and Star Cruises removed these cases to federal district court, alleging that Plaintiffs had entered into written agreements to arbitrate claims arising from their employment with NCL in the Philippines, and that these agreements were subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention").  Both the United States and the Philippines are signatories to the Convention, with the former implementing the Convention in 1970 through the enactment of 9 U.S.C. §§201-208 (collectively, "the Convention Act").[3]  NCL and Star Cruises based their removal on §205 of the Convention Act, which allows a defendant to remove an action to federal

---

[2]  *See generally* Amicus Curiae Memorandum of the Florida Admiralty Trial Lawyers Assn. at pp. 4-10.

[3]  Title 9 of the United States Code deals with arbitration and is divided into three chapters, two of which are relevant to this case.  Chapter 1 (9 U.S.C. §§ 1-16) is known as the Federal Arbitration Act ("FAA") which addresses domestic arbitration agreements.  Chapter 2 (9 U.S.C. §§ 201-208) deals with the Convention and its enabling legislation, and governs enforcement of international arbitration agreements.

district court before the start of trial when the dispute relates to an arbitration agreement or arbitral award covered by the Convention.

At the time of the Norway explosion, Plaintiffs' employment with NCL was governed by the terms of a standard Contract of Employment approved by the Philippine Overseas Employment Administration ("POEA"), a division of the Department of Labor and Employment of the Republic of Philippines ("DOLE"). Among other things, the POEA supervised, regulated, promoted, and monitored overseas employment programs for the purpose of ensuring the best terms and conditions of employment for Filipino contract workers.[4] To further this objective, the POEA periodically issued memorandum circulars setting minimum requirements or standards of compensation and other benefits for overseas Filipino workers, especially seafarers, to keep them on par with prevailing international standards. The POEA also collaborated with representatives of the local manning agencies and maritime employers such as NCL in negotiating standard employment agreements and terms of employment. This collaborative effort is referred to as the "Tripartite Technical Working Group" because of its goal of protecting the interests of three distinct groups: the Philippine government, the seamen or other contract workers, and the employers.

Each seaman was hired for employment through a manning agency licensed by the POEA to conduct recruitment activities. Each seaman's employment contract was signed in the Philippines by the seaman and by an NCL representative between August 2002 and March 2003, and was verified and approved by a POEA officer. Plaintiffs also initialed or signed each page of the Standard Terms. Plaintiffs' employment contracts, identical in form but varying based on the particular position attained, consist of one page that sets forth the basic terms and conditions of the seaman's employment, including the duration of the contract, the position accepted, and the monthly salary and hours of work. Paragraph 2 of the standard contract states that its terms and conditions are to be observed in accordance with

---

[4] *See generally* Affidavits of Ruben Del Rosario and Patricia Sto. Tomas, attached to NCL's Resp. in Opposition to Plaintiffs' Motion for Remand at Exhibits A and B, respectively; *see also Mariners Association for Regional and International Networking Organization, et al. v. Honorable Bienvenido Laguesma*, G.R. No. 144479, Jan. 11, 2001 (Phil. Sup.Ct.).

Department Order No. 4[5] and Memorandum Circular No. 9, promulgated by the DOLE and the POEA in 2000. Department Order No. 4, in turn, incorporates the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels ("Standard Terms").

Section 29 of the Standard Terms requires arbitration "[i]n cases of claims and disputes arising from [the seaman's] employment," either through submission of the claims to the National Labor Relations Commission ("NLRC") or voluntary arbitrators or a panel of arbitrators.[6] While Plaintiffs dispute that they ever saw or had the arbitration provision explained to them, NCL has produced copies of the Standard Terms initialed or signed by each of the Plaintiffs. NCL has also produced affidavits from managers at various manning agencies licensed by the POEA to recruit seamen, certifying that they explained the employment documents to the seamen in their native language and that the seamen had an opportunity to review the documents. *See* Exhibits C-G to NCL's Resp. in Opposition to Plaintiffs' Motion for Remand. Further, NCL's affidavits indicate that before the Plaintiffs were actually deployed to the vessel the S/S Norway, they were required to attend a Pre-Departure Orientation Seminar for seamen, which is conducted in both the English and Filipino languages and which reviewed, among other subjects, the Standard Terms and the dispute settlement procedures provided for in the employment contract. *Id.*

With these facts in mind, the Court turns to the parties' various arguments and the applicable law.

---

[5] In relevant part, Department Order No. 4, dated May 31, 2000, reads as follows: "In view of recent developments in the international maritime industry affecting the recruitment and employment of Filipino seafarers on ocean-going vessels and cognizant of the Department's objective of ensuring the continued employment of our seafarers and maintaining the Philippine global comparative advantage in shipmanning, the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels is hereby amended reflecting the consensus of all the stakeholders as determined through the several tripartite consultations conducted by the Philippine Overseas Employment Administration."

[6] In full, Section 29 of the Standard Terms states that "[i]n cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If the parties are not covered by a collective bargaining agreement, the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 8042 otherwise known as the Migrant Workers and Overseas Filipinos Act of 1995 or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If there is no provision as to the voluntary arbitrators to be appointed by the parties, the same shall be appointed from the accredited voluntary arbitrators of the National Conciliation and Mediation Board of the Department of Labor and Employment.

-4-

Discussion

**A.      The FAA's Exclusion of Seamen Contracts Does Not Apply to the Convention Act**

Plaintiffs assert that as a matter of law, NCL's Motion to Compel Arbitration must be denied because seamen employment contracts are exempted from the coverage of the Convention Act. Although the Convention Act does not explicitly exempt seamen employment contracts, Plaintiffs argue that the exemption in §1 of the FAA applies to the Convention Act, thus precluding enforcement of Section 29 of the Standard Terms. Unfortunately for the Plaintiffs, application of the seamen exemption in the domestic arbitration act to the international context is unsupported by the plain language of the Convention Act.

The threshold issue of whether the FAA's §1 exemption of seamen employment contracts applies to the Convention Act is a question of statutory construction. As in all such disputes, the Court must begin its analysis with the plain language of the statute in question. *See Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1283 n.6 (11th Cir. 2002) (citing *K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)); *see generally* 2A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* §46.01 (6th ed. 2000). The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.*; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). A court need look no further where the statute in question provides a plain and unambiguous meaning. *Id.*

The parties' dispute, regarding the application of the FAA's seamen exemption to the Convention, stems from the language of the Convention Act, 9 U.S.C. §202. Section 202 limits the Convention's reach to "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered commercial, *including* a transaction, contract, or agreement described in section 2 of this title." 9 U.S.C. §202 (emphasis added). Section 2 of Title 9 describes the arbitration agreements that are enforceable under the FAA and states as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to

-5-

submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

This provision, however, is limited by 9 U.S.C. §1, which excludes from the §2 definition of "maritime transaction" and "commerce" all "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

While the Convention Act does not directly address the application of §1's exclusions to international arbitration agreements, NCL relies on both §208 of the Convention Act and the Convention's ratifying language to argue against the exclusion of seamen employment agreements. NCL argues that pursuant to §208, the FAA's provisions apply to actions and proceedings brought under the Convention only to the extent that they are "not in conflict with [Chapter 2 of Title 9] or the Convention as ratified by the United States." In ratifying the Convention, the United States limited its application "only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States." *See* footnote 29 to the Convention, 9 U.S.C. §201. NCL concludes that because the ratifying language only limits the United States' application of the Convention to commercial legal relationships, the additional limitation suggested by Plaintiffs is in "conflict" with the Convention under §208.

Plaintiffs, however, assert that the reference in §202 to a "transaction, contract, or agreement described in section 2 of this title" evidences a legislative intent to define the types of commercial agreements covered by the Convention Act coextensively with the FAA's terms. Stated differently, Plaintiffs argue that the FAA's definition of commerce is the "national law of the United States" as referred to in the United States' ratification language. The Academy of Florida Trial Lawyers ("AFTL"), in its *amicus curiae* memorandum, seeks to buttress Plaintiffs' argument by pointing to the heading of §1: "'Maritime transactions' and 'commerce' defined; *exceptions to operation of title*." 9 U.S.C. §1 (emphasis added). Because both the FAA and the Convention Act are part of Title 9, the AFTL argues, the conclusion that §1's exemptions apply to the Convention Act is "nearly irrefutable."

However, nearly every court that has considered the application of §1's exemptions to the Convention Act has agreed with NCL's position. In *Francisco v. Stolt Achievement MT*, 293 F.3d 270 (5th Cir.), *cert. denied*, 537 U.S. 1030 (2002), the only circuit court decision directly addressing the issue, the Fifth Circuit held that neither the Convention nor its implementing legislation recognize an exception for seamen employment contracts. *Id.* at 274. Relying on the ratification language cited above, the Fifth Circuit concluded that the exclusion of seamen employment contracts in the FAA conflicts with the Convention Act's broad coverage of all commercial legal relationships. *Id.* Following the Fifth Circuit's analysis, several district courts have compelled arbitration of seamen arbitration agreements under the Convention. *See Jaranilla v. Mesasea Maritime Ltd.*, No. Civ.A.02-2048, 2002 WL 2022516, at *2 (E.D. La. Aug. 29, 2002); *see also Adolfo v. Carnival Corp., d/b/a Carnival Cruise Lines, Inc.*, No. 02-23672 (S.D. Fla. Mar. 17, 2003) (Huck, J.) (order granting motion to compel arbitration); *see also Amon v. Norwegian Cruise Lines, Ltd.*, No. 02-21025 (S.D. Fla. Sept. 26, 2002) (Huck, J.) (order granting motion to compel arbitration); *see also Santos v. Carnival Corp.*, No. 03-20914 (S.D. Fla. Sept. 16, 2003) (King, J.) (order granting motion to compel arbitration).[7]

Although Plaintiffs make compelling arguments for the rejection of the *Francisco* analysis, the Court agrees with the Fifth Circuit's ultimate conclusion. First, Plaintiffs' interpretation of the Convention Act overlooks the significance of the word "including" in §202. "A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what the terms 'means.'" Singer, *supra*, §47:07. In fact, "the word 'includes' is usually a term of enlargement, and not of limitation . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated by the statutes." *See Argosy*

---

[7]   Plaintiffs urge the Court to disregard the *Amon* and *Adolfo* decisions because they were premised on incomplete information provided to Judge Huck. Specifically, Plaintiffs argue that the defendants "did not provide [Judge Huck] with the pivotal information about the POEA's lack of authority to act for overseas seamen after July of 2000, and . . . not all of the facts about the true nature of the circumstances under which these seamen's employment are begun were before the Court." *See* Remand Memo at p. 4. The issue regarding the POEA's authority is addressed in Section C below. As to the alleged factual discrepancies between the instant cases and the matters before Judge Huck, a review of the parties' submissions in *Amon* and *Adolfo* reveals that the circumstances of the seamen's employment were virtually identical.

*Limited v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) (internal citations omitted). Based on these principles of statutory construction, the term "including" instructs that the transactions, contracts and agreements described in §2 of the FAA are covered by the Convention Act, as well as other arbitration agreements that arise out of commercial legal relationships. And while Plaintiffs maintain that the FAA's definition of commerce is the "national law of the United States," they cite to no compelling authority on this point.[8] Nothing in the plain language of the statute or in the nation's jurisprudence limits the Convention's application to the commercial agreements defined in the FAA.[9]

The AFTL's argument with respect to the title of §1 also fails to overcome the plain language of the statute. As an initial matter, although a title may be considered part of a statute, "it may not be used as a means of creating an ambiguity when the body of the act itself is clear." Singer, *supra*, §47:03; *see also Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 499 (1st Cir. 1994). Further, while courts occasionally look to the title of the entire statute in interpreting the contents of the act, "[t]he descriptive heading immediately preceding the text of a code or statutory section does not constitute part of the statute and is not controlling regarding its construction or interpretation." Singer, *supra*, §47:03. The title on which the AFTL relies is merely a descriptive heading preceding the text of §1, and as such, can not be afforded any weight in the interpretation of Convention Act's coverage.

---

[8] Plaintiffs' only support on this issue is a statement made by Richard D. Kearney, Chairman of the Secretary of State's Advisory Committee on Private International Law, that "[i]t was not, of course, necessary to make any reference to the national law of the United States in the first sentence of section 202 [of the Convention Act] because the definition of commerce contained in section 1 of the original Arbitration Act is the national law definition for purposes of the declaration." S.Rep. No. 91-702, at p.6 (1970). The testimony of a witness who was not a member of Congress cannot bind this Court where neither the legislature nor the courts have established the FAA's definition as the "national law." *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001) (noting that "[l]egislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress. It becomes far more so when we consult sources still more steps removed from the full Congress . . .").

[9] The Court also notes that statutory definition provisions are commonly understood "to establish meaning where the terms appear in that same act, or in the case of general interpretative statutes, the definition extends to as much legislation as the general act itself designates." Singer, *supra*, §47:07. Because the FAA is not a "general interpretative statute," and nothing in its language designates its limited definition of "commerce" as applying to other provisions, its exemptions from coverage cannot be read into the Convention Act absent contrary guidance from the legislature.

Finally, the Court notes that "the goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements and international contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Here, the Philippine government has implemented a system whereby disputes involving its seamen's employment contracts are governed by an arbitration tribunal. Thus, "an application of the §1 exclusions would thwart the goal of the Convention as stated by the Supreme Court in *Scherk*. Such a conflict is not permitted by §208." *Lejano v. K.S. Bandak*, No. Civ.A. 00-2990, 2000 WL 33416866 at *3 (E.D. La. Nov. 3, 2000).

**B.     The Arbitration Agreements Between Plaintiffs and NCL Fall Within the Scope of the Convention Act**

The United States Supreme Court has expressed a liberal federal policy favoring the enforcement of arbitration provisions. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)). This strong presumption in favor of arbitration "applies with special force in the field of international commerce." *Mitsubishi*, 473 U.S. at 631. As stated by the Court, "the concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce [international arbitration agreements], even assuming that a contrary result would be forthcoming in a domestic context." *Id*. at 629.

In light of the strong federal policy favoring arbitration, courts are to conduct "a very limited inquiry" in deciding whether to compel arbitration pursuant to the Convention Act. *See Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982); *see also Francisco*, 293 F.3d at 273. Accordingly, a party's request of the district court for an order requiring arbitration of a dispute must be granted where: (1) there is an agreement in writing to arbitrate the dispute; (2) the agreement provides for

-9-

arbitration in the territory of a signatory to the Convention; (3) the agreement to arbitrate arises out of a commercial legal relationship; and (4) there is a party to the agreement who is not an American citizen. *See Sedco v. Petroleos Mexicanos National Oil*, 767 F.2d 1140, 1144-45 (5th Cir. 1985); *see also Acme Brick Co. v. Agrupacion Exportadora de Maquinaria Ceramica*, 855 F. Supp. 163, 167 (N.D. Tex. 1994). Because there is no dispute as to the second and fourth elements of this analysis,[10] the Court focuses its inquiry on the first and third prongs and concludes that NCL's Motion to Compel Arbitration must be granted.

**1.      There Is An Agreement In Writing to Arbitrate the Dispute**

For the Convention to apply, there must be an agreement in writing between the parties to arbitrate the dispute in question. *Id.* NCL asserts that the POEA-approved employment contract that each Plaintiff signed qualifies as such an agreement. While the one-page employment contract itself does not contain an arbitration provision, the contract, by its explicit terms, is to be observed "in accordance with Department Order No. 4 and Memorandum Circular No. 9." Department Order No. 4 and Memorandum Circular No. 9, in turn, incorporate the Standard Terms, including the arbitration clause in Section 29 requiring that "claims and disputes arising from [Plaintiffs'] employment" are to be arbitrated in the Philippines.

Plaintiffs advance four primary arguments to attack the existence of enforceable arbitration agreements governing their claims against NCL. First, Plaintiffs assert that the "take-it-or-leave-it" contracts are unenforceable because they were not permitted to negotiate their terms, but rather were "herded through the paper signing portions of the employment process with no opportunity to read or discuss contract terms." *See* Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration, at p. 14. Second, Plaintiffs contend that they should not be bound by the arbitration requirement because

---

[10] While Plaintiffs dispute the existence and validity of the arbitration agreements, and further challenge that their particular claims against NCL are covered by the agreement, there is no dispute that Section 29 of the Standard Terms provides for arbitration in the Philippines, either by the NLRC, a voluntary arbitrator or a panel of arbitrators. Because the Philippines is a signatory to the Convention, this second element is met. It is also undisputed that Plaintiffs are citizens of the Philippines, satisfying the final element of the Court's analysis.

they were not provided with any notice of the provisions.  Third, Plaintiffs argue that the provision in Section 29 of the Standard Terms does not require arbitration in their cases, because they are not covered by a collective bargaining agreement.  And finally, Plaintiffs argue that even if the arbitration provisions are deemed enforceable, the requirement of arbitration does not apply to their tort claims against the cruise line.

As an initial matter, Plaintiffs' claims that they were precluded from negotiating the terms of their employment and coerced into signing the contracts are to be considered by the arbitrator, and not by this Court.  *See Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986).  In *Coleman*, the Eleventh Circuit held that "[c]laims alleging unconscionability, coercion, or confusion in signing the agreement generally should be determined by an arbitrator because those issues go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement." *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 637 F.2d 391, 398 (5th Cir. 1981)); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).  Where, as here, there is "no evidence to support the claim that the arbitration clause itself, standing apart from the whole agreement, was induced by fraud," this Court may not consider the Plaintiffs' allegations of fraud in the inducement of the contract generally.  *Coleman*, 802 F.2d at 1352.

Further, because the standard employment contract that each Plaintiff signed was approved by the POEA, an agency of the Philippine government, Plaintiffs lack a factual basis for the assertion that NCL took advantage of them in negotiating the language and terms of the contract.[11]  *See Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 221 (3d Cir. 1991).  Plaintiffs' employment contracts, with the incorporated Standard Terms, were in the form and language that their own government required to

---

[11]   Plaintiffs also rely on cases such as *In re Matter of Ferrara, S.P.A.*, 441 F. Supp. 778 (S.D.N.Y. 1977) and *Polytek Engineering Co., Ltd. V. Jacobson Companies*, 984 F. Supp. 1238 (D. Minn. 1997) to distinguish their situations from that of a sophisticated businessman or company.  While the Plaintiffs do not, by themselves, possess the same bargaining power or sophistication as NCL, it is clear that it is precisely for this reason that the POEA has taken the lead role in securing the terms and conditions of employment for Filipino seamen.

protect its own citizens.[12]   In fact, Philippine law prohibits foreign employers from hiring Philippine workers for overseas employment except through the POEA.  *Id.*  Where the Philippine government has acted, through the POEA, to protect its citizens and advance their employment opportunities with foreign employers, it is not the role of this Court to second-guess such actions.  *See Tismo v. M/V Ippolytos*, 776 F. Supp. 928, 932 (D.N.J. 1991) (noting that the "act of state" doctrine precludes the federal district courts from inquiring into the validity of the Philippine government's official acts performed within its own territory); *see generally Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1293 (11th Cir. 2001). Therefore, in assessing Plaintiffs' challenges to the hiring process and the manner in which they entered into their employment contracts, this Court must deem the acts of the Philippine government, taken within its own jurisdiction, as valid.  *Id.*

Plaintiffs' next challenge, alleging lack of notice of the arbitration provision, relies on the court's analysis in *Angeles v. Norwegian Cruise Lines, Inc.*, No. 01-CV-9441, 2002 WL 1997898 (S.D.N.Y. Aug. 29, 2002).  In *Angeles*, the court denied the employer's motion for summary judgment based on the existence of a forum selection clause in the employment contract, holding that fact issues existed as to whether the contents of the clause were reasonably communicated to the cruise line employee.  *Id.* at *5.  In reaching that conclusion, however, the *Angeles* court noted that "the Plaintiff does not argue that she was given a copy of the terms and conditions, including the forum clause, for too short a period of time or in too small a font.  Rather, she represents in a sworn affidavit, that she was never given a copy of the [documents] containing the forum selection clause."  *Id.*  Here, the situation is reversed.  NCL has demonstrated, by producing copies of the Standard Terms that Plaintiffs initialed or signed, that Plaintiffs were given copies of the Standard Terms.  While Plaintiffs contend that they were

---

[12]   In *Prado v. Sloman Neptun Schiffahrts, A.G.*, 611 So.2d 691 (La.App. 4th Cir. 1990), Louisiana's Fourth Circuit Court of Appeals explained the likely policy reasons behind the POEA's efforts to encourage international recognition of their employment contracts as follows: "In addition to requiring remedies for its injured seamen at levels which it has determined are commensurate with its own local standards, the government may be pursuing the equally legitimate goal of expanding maritime employment opportunities for its citizens by providing standardization and predictability of employment practices which is attractive to potential employers (and their insurers) who are trying to estimate cost projections as accurately as possible." *Prado*, 611 So.2d at 703.

not given an opportunity to review them before signing, and that the font was too small,[13] that does not support a conclusion that the Plaintiffs were not provided with any notice of the provisions to which they were agreeing.

Plaintiffs' next two arguments present challenges not to the existence of the agreements, but to their application in this particular context.  Focusing on the language of Section 29, Plaintiffs maintain that they cannot be compelled to arbitrate their claims before the NLRC because they are not members of unions and are not covered by collective bargaining agreements.  First, NCL has never alleged that Plaintiffs were members of a union.  Second, Plaintiffs' non-membership in a union does not establish that they are not covered by a collective bargaining agreement, as they could be deemed third-party beneficiaries to the agreement, contingent on the intent of the contracting parties.  *See Donaldson v. Bradley Printing Co.*, No. 90-C-5170, 1992 WL 358855 at *4 (N.D.Ill. Nov. 25, 1992).  But the Court need not make that determination in order to compel arbitration here, as the plain language of Section 29 provides alternative fora for arbitration in situations where the parties are not covered by a collective bargaining agreement.  In that situation, the parties are not bound to proceed before the NLRC, but rather "may at their option submit the claim or dispute to either the NLRC or to the voluntary arbitrator or panel of arbitrators."  *See* Section 29, Standard Terms.  Ultimately, the result is the same, as cases submitted to the NLRC are also resolved by arbitration.  *See Francisco*, 293 F.3d at 271, n. 1 (citing Section 10 of the Migrant Workers and Overseas Filipinos Act of 1995).

Finally, Plaintiffs' assertion that their tort claims are not "claims and disputes arising from this employment," and thus are not subject to arbitration under Section 29, is without merit.  The employment contract in question specifically obligates the shipowner to provide a seaworthy vessel, and further regulates the payment of sick pay, repatriation, and medical care.  As Plaintiffs' Complaints seek damages for, *inter alia*, failure to use reasonable care to provide and maintain a safe workplace and failure to provide prompt and adequate medical care, the Court finds that the claims and disputes arise

---

[13]  Indeed, Plaintiffs filed the complete deposition of Kjell Hjartnes, NCL's Director of Human Resources, Marine Operations, in part, to demonstrate that Mr. Hjartnes himself experienced difficulty in reading the small font of the Standard Terms.

directly from their employment with NCL and from NCL's obligations to Plaintiffs under the Standard Terms of the employment contract. *See Gavino v. Eurochem Italia*, No. Civ.A.01-1314, 2001 WL 1491177, at *1 (E.D. La. Nov. 23, 2001) (holding that requirement of arbitration of "any and all disputes or controversies arising out of or by virtue of" the Filipino seaman's POEA standard employment contract included tort causes of action); *see also Wick v. Atlantic Marine, Inc.*, 605 F.2d 166, 168 (5th Cir. 1979) (holding that arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue."). Accordingly, the Court finds that as to each Plaintiff, there is an agreement in writing to arbitrate the disputes in question.

**2.      The Agreements to Arbitrate Arise Out of a Commercial Legal Relationship**

The United States Supreme Court, in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), established that employment contracts qualify as "contracts evidencing a transaction involving interstate commerce" under the FAA. *Id.* at 113.   Therefore, as a general matter, the FAA covers arbitration agreements in employment contracts. *Id.* While the Supreme Court reaffirmed that §1 of the FAA exempts contracts of employment of transportation workers (including seamen) from that general rule, it also addressed the likely reasons why Congress excluded seamen contracts from the FAA:

> We see no paradox in the congressional decision to exempt the workers over whom the commerce power was most apparent.  To the contrary, it is a permissible inference that the employment contracts of the classes of workers in §1 were excluded from the FAA precisely because of Congress' undoubted authority to govern the employment relationships at issue by the enactment of statutes specific to them.  By the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers . . .   It is reasonable to assume that Congress excluded "seamen" and "railroad employees" from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers."

*Id.* at 120-21.  This language supports a conclusion that while seamen employment contracts do involve interstate commerce and are properly viewed as commercial, the legislature carved out a specific exemption in the domestic context because it had passed other legislation to govern disputes between seamen and their employers.  Because there is no indication that Congress intended the specific exemption to extend beyond the domestic context and into the international realm, the Court concludes

-14-

that the international seamen employment contracts at issue are "commercial" under the law of the United States.

**C.     The Arbitration Agreements Are Not Null and Void, Inoperative, Or Incapable of Being Performed**

Article II, section 3 of the Convention provides that "[t]he court of a Contracting State, when seized of an action in a matter in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."   Under the Convention, an agreement to arbitrate is null and void only when it is subject to internationally recognized defenses such as duress, mistake, fraud or waiver, or when it contravenes fundamental policies of the forum nation. *See Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F. Supp. 75, 78 (S.D.N.Y. 1985).   The "null and void" language of the Convention must be read narrowly, because the signatory nations have declared a general policy of enforceability of agreements to arbitrate. *Id.*   Although Plaintiffs present several challenges to the validity of the arbitration agreements under this section, none rise to the level required for invalidation of an otherwise enforceable agreement.

First, Plaintiffs argue that the arbitration agreements are null and void because at the time they were entered into, the POEA was no longer authorized to perform regulatory functions on behalf of Filipino workers.   In support of this argument, Plaintiffs cite to Republic Act No. 8042, known as the Migrant Workers and Overseas Filipinos Act of 1995 ("MWOFA").   According to Plaintiffs, Section 29 of the MWOFA, titled "Comprehensive Deregulation Plan on Recruitment Activities," constitutes a legislative mandate that the POEA and the DOLE be completely phased out within five years of the MWOFA's July 15, 1995 effective date – or by July 15, 2000.   Plaintiffs argue that any regulatory functions undertaken by the POEA or the DOLE after July 15, 2000 were *ultra vires*, or outside the agencies' authority, and are therefore contrary to law.

Plaintiffs' argument regarding the phase-out of the POEA and DOLE's functions must fail. Department Order No. 4 and Memorandum Circular No. 9, which incorporate the arbitration provision

into the Plaintiffs' employment contracts, were adopted and took effect in May and June 2000, prior to the alleged phase-out of the agencies' regulatory functions.  Notably, the only case that Plaintiffs cited in support of the proposition that these agencies were prohibited from regulating overseas employment after July 15, 2000 – *Rey Salac, et al. v. Hon. Patricia Sto. Tomas, et al.*, a March 20, 2002 decision of the Regional Trial Court of Quezon City, Metro Manila – involved the promulgation of new rules or regulations in the aftermath of the phase-out.  Plaintiffs have failed to present any authority for invalidating the pre-July 15, 2000 regulatory acts of the POEA and the DOLE.  Absent a clear indication from the Philippine government that such acts are to be retroactively invalidated, this Court must respect the POEA's mandates under the act of state doctrine, discussed above.  *See Fogade*, 263 F.3d at 1293.

Plaintiffs also seek to invalidate the arbitration agreement by arguing that the Philippine Supreme Court has ruled that seafarer tort claims for injuries and deaths arising from shipboard negligence are not subject to arbitration by the NLRC or by Philippine labor arbiters, rendering the agreements inoperative or incapable of being performed.  *See Tolosa v. National Labor Relations Commission, et al.*, G.R. No. 149578, Apr. 10, 2003.  Plaintiffs argue that under *Tolosa*, they would be deprived of any meaningful remedy if forced to pursue their claims in arbitration.  Such a result, Plaintiffs contend, is inconsistent with the Eleventh Circuit's direction that "[w]hen an arbitration clause has provisions that defeat the remedial purpose of the statute . . . the arbitration clause is not enforceable."  *See Paladino v. Avnet Computer Techonologies, Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998).  The *Tolosa* case, however, is distinguishable from the cases at bar and does not mandate invalidation of the arbitration agreements.

In *Tolosa*, the court upheld the NLRC's dismissal of a seaman's widow's claims for lack of jurisdiction.  Tolosa developed a high fever when he was drenched with rainwater during the course of his employment as the vessel's captain.  Following Tolosa's death, his widow filed a complaint with the POEA against Tolosa's employer and his two former co-workers, alleging that their failure to provide him with timely, adequate and competent medical services violated Article 161 of the Philippine Labor Code.  The POEA transferred the case to the NLRC, which then referred Tolosa's claims to a labor arbiter who awarded Tolosa back pay, moral damages, exemplary damages, and attorney's fees.

On appeal, the Philippine Supreme Court held that the labor commission did not have jurisdiction over the subject matter of the action filed by Tolosa's widow, because her claims did not arise from an employer-employee relationship, but rather from a "quasi delict or tort." A "quasi delict" is defined by Article 2176 of the Civil Code as "fault or negligence, if there is no pre-existing contractual relation between the parties." The *Tolosa* decision, therefore, was premised on the fact that Tolosa's death stemmed from the negligent acts of his shipmates, who had no contractual employer-employee relationship with Tolosa. Because the instant cases relate directly to the contractual employer-employee relationship between Plaintiffs and NCL, the Court does not interpret *Tolosa* as precluding Plaintiffs' claims before the NLRC and thereby denying Plaintiffs "any meaningful relief" through arbitration.

**D.      Removal of These Cases Was Proper Under 9 U.S.C. §205**

Based on the Court's determination that the arbitration agreements between NCL and Plaintiffs fall under the Convention, and cannot be deemed null and void, inoperative, or incapable of being performed, the Court must deny Plaintiffs' Motion for Remand. Pursuant to §205, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." While Plaintiffs correctly assert that their Jones Act cases may not be removed based on federal question jurisdiction under 28 U.S.C. §1331, these cases were removed under the Convention Act, which is to construed broadly in favor of removal. *See McDermott International, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199 (5th Cir. 1991); *see also Acosta v. Master Maintenance and Construction, Inc.*, 52 F. Supp. 2d 699, 705 (M.D.La. 1999). The Court also denies Plaintiffs' Motions for Attorneys' Fees, which is premised on the allegedly improper removal of these cases.

-17-

**Conclusion**

Accordingly, based upon the foregoing reasons, it is hereby

ORDERED that:

(1)  Defendant NCL's Motion to Compel Arbitration [DE-10] is GRANTED.  Plaintiffs and Defendant NCL must submit to arbitration in the Philippines pursuant to Section 29 of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On-Board Ocean-Going Vessels, incorporated into Plaintiffs' contracts of employment through the Department of Labor's Department Order No. 4 and the POEA's Memorandum Circular No. 9;

(2)  Plaintiffs' Motion for Remand [DE-13] is DENIED;

(3)  Plaintiffs' Motion for Attorneys' Fees [DE-19] is DENIED;

(4)  This Court retains jurisdiction over this matter to consider timely motions to enforce or confirm any arbitral award pursuant to the Convention Act;

(5)  All pending motions not otherwise ruled upon are DENIED AS MOOT; and

(6)  This case is CLOSED for administrative purposes, pending resolution of arbitration.

DONE and ORDERED in Miami, Florida, this ____ day of October, 2003.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Magistrate Judge Ted E. Bandstra
William T. Huggett, Esq.  (fax: 305-539-0533)
Charles L. Lipcon, Esq.  (fax: 305-373-6204)
Harley S. Tropin, Esq.  (fax: 305-372-3508)
Elizabeth K. Russo, Esq.  (fax: 305-666-4470)
Curtis J. Mase, Esq.  (fax: 305-377-0080)