UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| RIZALYN BAUTISTA, | CASE NO.: 03-21642-CIV-SEITZ/BANDSTRA |
| PAUL PERALTA, | CASE NO.: 03-21643-CIV-SEITZ/BANDSTRA |
| RAYMOND LOVINO, | CASE NO.: 03-21644-CIV-SEITZ/BANDSTRA |
| RONALDO MARCELINO, | CASE NO.: 03-21645-CIV-SEITZ/BANDSTRA |
| ROLANDO TEJERO, | CASE NO.: 03-21646-CIV-SEITZ/BANDSTRA |
| ABDI COMEDIA, | CASE NO.: 03-21647-CIV-SEITZ/BANDSTRA |
| CRISTINA L. VALENZUELA, | CASE NO.: 03-21648-CIV-SEITZ/BANDSTRA |
| MARILEN S. BERNAL, | CASE NO.: 03-21649-CIV-SEITZ/BANDSTRA |
| WILLY I. VILLANEUVA, | CASE NO.: 03-21650-CIV-SEITZ/BANDSTRA |
| MARCIA GARCIA L. ROSAL, | CASE NO.: 03-21651-CIV-SEITZ/BANDSTRA |

Plaintiffs,

V.

STAR CRUISES and NORWEGIAN
CRUISE LINE, LTD.,

Defendants.

_____/



## REPORT AND RECOMMENDATION

THIS CASE came before the Court on (a) Defendant's Motion for Sanctions for

Violation of This Court's September 10, 2003, Mediation Order filed on December 16, 2003;

and (b) Defendant's Second Motion for Sanctions Against Attorney William Huggett [for

Violation of this Court's Order of October 14, 2003, Compelling Arbitration in the Philippines]

filed on February 27, 2004. Previously, both motions were referred to the undersigned for

appropriate resolution pursuant to 28 U.S.C. §636(b). Accordingly, the undersigned

conducted an evidentiary hearing on these motions on April 28, 2004.[1]

_____

[1]The hearing on these motions was continued on several occasions due to
scheduling conflicts of the attorneys and to accommodate the schedule of the
mediator, retired Justice Gerald Kogan.



Based on the facts as found herein and applicable law, the undersigned recommends:

a. that Defendant's Motion for Sanctions for Violation of this Court's September 10, 2003 Mediation Order be DENIED; and

b. that Defendant's Second Motion for Sanctions Against Attorney William Huggett (for Violation of this Court's Order of October 14, 2003) be DENIED.

## INTRODUCTION

These cases arise from a steam boiler explosion on board NCL's vessel, the S/S Norway, at the Port of Miami on May 25, 2003. The explosion killed six crew members and seriously injured four others. On June 2, 2003, the four surviving seamen and the personal representatives of the six decedent crew members filed suit against NCL and Star Cruises in a Florida state court seeking damages for negligence and unseaworthiness under the Jones Act, 46 U.S.C. §§ 688, and for failure to provide maintenance, cure and unearned wages under the general maritime law of the United States. On June 17, 2003, these cases were removed to this federal court for further proceedings.

On September 10, 2003, this Court entered an Order for Expedited Mediation (the "Mediation Order"). Among other provisions, the Mediation Order provided that all discussions, representations and statements made at the expedited mediation conference shall be "confidential and privileged." Mediation Order, ¶ 6. In addition, the Mediation Order provided that "the Court may impose sanctions against parties and/or counsel who do not comply with the requirements herein or who otherwise violate the terms of this Order." Mediation Order, ¶ 8.

The expedited mediation conference was held on September 29 and 30, 2003, with

2

former Justice Gerald Kogan presiding as mediator.  Although both sides engaged in lengthy settlement discussions, no settlement was reached at the conference.

On October 14, 2003, this Court entered an order granting NCL's  motion to compel arbitration (the "Arbitration Order") which required plaintiffs and NCL to submit to arbitration in the Philippines pursuant to the contracts of employment between plaintiffs and NCL and other relevant documents.  The Court then closed these cases pending resolution of arbitration while retaining jurisdiction to consider motions to confirm any eventual arbitral award entered in the Philippines.  Plaintiffs subsequently appealed the Arbitration Order to the Eleventh Circuit Court of Appeals on November 14, 2003.

On December 16, 2003, NCL filed its first motion for sanctions alleging that plaintiffs and their counsel, William Huggett, Esq., willfully and deliberately violated the Mediation Order by disclosing confidential and privileged communications made at the mediation conference to the media.  Specifically, NCL alleges that Mr. Huggett and certain plaintiffs told news reporters about settlement offers made by NCL at the mediation conference.  Plaintiffs and Mr. Huggett deny any improper disclosure.

On February 27, 2004, NCL filed its second motion for sanctions alleging that Mr. Huggett violated the Arbitration Order by instructing plaintiffs not to participate in arbitration in the Philippines and/or by otherwise interfering in the arbitration process.  Once again, Mr. Huggett denies all allegations of improper conduct.

On April 28, 2004, the undersigned conducted an evidentiary hearing on both motions for sanctions and heard testimony of the mediator, retired Justice Gerald Kogan, and William Huggett, the only live witnesses called by the parties.  In addition, the Court received into evidence affidavits, hearing transcripts and other documentary materials referred to below.

## ANALYSIS

A. First Motion for Sanctions for Alleged Violation of the Mediation Order

NCL's first motion for sanctions alleges that William Huggett and certain unidentified plaintiffs violated the Mediation Order by improperly disclosing to news reporters certain offers of settlement made by NCL at the mediation conference conducted by Justice Kogan. Specifically, NCL alleges, based on published newspaper articles, that plaintiffs disclosed that NCL offered $8.5 million at mediation as reported in a Sun Sentinel article dated October 16, 2003; and that Mr. Huggett told a reporter that NCL offered $11.0 million to settle this lawsuit as reported in a Bradenton Herald article dated November 26, 2003.

### Factual Findings

On April 28, 2004, the undersigned conducted an evidentiary hearing and heard testimony of Justice Gerald Kogan and William Huggett with respect to this motion. Based on that testimony, and affidavits, exhibits and other documents submitted into evidence, the undersigned finds as follows:

1. On September 29 and 30, 2003, the parties engaged in expedited mediation with retired Justice Gerald Kogan presiding as mediator. Numerous settlement offers were made by NCL over this two-day period which were rejected by plaintiffs through their attorney. Near the end of the second day, the parties began discussing the possibility of a "high-low" settlement - - the final amount to depend on the anticipated ruling on NCL's motion to compel arbitration in the Philippines. The mediator recalls a "high-low" offer of $11.0   8.5 million from NCL as the last offer discussed before the mediation session was terminated late on the

4

second day. This offer was not accepted by plaintiffs before termination of the mediation conference.

2. Following the mediation conference, the parties through their counsel continued to discuss a possible settlement using "high-low" figures. On October 8, 2003, Curtis J. Mase, Esq., counsel for NCL, wrote to Mr. Huggett, documenting settlement discussions that had transpired after the mediation conference had terminated. Among other things, Mr. Mase confirmed his understanding that the parties had agreed on a "global settlement" after the mediation session had terminated for "high-low" amounts of $13.75 - $8.5 million depending on the possible requirement for arbitration in the Philippines. Alternatively, NCL had offered an $11 million cash settlement payable immediately (i.e., not dependent on the Court's ruling on the motion to compel arbitration). Mr. Mase noted in his letter that NCL's "unconditional" offer of $11 million had been rejected by plaintiffs. Although written to confirm an "agreed" settlement, no settlement was ever reported to the mediator or this Court.

3. On October 16, 2003, a newspaper article appeared in the Sun Sentinel newspaper entitled "S/S Norway Victims, Widows Rejected $8.5 Million Settlement." In this article, unnamed widows were reported as saying that settlement talks broke down when NCL set its final offer at $8.5 million and "their attorney would not go below $13.7 million." The article further reported that William Huggett was also contacted but said only "that the talks between the two sides were confidential." Sun Sentinel Article dated October 16, 2003, Exhibit C to NCL's First Motion for Sanctions.

4. On November 26, 2003, nearly two months after the mediation conference, a second newspaper article written by an AP reporter appeared in the Bradenton Herald. Exhibit B to NCL's Motion for Sanctions. Among other things, the article stated that "Huggett said

5

Norwegian had offered $11 million to settle lawsuits filed by 10 victims to avoid a potential U.S. court decision against cruise lines."[2]

4. Meanwhile, the Court, on October 14, 2003, entered its Order compelling arbitration in the Philippines and closing this case.

### ANALYSIS

On December 16, 2003, NCL filed its first motion for sanctions based on plaintiffs' and Mr. Huggett's alleged violation of the Mediation Order requiring that all "discussions, representations and statements made at the mediation conference be confidential and privileged." Mediation Order, ¶ 6. NCL bases its motion on the two newspaper articles discussed above and particularly on Mr. Huggett's alleged acknowledgment that NCL had offered $11.0 million to settle these lawsuits in the November 26 Bradenton Herald article.

The Court's ruling on NCL's first motion for sanctions depends largely on the determination of whether the "11 million" settlement offer first referred to in the November 26 Bradenton Herald article was "made at... the mediation conference" or sometime thereafter as settlement discussions continued between the parties. NCL argues that this offer was made "at" mediation as recalled by the mediator. Mr. Huggett insists that it was not because no "unconditional" offer of $11 million was ever made by NCL prior to termination of the two-day mediation conference.

The facts as found above support both positions. Most significantly, Justice Kogan testified that numerous settlement offers were made during the two day mediation conference

_____

[2]The same information was later repeated word-for-word in an AP article which appeared in the Miami Herald on December 19, 2003.

which culminated with NCL's "high-low" offer of $11.0 - 8.5 million just prior to termination of the conference. This evidence alone suggests that Mr. Huggett violated the mediation order by reporting an "$11 million" offer to the AP news reporter.

On the other hand, Mr. Huggett testified that he first refused to provide any information to a news reporter who contacted him soon after the mediation conference as confirmed in the Sun Sentinel article dated October 16, 2003 ("... William Huggett... said the talks between the two sides are confidential"). Mr. Huggett further testified that any "$11 million" offer discussed at mediation was made solely in the context of a "high-low" offer which was not his reference in the later Bradenton Herald article. Mr. Huggett's testimony is supported by Mr. Mase's October 8 letter which refers to an $11 million offer made after the mediation conference which was not dependent on the Court's anticipated decision on the motion to compel arbitration, and which was rejected by Mr. Huggett and his clients after mediation. Finally, Mr. Huggett notes that the first news report of any $11 million offer mentioned by him appeared on November 26 - - almost two months after the mediation conference.

Considering this conflicting evidence, the undersigned finds that NCL fails to establish a clear violation of the Mediation Order by Mr. Huggett or his clients which would warrant the requested sanctions.[1] In its motion, NCL argues that Mr. Huggett willfully and deliberately violated the Mediation Order by disclosing confidential and privileged communications to the media so that he should be subjected to "the severest of sanctions" including a monetary penalty, his disqualification from further representation of plaintiffs in this case, and his

_____

[1] While arguing a violation by both Mr. Huggett and certain plaintiffs, the focus of NCL's motion is Mr. Huggett and the October 26 Bradenton Herald article. NCL seeks no separate sanctions against plaintiffs for statements attributed to them in the earlier Sun Sentinel article.

7

disqualification from future practice in the Southern District of Florida.

While NCL correctly notes that federal courts have the inherent power to impose appropriate sanctions against an attorney for failure to comply with court orders, see Carlucci v. Piper Aircraft Corp, Inc., 775 F.2d 1440 (11th Cir. 1985), this Court must evaluate NCL's request for disqualification and other sanctions with appropriate caution. See In Re Bellsouth Corp., 334 F.3d 941, 963 (11th Cir. 2003) ("... as the seriousness of the consequences of a disqualification order increases, so the care and caution by the district court should be enhanced"). As explained in Bellsouth:

> A federal court has the inherent authority to suspend or disbar an attorney from practicing before it. In re Snyder, 472 U.S. 634, 642-45, 105 S.Ct. 2874, 2880-81, 86 L.Ed. 2d 504 (1985); In re Evans, 801 F.2d 703, 706 (4th Cir. 1986). Because disbarment is such a heavy sanction, courts require a heightened showing before an attorney's livelihood may be taken away. See, e.g., Dailey v. Vought Aircraft Co., 141 F.3d 224, 229 (5th Cir. 1998) ("A federal court may only disbar an attorney upon clear and convincing evidence of a violation warranting this extreme sanction."); see also Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11 th Cir. 2002) ("before a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct constituted or was tantamount to bad faith") (internal quotes and citation omitted).

Id. at 963 n. 19.

Here, the evidence is conflicting and does not support a finding of willful and deliberate misconduct by Mr. Huggett or "bad faith" in his communicating with the media. As stated above, Mr. Huggett initially refused to make any comment to the Sun Sentinel reporter soon after the mediation conference had terminated other than to state that the "talks between the two sides are confidential." Six weeks later, the Bradenton Herald reported only that "Huggett said that Norwegian had offered $11 million to settle [these] lawsuits" without any indication in the article of when or under what circumstances such an offer had been made. Thus, while the Court recognizes that an $11 million offer had been made as part of a "high-

low" settlement offer at the mediation conference, the Court finds no clear and convincing evidence that the statement attributed to Mr. Huggett in the Bradenton Herald article was made during mediation discussions. By that time, nearly two months had elapsed and the parties had continued their settlement discussions which included an unconditional settlement offer of $11 million as discussed in Mr. Mase's letter of October 8, 2003.

In short, the undersigned finds that NCL has failed to prove that Mr. Huggett violated the Mediation Order by disclosing confidential and privileged communications made "at" the mediation conference. Accordingly, the undersigned recommends that NCL's first motion for sanctions be DENIED.

### B. Second Motion for Sanctions for Alleged Violation of Arbitration Order

NCL's second motion for sanctions alleges that Mr. Huggett "willfully and contumaciously" violated the Arbitration Order entered on October 14, 2003 by instructing his clients to disregard the Arbitration Order and by otherwise interfering with the arbitration process in the Philippines. Specifically, NCL charges that Mr. Huggett objected and refused to allow plaintiffs to participate in pre-arbitration "conciliatory proceedings" in the Philippines, threatened NCL's Filipino counsel with blackmail and extortion, and made misrepresentations to opposing counsel concerning his continued representation of certain plaintiffs in the Philippines. NCL seeks severe sanctions against Mr. Huggett for his alleged misconduct including criminal contempt with monetary fines, disqualification of Mr. Huggett in all further proceedings in this case, and compensation for legal fees, costs and expenses incurred by NCL as a result of Mr. Huggett's alleged violation.

Mr. Huggett denies all accusations of misconduct and any violation of the October 14 Arbitration Order. Mr. Huggett concedes that he objected to arbitration in the Philippines as

first evidenced by the appeal on the Arbitration Order now pending before the Eleventh Circuit Court of Appeals. Mr. Huggett also agrees that he continued to object to arbitration once the case was sent to the Philippines. Mr. Huggett insists, however, that he never instructed any of his clients to not participate in arbitration in the Philippines and that his remaining clients[4] remain ready and willing to attend arbitration proceedings once commenced in the Philippines. Mr. Huggett argues that no arbitration proceedings have commenced in the Philippines; and that his clients do not wish to engage in any further settlement discussions with NCL in advance of arbitration.

<u>Factual Findings</u>

On April 28, 2004, the undersigned conducted an evidentiary hearing on this second motion for sanctions and heard testimomy from Mr. Huggett - - the only witness called by the parties. The Court also received into evidence certain affidavits, hearing transcripts, copies of correspondence and other relevant documents. Based on this evidence, the Court finds the following facts:

1. On October 14, 2002, this Court granted NCL's motion to compel arbitration and ordered plaintiffs and NCL to "submit to arbitration in the Philippines..." Arbitration Order, pg. 18. The Court retained jurisdiction to consider timely motions to enforce or confirm any arbitral awards.

2. On December 19, 2003, NCL, through counsel retained in the Philippines, wrote to the Associated Marine Officers' and Seamen's Union of the Philippines ("AMOSUP") and

---

[4]As discussed more fully below, five of the ten original plaintiffs previously represented by Mr. Huggett have apparently settled with NCL in the Philippines after retaining other counsel in place of Mr. Huggett.

advised that NCL had filed a notice to arbitrate with the National Conciliation and Mediation Board ("NCMB"). NCL requested that the NCMB immediately commence arbitration proceedings or at least select a voluntary arbitrator.

3.  On January 8, 2004, Hearing Officer Delia D. Yu of the NCMB held a preliminary conference with Filipino counsel representing the parties. The parties themselves were not required to be present at this preliminary conference. Hearing Officer Yu then set another meeting for January 29, 2004, in order to provide time for notices to be sent to the individual parties. Thereafter, notices of the January 29 hearing were sent to NCL representatives and the ten plaintiffs to this case. The notices requested the appearance of the parties before the hearing officer but did not indicate the purpose of the hearing. Also, the notices did not require plaintiffs' personal appearance but did state that "[y]our presence and cooperation are very important in the early resolution of the labor dispute." Notice of Conference, Exhibit 4 to Defendant's Second Motion for Sanctions.

4.  On January 29, 2004, Hearing Officer Yu conducted the noticed hearing with several plaintiffs appearing personally represented by Rey Quimpo of the Law Offices of Quimpo and Capuyan. Hearing Officer Yu inquired about the possibility of settlement and strongly encouraged the parties to consider settlement in advance of arbitration. Officer Yu then set a "conciliatory hearing" for February 18, 2004. Notices of the conciliatory hearing were sent to all plaintiffs and NCL's representatives.

5.  On February 10, 2004, NCL's Filipino attorney, Domingo G. Castillo, wrote to plaintiffs' Filipino counsel, Joseph Capuyan, and advised that two "claimant s," namely, Ramil Bernal and Ricardo Rosal, had contacted Mr. Castillo's office through AMOSUP (the Philippines seamen's union) and had indicated that they wished to speak to NCL's attorneys.

11

Mr. Castillo further advised that Bernal and Rosal then came to his office on February 4, 2004 without an attorney. According to Mr. Castillo, the meeting "did not proceed very far at all" because Mr. Castillo was unclear who represented them. Mr. Castillo asked Mr. Capuyan to immediately advise whether he represented Bernal and Rosal or any of the other eight "claimants" and indicated that he (Mr. Castillo) wished to pursue settlement discussions with Mr. Capuyan's attendance and participation.[5] Mr. Castillo copied a second attorney, Joven S. Joya, on his letter to Mr. Huggett.[6]

6. On February 11, 2004, Mr. Joya wrote Mr. Castillo in response to Castillo's letter to Mr. Capuyan the preceding day and advised that he represented Marilen Bernal "in preparation for our meeting on February 13, 2004 at 2:00 p.m. in your office." Mr. Castillo

---

[5]NCL contends that Mr. Castillo's February 10 letter followed a meeting of all ten plaintiffs at the house of Cristina Valenzuela in the Philippines at which time Mr. Huggett allegedly spoke to all plaintiffs by telephone and instructed them to not attend the upcoming "conciliatory hearing" noticed for February 18 or otherwise participate in arbitration. NCL submits the affidavits of Marilen Bernal and Marcia L. Rosal attesting to these instructions from Mr. Huggett.

In response, Mr. Huggett submits the affidavit of plaintiff Cristina Valenzuela, at whose house the alleged meeting took place, who denies that Mr. Huggett ever instructed her or any plaintiffs to not participate in arbitration. Rather, Ms. Valenzuela recalls Mr. Huggett telling them to follow the advice of their Filipino attorney, Joseph Capuyan, to not attend any settlement conferences without Mr. Capuyan, and to not be "pressured or bullied" into settling their case. A second family member, Corazon Tejero, also signed an affidavit in which he attests that Mr. Huggett never advised any of the plaintiffs to not attend arbitration during the subject telephone conversation.

Reviewing these conflicting affidavits, the undersigned makes no factual findings concerning the subject meeting at Ms. Valenzuela's house or any instructions by Mr. Huggett to plaintiffs with respect to arbitration.

[6]Apparently, Marilen Bernal and Marcia Rosal were represented by Mr. Joya when they signed their affidavits on February 18, 2004.

12

had made no reference to Mr. Joya or any upcoming meeting with him in his letter to Mr. Capuyan.

7.  On February 12, 2004, Mr. Huggett wrote to Mr. Castillo and advised that he represented all of the plaintiffs involved in the Norway accident.  Mr. Huggett stated in his letter this "[w]e are not interested in arbitration.... [p]lease do not contact my clients."  Mr. Huggett then advised that all of his clients were also represented by Mr. Capuyan in the Philippines.  Mr. Huggett added that he was not aware of the commencement of any arbitration proceedings in the Philippines and asked for confirmation of any such proceeding. Mr. Huggett concluded his letter by asking Mr. Castillo to not approach his clients, meet with them, or misrepresent that arbitration was proceeding.

8.  On February 16, 2004, Mr. Castillo wrote again to Mr. Capuyan and asked why Mr. Huggett, an American lawyer, was writing to him.  Mr. Castillo reminded Mr. Capuyan that his office had appeared as plaintiffs' lawyer on January 29, 2004.  Mr. Castillo asked Mr. Capuyan to immediately confirm in writing "exactly which claimants you represent and that they will also be in attendance" at the February 18 hearing.

9.  On February 17, 2004, Bernal and Rosal signed letters confirming that they had retained Joven S. Joya as their "sole and exclusive" attorney for the NCMB proceedings in the Philippines.

10.  On January 18, 2004, a second conciliatory proceeding was conducted by Hearing Office Yu.  Mr. Israel-Orbe of Quimbo and Capuyan appeared for all plaintiffs/claimants.  No plaintiffs personally appeared on this date.  Hearing Officer Yu elected to proceed in the absence of plaintiffs because "claimants were represented" by counsel.  Officer Yu then inquired about plaintiffs' response to NCL's previous offer of settlement.  Mr. Israel-Orbe

13

responded by stating that arbitration was "still premature" because this case was pending on appeal in the United States.

11.  Hearing Officer Yu confirmed that the February 18 hearing was a preliminary settlement conference and not yet arbitration.  February 18 Transcript, pg. 7, Exh. C to Second Motion for Sanctions.  Mr. Castillo indicated that NCL was present and "willing to settle" but added that certain "claimants" might be represented by Mr. Joya who was not present at the hearing. Mr. Castillo suggested a "resetting of this conciliation" for thirty days to resolve any confusion over representation of the claimants and in order to have all claimants present for settlement discussions. Officer Yu agreed that "it would be better if the claimants themselves are here" adding that "it is better to have an amicable settlement than a voluntary arbitration." February 18 Transcript, pg. 24. The February 18 proceeding was adjourned without further discussion after learning that Mr. Joya had been involved in an automobile accident and would be unavailable that day. The next meeting was set for March 24, 2004.

12.  On February 24, 2004, Mr. Huggett wrote to Mr. Castillo again.  Mr. Huggett expressed concern over Mr. Castillo's offer to send notices to plaintiffs of the next conciliatory hearing to ensure their attendance. Mr. Huggett wrote:   **"DO NOT SEND MY CLIENTS ANYTHING.** I will seek to prosecute you criminally and civilly if you have     any contact with them outside their attorneys." Huggett Letter of February 24, 2004, Exh. 16 to Second Motion for Sanctions. Mr. Huggett added: "There is no conference on March 24, 2004 except your attempts to pressure my clients to settle. Furthermore, we do not intend to appear, however our attorneys in the Philippines from the office of Capuyan and Quimpo are available if you wish to discuss any of my clients' affairs."

13. On March 24, 2004, Hearing Officer Yu reconvened her hearing to "explor[e] the

14

possibilities of settlement." March 24 Transcript, pg. 12. Hearing Officer Yu explained at the outset: "... this is not yet an arbitration proceeding, we are still in the process of exploring the possibilities for settlement." Id. Five plaintiffs/claimants previously represented by Mr. Huggett personally appeared and were represented by Mr. Joya. Mr. Capuyan was present for the remaining five claimants who were not present due to a pending motion previously filed by Mr. Capuyan to dismiss the arbitration proceedings in the Philippines. Hearing Officer Yu then excluded Mr. Capuyan from the conciliatory proceedings over his objection and proceeded to confirm settlements between Mr. Joya and his five clients with NCL representatives.[7]

## CONCLUSIONS OF LAW

Based on these facts and applicable law, the undersigned finds that Mr. Huggett did not knowingly and willfully violate the Arbitration Order by personally objecting to or refusing to participate in arbitration proceedings in the Philippines or by instructing his clients not to do so. NCL, in arguing the alleged violations, relies on three key indicators of such violations: (a) the affidavits of Bernal and Rosal attesting to Mr. Huggett's alleged instructions to all plaintiffs to not participate in arbitration in the Philippines; (b) Mr. Huggett's letters to Mr. Castillo on February 12 and 24, 2004, in which he objects to arbitration and denies any personal knowledge of the commencement of arbitration proceedings in the Philippines; and (c) the non-appearance of certain plaintiffs at conciliatory proceedings conducted by Hearing Officer Yu on February 18 and March 24, 2004. While each of these "indicators" suggest a possible violation of the Arbitration Order by Mr. Huggett, the undersigned finds, on careful

---

Mr. Capuyan reports in his affidavit that the five claimants represented by Mr. Joya each settled with NCL in the amount of $250,000.

review of the evidence, that no actual violation occurred which would warrant any requested sanction.

By the way of explanation, the undersigned begins with the conciliatory proceedings in the Philippines and the issue of whether plaintiffs' alleged failures to attend or to participate in those proceedings on February 18 and March 24 constituted a violation of the Arbitration Order. While the evidence is conflicting as to the exact nature of these proceedings, the undersigned finds that the several proceedings before Hearing Officer Yu were not "arbitration" as envisioned by the Arbitration Order.[8] First, the hearing transcripts themselves clearly reveal that the "conciliatory proceedings" conducted by Officer Yu were for the purpose of pursuing settlement which might eliminate the need for arbitration. Second, the transcripts reveal that the personal attendance of plaintiffs was requested but never required by the hearing officer. In fact, Hearing Officer Yu was ready to proceed in the absence of plaintiffs' personal attendance on February 18 until a continuance was requested by NCL's counsel due to the absence of Mr. Joya. Third, plaintiffs were represented by counsel at these conciliatory proceedings, as arranged by Mr. Huggett, who clearly expressed their desire not to engage in any pre-arbitration settlement negotiations. The Arbitration Order of this Court

---

[8]NCL submits the affidavit of Mr. Castillo in which he states that conciliatory proceedings in the Philippines are a specific function of the NCMB under Philippine law and that such proceedings are a "necessary pre-requisite" to formal arbitration proceedings and "a routine and integral part of the arbitration process." Castillo Affidavit, ¶¶ 21, 22. In response, Mr. Huggett submits the affidavit of Mr. Capuyan who attests that the "conciliatory proceedings" before Hearing Officer Yu were not arbitration proceedings which would require plaintiffs' personal attendance and participation. Capuyan Affidavit, ¶¶ 4, 5. Mr. Capuyan notes that Hearing Officer Yu is not a voluntary arbitrator in the Philippines and that she herself stated that the proceedings were "not yet an arbitration proceeding" but rather a "process of exploring the possibilities for settlement." Transcript of March 24, 2004, pg. 19.

requires plaintiffs to participate in arbitration in the Philippines but not further settlement discussions. Thus, the undersigned finds that Mr. Huggett did not violate the Arbitration Order by any actions taken by himself or his clients at the pre-arbitration settlement proceedings.

Mr. Huggett's letters to Mr. Castillo in which he objected to arbitration ("we are not interested in arbitration") and expressed his lack of personal knowledge of commencement of arbitration proceedings are also not sanctionable. Mr. Huggett's February 24 letter was clearly worded too strongly ("DO NOT SEND MY CLIENTS ANYTHING.  I will seek to prosecute you criminally and civilly if you have any contact with them outside their attorneys"). Mr. Huggert acknowledged this at the hearing on these motions. While this letter was too "hot" and certainly suggested that Mr. Huggett objected to arbitration, his personal views and emotional reaction to the situation did not violate the Arbitration Order and did not constitute blackmail or extortion as contended by NCL. Most importantly, no arbitration proceedings had commenced at the time Mr. Huggett wrote his letter to Mr. Castillo - - and the "conciliatory proceedings" had been reset for March 24, 2004. Also, while Mr. Huggett stated that "we do not intent to appear" at the settlement conference on March 24, 2004, Mr. Capuyan did appear and represented Mr. Huggett's five remaining clients at that time.

## SUMMARY

In short, the undersigned finds no clear and convincing evidence in support of NCL's two motions for sanctions against Mr. Huggett. With respect to the second motion, Mr. Huggett certainly objected to arbitration in the Philippines - - first during proceedings in this Court and then after entry of the Arbitration Order. Nevertheless, no clear evidence indicates that he advised his clients to not participate in arbitration in the Philippines or obstructed their

17

participation. To date, no arbitration hearings have commenced in the Philippines. Thus, while this Court should not condone the tone and temperament of Mr. Huggett's written communication with opposing counsel, Mr. Huggett has himself recognized his impertinence while attempting to explain his legitimate concerns over perceived improper conduct by others resulting in the loss of his client in the Philippines.

*Accordingly, the undersigned recommends:*

a. that Defendant's Motion for Sanctions for Violation of this Court's September 10, 2003 Mediation Order, be DENIED; and

b. that Defendant's Second Motion for Sanctions Against Attorney William Huggett be DENIED.

The parties may serve and file written objections to this Report and Recommendation with the **Honorable Patricia A. Seitz, United** States District Judge, within ten (10) days of the receipt. See 28 U.S.C. § 636(b)(1)(C); United States v. Warren, 687 F.2d 347 (11th Cir. 1982), cert. denied, 460 U.S. 1087 (1983); Hardin v. Wainwright, 678 F.2d 589 (5th Cir. Unit B 1982); see also Thomas v. Arn, 474 U.S. 140 (1985).

DONE AND ORDERED in Chambers at Miami, Florida this 21st day of May, 2004.

Ted E. Bandstra
United States Magistrate Judge

Copies furnished to:

Honorable Patricia A. Seitz

Service List
Case Nos. 03-21642 through 03-21651

18

cc:
William T. Huggett, Esq.
Fax No.: (305) 539-0533

Charles L. Lipcon, Esq.
Fax No.: (305) 373-6204

Harley S. Tropin, Esq.
Fax No.: (305) 372-3508

Elizabeth K. Russo, Esq.
Fax No.: (305) 666-4470

Curtis J. Mase, Esq.
Fax No.: (305) 377-0080

Thomas E. Scott, Esq.
Fax No. (305) 373-2294

Bruce S. Rogow, Esq.
Fax No. (954) 764-1530

Justice **Gerald Kogan**
**2 S. Biscayne Blvd., Suite 2930**
Miami, **FL 33131**
Fax No.: **(305) 374-4933**